No. 24-2341

_____

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.,

*Plaintiff-Appellant,*

v.

BONTA, ET AL.,

*Defendant-Appellee*

On Appeal from the United States District Court
for the Southern District of California
No. 3:18-cv-02458-BEN-DEB
Hon. Roger T. Benitez

_____

## APPELLANT'S OPENING BRIEF

_____

Paul D. Cullen, Jr.
Charles R. Stinson
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 500
Washington, DC 20007
(202) 298-4774
*paul@cullenlaw.com*
*charles@cullenlaw.com*

*Attorneys for Appellant Owner-Operator
Independent Drivers Association, Inc.*

# DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Intervenor Plaintiff-Appellant, Owner-Operator Independent Drivers Association, Inc., states that it has no parent corporation, subsidiaries (including wholly-owned subsidiaries), or affiliates that have issued shares to the public and that no publicly held corporation owns 10% or more of its stock.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td>Date: August 5, 2024</td><td>THE CULLEN LAW FIRM, PLLC</td></tr>
</table>

 */s/ Paul D. Cullen, Jr.*
Paul D. Cullen, Jr.

*Attorney for Appellant Owner-Operator Independent Drivers Association, Inc.*

i

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS.......................................................................... ii

TABLE OF AUTHORITIES ....................................................................v

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT .........................................................5

STATUTORY AND REGULATORY AUTHORITIES .............................6

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW .............8

STATEMENT OF THE CASE.................................................................9

     A.    The small business truckers excluded by AB 5 from operating in California are an institutional part of the trucking industry.................9

     B.    AB 5 categorically prohibits leased owner-operators from operating in California. ..................................................................11

          1.    Leased owner-operators cannot satisfy Prong B of the ABC test. ..........................................................................11

          2.    Defendants argued that leased owner-operators were not burdened because they could continue to drive a truck under AB 5 by taking other roles in the trucking industry. ................13

     C.    AB 5's prohibition on leased owner-operator truck drivers imposes an unconstitutional burden on interstate commerce............................16

     D.    The district court improperly refused to conduct *Pike* balancing.......18

     E.    In evaluating AB 5's burdens, the district court ignored the harm suffered by owner-operators.............................................................19

     F.    AB 5's Business-to-Business exemption favors in-state truckers over out-of-state truckers in violation of the dormant Commerce Clause and the Equal Protection Clause of the U.S. Constitution. .....20

     G.    Summary of proceedings below...........................................................23

SUMMARY OF ARGUMENT ..............................................................25

STANDARD OF REVIEW ....................................................................28

ARGUMENT ........................................................................................28

I.  The district court should have applied *Pike*'s balancing standard to OOIDA's claim that AB 5 imposes an unconstitutional burden on interstate commerce independent of AB 5's discriminatory effects. ............28

II.  The "burden" of eliminating leased owner-operator businesses clearly exceeds AB 5's negligible, at most, benefits to California. .........................31

   A.  The district court ignored AB 5's impact on leased owner-operators—there is no burden they can bear to keep their businesses under AB 5. ................................................................32

      1.  Eliminating all leased owner-operator businesses serving California constitutes a substantial burden on interstate commerce. ..................................................................32

      2.  Defendants confirm that AB 5 prohibits leased owner-operators from operating in California. ....................................34

   B.  California enjoys negligible, if any, benefits from prohibiting independent contractor drivers from hauling goods in California, particularly for drivers based outside of the state. .............................38

      1.  California enjoys *no* benefits from applying AB 5 to out-of-state truckers. ......................................................................38

      2.  AB 5 provides only illusory benefits to the State when applied to interstate trucking generally. .....................................40

   C.  AB 5's substantial burdens clearly exceed its illusory benefits as applied to interstate trucking. .............................................................42

III.  AB 5 as applied in the trucking industry violates the Commerce Clause's restrictions against discrimination. .................................................43

   A.  State laws that favor in-state interests at the expense of out-of-state interests discriminate against interstate commerce. ...........................44

   B.  AB 5's Business-to-Business exemption favors local, intrastate operations over their interstate counterparts. ......................................45

   C.  The conflicting language of the B2B exemption and the Truth-in-Leasing rules leaves no room for compliance with both. ..................48

IV.  The Business-to-Business exemption favors local, intrastate operators over their interstate counterparts with no rational basis in violation of the Equal Protection Clause..............................................................................51

A.   Laws that differentiate between similarly-situated persons with no rational justification violate the Constitution's guarantee of Equal Protection..............................................................52

B.   AB 5's Business-to-Business exemption differentiates between interstate and intrastate trucking operations........................................53

C.   No rational basis supports AB 5's distinction between intra- and interstate truckers because exempting intrastate—but not interstate—truckers undermines the law's purported goal of reclassifying California workers. .........................................................53

CONCLUSION ..................................................................................55

STATEMENT OF RELATED CASES ................................................57

CERTIFICATE OF COMPLIANCE FOR BRIEFS ..............................58

ADDENDUM ........................................................... ADD-1–ADD-8

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Trucking Ass'ns v. United States*,
    344 U.S. 298 (1953)..................................................... 21, 47

*Associated Industries of Mo. v. Lohman*,
    511 U.S. 641 (1994)..................................................... 43, 44

*Bacchus Imports, Ltd. v. Dias*,
    468 U.S. 263 (1984)..................................................... 43, 44

*Bernstein v. Virgin America, Inc.*,
    3 F.4th 1127 (9th Cir. 2021) ..................................... 38, 39

*Cal. Trucking Ass'n v. Bonta*,
    996 F.3d 644 (9th Cir. 2021) ...........................................24

*Comptroller of Treas. of Md. v. Wynne*,
    575 U.S. 542 (2015)........................................................44

*Diaz v. Brewer*,
    656 F.3d 1008 (9th Cir. 2011) ......................................52

*FCC v. Beach Commc'ns, Inc.*,
    508 U.S. 307 (1993)........................................................52

*FDIC v. Meyer*,
    510 U.S. 471 (1994)..................................................... 48, 49

*Global Van Lines, Inc. v. I.C.C.*,
    627 F.2d 546 (D.C. Cir. 1980) ................................... 21, 47

*Goyal v. CSX Intermodal Terminals, Inc.*,
    No. 17-CV-06081-EMC, 2018 WL 4649829 (N.D. Cal. Sept. 25, 2018) ....50

*HollyFrontier Cheyenne Ref. v. Renewable Fuels Ass'n*,
    141 S. Ct. 2172 (2021)................................................. 48, 49

*Hughes v. Alexandria Scrap Corp.*,
    426 U.S. 794 (1976)........................................................52

*Hunt v. Wash. State Apple Advert. Comm'n*,
    432 U.S. 333 (1977)........................................................44

*Maine v. Taylor,*
　　477 U.S. 131 (1986)......................................................44

*Merrifield v. Lockyer*,
　　547 F.3d 978 (9th Cir. 2008) ................................. 51-54

*National Pork Producers Council v. Ross*,
　　598 U.S. 356 (2023).........................4, 18, 19, 25, 28-31

*Nat'l Pork Producers Council v. Ross*,
　　6 F.4th 1021 (9th Cir. 2021) ........................... 19, 30, 33

*Oman v. Delta Air Lines, Inc.*,
　　466 P.3d 325 (Cal. 2020)..............................................38

*Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*,
　　511 U.S. 93 (1994)........................................................43

*Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc. (AZ)*,
　　367 F.3d 1108 (9th Cir. 2004) ............................. 46, 47

*Pike v. Bruce Church, Inc.*,
　　397 U.S. 137 (1970).............................................. *passim*

*Portillo v. Nat'l Freight, Inc.*,
　　606 F. Supp. 3d 72 (D.N.J. 2022)........................ 49, 50

*Price v. U.S. Navy*,
　　39 F.3d 1011 (9th Cir. 1994) .....................................28

*Rocky Mountain Farmers Union v. Corey*,
　　730 F.3d 1070 (9th Cir. 2013) ............................. 30, 44

*Santa Clarita Valley Water Agency v. Whittaker Corp.*,
　　99 F.4th 458 (9th Cir. 2024) ......................................28

*S.G. Borello & Sons, Inc. v. Dep't of Indus. Rel.*,
　　769 P.2d 399 (Cal. 1989)......................5, 17, 38, 40-42, 45, 50, 53

*Sierra Nevada Transp., Inc. v. Nevada Transp. Auth.*,
　　No. 22-15823, 2023 WL 6871575 (9th Cir. Oct. 18, 2023)........................33

*South Dakota v. Wayfair, Inc.*,
　　585 U.S. 162 (2018)....................................... 16, 28, 30

*Sullivan v. Oracle Corp.*,
　　254 P.3d 237 (Cal. 2011)............................................39

vi

*Tidewater Marine Western, Inc. v. Bradshaw*,
   927 P.2d 296 (1996) ....................................................................39

*Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*,
   423 U.S. 28 (1975)............................................................... 21, 47

*Ward v. United Airlines, Inc.*,
   466 P.3d 309 (Cal. 2020).............................................................38

*White v. Excalibur Ins. Co.*,
   599 F.2d 50 (5th Cir. 1979) .................................................. 21, 47

**Constitutional Provisions**

U.S. Const. art. I, § 8..........................................................................5

U.S. Const. art. VI, § 3 .......................................................................5

U.S. Const. amend. XIV, § 1 ..............................................................5

**Statutes**

28 U.S.C. § 1291 .................................................................................5

28 U.S.C. § 1331 .................................................................................5

42 U.S.C. § 1983 .................................................................................5

42 U.S.C. § 1988.................................................................................5

49 U.S.C. § 13501 .............................................................. 7, 10, 46, 48

49 U.S.C. § 13902 .............................................................................36

49 U.S.C. § 13906 .............................................................................36

49 U.S.C. § 14102 .......................................................... 3, 7, 10, 21, 46

49 U.S.C. § 14505a ...........................................................................36

49 U.S.C. § 31141 .............................................................................49

Cal. Lab. Code § 2775(b)(1) ........................................... 1, 6, 12, 46

Cal. Lab. Code § 2776(a) ................................................ 3, 6, 20, 45, 48

**Regulations and Rules**

49 C.F.R. Part 376........................................................................ 10, 21

49 C.F.R. § 376.12(c)(1) ................................................................ 3, 7, 21, 46, 48-50

49 C.F.R. Part 382 ............................................................................................. 36

49 C.F.R. § 385.403 ........................................................................................... 36

49 C.F.R. Part 390 ............................................................................................. 36

Fed. R. App. P. 4(a)(1)(A) ................................................................................. 6

Fed. R. Civ. P. 65(a)(2) ................................................................................. 24, 27

Lease & Interchange of Vehicles,
    131 M.C.C. 141 (Jan. 9, 1979) ................................................................ 21, 47

Lease & Interchange of Vehicles,
    43 Fed. Reg. 29,812 (July 11, 1978) .............................................................. 22

## Other Authorities

AB-5 Fact Sheet from Assemblywoman Lorena Gonzalez, Californians for the
    Arts (Sept. 8, 2019), https://www.caartsadvocates.org/research/ab-5-fact-
    sheet-from-assemblywoman-lorena-gonzalez ................................................ 12

Analysis of AB 5, Senate Rules Committee,
    Sept. 3, 2019 ................................................................................................... 41

Analysis of SB 1402, California Senate Committee,
    May 7, 2018 ..................................................................................................... 41

Assembly Comm. on Lab. & Empl. AB5,
    2019-20 Reg. Sess. (Cal. April 3, 2019) ........................................................ 13

Video record of Assembly Floor Session (Sept. 11, 2019),
    https://www.assembly.ca.gov/media/assembly-floor-session-20190911 ..... 12

## INTRODUCTION

The ABC test for proving that a person is an independent contractor under California's worker classification law AB 5 requires in part that the worker "performs work that is outside the usual course of the hiring entity's business." Cal. Lab. Code § 2775(b)(1)(B). This provision effectively prohibits an entire sector of small business truckers from operating in California: individual truck owners and operators who lease their truck and driving services to move freight as independent contractors for motor carriers. Because leased owner-operators' work is within motor carriers' usual course of business—moving freight by truck—they cannot work as independent contractors for motor carriers under the ABC test.

AB 5's prohibition of leased owner-operators applies not only to truckers who live in California, it extends to all leased owner-operators who work in California, regardless of where they are from or how little time they spend in California to pick up or drop off freight in interstate commerce. This prohibition of leased owner-operators was not an accidental byproduct of a law that was purportedly passed to address worker misclassification. The sponsor of the legislation, a then-former (and again current) International Brotherhood of Teamsters official, publicly stated that one of AB 5's purposes was to eliminate this sector of the trucking industry.

1

This leased owner-operator model has been an institutional part of the trucking industry and a federally regulated part of interstate commerce for nearly 80 years. These men and women have invested in trucks and equipment and worked hard to create small businesses through their entrepreneurial efforts and determination. The Owner-Operator Independent Drivers Association, Inc. ("OOIDA") brings this action on their members' behalf to save their small businesses.

AB 5's blanket prohibition of leased owner-operators constitutes an unreasonable burden on interstate commerce in violation of the dormant Commerce Clause of the U.S. Constitution under the test established by the Supreme Court in *Pike v. Bruce Church Inc.*, 397 U.S. 137 (1970). Under *Pike*'s balancing test, AB 5's burden on leased owner-operators is absolute, and the benefits to the State are minimal, if not illusory. There is no cost truckers can incur or administrative hurdle they can overcome to keep their independent contractor small businesses as leased owner-operators.[1] As to any putative benefits to California from enforcing AB 5 against leased owner-operators, neither the State nor Intervenor-Defendants International Brotherhood of Teamsters made any showing that AB 5 is in any way better at addressing truck driver misclassification

---

[1] This brief uses "leased owner-operators" to refer to those truckers who work as independent contractors for and lease their trucks and services to motor carriers.

than the standard it replaced. And, notably, Defendants introduced no evidence that California derives any benefit from the application of AB 5 to out-of-state truckers who visit California to drop off or pick up freight.

AB 5 also violates the dormant Commerce Clause because it discriminates against interstate commerce. AB 5 provides a "Business-to-Business" ("B2B") exemption to the ABC test that California intrastate truckers can use but federally regulated interstate truckers cannot. The B2B exemption requires, in part, that "[t]he business service provider is *free from the control and direction* of the contracting business entity in connection with the performance of the work, both under the contract for the performance of the work and in fact." Cal. Lab. Code § 2776(a)(1) (emphasis added). The federal "Truth-in-Leasing" rules that apply to interstate truckers, however, require motor carriers to have "exclusive possession, control, and use" of and "complete responsibility for the operation of" the leased owner-operator's truck. 49 C.F.R. § 376.12(c)(1): *see also* 49 U.S.C. § 14102. This motor carrier control required by federal law forecloses an interstate leased owner-operator from being "free from control or direction" required by the B2B exemption. The availability of the B2B exemption to California-based intrastate truckers but not interstate truckers not only discriminates against interstate commerce, but it also violates the Equal Protection Clause. For a law adopted for the purpose of classifying California workers under the ABC test, there is no

rational basis for the California legislature to provide an exemption for local intrastate—but not interstate—truckers.

The district court, citing the opinion of a minority of the Supreme Court in *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356 (2023), rejected the *Pike* balancing test as the proper basis for OOIDA's first dormant Commerce Clause claim. The district court did not address OOIDA's application of *Pike* balancing to the State's categorical prohibition of leased owner-operators' businesses and illusory benefits from enforcing AB 5 in trucking. Nor did the district court attempt to reconcile the conflict between the language of the B2B exemption and the federal Truth-in-Leasing rules that supports both OOIDA's dormant Commerce Clause claim based on discrimination and its Equal Protection claim.

OOIDA respectfully requests that this Court hold that AB 5 violates the dormant Commerce Clause of the U.S. Constitution as unreasonably burdensome under the *Pike* balancing test as applied to all leased owner-operators in interstate commerce or, in the alternative, at least as applied to all leased owner-operators based outside of California who perform less than a majority of their work in California. OOIDA also respectfully asks this Court to invalidate the requirements of AB 5's B2B exemption that conflict with the requirements of the federal Truth-in-Leasing rules as unconstitutional discrimination against interstate commerce and a violation of leased owner-operators' constitutional rights to equal protection

4

under the law. This relief would allow leased owner-operators to be classified

under the prior *Borello* standard,[2] a standard that permits proper leased owner-

operators and that, according to Intervenor-Defendant Teamsters, effectively

addressed truck driver misclassification in the courts 97% of the time. To be clear,

OOIDA's challenge is not directed at AB 5's application to intrastate drivers who

live and work exclusively in California and who operate as in drayage businesses

servicing the ports and other intermodal operations, as represented by the motor

carrier and driver evidence offered into evidence by the Teamsters.

## JURISDICTIONAL STATEMENT

The district court and this Court have subject matter jurisdiction pursuant to

28 U.S.C. § 1331, as this case arises under the Constitution and laws of the United

States, including United States Constitution Article I, § 8 (the Commerce Clause),

Amendment XIV, § 1 (the Equal Protection Clause), Article VI, § 3 (the

Supremacy Clause); and 42 U.S.C. §§ 1983 and 1988.

This matter is properly before this Court pursuant to 28 U.S.C. § 1291 as an

appeal from a final order of the United States District Court for the Southern

District of California, Case No. 3:18-CV-02458-BEN-DEB. The district court

entered its final decision and judgment in favor of Defendants-Appellees on all

claims on March 15, 2024. ER-3–4. OOIDA filed its Notice of Appeal on April 12,

---

[2] *S. G. Borello & Sons, Inc. v. Dep't of Indus. Rel.*, 769 P.2d 399 (Cal. 1989).

5

2024 (ER-264), within 30 days of the final order as required by Fed. R. App. P. 4(a)(1)(A).

## STATUTORY AND REGULATORY AUTHORITIES

This case involves the U.S. Constitution, Article 1, Section 8 (the Commerce Clause): "The Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ." This case also involves the U.S. Constitution, Amendment 14, Section 1 (the Equal Protection Clause): "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

This case involves provisions of the California Labor Code, which are reproduced in part below and in full in the Addendum at ADD-1–ADD-3.

Cal. Labor Code § 2775(b)(1):

> For purposes of this code and the Unemployment Insurance Code, and for the purposes of wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:
>
> (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.
>
> (B) The person performs work that is outside the usual course of the hiring entity's business.
>
> (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

Cal. Labor Code § 2776(a):

6

If an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation ("business service provider") contracts to provide services to another such business or to a public agency or quasi-public corporation ("contracting business"), the determination of employee or independent contractor status of the business services provider shall be governed by Borello, if the contracting business demonstrates that all of the following criteria are satisfied:

(1) The business service provider is free from the control and direction of the contracting business entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

This case also involves provisions of the federal Truth-in-Leasing rules found in 49 C.F.R. § 376.12(c), which is reproduced in part below and in full in the Addendum at ADD-6–ADD-7.

> (c) Exclusive possession and responsibilities.
>
> > (1): The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.
> > . . .
> > (4) Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

This case also involves 49 U.S.C. § 13501 and § 14102(a), which are reproduced in full in the Addendum at ADD-7–ADD-8.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.     Whether the district court erred in relying on the minority opinions in *National Pork Producers Council v. Ross* to hold that the *Pike* balancing test does not provide an independent basis for evaluating whether state laws that regulate evenhandedly, like AB 5, impose an unreasonable burden on interstate commerce in violation of the dormant Commerce Clause.

2.     Whether, separate from its error in rejecting the *Pike* balancing test, the district court erred in not performing the *Pike* analysis that proves the ABC test violates the dormant Commerce Clause: balancing the categorical loss of all leased owner-operator businesses serving California against the complete lack of benefit California derives from applying AB 5 to leased owner-operators based outside of the state and, in the alternative, the illusory benefit California enjoys from applying AB 5 to leased owner-operators in interstate commerce generally.

3.     Whether the district court erred by not holding that AB 5's Business-to-Business exemption discriminates against interstate commerce in violation of the dormant Commerce Clause because it can only be used by intrastate truckers, but not interstate truckers who are required to comply with the federal Truth-in-Leasing rules.

4.     Whether the district court erred by not holding that AB 5 violates the Equal Protection Clauses of the California and U.S. Constitutions because the

legislature had no rational basis to exempt from the ABC test, via the Business-to-Business exemption, the intrastate California-based truckers AB 5 purports to protect but not similarly-situated interstate truckers.

## STATEMENT OF THE CASE

**A.     The small business truckers excluded by AB 5 from operating in California are an institutional part of the trucking industry.**

AB 5 prohibits from operating in California the owners and operators of trucks who lease their trucks and driving services as independent contractors to motor carriers. *See* Declaration of Todd Spencer in Support of Intervenor/Plaintiff OOIDA's Trial Brief (Dist. Ct. ECF No. 193-1) ("Spencer Dec.") at ¶ 48 (ER-159). These leased owner-operators have been an essential component of interstate commerce and the trucking industry for decades. *See* Spencer Dec. ¶ 16 (ER-154). But AB 5 has closed California's borders to this entire sector of the trucking industry. Spencer Dec. ¶ 43 (ER-158).

Leased owner-operators are independent small businesses. They purchase their own trucks, and sometimes additional equipment, which can cost hundreds of thousands of dollars. Spencer Dec. ¶ 19 (ER-154). They are often separately incorporated. Spencer Dec. ¶ 25 (ER-155). They remain the sole owners of their trucks, which they are responsible for maintaining. Spencer Dec. ¶ 25 (ER-155). Leased owner-operators exercise their discretion to build business relationships,

establish routines, and maintain practices that make them successful business owners and entrepreneurs. Spencer Dec. ¶ 26 (ER-155).

Leased owner-operators typically operate under a single motor carrier's federally granted interstate motor carrier operating authority. The lease relationship between motor carriers and owner-operators is federally regulated under 49 U.S.C. § 14102 and the Truth-in-Leasing rules, 49 C.F.R. Part 376. Spencer Dec. ¶ 20 (ER-155). The federal government's jurisdiction to promulgate the Truth-in-Leasing rules extends to all motor carriers operating in interstate commerce. 49 U.S.C. § 13501. Leased owner-operators can be based anywhere in the country regardless of where their motor carrier is based, and they can transport freight in interstate commerce under their carrier's federal authority throughout the United States, including (until AB 5) California. Spencer Dec. ¶¶ 23-24 (ER-155).

When the owner-operator independent contractor model is properly utilized, and motor carriers are in compliance with the federal Truth-in-Leasing regulations, leased owner-operators have the ability to set their own schedules, choose the freight they want to transport, select their own routes to deliver that freight, purchase equipment that best serves their business needs, choose where and how that equipment is maintained, and make numerous other decisions that

determine the success of their business, preferred lifestyle, and working

conditions. Spencer Dec. ¶ 27 (ER-155).

In other words, leased owner-operators are truly independent contractors

and entrepreneurs who have taken risks, bet on themselves, and succeeded in

creating their own businesses. Through AB 5, California has completely excluded

this sector of the trucking industry from operating in the State.

**B.     AB 5 categorically prohibits leased owner-operators from operating in California.**

### 1.     Leased owner-operators cannot satisfy Prong B of the ABC test.

California's ABC worker classification test established in AB 5 was enacted

to address reported general worker misclassifying problems. *See, e.g.*, Dist. Ct. Op.

at 1 (ER-4). As in other industries, truck drivers are sometimes incorrectly

classified as independent contractors. Spencer Dec. ¶ 48 (ER-159). But Defendants

introduced no evidence that all leased owner-operators are misclassified as

independent contractors, and yet that is how AB 5 treats leased owner-operators:

categorically eliminating all leased owner-operators working as independent

contractors in California and prohibiting them from keeping their hard-earned

small businesses, or at least from working in interstate commerce that requires

them to operate for any amount of time in California.

The ABC test considers every worker to be an employee for unemployment, welfare, and labor laws purposes unless the relationship satisfies three conditions:

> (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

> (B) The person performs work that is outside the usual course of the hiring entity's business.

> (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

Cal. Lab. Code § 2775(b)(1). Prong B makes it impossible for leased owner-operators to work in California because the work they perform, providing truck transportation, is within "the usual course of the [motor carrier]'s business." Spencer Dec. ¶ 41 (ER-158). Therefore, AB 5 categorically prohibits leased owner-operators from working in California. *Id.* ¶¶ 43, 48 (ER-158–59).

AB 5's blanket prohibition on leased owner-operator truck drivers—as opposed to merely addressing driver misclassification—was no accident. The legislator/sponsor of the bill, a then-former, now resumed, Teamsters official, plus another of the bill's main sponsors, outwardly claimed that AB 5 was intended, in part, to abolish the leased owner-operator model. *See, e.g.*, Dist. Ct. Op. at 14 (ER-17); *see also* Video record of Assembly Floor Session, at 1:07:20-1:08:30 (Sept. 11, 2019), available at https://www.assembly.ca.gov/media/assembly-floor-session-20190911 (last visited July 23, 2024); AB-5 Fact Sheet from

12

Assemblywoman Lorena Gonzalez, Californians for the Arts (Sept. 8, 2019),

https://www.caartsadvocates.org/research/ab-5-fact-sheet-from-assemblywoman-

lorena-gonzalez (referring to trucking industry worker misclassification and

describing the independent contractor model as "exploitative" and dubbed it an

"illegal business model") (last visited Aug. 2, 2024); Assembly Comm. on Lab. &

Empl. AB5, 2019-20 Reg. Sess., at 6 (Cal. April 3, 2019) ("It distinguishes

carefully between a trucking company that has no employee drivers

(misclassification) and a trucking company that contracts with a mechanic

(legitimate contractor).").

This prohibition of an entire sector of the trucking industry is the basis for

OOIDA's claim that the ABC test imposes an unreasonable burden on interstate

commerce in violation of the Constitution's dormant Commerce Clause.

### 2. Defendants argued that leased owner-operators were not burdened because they could continue to drive a truck under AB 5 by taking other roles in the trucking industry.

Defendants conceded that leased owner-operators must give up their small

independent contractor businesses to continue working as a truck driver in

California: "[C]arriers can continue working with owner-operators, much as they

do now, by treating them 'as employees.'" State Prelim. Inj. Opp. (Dist. Ct. ECF

175) at 9-10; *see also* IBT Prelim. Inj. Opp. (Dist. Ct. ECF 173) at 13-18 (arguing

that AB-5 does not burden independent truckers because they can work as

employees and that "owner-operators *could* obtain and operate under independent motor carrier authority"). Neither employee drivers nor drivers with motor carrier operating authority do the same work or run the same type of business as leased owner-operators. Defendants incorrectly mischaracterize employee drivers, leased owner-operators, and motor carriers as simply interchangeable truck driving jobs.

As OOIDA President Todd Spencer described, employee driver positions or individuals with their federal motor carrier authority are significantly different from leased owner-operators. Spencer Dec. ¶¶ 17-18, 22, 36-37 (ER-154–55, 157). These three jobs are significantly distinguished by their relative levels of regulatory and business responsibility. Spencer Dec. ¶¶ 16-35 (ER-154–57).

The job of being an employee truck driver is mostly an entry-level job with no entrepreneurial opportunity and little or no autonomy. Spencer Dec. ¶ 17 (ER-154). Employee drivers have little or no control over their own work for motor carriers. Spencer Dec. ¶ 17 (ER-154). The employee driver position requires no investment in capital, involves no assumption of financial risk, and provides no entrepreneurial opportunity. Spencer Dec. ¶ 17 (ER-154). Leased owner-operators view the option of becoming an employee driver as the complete loss of their small businesses, the loss of their investment in their creation of a business, and the loss of freedom to control their work. Spencer Dec. ¶¶ 42, 56-57 (ER-160–62). Being an employee truck driver is a different job than being a leased owner-

14

operator who has invested in and taken responsibility for a small business. Spencer Dec. ¶¶ 17, 42, 56-57 (ER-154, 158, 160–62).

Nor is a motor carrier operation the same as being a leased owner-operator. The acquisition of federal motor carrier authority and the attendant increase in professional and regulatory responsibilities are not necessarily within a leased owner-operator's experience or abilities. Spencer Dec. ¶ 37 (ER-157). Obtaining federal motor carrier authority requires an assumption of financial and regulatory responsibilities that significantly exceeds the requirements of being a leased owner-operator. Spencer Dec. ¶¶ 36, 38, 58 (ER-157, 162–66). Experience as a leased owner-operator does not automatically qualify an individual to become a motor carrier. Spencer Dec. ¶ 37 (ER-157).[3] Motor carrier businesses must assume much greater financial and regulatory responsibilities than leased owner-operators. Spencer Dec. ¶ 58 (ER-162–66). Leased owner-operators have worked hard to establish their businesses and do not necessarily want to take on the increased responsibilities of motor carriers.

---

[3] And many leased owner-operators do not aspire to be motor carriers. *See, e.g.,* Declaration of Marc McElroy in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction (Dist. Ct. ECF 155-5) ("McElroy Dec.") ¶¶ 7 (ER-249); Declaration of Albert Hemerson in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction (Dist. Ct. ECF 155-4) ("Hemerson Dec.") ¶¶ 12, 14-15 (ER-254).

Leased owner-operators have only one option to keep their choice of small business under AB 5: give up all business that requires them to operate for any amount of time in California.

**C.     AB 5's prohibition on leased owner-operator truck drivers imposes an unconstitutional burden on interstate commerce.**

The dormant Commerce Clause protects against two kinds of state laws: (1) those that discriminate against interstate commerce; and (2) those that regulate even-handedly but impose a burden on interstate commerce that clearly exceeds the law's putative local benefits. *South Dakota v. Wayfair*, 585 U.S. 162, 173 (2018). Each of these two categories describes a separate, independent violation of the dormant Commerce Clause. OOIDA demonstrated that AB 5 violates both prongs of this standard.

First, AB 5 imposes an undue burden on interstate commerce under the balancing test established in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). OOIDA submitted evidence that prohibiting all leased owner-operators from doing business in California exceeded any notion of "burden" under the *Pike* balancing test. There is no burden, cost, or regulatory hurdle that an independent contractor can take on, pay for, or overcome to keep their small business as a leased owner-operator. Spencer Dec. ¶¶ 42-47 (ER-158–59). OOIDA's witnesses declared that their only option to avoid violating AB 5 was to stop hauling freight in California (or, in one instance, to move out of the State). *See* Declaration of Albert Hemerson

16

in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction (ECF 155-4) ("Hemerson Dec.") ¶¶ 12, 14-15 (ER-254); Declaration of Marc McElroy in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction (ECF 155-5) ("McElroy Dec.") ¶¶ 11-15 (ER-249–50); Declaration of Stacy R. Williams in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction (ECF 155-6) ("Williams Dec.") ¶¶ 14-16 (ER-250).

On the state benefits side of the balancing test, the State claims AB 5 addresses worker misclassification and results in the application of the State's employment laws to more workers. *See, e.g.*, Dist. Ct. Op. at 13 (ER-16). But the previous classification test, *Borello*, already provided those benefits for many workers who were misclassified before AB 5. AB 5's benefits, therefore, can only be measured by how much better than *Borello* the ABC test addresses misclassification.

The dearth of evidence of AB 5's improvement of truck driver classification over the previous *Borello* standard demonstrates that the putative *Pike* "benefits" enjoyed by the State from applying AB 5 to all drivers operating in interstate commerce are minimal, if not illusory. As to truckers based outside of California who temporarily visit the State to deliver and pick up freight, OOIDA demonstrated, through California caselaw, that the State has no interest in applying its employment laws to those workers, and, therefore, the State enjoys no benefits

17

from applying the ABC test to them. ECF 193 at 29. Defendants offered no contrary evidence. In summary, the burden to leased owner-operators—the loss of their small businesses (or being cut off from any business moving freight in California)—clearly exceeds the minimal, illusory, or nonexistent benefit to the State of applying AB 5 to them.

**D.    The district court improperly refused to conduct *Pike* balancing.**

Citing *Pork Producers* minority opinions, the district court rejected the *Pike* balancing test as an independent basis for determining a dormant Commerce Clause violation. *See* Dist. Ct. Op. at 10-11 (ER-13–14) (citing *Pork Producers*, 598 U.S. at 377-78). The district court also cited *Pork Producers* in stating that "the Supreme Court reminds lower courts that judges are not institutionally well-suited to draw reliable conclusions for applying the *Pike* test." *See id.* at 11 (ER-14) (quoting *Pork Producers*, 598 U.S. at 380). Ultimately, the district court held that discrimination against—and not unreasonable burdens on—interstate commerce is the only valid basis of a dormant Commerce Clause claim.

The district court justified this narrowing of the dormant Commerce Clause by citing to sections of Justice Gorsuch's *Pork Producers* opinion supported by only a minority of the Court (Parts IV-B through IV-D). A majority of the Court recognized that the dormant Commerce Clause restricts nondiscriminatory state laws and that the Court's *Pike* balancing test remains the standard for evaluating

18

their constitutionality. *See id.* at 379 (Gorsuch, J., plurality opinion); 392

(Sotomayor, J., concurring in part); 395-96 (Roberts, J., concurring in part).

Moreover, the Court confirmed that dormant Commerce Clause is particularly

important for protecting instrumentalities of commerce. *See* 598 U.S. at 380; *see*

*also id.* at 392 (Sotomayor, J., concurring in part); *id.* at 395-96 (Roberts, C.J.,

concurring in part).

**E.    In evaluating AB 5's burdens, the district court ignored the harm suffered by owner-operators.**

After it rejected the *Pike* balancing test, the district court gave a cursory

assessment of AB 5's burdens on the trucking industry described by the Plaintiffs.

> Although courts are not well-equipped to do such weighing, when it comes to weighing the burdens of AB5 against the salutary effects under *Pike*, it does not appear that the pure economic burdens on out-of-state worker-drivers and freight hauling firms substantially outweigh the in-state benefits of correctly classifying worker-drivers as employees.

*See* Dist. Ct. Op. at 13 (ER-16). Thus, the district court categorized AB 5's

harms—contrary to OOIDA's evidence that AB 5 prohibits an entire sector of

small business trucker from operating in California—as "pure economic burdens"

and "increase[d] compliance costs" that, on their own, do not establish a

substantial burden on interstate commerce. *See id.* at 12, 13 (ER-15–16) (citing

*Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021 (9th Cir. 2021)).

The "compliance costs" cases held that laws that merely imposed new primarily economic burdens on businesses were not unconstitutional. There is no burden, cost, or regulatory hurdle that independent contractor drivers can take on, pay, or overcome to keep their leased owner-operator businesses. None of those "compliance costs" cases considered the elimination of an entire sector of small businesses, especially a small business sector that has been an institution in its industry for decades and one that is an instrumentality of interstate commerce.

**F.     AB 5's Business-to-Business exemption favors in-state truckers over out-of-state truckers in violation of the dormant Commerce Clause and the Equal Protection Clause of the U.S. Constitution.**

Defendants argued to the district court that truck drivers can continue to work as independent contractors under AB 5 via its Business-to-Business ("B2B") exemption to the ABC test found in Cal. Lab. Code § 2776(a). State Prelim. Inj. Opp. (Dist. Ct. ECF 175) at 9-10; IBT Prelim. Inj. Opp. (Dist. Ct. ECF 173) at 17-19. Workers must satisfy twelve elements to utilize this exemption. Cal. Lab. Code § 2776(a)(1)-(12). The first element requires the worker to be "free from the control and direction of the contracting business entity in connection with the performance of the work, both under the contract for the performance of the work and in fact." Cal. Lab. Code § 2776 (a)(1). The seventh element requires that the "business service provider can contract with other businesses to provide the same or similar services and maintain a clientele without restrictions from the hiring

entity." Cal. Lab. Code § 2776(a)(7). The eighth element requires that "[t]he business service provider advertises and holds itself out to the public as available to provide the same or similar services." Cal. Lab. Code § 2776(a)(8).

But each of these elements conflicts with specific requirements of the federal regulations applicable to truckers working in interstate commerce. Those rules (the "Truth-in-Leasing" rules authorized by 49 U.S.C. § 14102 and promulgated at 49 C.F.R. Part 376) require interstate motor carriers who engage owner-operators to have "exclusive possession, control, and use" of and "complete responsibility for the operation of" the leased owner-operator's truck. 49 C.F.R. § 376.12(c)(1).

The leasing rules were first promulgated in the 1950s to protect owner-operators' business potential and adopted a requirement of motor carrier control of owner-operators to make motor carriers liable for accidents. *See, e.g.*, *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 305 (1953); *see also Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28 (1975); *White v. Excalibur Ins. Co.*, 599 F.2d 50, 52-53 (5th Cir. 1979). Later updates to the rules reaffirmed their purpose of protecting owner-operators. *See, e.g.*, Lease & Interchange of Vehicles, 131 M.C.C. 141 (Jan. 9, 1979) (noting that the Truth-in-Leasing rules were intended to "promote the stability and economic welfare of the independent trucker segment of the motor carrier industry"); *see*

21

*also Global Van Lines, Inc. v. I.C.C.*, 627 F.2d 546, 548 (D.C. Cir. 1980) (noting

Truth-in-Leasing rules' role in protecting independent owner-operators).

Indeed, in commenting on the proposed rules, the then-Interstate Commerce

Commission Chairman observed:

> My concern is that because they like to eat, owner-operators will
> continue to find it necessary to enter into contracts with carriers they
> would like to avoid. . . . The difficulty is that one owner-operator by
> himself will have very little chance of bargaining any changes in any
> contract. His option will be take it or leave it.

Lease & Interchange of Vehicles, 43 Fed. Reg. 29,812, 29,813 (July 11,

1978). The leasing rules' protection of owners and operators of trucks is inherent

in their purpose to support and preserve this important trucking industry segment.

In short, as a matter of plain language and simple logic, owner-operator

drivers cannot be "free from the control and direction" of the motor carrier

necessary to qualify for AB 5's B2B exemption while their equipment and

operation of that equipment is under the "exclusive possession, control, and use"

of their motor carrier as required by the federal rules.

Therefore, if the Business-to-Business exemption allows leased owner-

operators to be a part of the trucking industry, then the exemption is only available

to California *intrastate* truckers who are not required to follow the Truth-in-

Leasing rules and is unavailable to trucking operations in *interstate* commerce

who must comply with the federal rules. This exemption causes AB 5 to violate

22

the Constitution in two ways. First, it discriminates against interstate commerce and favors California domestic interests in violation of the dormant Commerce Clause. And second, because there is no rational basis for the B2B exemption's disparate treatment of interstate California truckers and truckers operating in interstate commerce, AB 5 violates the Equal Protection clause of the U.S. and California Constitutions.

In reviewing OOIDA's claims based on the B2B exemption, the district court looked generally at the purposes of the Truth-in-Leasing rules and AB 5 and decided that it was not clear how the two laws directly conflict. *See* Dist. Ct. Op. at 18-19 (ER-21–22). The district court did not analyze the B2B exemption's specific language requiring a worker to be "free from the control and direction of the contracting business entity." Nor did the court explain how the federal rules requiring the motor carrier's "exclusive possession, control, and use" of and "complete responsibility for the operation of" the leased owner-operator's truck could in any way leave the driver "free from the control" of the motor carrier as required by the B2B exemption.

## G.     Summary of proceedings below

The California Trucking Association and the other original Plaintiffs filed this suit in October 2018 (Dist. Ct. ECF 1), and the International Brotherhood of Teamsters' ("IBT" or "Teamsters") intervened in January 2019 (Dist. Ct. ECF 11,

21). The district court granted Plaintiffs' motion for preliminary injunction on FAAAA preemption grounds in January 2020. *See* Order Granting Preliminary Injunction (Dist. Ct. ECF 89). The district court dismissed CTA Plaintiffs' Commerce Clause claim premised on its finding of FAAAA preemption. Order on Motions to Dismiss (Dist. Ct. ECF 110). Defendants appealed the injunction, and this Court reversed in April 2021. *Cal. Trucking Ass'n v. Bonta*, 996 F.3d 644 (9th Cir. 2021). After petitions for rehearing and certiorari were denied by this Court and the Supreme Court, respectively, the district court spread this Court's mandate and took back the case in August 2022. Minute Order dated Aug. 30, 2022 (Dist. Ct. ECF 144). On September 22, 2022, the district court granted OOIDA's motion to intervene in this matter. Order Granting Owner-Operator Independent Drivers Association's Motion to Intervene (Dist. Ct. ECF 147).

The parties thereafter briefed motions for preliminary injunction, and OOIDA and Plaintiffs later filed amended complaints, adding claims for violations of the Equal Protection clause. Before the parties concluded briefing the injunction motions, the district court consolidated the preliminary injunction hearing with the trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2). The parties agreed to a stipulated schedule and procedures for the consolidated hearing.

The district court heard oral argument on October 13, 2023, and considered the parties' written evidence in making its decision. *See* Joint Stipulated Motion to

24

Continue Hearing and Trial Date and to Set Pretrial and Trial Procedures (Dist. Ct.
ECF 182) ¶¶ 3-4; Minute Order dated August 22, 2023 (Dist. Ct. ECF 183). It
issued its Decision and Judgment in favor of the State on all claims on March 15,
2024. Decision (Dist. Ct. ECF 206); Judgment in a Civil Case (Dist. Ct. ECF 207).
OOIDA and CTA filed their timely Notices of Appeal of that decision on April
14, 2024. Notice of Appeal (Dist. Ct. ECF 208); Notice of Appeal (Dist. Ct. ECF
209).

## SUMMARY OF ARGUMENT

I. The Supreme Court has repeatedly affirmed that the dormant Commerce
Clause limits two distinct categories of state laws: (1) those that discriminate
against interstate commerce and (2) those that regulate even-handedly but impose a
burden on interstate commerce that clearly exceeds the law's putative local
benefits. But, contrary to this long-standing precedent, the district court provided
two reasons for rejecting OOIDA's claim that, under the *Pike* balancing test, AB 5
unconstitutionally burdens interstate trucking: (1) Undue burden claims require
proof that the challenged law discriminates against out-of-state interests, and
OOIDA failed to establish that AB 5 so discriminates, and (2) courts are not
competent to compare a law's benefits and burdens. This Court should reverse,
confirming that—as acknowledged by a majority of the *Pork Producers* Court—
the dormant Commerce Clause restricts nondiscriminatory burdensome state laws

and that courts can readily compare a law's benefits and burdens, particularly as here where the comparison is so stark.

II. Had the district court properly applied *Pike*'s balancing test, it would have first recognized the stark burden AB 5 imposes on leased owner-operators—the categorical prohibition on operating in California. The court would have then weighed that more than substantial burden against California's interest in enforcing AB 5 as to two distinct segments of interstate commerce. First, as to interstate trucking in general, the state enjoys a negligible incremental improvement in the proper classification of truckers. Second, as to out-of-state truckers visiting California, the State's interest in enforcing AB 5 is nonexistent. This Court should reverse and find that AB 5's stark burdens—eliminating the businesses of leased owner-operators—clearly exceed the law's minimal if not illusory benefits to the State as to truckers operating in interstate commerce, and in the alternative, clearly exceed the nonexistent benefits to the State as to out-of-state truckers who spend less than 50% of their time working in the state to pick up and deliver freight.

III. Although the *Pike* balancing test does not require OOIDA to show that AB 5 discriminates against interstate commerce, AB 5, as applied to trucking, does in fact discriminate against interstate trucking and favor local, intrastate truckers. In arguing that AB 5 does not completely eliminate independent contractor truckers, Defendants argued that those businesses can take advantage of the law's

26

Business-to-Business exemption. But interstate operators who must comply with the federal regulations applicable to leased owner-operators cannot satisfy that exemption's requirements. Federal rules require motor carriers to assume exclusive possession and control over leased owner-operators' vehicles and the operation of those vehicles. But this degree of control precludes qualification for the B2B exemption, which requires a worker to be "free from the control and direction of" the hirer. Thus, only local, California intrastate owner-operators who do not have to comply with the federal regulations can ever qualify for the B2B exemption. This Court should reverse and find that AB 5 discriminates against interstate commerce in violation of the dormant Commerce Clause.

IV. The B2B exemption's disparate treatment of similarly-situated intrastate and interstate truckers also violates the Equal Protection Clause of the U.S. Constitution. There is no rational basis for a law designed to protect California workers to provide the B2B exemption for only California truckers who operate exclusively within the State but deny the exemption for interstate truckers for whom the State has no interest in protecting. Per this Court's precedent, this contradiction in terms cannot survive rational basis review. The Court should reverse the district court and hold that AB 5's B2B exemption violates interstate truckers' right to equal protection under the law.

## STANDARD OF REVIEW

The district court held a consolidated hearing on the preliminary injunction motions and the trial on the merits under Federal Rule of Civil Procedure 65(a)(2), issuing findings of fact and conclusions of law. For a judgment following a bench trial, "this court reviews the district court's findings of fact for clear error and its legal conclusions de novo." *Santa Clarita Valley Water Agency v. Whittaker Corp.*, 99 F.4th 458, 475 (9th Cir. 2024) (quoting *Price v. U.S. Navy*, 39 F.3d 1011, 1021 (9th Cir. 1994)). Each issue in this appeal requires this Court to review *de novo* the district court's legal conclusions regarding application of dormant Commerce Clause and Equal Protection Clause standards.

## ARGUMENT

**I.  The district court should have applied *Pike*'s balancing standard to OOIDA's claim that AB 5 imposes an unconstitutional burden on interstate commerce independent of AB 5's discriminatory effects.**

The dormant Commerce Clause prohibits state laws that "regulate even-handedly" but impose burdens on interstate commerce that clearly exceed those law's putative local benefits. *See, e.g.*, *Wayfair*, 585 U.S. at 173 (quoting *Pike*, 397 U.S. at 142).

But the district court below decided that it and other courts cannot and should not apply this decades-old constitutional standard. *See* Dist. Ct. Op. at 11 (ER-14). The district court relied on sections of Justice Gorsuch's *Pork Producers*

28

opinion supported by only a minority of the court in rejecting OOIDA's Commerce Clause burden claim. The district court adopted Justice Gorsuch's writings that confined the dormant Commerce Clause's scope to cases of state discrimination or protectionism. *See id.* at 9-10 (ER-12–13); *see also id.* at 13 (ER-16) ("AB5 does not offend the core constitutional principle of prohibiting purposeful discrimination against interstate commerce. And while AB5 has economic effects, the effects do not confirm purposeful discrimination against interstate commerce in the design of AB5."); *cf. id.* at 11 (ER-14) ("[T]oday's claim against AB5 is far from *Pike*'s heartland."). But the district court could have and should have applied *Pike*, with or without discrimination. The dormant Commerce Clause protects against state obstructions against interstate commerce, even those in the form of nondiscriminatory state laws.

The Supreme Court has invalidated "genuinely nondiscriminatory" state laws under the dormant Commerce Clause on multiple occasions. *See Pork Producers*, 598 U.S. at 379; *see also id.* at 392 (Sotomayor, J., concurring in part); *id.* at 395-96 (Roberts, C.J., concurring in part). That point, standing alone, belies the district court's conclusions—based on a minority's discussion[4] in *Pork*

---

[4] The fractured *Pork Producers* decision consists of Justice Gorsuch's principal opinion, which garnered a majority for only some of its sections, and four additional opinions. Notably, a few important passages of the main opinion did not achieve majority support: Only Justices Thomas and Barrett joined Parts IV-B and

*Producers*—that it could not conduct *Pike* balancing and that the dormant Commerce Clause protects only against discrimination. That point was true before *Pork Producers* and remains true today. *See, e.g.*, *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1106 (9th Cir. 2013) (noting that incidental burdens on interstate commerce that don't constitute extraterritorial control are to be considered under *Pike* balancing); *Pork Producers*, 598 U.S. at 395-96 (Roberts, C.J.) ("As a majority of the Court agrees, *Pike* extends beyond laws either concerning discrimination or governing interstate transportation.").

In sum, the framework laid out in *Wayfair*, and applied by the Ninth Circuit in *Pork Producers*, controls the outcome here: "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Pork Producers*, 6 F.4th at 1026 (quoting *Wayfair*, 585 U.S. at 173).

---

IV-D, and only Justices Thomas, Sotomayor, and Kagan joined Part IV-C. Yet these sections, which question *Pike*'s nondiscriminatory application, formed the basis of the district court's Commerce Clause holding.

The entire Court, Justice Gorsuch included, acknowledged (expressly or impliedly) that the Court has invalidated nondiscriminatory state laws under the dormant Commerce Clause. *See id.* at 379 (Gorsuch, J., plurality opinion); 392 (Sotomayor, J., concurring in part) (noting that "petitioners' failure to allege discrimination or an impact on the instrumentalities of commerce does not doom their *Pike* claim"); 395-96 (Roberts, J., concurring in part) (rejecting primary opinion's attempt to "narrowly typecast" *Pike* to exclude nondiscriminatory burden claims).

Moreover, *Pork Producers* confirms that the dormant Commerce Clause is particularly important for protecting instrumentalities of commerce. *See* 598 U.S. at 380; *see also id.* at 392 (Sotomayor, J., concurring in part); *id.* at 395-96 (Roberts, C.J., concurring in part). The interstate transportation of the nation's goods by truck represents an archetypal instrumentality of commerce that needs protection in the form of a functioning dormant Commerce Clause. *Cf. Pork Producers*, 598 U.S. at 379 n.2 (referring to long-standing Commerce Clause protection of laws burdening "trucks, trains, and the like"). AB 5 applies generally, but OOIDA challenges only its application to interstate trucking, putting this case squarely in "*Pike*'s heartland." *Pork Producers*, 598 U.S. at 380.

This Court should recognize that the dormant Commerce Clause restricts even nondiscriminatory state laws when, like AB 5, they impose substantial burdens on interstate commerce, as OOIDA demonstrated.

## II.     The "burden" of eliminating leased owner-operator businesses clearly exceeds AB 5's negligible, at most, benefits to California.

The district court also relied on Justice Gorsuch's (minority) statements in *Pork Producers* that suggested that courts are not capable of balancing a state law's burdens against its putative benefits. Dist. Ct. Op. at 11 (ER-14). But, as the *Pork Producers* majority recognized, "it is possible to balance benefits and burdens under the approach set forth in *Pike*." *See, e.g.*, 598 U.S. at 396-97 (Roberts, C.J., concurring in part).

31

*Pike* balancing in this case does not require complex analysis: AB 5 as applied to interstate trucking (eliminating an entire sector of the trucking industry from California) imposes substantial harm to interstate commerce far in excess of the law's illusory or nonexistent benefits to California. The Court should therefore overturn the ABC test as applied to: (1) all leased owner-operators operating in interstate commerce; or, in the alternative (2) all leased owner-operators based outside of California who perform less than a majority of their work in California.

### A. The district court ignored AB 5's impact on leased owner-operators—there is no burden they can bear to keep their businesses under AB 5.

### 1. Eliminating all leased owner-operator businesses serving California constitutes a substantial burden on interstate commerce.

Although the district court decided that courts should not conduct a *Pike* analysis, where it did recite AB 5's burdens, it ignored the primary harm OOIDA sued to redress: AB 5's prohibition of an entire sector of small businesses, leased owner-operators, from working as independent contractors in California, even as temporary visitors to deliver or pick up freight. Eliminating an entire sector of small business transcends any financial burden acceptable under dormant Commerce Clause jurisprudence. Absent AB 5, leased owner-operators could work throughout the country. But AB 5 closes California's borders to them, even those based in other states. *See* Spencer Dec. ¶¶ 42, 54, 59 (ER-150–60, 166).

The district court characterized AB 5's harms as "pure[ly] economic" compliance costs and thus not worthy of protection by the dormant Commerce Clause. *See* Dist. Ct. Op. at 13 (ER-16). But eliminating an entire class of small business trucker can hardly be equated with the economic and administrative burdens that this Court and others have previously concluded did not warrant Commerce Clause limitation—*i.e.*, mere "increased costs as a result of complying with state regulations." *See* Dist. Ct. Op. at 12 (ER-15) (quoting *Sierra Nevada Transp., Inc. v. Nevada Transp. Auth.*, No. 22-15823, 2023 WL 6871575, at *3 (9th Cir. Oct. 18, 2023), *cert. denied,* 144 S. Ct. 1062 (2024)); *see also e.g.*, *Pork Producers*, 6 F.4th at 1032. In *Sierra Nevada Transportation*, relied on by the district court, this Court approved burdens categorically different than AB 5's elimination of independent leased owner-operators. That case involved a licensing requirement to carry passengers to and from an airport. *See Sierra Nevada Transportation*, 2023 WL 6871575, at *3. Indeed, the challengers described the law as "impos[ing] difficult, costly, and time-consuming hurdles." *See id.* Likewise, this Court in *Pork Producers* analyzed laws increasing the costs of producing pork by 9.2% nationwide. 6 F.4th at 1033.

These compliance costs and regulatory burdens pale in comparison to the harm felt by leased owner-operators under AB 5. These truckers cannot merely

incur increased costs or overcome additional administrative hurdles to keep their leased owner-operator businesses.[5] The "burden" of this law is complete.

### 2. Defendants confirm that AB 5 prohibits leased owner-operators from operating in California.

Defendants argued below that AB 5 does not burden interstate commerce because leased owner-operators can continue to drive a truck in California as employee drivers or as motor carriers. *See, e.g.,* State Defendants' Opposition to Intervenor-Plaintiff Owner-Operator Independent Drivers Association's Motion for Preliminary Injunction (Dist. Ct. ECF 175) at 9-10. Defendants' argument concedes OOIDA's analysis of AB 5, that the ABC test prohibits the entire sector of leased owner-operator small business independent contractor from operating in California. Defendants' arguments also incorrectly and misleadingly treat leased owner-operators, employee drivers, and regulated motor carriers as mere variations of the same job, driving a truck. In reality, these are very different jobs and businesses.

Leased owner-operators are small businessmen and women who have assumed the risks and responsibilities for their success. They invest in their own truck and equipment and control the variabilities that affect their costs and income.

---

[5] Moreover, in *Pike* itself, the burden of requiring a single company to construct an otherwise-unnecessary $200,000 facility clearly exceeded a legitimate state interest in buttressing the reputation of Arizona cantaloupes. *See* 397 U.S. at 145-46. Here, unlike in *Pike*, AB 5 imposes substantial burdens "on an entire industry." *Id.* at 146.

Spencer Dec. ¶¶ 18-19, 22, 25, 27 (ER-154–56). Leased owner-operators have the discretion and flexibility for how they perform their work, when and where they work, and what loads they haul. *See* Spencer Dec. ¶¶ 20-27 (ER-155). As a result, they can control the success of their business and can earn more than employees. Hemerson Dec. ¶ 9 (ER-253); McElroy Dec. ¶ 6 (ER-249); Williams Dec. ¶¶ 6, 16 (ER-245–56); Spencer Dec. ¶¶ 25-27 (ER-155).

By contrast, employee drivers have no responsibility for running a trucking business. Employee drivers have only basic responsibilities for safe driving, equipment safety, freight securement, and the pick-up and delivery of freight. *See* Spencer Dec. ¶ 17 (ER-154); Hemerson Dec. ¶ 9 (ER-253). Employee drivers have little flexibility to make decisions about their work. Employee drivers are instructed by motor carriers what to haul and where to haul it. *See* Spencer Dec. ¶ 17 (ER-154). OOIDA's declarants outlined the ways that employer motor carriers tightly control drivers' schedules and operations. *See* Spencer Dec. ¶ 17 (ER-154); Williams Dec. ¶¶ 8-9 (ER-245), Hemerson Dec. ¶¶ 8-11 (ER-253–54).

Motor carrier control also extends to limit personal and family time, such as vacation time and sick leave. As OOIDA's declarant Stacy Williams testified:

> My wife passed away on October 23, 2022. Because I am an owner-operator rather than an employee, I was able to take the necessary time off to bury my wife and settle her affairs without hauling loads for a sufficient time to weather this personal storm. I would not have had the discretion to take this time off had I been an employee driver.

Williams Dec. ¶ 10 (ER-245).

Motor carrier control of employee drivers creates a work environment that highly motivates leased owner-operators to continue operating as leased owner-operators rather than become employee drivers. *See* Hemerson Dec. ¶¶ 8-11, 16 (ER-253–55); McElroy Dec. ¶¶ 6, 13 (ER-249–50); Williams Dec. ¶¶ 7-10 (ER-245).

On the other hand, becoming a federally regulated motor carrier requires more trucking business experience and responsibility for complying with a more extensive universe of federal regulations than is required of leased owner-operators. Spencer Dec. ¶ 21 (ER-155). Federal law imposes a myriad of obligations specific to motor carriers. *See, e.g.*, 49 U.S.C. § 13902 (registration of motor carriers); 49 U.S.C. § 13906 (public liability insurance); 49 U.S.C. § 14505a (Unified Carrier Registration); 49 C.F.R. Part 382 (drug and alcohol testing); 49 C.F.R. § 385.403 (DOT Number for roadside identification); 49 C.F.R. Part 390 (motor carrier operating authority). Leased owner-operators with sufficient experience can become successful motor carriers. *See* Spencer Dec. ¶¶ 36-37 (ER-157). The basic qualifications for becoming a leased owner-operator, however, are not evidence that the individual is prepared to assume a carrier's expanded legal and business responsibilities. Spencer Dec. ¶¶ 20-22 (ER-155). Nor do leased

owner-operators necessarily want to take on motor carrier obligations. Spencer Dec. ¶ 37 (ER-157).

Further undermining Defendants' argument, OOIDA members report that, instead of giving up their leased owner-operators and choosing to use employee drivers, their motor carriers have given up taking freight to California. *See* Spencer Dec. ¶¶ 54-59 (ER-160–66); Declaration of Danny R. Schnautz in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction (Dist. Ct. ECF 171-3) ¶¶ 9-12 (ER-242–43). One OOIDA member even moved out of California to continue to be a leased owner-operator. Williams Dec. ¶¶ 11-12 (ER-246). Another leased owner-operator's motor carrier asked him to pick up loads in Nevada and Arizona and haul them interstate, but he must drive, uncompensated, from his base in California to pick up those loads to avoid the potential application of AB 5. *See* McElroy Dec. ¶¶ 3, 11-12 (ER-249–50).

Defendants' assertion, therefore, that leased owner-operators can simply become employee drivers or motor carriers is a misrepresentation of the reality of the trucking industry. The argument, instead, concedes OOIDA's argument and evidence that AB 5 prohibits the entire class of small businesses, leased owner-operators from operating in California.

**B.     California enjoys negligible, if any, benefits from prohibiting independent contractor drivers from hauling goods in California, particularly for drivers based outside of the state.**

OOIDA argues two separate bases for the Court's analysis of the second *Pike* balancing component—the putative benefits to the State of applying AB 5 and the State's employment laws to truck drivers. First, California has no interest in applying its employment laws, and therefore AB 5, to truckers from out of state who spend less than half of their time in California to drop off and pick up freight. Second, California enjoys a minimal, if not illusory, increase in benefits from applying AB 5 over *Borello* as to truckers operating in interstate commerce generally.

**1.     California enjoys *no* benefits from applying AB 5 to out-of-state truckers.**

The putative benefit California claims from AB 5 is the application and protection of state employment laws to properly classified workers in California. The State, however, holds no interest in applying its employment laws to out-of-state drivers visiting California and thus derives no *Pike* "benefits" from enforcing AB 5 on them. California's interest in applying its employment laws requires significantly more contact with the State. *See, e.g.*, *Ward v. United Airlines, Inc.*, 466 P.3d 309 (Cal. 2020); *Oman v. Delta Air Lines, Inc.*, 466 P.3d 325 (Cal. 2020). In these two cases, the Supreme Court of California examined labor rules to determine their reach for interstate workers. In both cases, the court held that the

38

California rules, which did not expressly limit their geographic reach, covered only workers whose principal place of work is California—that is, the state only has an interest in protecting workers who performed a majority of their work in California or, for workers who did not perform a majority of their work in any one state, workers based in California. *See Ward*, 466 P.3d at 321; *Oman*, 466 P.3d at 330; *see also Bernstein v. Virgin America, Inc.,* 3 F.4th 1127 (9th Cir. 2021) (California law applied when aircraft were registered in California and plaintiffs were California-based); *Sullivan v. Oracle Corp.*, 254 P.3d 237 (Cal. 2011) (California law applied when company was based in California and work was performed in California); *Tidewater Marine Western, Inc. v. Bradshaw*, 927 P.2d 296 (Cal. 1996) (California law applied when 100% of work was performed in California).

   None of these cases concluded that California has an interest in enforcing its labor laws on workers in the same circumstances as the truckers described in OOIDA's alternative request for relief—leased owner-operators based outside of California who spend less than a majority of their work time in the State. And, notably, Defendants provided no evidence or caselaw demonstrating the State's interest in applying its rules to these workers. For the purpose of the *Pike* balancing test, therefore, *Oman* and *Ward* demonstrate that as a matter of law, California has no interest in enforcing its labor laws to workers based out of state.

39

The State all but confirmed this conclusion when, instead of arguing or submitting evidence demonstrating its interest in applying AB 5 to out-of-state truckers, it criticized OOIDA for not proving that AB 5 applies to them. The Teamsters agreed, stating that "it is not even clear whether AB 5 applies to such out-of-state workers." IBT Prelim. Inj. Opp. (Dist. Ct. ECF 173) at 23; *see also* State Opp. CTA/OOIDA Contentions (Dist. Ct. ECF 195) at 6, 9-11. Did the Defendants concede that, despite AB 5 containing no geographic qualification to whom it applies (other than working in California), the law does not apply to out-of-state truckers? Without some reliable, legally enforceable declaration by the State that AB 5 does not apply to out-of-state truckers, judgment on OOIDA's Commerce Clause claim is necessary to establish the precedent that tens of thousands of out-of-state truckers can rely upon to continue to deliver freight in and out of California without fear of AB 5 enforcement.

### 2. AB 5 provides only illusory benefits to the State when applied to interstate trucking generally.

California enjoys only minimal, if not illusory, benefits from applying AB 5 to truckers operating in interstate commerce generally (*i.e.*, with respect to drivers based both in California and elsewhere). AB 5 cannot be viewed in a vacuum. California did not lack a worker classification standard before the ABC test. Rather, the ABC test replaced the *Borello* standard, and any claimed "benefits" of applying the ABC test can only be viewed as to the incremental increase in

40

effectiveness of the ABC test relative to *Borello*. The *Borello* standard would once again apply to interstate truck drivers under OOIDA's requested relief. The district court failed to appreciate this important component of the *Pike* balance. It noted that AB 5's benefits include "protecting in-state drivers from being misclassified as independent contractors and losing statutory entitlements under state labor laws." *See* Dist. Ct. Op. at 13 (ER-16). But Defendants introduced no evidence of, and the district court did not consider, whether AB 5 provides any *improvement* in addressing misclassification over the standard it replaced. If it does not, then AB 5 provides no benefits at all.

Indeed, when it comes to trucking, the previous standard apparently served the State quite well. The State suggested that *Borello* failed to properly classify truckers, arguing that *Borello*'s flexibility made the test subject to manipulation with the result being widespread misclassification in the trucking industry. *See* State Defendants' Memorandum of Contentions of Fact and Law (Dist. Ct. ECF 190) at 31 (quoting Analysis of AB 5, Senate Rules Committee, Sept. 3, 2019). But regardless of whether applying *Borello* in some contexts was complicated, the State and workers successfully corrected driver misclassification in the vast majority of cases they brought under *Borello*. *See, e.g.*, Intervenor-Defendant's Mem. in Supp. of Mot. to Dismiss (Dist. Ct. ECF 63-1) at 6 (citing Analysis of SB 1402, California Senate Committee on May 7, 2018); *see also* State Defendants'

41

Memorandum of Contentions of Fact and Law (Dist. Ct. ECF 190) at 3-4 (citing

cases decided under *Borello* that determined drivers were misclassified).

Thus, even accepting the State's theoretical *Borello* critiques as true, they do

not lead to the conclusion that *Borello* was inadequate to address misclassification

in trucking—and, therefore, that AB 5's ABC test would better address this driver

misclassification. Thus, AB 5 "combats" purported worker misclassification not by

improving the State's tools to remedy misclassification, but instead by adopting a

test that affirmatively reclassifies all truck drivers as employees, even those leased

owner-operators who were not previously misclassified. Preventing properly-

independent workers from operating their businesses without improving the State's

ability to crack down on misclassification is an injury (burden) to many and no

benefit to California at all.

Thus, here the "putative state benefit" side of the *Pike* balance is clear:

California enjoys minimal, if not illusory benefits from applying AB 5 to all

truckers operating in interstate commerce.

### C.     AB 5's substantial burdens clearly exceed its illusory benefits as applied to interstate trucking.

Applying *Pike* to compare AB 5's benefits and burdens yields a

straightforward result that does not require a complex economic analysis: The

"burden" of leased owner-operators giving up their small businesses or giving

hauling freight to or from California clearly exceed any negligible or nonexistent

"benefit" to the State associated with (1) switching from *Borello* to the ABC test for interstate truck drivers generally or (2) applying California classification laws to truckers based out of state who work less than half of their time in California.

AB 5 violates the dormant Commerce Clause under *Pike*. This Court should reverse and find that AB 5's substantial burdens clearly exceed the law's minimal if not illusory benefits to the State as to truckers operating in interstate commerce, and in the alternative, clearly exceed the nonexistent benefits to the State as to out-of-state truckers who spend less than 50% of their time working in California.

## III.   AB 5 as applied in the trucking industry violates the Commerce Clause's restrictions against discrimination.

Defendants argued below that independent truckers who wished to continue working in California as independent contractors could utilize AB 5's Business-to-Business ("B2B") exemption. But the B2B exemption's requirements directly conflict with the federal regulations applicable to interstate leased owner-operators and their motor carriers. The exemption is available, therefore, only to California intrastate truckers not subject to the federal rules. AB 5, therefore, discriminates against interstate truckers in violation of the dormant Commerce Clause. This Court should therefore overturn those B2B exemption requirements that conflict with the Truth-in-Leasing rules as unconstitutionally discriminatory as to interstate truckers.

A.    **State laws that favor in-state interests at the expense of out-of-state interests discriminate against interstate commerce.**

"'[D]iscrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 99 (1994). Courts judge a law's practical effects to determine whether it discriminates against interstate commerce. *See, e.g., Associated Industries of Mo. v. Lohman*, 511 U.S. 641, 654 (1994) (emphasizing that Supreme Court has "repeatedly . . . focused [its] Commerce Clause analysis on whether a challenged scheme is discriminatory in 'effect'" (quoting *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984)); *see also Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015) (noting that Commerce Clause restricts state laws that are discriminatory in effect); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 350-51 (1977) (finding that North Carolina law discriminated against interstate commerce in practical effect). "If a statute discriminates against out-of-state entities on its face, in its purpose, or in its practical effect, it is unconstitutional unless it 'serves a legitimate local purpose, and this purpose could not be served as well by available nondiscriminatory means.'" *Rocky Mt. Farmers Union*, 730 F.3d at 1087 (quoting *Maine v. Taylor,* 477 U.S. 131, 138 (1986)).

Thus, state laws need not be accompanied by a flashing neon sign that declares "this law discriminates against interstate commerce" to in fact illegally

discriminate against interstate commerce. *See, e.g.*, *Lohman*, 511 U.S. at 654 (emphasizing that Supreme Court has "repeatedly . . . focused [its] Commerce Clause analysis on whether a challenged scheme is discriminatory in 'effect'" (quoting *Bacchus Imports*, 468 U.S. at 270); *see also Wynne*, 575 U.S. at 561 n.4 (noting that Commerce Clause restricts state laws that are discriminatory in effect); *Hunt*, 432 U.S. 333, 350-51 (1977) (finding that North Carolina law discriminated against interstate commerce in practical effect).

**B.      AB 5's Business-to-Business exemption favors local, intrastate operations over their interstate counterparts.**

According to the Defendants, truckers could operate as independent contractors if they can satisfy the B2B exemption. State Opp. CTA/OOIDA Contentions (Dist. Ct. ECF 195) at 6, 9-10; IBT Prelim. Inj. Opp. (Dist. Ct. ECF 173) at 18-19, 29. When the exemption's twelve requirements are satisfied, workers are then classified under the *Borello* standard, which has long classified leased owner-operators as independent contractors (and, according to Defendants, which has long been used successfully to remedy truck driver misclassification). But only local, intrastate truckers could ever satisfy the exemption's requirements because it requires the workers be free from their hirers' control:

- Labor Code § 2776(a)(1) limits the exemption to situations where the worker "is free from the control and direction" of the hiring business "in connection with the performance of the work."

45

- Labor Code § 2776(a)(7) requires that the "business service provider can contract with other businesses to provide the same or similar services and maintain a clientele without restrictions from the hiring entity."

- Labor Code § 2776(a)(8) limits the exemption to situations where the worker "advertises and holds itself out to the public as available to provide the same or similar services."

*Cf.* Cal. Lab. Code § 2775(b)(1)(A) ("The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.").

But the federal Truth-in-Leasing rules directly conflict with these requirements. The Truth-in-Leasing rules apply to the contracts (leases) and conduct of all independent contractor owner-operators and motor carriers operating in interstate commerce. *See* 49 U.S.C. § 13501; 49 U.S.C. § 14102 (referring to 49 U.S.C. chapter 135 to define scope of Truth-in-Leasing rules' application). Those rules explicitly require that the lease agreement provide that the motor carrier—the lessee of the owner-operator's equipment—"have exclusive possession, control, and use of the equipment [and] assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1).

46

The Truth-in-Leasing rules are far more than mere paperwork or "disclosure" requirements. Dist. Ct. Op. at 18-19 (ER-21–22). Indeed, "[t]he required lease provisions shall be adhered to and performed by the authorized carrier." 49 C.F.R. § 376.12; *see also* § 376.12 (c)(1) ("The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease."). This substantive impact was not an accident. "Congress's substantive purpose in authorizing the Truth-in-Leasing regulations was to protect owner-operators. The method selected to achieve this goal was to require that certain terms be included in every lease between carriers and owner-operators." *Owner Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co., Inc. (AZ)*, 367 F.3d 1108, 1115 (9th Cir. 2004).

The first iteration of the leasing rules in the 1950's aimed to protect owner-operators from exploitation and ensure motor carriers' liability to the public for accidents. *See, e.g.*, *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 305 (1953); *see also Transamerican Freight Lines, Inc. v. Brada Miller Freight Sys., Inc.*, 423 U.S. 28 (1975) (noting that one "significant aim" of leasing rules was to ensure financial responsibility for harm to shippers and the public); *White v. Excalibur Ins. Co.*, 599 F.2d 50, 52-53 (5th Cir. 1979) (noting that rules require motor carrier "control" to protect the public).

Updates to the rules reaffirmed their aims of protecting the owner-operator role and the public. *See, e.g.*, Lease & Interchange of Vehicles, 131 M.C.C. 141 (Jan. 9, 1979) (noting that the Truth-in-Leasing rules were intended to "promote the stability and economic welfare of the independent trucker segment of the motor carrier industry"); *see also Global Van Lines, Inc. v. I.C.C.*, 627 F.2d 546, 548 (D.C. Cir. 1980) (noting Truth-in-Leasing rules' role in protecting independent owner-operators).

In short, the B2B exemption requires the driver to be "free from the control" of the carrier, but the Truth-in-Leasing rules require the carrier to maintain "exclusive possession, control, and use" of the truck and assume responsibility for its operation. These requirements cannot be reconcile, rendering the B2B exemption unavailable to any leased owner-operator or motor carrier engaged in interstate commerce (as defined by 49 U.S.C. § 13501). And the rules directly contradict Defendants' implicit suggestion that carriers could ignore the lease provisions and federal rules so that their drivers can be classified under the B2B exemption.

AB 5's B2B exemption discriminates against interstate commerce.

### C. The conflicting language of the B2B exemption and the Truth-in-Leasing rules leaves no room for compliance with both.

Defendants suggested below that motor carriers *could* exercise such "exclusive possession and control" (49 C.F.R. § 376.12(c)(1)) over drivers yet not

be exercising "control and direction of the" drivers (Cal. Lab. Code § 2776(a)(1)), thus simultaneously satisfying both standards. *Cf.* Dist. Ct. Op. at 19 (ER-22) (questioning whether "control" under B2B exemption conflicts with TIL rules). The federal rules do not define "exclusive possession and control," but any suggestion of harmonizing these "control" requirements falls short for multiple reasons. First, this argument fails because words in statutes are given their ordinary meaning unless otherwise indicated, and both standards refer to a hiring entity exercising—or not exercising—"control" over its workers. *See HollyFrontier Cheyenne Ref. v. Renewable Fuels Ass'n*, 141 S. Ct. 2172, 2176 (2021) (quoting *FDIC v. Meyer*, 510 U.S. 471, 476 (1994)).

Defendants questioned the intended scope of the federal rules' "exclusive possession and control" requirement but did not rebut the straightforward conclusion that truckers complying with the federal rules, whatever the scope of "control" intended, cannot be said to be "free from the control and direction" of their carriers as required by the B2B exemption.

Finally, the district court erred in finding that 49 C.F.R. § 376.12(c)(4) harmonizes the inherent conflict between the B2B exemption and the TIL rules. *See* Dist. Ct. Op. at 19 (ER-22) (quoting § 376.12(c)(4) as support for "it is clear that § 376.12(c) does not prevent an owner-operator from acting in either capacity").

In effect, the district court's decision implies that Section 376.12(c)(4)
preempts state law, dictating what factors States can or cannot consider under their
worker classification laws. Congress has given DOT and FMCSA express
preemption authority in the regulation of safety. *See* 49 U.S.C. § 31141. But
Congress has not granted either the U.S. Department of Transportation or the
Federal Motor Carrier Safety Administration the authority to preempt, in whole or
in part, state worker classification laws, and neither the district court nor the
Defendants cite to any such authority. Indeed, courts have concluded that the
Truth-in-Leasing rules do not preempt state labor laws. *See, e.g.*, *Portillo v. Nat'l
Freight, Inc.*, 606 F. Supp. 3d 72, 100 (D.N.J. 2022) ("The Court finds that the TIL
regulations do not preempt Plaintiffs' [New Jersey Wage and Payment Law]
claims. Express preemption does not apply because 'no text of the [TIL] regulation
expressly preempts state laws; indeed, nothing in the regulations (or governing
federal statute) mentions preemption.'" (quoting *Goyal v. CSX Intermodal
Terminals, Inc.*, No. 17-CV-06081-EMC, 2018 WL 4649829, at *3 (N.D. Cal.
Sept. 25, 2018))).

Importantly, this subsection aims to *preserve* the leased owner-operator
model by confirming drivers can operate as independent contractors despite
(c)(1)'s control requirements. *See* § 376.12(c)(4).

Thus, OOIDA does *not* argue that complying with (c)(1) creates an independent contractor (or, for that matter, an employee) relationship. Instead, complying with (c)(1) mandates a factual scenario whereby the hiring carrier exercises a degree of control over the leased owner-operator's work that cannot be reconciled with the B2B exemption's "free from control" requirements.

Accordingly, the B2B exemption—and its *Borello* standard—is available only to motor carriers and their drivers from California who do not haul loads in interstate commerce. But drivers working as independent contractors for carriers engaged in interstate commerce cannot utilize it. Hence, AB 5 discriminates against interstate owner-operators and against interstate commerce itself and is protectionist of intrastate drivers. This Court should reverse and find that AB 5's B2B exemption discriminates against interstate commerce in violation of the dormant Commerce Clause.

## IV.  The Business-to-Business exemption favors local, intrastate operators over their interstate counterparts with no rational basis in violation of the Equal Protection Clause.

The California legislature had no rational basis to grant AB 5's B2B exemption to the workers it was trying to help, intrastate California truckers, but deny this exemption to truckers it has little or no interest in protecting, truckers operating in interstate commerce. The disparate treatment of these two classes of similarly-situated truckers, therefore, violates the Equal Protection clauses of both

51

the California and U.S. Constitutions. This Court should therefore overturn as unconstitutional, for interstate truckers, those B2B exemption requirements that conflict with the Truth-in-Leasing rules.

### A. Laws that differentiate between similarly-situated persons with no rational justification violate the Constitution's guarantee of Equal Protection.

The Equal Protection Clause guarantees that "similarly situated persons must be treated equally." *Merrifield v. Lockyer*, 547 F.3d 978, 992 (9th Cir. 2008). In reviewing a challenge to a law's economic or occupational distinctions, courts apply "rational basis" review and uphold the law so long as "there is any reasonably conceivable state of facts that could provide a rational basis" for the law. *Id.* at 989 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)). Accordingly, equal protection claimants must show that the challenged law treats them differently from other similarly-situated persons and that there exists no rational basis for that distinction.

But a would-be rational basis must make sense in practice. Thus, a state need not "verify *logical* assumptions with statistical evidence," *Merrifield*, 547 F.3d at 989 (quoting *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 812 (1976)), and a claimed rational basis that is contradicted by reality cannot sustain a legal distinction. *See, e.g.*, *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (affirming district court's rejection of "claimed legislative justification because the

record established that the statute was not rationally related to furthering such interests"). "Needless to say, while a government need not provide a perfectly logically solution to regulatory problems, it cannot hope to survive *rational* basis review by resorting to irrationality." *Merrifield*, 547 F.3d at 991.

### B.     AB 5's Business-to-Business exemption differentiates between interstate and intrastate trucking operations.

If, as posited by Defendants, leased owner-operators can continue to work via AB 5's B2B exemption, then the law favors local, intrastate workers over their interstate counterparts. As set forth above, the B2B requirements conflict directly with the federal Truth-in-Leasing rules, which apply to interstate truckers. *Supra* Part III.B. Thus, only those truckers not subject to the Truth-in-Leasing rules could ever satisfy the B2B exemption and take advantage of the *Borello* classification standard. AB 5 draws an economic distinction between otherwise identical intrastate and interstate owner-operators, and no rational basis supports this disparate treatment.

### C.     No rational basis supports AB 5's distinction between intra- and interstate truckers because exempting intrastate—but not interstate—truckers undermines the law's purported goal of reclassifying California workers.

The B2B exemption's disparate treatment contradicts and undermines AB 5's stated purpose of remedying worker misclassification in California via the ABC standard. This Court's *Merrifield* decision confirms that laws that contradict

their claimed rationales fail rational basis review. In *Merrifield*, a California licensing law aimed at pesticide-based pest control applied to all pest controllers, regardless of pesticide use, based on the rationale that all pest controllers may come into contact with pesticides and need to know about their use. 547 F.3d at 989-90. But the law exempted a class of controllers who did non-pesticide control of *certain* pests. The plaintiff engaged in non-pesticide control of *non-exempted* pests and challenged this disparate treatment.

This Court agreed with the *Merrifield* plaintiff that the exemption violated Equal Protection. Critical to the analysis was the fact that the exempted workers were more likely to be exposed to pesticides than workers like the plaintiff. *Id.* at 990-91. Thus, the State justified applying the licensing regime generally—*i.e.*, to both pesticide and non-pesticide pest controllers—because even non-pesticide users like the plaintiff were likely to encounter pesticides. But the law exempted the non-pesticide users who were *most likely* to interact with pesticides. The challenged exemption undermined the law's rationale: "Needless to say, while a government need not provide a perfectly logical[] solution to regulatory problems, it cannot hope to survive *rational* basis review by resorting to irrationality." *Id.* at 991. And the law's irrational exemption of certain pests was "designed to favor economically certain constituents at the expense of others similarly situated." *Id.*

*Merrifield* confirms the straightforward proposition that economic classifications do not survive rational basis review if they are rooted in logical contradictions and the result of political targeting. This principle dooms AB 5's B2B exemption: AB 5 purports to address misclassification of California workers, but the B2B exemption as applied to trucking can only ever exempt local workers. *See supra* Part III.B. Rational basis review affords state lawmakers wide latitude in addressing public ills. But it does not permit courts to ignore patent irrationality in a law's practical effects. There can be no rational basis for making an exemption from a law meant to protect California workers available only to California intrastate workers but make it unavailable to interstate workers. The B2B exemption violates interstate truckers' right to equal protection under the law. The Court should reverse the district court and hold that AB 5's B2B exemption violates interstate truckers' right to equal protection under the law.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed, and this Court should enter judgment in favor of Plaintiff, or, in the alternative, the case should be remanded to the district court for reconsideration of Plaintiff's dormant Commerce Clause and Equal Protection claims under the proper standards.

Date:  August 5, 2024

Respectfully submitted,


*/s/ Paul D. Cullen, Jr.*

By:    Paul D. Cullen, Jr.
Charles R. Stinson
**THE CULLEN LAW FIRM, PLLC**
1101 30th Street NW, Suite 500
Washington, DC 20007
(202) 944-8600
paul@cullenlaw.com
*Counsel for Appellant Owner-Operator*
*Independent Drivers Association, Inc.*

## STATEMENT OF RELATED CASES

**9th Cir. Case Number 24-2341**

I, the undersigned attorney, state that I am aware of one related case currently pending in this Court: *California Trucking Association, et al. v. Rob Bonta, et al.*, No. 24-2351. Its relationship to this case is as follows.

Plaintiffs-Appellants in No. 24-2351 and Intervenor-Plaintiff-Appellant OOIDA in this appeal were all Plaintiffs in the district court case under review here: S.D. Cal. No. 3:18-CV-02458-BEN-DEB. The Defendants and the Intervenor-Defendant from S.D. Cal. No. 3:18-CV-02458-BEN-DEB are Appellees in both No. 24-2351 and this appeal. The Plaintiffs-Appellants in No. 24-2351 and OOIDA filed separate pleadings and trial briefs but advanced claims challenging AB 5's application to the trucking industry based on some shared facts (particularly that the ABC test eliminates independent contractor leased owner-operators), and they filed separate notices of appeal.

**Signature** _/s/ Paul D. Cullen, Jr._          **Date**  August 5, 2024

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number 24-2341**

I am the attorney or self-represented party.

**This brief contains  12,545  words,** excluding the items exempted by Fed.

R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P.

32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[  ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[  ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[  ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[  ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [  ] it is a joint brief submitted by separately represented parties;
    [  ] a party or parties are filing a single brief in response to multiple briefs; or
    [  ] a party or parties are filing a single brief in response to a longer joint brief.

[  ] complies with the length limit designated by court order dated _____.

[  ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**  */s/ Paul D. Cullen, Jr.*          **Date**  August 5, 2024

## ADDENDUM

Cal. Labor Code § 2775 .................................................................. ADD-1

Cal. Labor Code § 2776 .................................................................. ADD-3

49 C.F.R. § 376.12(c)..................................................................... ADD-6

49 U.S.C. § 13501 ......................................................................... ADD-7

49 U.S.C. § 14102(a) ..................................................................... ADD-8

**Cal. Labor Code § 2775**

(a) As used in this article:

(1) "Dynamex" means Dynamex Operations W. Inc. v. Superior Court (2018) 4 Cal.5th 903.

(2) "Borello" means the California Supreme Court's decision in S. G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48 Cal.3d 341.

(b) (1) For purposes of this code and the Unemployment Insurance Code, and for the purposes of wage orders of the Industrial Welfare Commission, a person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:

(A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.

(B) The person performs work that is outside the usual course of the hiring entity's business.

(C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

(2) Notwithstanding paragraph (1), any exceptions to the terms "employee," "employer," "employ," or "independent contractor," and any extensions of employer status or liability, that are expressly made by a provision of this code, the Unemployment Insurance Code, or in an applicable order of the Industrial Welfare Commission, including, but not limited to, the definition of "employee" in subdivision 2(E) of Wage Order No. 2, shall remain in effect for the purposes set forth therein.

(3) If a court of law rules that the three-part test in paragraph (1) cannot be applied to a particular context based on grounds other than an express exception to employment status as provided under paragraph (2), then the determination of employee or independent contractor status in that context shall instead be governed by the California Supreme Court's decision in S.

G. Borello & Sons, Inc. v. Department of Industrial Relations (1989) 48

Cal.3d 341 (Borello).

## Cal. Labor Code § 2776

Section 2775 and the holding in Dynamex do not apply to a bona fide

business-to-business contracting relationship, as defined below, under the

following conditions:

(a) If an individual acting as a sole proprietor, or a business entity formed as a

partnership, limited liability company, limited liability partnership, or corporation

("business service provider") contracts to provide services to another such business

or to a public agency or quasi-public corporation ("contracting business"), the

determination of employee or independent contractor status of the business

services provider shall be governed by Borello, if the contracting business

demonstrates that all of the following criteria are satisfied:

> (1) The business service provider is free from the control and direction of the
>
> contracting business entity in connection with the performance of the work,
>
> both under the contract for the performance of the work and in fact.
>
> (2) The business service provider is providing services directly to the
>
> contracting business rather than to customers of the contracting business.
>
> This subparagraph does not apply if the business service provider's

employees are solely performing the services under the contract under the name of the business service provider and the business service provider regularly contracts with other businesses.

(3) The contract with the business service provider is in writing and specifies the payment amount, including any applicable rate of pay, for services to be performed, as well as the due date of payment for such services.

(4) If the work is performed in a jurisdiction that requires the business service provider to have a business license or business tax registration, the business service provider has the required business license or business tax registration.

(5) The business service provider maintains a business location, which may include the business service provider's residence, that is separate from the business or work location of the contracting business.

(6) The business service provider is customarily engaged in an independently established business of the same nature as that involved in the work performed.

(7) The business service provider can contract with other businesses to provide the same or similar services and maintain a clientele without restrictions from the hiring entity.

(8) The business service provider advertises and holds itself out to the public as available to provide the same or similar services.

(9) Consistent with the nature of the work, the business service provider provides its own tools, vehicles, and equipment to perform the services, not including any proprietary materials that may be necessary to perform the services under the contract.

(10) The business service provider can negotiate its own rates.

(11) Consistent with the nature of the work, the business service provider can set its own hours and location of work.

(12) The business service provider is not performing the type of work for which a license from the Contractors' State License Board is required, pursuant to Chapter 9 (commencing with Section 7000) of Division 3 of the Business and Professions Code.

(b) When two bona fide businesses are contracting with one another under the conditions set forth in subdivision (a), the determination of whether an individual worker who is not acting as a sole proprietor or formed as a business entity, is an employee or independent contractor of the business service provider or contracting business is governed by Section 2775.

(c) This section does not alter or supersede any existing rights under Section 2810.3.

**49 C.F.R. § 376.12(c)**

Except as provided in the exemptions set forth in subpart C of this part, the written lease required under § 376.11(a) shall contain the following provisions. The required lease provisions shall be adhered to and performed by the authorized carrier.

. . .

(c) Exclusive possession and responsibilities.

> (1) The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease.

> (2) Provision may be made in the lease for considering the authorized carrier lessee as the owner of the equipment for the purpose of subleasing it under these regulations to other authorized carriers during the lease.

> (3) When an authorized carrier of household goods leases equipment for the transportation of household goods, as defined by the Secretary, the parties may provide in the lease that the provisions required by paragraph (c)(1) of this section apply only during the time the equipment is operated by or for the authorized carrier lessee.

(4) Nothing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee. An independent contractor relationship may exist when a carrier lessee complies with 49 U.S.C. 14102 and attendant administrative requirements.

## 49 U.S.C. § 13501

The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier—

(1) between a place in—

(A) a State and a place in another State;

(B) a State and another place in the same State through another State;

(C) the United States and a place in a territory or possession of the United States to the extent the transportation is in the United States;

(D) the United States and another place in the United States through a foreign country to the extent the transportation is in the United States; or

(E) the United States and a place in a foreign country to the extent the transportation is in the United States; and

(2) in a reservation under the exclusive jurisdiction of the United States or on a public highway.

**49 U.S.C. § 14102(a)**

(a) General Authority of Secretary.—The Secretary may require a motor carrier providing transportation subject to jurisdiction under subchapter I of chapter 135 that uses motor vehicles not owned by it to transport property under an arrangement with another party to—

(1) make the arrangement in writing signed by the parties specifying its duration and the compensation to be paid by the motor carrier;

(2) carry a copy of the arrangement in each motor vehicle to which it applies during the period the arrangement is in effect;

(3) inspect the motor vehicles and obtain liability and cargo insurance on them; and

(4) have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.

No. 24-2341

_____

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

_____

OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.,

*Plaintiff-Appellant*,

v.

BONTA, ET AL.,

*Defendant-Appellee*

On Appeal from the United States District Court
for the Southern District of California
No. 3:18-cv-02458-BEN-DEB
Hon. Roger T. Benitez

_____

### APPELLANT'S EXCERPTS OF RECORD
### VOLUME 1 OF 1

_____

Paul D. Cullen, Jr.
Charles R. Stinson
The Cullen Law Firm, PLLC
1101 30th Street NW, Suite 500
Washington, DC 20007
(202) 298-4774
*paul@cullenlaw.com*
*charles@cullenlaw.com*

*Attorneys for Appellant Owner-Operator
Independent Drivers Association, Inc.*

# INDEX

| Document | File Date | USDC Dkt. No. | ER No. |
|---|---|---|---|
| **VOLUME 1 of 1** | | | |
| Judgment in a Civil Case | 3/15/24 | 207 | 3 |
| Decision | 3/15/24 | 206 | 4 |
| State Defendants' Answer to Amended Complaint by Intervenor-Plaintiff Owner-Operator Independent Drivers Association, Inc. | 9/29/23 | 192 | 25 |
| State Defendants' Answer to [CTA Plaintiffs'] Third Amended Complaint for Declaratory and Injunctive Relief | 9/29/23 | 191 | 42 |
| Intervenor-Defendant International Brotherhood of Teamsters' Answer to Plaintiff California Trucking Association's Third Amended Complaint | 9/29/23 | 188 | 60 |
| Intervenor-Defendant International Brotherhood of Teamsters' Answer to Intervenor-Plaintiff Owner-Operator Independent Drivers Association's First Amended Complaint | 9/29/23 | 187 | 74 |
| [CTA Plaintiffs'] Third Amended Complaint for Declaratory and Injunctive Relief | 5/19/23 | 168 | 94 |
| [Intervenor-Plaintiff OOIDA's] Amended Complaint for Declaratory and Injunctive Relief | 5/19/23 | 166 | 129 |
| Declaration of Todd Spencer in Support of Intervenor/Plaintiff OOIDA's Trial Brief | 9/29/23 | 193-1 | 152 |
| Declaration of Danny R. Schnautz in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction | 6/19/23 | 171-3 | 241 |
| Declaration of Stacy R. Williams in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction | 1/11/23 | 155-6 | 244 |
| Declaration of Marc McElroy in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction | 1/11/23 | 155-5 | 248 |
| Declaration of Albert Hemerson in Support of Intervenor-Plaintiff OOIDA's Motion for Preliminary Injunction | 1/11/23 | 155-4 | 252 |
| Declaration of Todd Spencer in Support of [OOIDA's] Motion to Intervene | 4/19/21 | 122-3 | 256 |
| Notice of Appeal | 4/12/24 | 208 | 264 |
| Civil Docket for Case No. 3:18-cv-02458-BEN-DEB United States District Court, Southern District of California | as of 7/31/24 | | 269 |

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 3 of 295  (78 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 207   Filed 03/15/24   PageID.4569   Page 1 of 1
ER-3



# United States District Court

## SOUTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| California Trucking Association; Ravinder Singh; Thomas Odom | **Plaintiff,** | Civil Action No. 18-cv-02458-BEN-DEB |
| | v. | |
| Xavier Becerra; Andre Schoorl; Julie Su; Patrick Henning; Lilia Garcia-Brower; Rob Bonta; Katrina Hagen; Natalie Palugyai; Nancy Farias | **Defendant,** v. | **JUDGMENT IN A CIVIL CASE** |
| Owner-Operator Independent Drivers Association, Inc. | **Intervenor Plaintiff,** v. | |
| International Brotherhood of Teamsters | **Intervenor Defendant.** | |

**Decision by Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED:

Judgment is entered in favor of the Defendants. The case is hereby closed.

Date:    3/15/24

**CLERK OF COURT**
**JOHN MORRILL, Clerk of Court**
By: s/ A. Sudan

A. Sudan, Deputy

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, et al., and OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION,<br><br>                                        Plaintiffs,<br><br>v.<br><br>ATTORNEY GENERAL ROB BONTA, et al., and INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>                                        Defendants. | Case No.:  18cv2458-BEN-BLM<br><br><br><br>**DECISION** |

Plaintiffs' renewed motions for a preliminary injunction were combined with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2).  The motions for a preliminary injunction are denied and judgment on all claims is entered in favor of Defendants.  These are the findings of facts and conclusions of law.

## I.     BACKGROUND

Plaintiffs California Trucking Association ("CTA"), Ravinder Singh, and Thomas Odom previously sought industry-wide relief from the operation of a new California state law: Assembly Bill 5 (commonly known as AB5).   Purportedly, AB5 was enacted to address a widespread problem of the misclassification of employee workers, including freight hauling drivers, classifying them instead as independent contractors.  *Am. Soc'y of Journalists & Authors, Inc. v. Bonta*, 15 F.4th 954, 957 (9th Cir. 2021) ("To confront the misclassification of employees as independent contractors, California passed Assembly Bill (AB) 5, then AB 2257, which codified a more expansive test for determining

workers' statuses, albeit with certain occupational exemptions."). In effect, the operation of AB5 deems most, if not all, freight hauling drivers driving in or into California as employees of a freight hauling business. This occurs by application of a test known as the "ABC test." AB5 was superseded by AB-2257 on January 1, 2021, without significant changes. *See* Cal. Labor Code § 2775. AB5 as superseded by AB-2257 is referred to as AB5 throughout for ease of understanding.

A preliminary injunction was entered based upon the preliminary conclusion that AB5 was preempted by the Federal Aviation Administration Authorization Act ("FAAAA"). Title 49 U.S.C. § 14501(c)(1). Because it appeared that the preemption claim was sufficient to grant relief, the Court did not reach the alternate claim concerning the dormant Commerce Clause doctrine. Defendants appealed. The Court of Appeals concluded that AB5 was not preempted by the FAAAA and reversed. *See California Trucking Assoc. v. Bonta*, 996 F.3d 644 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 2903 (2022). Following remand, Plaintiffs amended their Complaint, and Owner-Operator Independent Drivers Association ("OOIDA") was granted leave to intervene as a Plaintiff. Renewed motions for a preliminary injunction were filed. Most of the salient facts were set out in this Court's prior Order and are re-adopted here.

The CTA Plaintiffs put forth four primary claims for relief in their Third Amended Complaint (filed May 19, 2023). Dkt. 168. First, they re-allege express FAAAA preemption of AB5. Second, they allege implied preemption of AB5. Third, they allege AB5 runs afoul of the dormant Commerce Clause. Fourth, they allege AB5 violates the Equal Protection Clause by creating irrational or animus-based classifications.[1]

---

[1] Plaintiffs waived their Third claim for relief that the Supremacy Clause, together with the express preemption provision of 49 U.S.C. § 31141, prohibits states from enforcing a law or regulation on commercial motor vehicle safety that the Secretary of Transportation has determined to be preempted. *See* Pltfs' Mem. of Cont. of Facts and Law, Dkt. 189, at 33 ("At trial, Plaintiffs do not intend to seek any relief based upon their Third Claim for Relief in the Third Amended Complaint, ECF No. 168, ¶¶ 87-94.").

OOIDA's Amended Complaint (filed May 19, 2023), *see* Dkt. 166, alleges four similar claims for relief (albeit in a different order) and are considered together with CTA's claims.  All Plaintiffs seek declaratory and injunctive relief on all claims.

CTA is an association of licensed motor-carrier companies that manage, coordinate, and schedule the movement of property throughout California.  Many of CTA's motor-carrier members contract with owner-operators as independent contractors. Plaintiff Ravinder Singh is one example.  He owns and operates his own truck, and he contracts as an independent contractor with different motor carriers and brokers in California to perform various trucking services.  Plaintiff Thomas Odom also owns and operates his own truck.  He contracts as an independent contractor with a national motor carrier to haul property within California and between California and Texas.  OOIDA is an association of 150,000 members located throughout the country.  These members own and operate more than 200,000 heavy-duty trucks.  Many members own and drive their own trucks and work as independent contractors.  Among their truck driving members are 6,103 in California, with 7,050 more in Arizona, Nevada, Oregon and Washington.

For decades, the trucking industry has used an owner-operator model to provide for the transportation of property in interstate commerce.  That model generally involves a licensed motor carrier contracting with an independent contractor driver to transport the carrier-customer's property.  Individual owner-operators commonly use the independent contractor business model in California and across the country.  They typically buy or lease their own trucks and may, in turn, lease both their trucks and contract for their driving services to freight hauling businesses.

Whether certain laws and regulations in the California Labor Code apply to truck drivers, generally depends on their status as employees or independent contractors.  *S.G. Borello & Sons, Inc. v. Dep't of Indus. Relations*, 48 Cal. 3d 341, 350 (1989).  In the past, California courts have used a test based on the *Borello* decision to determine whether workers are correctly classified as employees or independent contractors.  *See id.* at 341. The *Borello* standard considers the "right to control work," as well as many other

factors.[2]  *Id.* at 355.  In April of 2018, the California Supreme Court replaced the *Borello*
classification test for California Wage Order No. 9 with the "ABC test" or the "*Dynamex*
test."  *Dynamex Operations West v. Superior Court*, 4 Cal. 5th 903 (2018).  California's
Assembly Bill 5 codified the ABC test adopted in *Dynamex* and expanded its reach to
contexts beyond Wage Order No. 9, to include workers' compensation, unemployment
insurance, and disability insurance.

As applied to the motor carrier context, AB5 provides a mandatory test for
determining whether a person driving/hauling freight for another contracting person or
entity is an independent contractor or an employee for all purposes under the California
Labor Code, the Industrial Welfare Commission wage orders, and the Unemployment
Insurance Code.  Under AB5's new ABC test, an owner-operator is presumed to be an
employee *unless* the motor carrier can establish each of three requirements:

> There is a rebuttable presumption . . . that a worker
> performing services . . . is an employee rather than an
> independent contractor.  Proof of independent contractor status
> includes satisfactory proof of these factors:
> (a) That the individual has the right to control and
> discretion as to the manner of performance of the contract for
> services in that the result of the work and not the means by
> which it is accomplished is the primary factor bargained for.
> (b) That the individual is customarily engaged in an
> independently established business.
> (c) That the individual's independent contractor status is
> bona fide and not a subterfuge to avoid employee status.  A
> bona fide independent contractor status is further evidenced by
> the presence of cumulative factors such as substantial
> investment other than personal services in the business, holding

---

[2] These factors include: (a) whether the worker is engaged in a distinct occupation or
business; (b) the amount of supervision required; (c) the skill required; (d) whether the
worker supplies the tools required; (e) the length of time for which services are to be
performed; (f) the method of payment; (g) whether the work is part of the regular
business of the principal; and (h) whether the parties believe they are creating an
employer-employee relationship.

out to be in business for oneself, bargaining for a contract to complete a specific project for compensation by project rather than by time, control over the time and place the work is performed, supplying the tools or instrumentalities used in the work other than tools and instrumentalities normally and customarily provided by employees, hiring employees, performing work that is not ordinarily in the course of the principal's work, performing work that requires a particular skill, holding a license pursuant to the Business and Professions Code, the intent by the parties that the work relationship is of an independent contractor status, or that the relationship is not severable or terminable at will by the principal but gives rise to an action for breach of contract.

*See* Cal. Labor Code §§ 2750.5 and 2775.  AB5 includes an exception that was not part of the *Dynamex* test, which is an exception for business-to-business contracting relationships, also known as the B2B exemption.  *See* Cal. Labor Code § 2776 ("Section 2775 and the holding in Dynamex do not apply to a bona fide business-to-business contracting relationship, as defined below, under the following conditions . . . .").

## II.  DISCUSSION

### A.  First Claim for Relief: Express Preemption

Within the FAAAA, Congress included an express preemption provision providing that states "may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).  The preemption provision is a broad one.  "The phrase 'related to' embraces state laws 'having a connection with or reference to' carrier 'rates, routes, or services,' whether directly or indirectly."  *Cal. Trucking Ass'n v. Su*, 903 F.3d 953, 960 (9th Cir. 2018).  As the Ninth Circuit has explained, "[t]here can be no doubt that when Congress adopted the FAAAA, it intended to *broadly* preempt state laws that were 'related to a price, route or service' of a motor carrier."  *Am. Trucking Ass'n, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1053 (9th Cir. 2009) (emphasis added); *see also Schwann v. FedEx Ground Pkg. System, Inc.*, 813 F.3d

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 9 of 295    (84 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 206  Filed 03/15/24  PageID.4553  Page 6 of 21
ER-9

429, 436 (1st Cir. 2016) (Congress had "dual objectives" for adopting a "broad reach" by copying the language of the Airline Deregulation Act of 1978 into the FAAAA's preemption clause).  However, "Congress did not intend to preempt laws that implement California's traditional labor protection powers, and which affect carriers' rates, routes, or services in only *tenuous* ways."  *Su*, 903 F.3d at 960-61 (emphasis added) (citing *Dilts v. Penske Logistics, LLC*, 769 F.3d 637, 647-50 (9th Cir. 2014) (meal and rest break laws) and *Californians for Safe & Competitive Dump Truck Transp. v. Mendonca*, 152 F.3d 1184, 1189 (9th Cir. 1998) (prevailing wage law)); *see also Su*, 903 F.3d at 960 ("[T]he FAAAA does not preempt state laws that affect a carrier's prices, routes, or services in only a tenuous, remote or peripheral manner with no significant impact on Congress's deregulatory objectives.") (internal quotation marks omitted).  FAAAA preemption is broad but not so broad that the sky is the limit: states retain the ability to execute their police power with laws that do not significantly impact rates, routes, or services.  *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013).

That the FAAAA does not explicitly preempt AB5 was resolved earlier in this case.  *California Trucking Assoc.* held that,

> Because AB-5 is a generally applicable law that impacts a motor carrier's business at the point where the motor carrier interacts with its workers, and the law affects motor carriers' relationship with their workers in a manner analogous to the worker classification laws we have previously upheld in *Su*, AB-5 is not significantly related to rates, routes, or services. Therefore, we conclude that the F4A does not preempt AB-5 as applied to motor carriers.

996 F.3d at 659.  And *California Trucking Assoc.* reiterated its conclusion explaining,

> Because AB-5 is a generally applicable labor law that impacts the relationship between a motor carrier and its workforce, and does not bind, compel, or otherwise freeze into place a particular price, route, or service of a motor carrier at the level of its customers, it is not preempted by the F4A.

*Id.* at 664. While Plaintiffs continue to advance arguments that the FAAAA explicitly preempts AB5 and may preserve such arguments for appeal, the decision regarding preemption in *California Trucking Assoc.* is binding on this Court. *See Ranchers Cattlemen Action Legal Fund United Stockgrowers of America v. U.S. Dep't of Agr.*, 499 F.3d 1108, 1114 (9th Cir. 2007) ("[T]he district court should abide by 'the general rule' that our decisions at the preliminary injunction phase do not constitute the law of the case. Any of our conclusions on pure issues of law, however, are binding.") (citations omitted). The claim of FAAAA express preemption fails as a matter of law.

### B. Implied Preemption

Plaintiffs make a related argument that the FAAAA implicitly preempts AB5. The FAAAA contains an express preemption provision. Where Congress sets out in express terms, as it did in the FAAAA, the type of state laws that are to be preempted, is there any room left for preempting laws on similar subjects *not* expressly addressed by Congress? Certainly, an inference can be drawn that an express preemption clause forecloses implied preemption. Yet, implied preemption might have a place.

"At best, *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992) supports an inference that an express pre-emption clause forecloses implied pre-emption; it does not establish a rule." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 289 (1995). After all, "[i]mplied conflict preemption can exist even when Congress has chosen to include an express preemption clause in a statute." *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1204 (9th Cir. 2002) (citing *Freightliner*, 514 U.S. at 287). Although the field of implied preemption in such cases is very narrow, there are two trails: (1) impossibility; and (2) obstruction. "We have found implied conflict pre-emption where it is 'impossible for a private party to comply with both state and federal requirements,' or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Freightliner*, 514 U.S. at 287 (citations omitted).

### 1. Impossibility

AB5's employee classification scheme does not directly conflict with the FAAAA. First, it is not impossible for truck drivers to comply with both federal and state law because there is simply no federal standard of classification requiring compliance.  The FAAAA does not dictate that truck drivers must be classified as independent contractors or that drivers are not subject to state wage and hour laws.  Among the fifty states there are various methods used for classifying workers.  Federal Truth-in-Leasing regulations contemplate some truck drivers will be independent contractors but do not prohibit drivers working as employees.  *See* II(D)(2)(b), *infra*.  In the end, California's scheme does not falter on the impossibility-of-compliance trail of implied preemption.

### 2.  *Obstacle*

Second, it is not accurate to say that California's employee classification scheme when applied to truck drivers stands as an obstacle to "the accomplishment and execution of the full purposes and objectives of Congress."  While the jury is out as to whether AB5 substantially affects carrier prices, routes, or services, it does not attempt to do so directly.  The Supreme Court "ha[s] cautioned that § 14501(c)(1) [of the FAAAA] does not preempt state laws affecting carrier prices, routes, and services 'in only a tenuous, remote, or peripheral . . . manner.'"  *Dan's City Used Cars*, 569 U.S. at 261 (citations omitted).   Here, the evidence suggests AB5's effect is peripheral.  If the effect of AB5 is peripheral, then the second trail of implied preemption is closed off.

### 3.  *Patchwork Quilt*

Lastly, Plaintiffs' implied preemption argument is unavailing because it proceeds down a third trail with a dead end.  Plaintiffs say that AB5 frustrates Congress' aim to avoid a patchwork quilt of national regulations.  But the particular regulations about which Congress is concerned are those addressing carrier prices, routes, and services.  Congress does not appear to be concerned with a patchwork quilt of truck driver classifications for purposes of wage and hour protection.  The Plaintiff drivers' claims here "are far removed from Congress' driving concern."  *Dan's City Used Cars*, 569 U.S. at 263.  In the end, after

considering the three avenues of implied preemption, the Court concludes Plaintiffs' claim of FAAAA implied preemption remains unproven and unconvincing.

### C.  Second Claim for Relief: Dormant Commerce Clause

Next, Plaintiffs argue that AB5 runs afoul of Article 1, § 8, clause 3 of the Constitution, known as the dormant Commerce Clause.  Article I, § 8, clause 3 of the Constitution, gives Congress the power "[t]o regulate commerce . . . among the several states."  This affirmative grant of power to Congress includes a negative implication, which may restrict the ability of states to regulate and interfere with interstate commerce. *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).  That restriction upon the states prohibits economic protectionism.  "[R]egulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors" are impermissible.  *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330 (1996) ("This reading effectuates the Framers' purpose to 'prevent a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.'").  One example is the case of *Granholm v. Heald*, 544 U.S. 460, 465-66 (2005), which invalidated state laws preventing the sale of wine from out-of-state wineries to consumers in Michigan and New York.  "[T]he object and effect of the laws are the same: to allow in-state wineries to sell wine directly to consumers in that State but to prohibit out-of-state wineries from doing so, or, at the least, to make direct sales impractical from an economic standpoint."[3]  This antidiscrimination principle lies at the core of the dormant Commerce Clause cases.

Recently, the Supreme Court decided *Nat'l Pork Producers Council v. Ross*, 143 S. Ct. 1142 (2023).  It reinforces the notion that the antidiscrimination principle continues to occupy the core of the Supreme Court's dormant Commerce Clause

---

[3] *See also Dean Milk Co. v. Madison*, 340 U.S. 349 (1950).

concerns. *Id.* at 1153 ("Today, this antidiscrimination principle lies at the 'very core' of our dormant Commerce Clause jurisprudence.") (citation omitted). The antidiscrimination principle prohibits state laws that are driven by economic protectionism, *i.e.*, "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Id.*

Plaintiffs here do not try to make the case that AB5 was designed to benefit in-state freight drivers by burdening out-of-state freight drivers. Plaintiffs do not try to make the case that classifying independent contractor drivers as employees in California is designed to benefit those in-state drivers by burdening out-of-state independent contractor drivers. Rather, Plaintiffs object to the employee classification approach as burdening independent drivers everywhere. Yet, even Plaintiffs acknowledge that California has no interest in applying its labor laws to out-of-state workers and gains no benefit from classifying those workers. *See* OOIDA's Oppo. to Defs' Mem., Dkt. 196 at 10 ("California enjoys virtually no benefits from applying AB-5 to interstate truckers who are not based in California . . . ."). In other words, Plaintiffs are not contending that AB5 was designed to discriminate in favor of in-state workers and against out-of-state workers. While it may have other undesirable effects in Plaintiffs' view, AB5 is not an act of economic protectionism by legislative design. Thus, Plaintiffs' claim does not rest on the antidiscrimination principle.

Instead, it is the *effect* of AB5 that offends the dormant Commerce Clause, say the Plaintiffs. They argue that AB5's burdens on interstate commerce outweigh the local benefits, relying on *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970), and its progeny. The same argument was made by plaintiffs in *Nat'l Pork*. There, the claim relied on *Pike* (rather than the antidiscrimination principle) arguing that a California ballot proposition about conditions for pigs on farms burdened interstate commerce and the burden outweighed the local California benefit. *Nat'l Pork*, 143 S. Ct. at 1157. The Supreme Court was unmoved. *Id.* ("We see problems with this theory too."). While a few cases

have invalidated state laws that are nondiscriminatory based on *Pike*, today's claim against AB5 is far from *Pike*'s heartland.

The Supreme Court reminds lower courts that the dormant Commerce Clause is not "a roving license for federal courts to decide what activities are appropriate for state and local government to undertake." *Id*. at 1159 (quoting *United Haulers*, 550 U.S. at 343). More to the point, the Supreme Court reminds lower courts that judges are not institutionally well-suited to draw reliable conclusions for applying the *Pike* test. *Id*. And the Supreme Court reminds all of us that in a functioning democracy policy choices usually belong to the elected representatives of a state. *Id*. at 1160. "Judges cannot displace the cost-benefit analyses embodied in democratically adopted legislation guided by nothing more than their own faith" in economics. *Id*. AB5 is democratically adopted legislation addressing the undesirable situation of worker-drivers in California who should be classified as employees being misclassified against their will or without their understanding as independent contractors. AB5 does not apply to out-of-state worker-drivers while they work and drive outside of California. So, AB5 does not run afoul of the extraterritoriality doctrine forbidding laws that control commerce outside the state. *Id*. at 1154. While AB5 may apply to the classification of worker-drivers who deliver freight into California, the burden on businesses using worker-drivers is similar for both in-state and out-of-state businesses. The state benefit of potentially overclassifying all independent contractor worker-drivers as employees may be debatable, maybe even illusory, but "the dormant Commerce Clause does not protect a 'particular structure or method of operation.'" *Id*. at 1162. That goes for pork production and for employee labor law classifications.

Undaunted, Plaintiffs highlight the new burdens on out-of-state freight hauling businesses. They say that these businesses will have to reclassify their contracted drivers as employees to continue delivering freight into California. Perhaps so. But such burdens from AB5 are also placed on wholly in-state freight hauling businesses and

reveal no discriminatory effect, much less a large enough unwelcome commercial effect to warrant *Pike* relief.

Defendants argue that the burdens on out-of-state businesses are not that heavy and that the in-state benefits are substantial. Defendants minimize the burdens on interstate commerce as "incidental," not significant, and far outweighed by the benefits of AB5. Some businesses would not describe the burdens of AB5 in such mild terms. For example, RDS is a freight hauling company operating in California, Nevada, and Arizona. When RDS tried to recruit its 85 independent contractor drivers to become employees, only two accepted. *See* Declaration of Greg P. Stefflre, Dkt. 172-5, at ¶ 12. The cost of recruiting employees to drive and lost business from conversion efforts resulted in a $4,000,000 loss of revenue for RDS. *Id.* at ¶ 13. There are, no doubt, other firms like RDS shouldering economic burdens that seem greater than what the Defendants call "incidental." Nevertheless, the Ninth Circuit has said laws that increase compliance costs, without more, do not qualify as a significant burden on interstate commerce. *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1032 (9th Cir. 2021), *aff'd*, 143 S. Ct. 1142 (2023); *cf. Sierra Nevada Transportation, Inc. v. Nevada Transportation Authority*, No. 22-15823, 2023, WL 6871575 *3 (9th Cir. Oct. 18, 2023) ("But 'the mere fact that a firm engaged in interstate commerce will face increased costs as a result of complying with state regulations does not, on its own, suffice to establish a substantial burden on interstate commerce.'") (quoting *Ross*, 6 F.4th at 1032). Defendants contend, on the other side of the equation, that the state is enjoying manifold noneconomic benefits from AB5. "AB 5 serves the important interest of ensuring that employees receive benefits guaranteed by law, including minimum wage, unemployment insurance, workers' compensation, sick leave, and others and to level the playing field for compliant employers." *See* State Defs' Oppo., Dkt. 195 at 14 ("AB 5's benefits far outweigh any burden AB 5 may impose.").

The Supreme Court issued a reminder that federal judges are not well-equipped to assess and weigh these kinds of economic burdens with non-economic benefits. "This

Court has also recognized that judges often are 'not institutionally suited to draw reliable conclusions of the kind that would be necessary to satisfy the *Pike* test.'" *Nat'l Pork*, 143 S. Ct. at 1159 (quoting *Davis*, 553 U.S. at 535). "How is a court supposed to compare or weigh economic costs (to some) against noneconomic benefits (to others)?" *Id*. "Really, the task is like being asked to decide 'whether a particular line is longer than a particular rock is heavy.'" *Id*. at 1160 (quoting *Bendix Autolite Corp. v. Midwesco Enterprises, Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring)). It is "a task no court is equipped to undertake." *Id*.

The burdens and the benefits of AB5 are incommensurable. California's interest in protecting in-state drivers from being misclassified as independent contractors and losing statutory entitlements under state labor laws cannot be weighed on a scale opposite the additional dollars spent on compliance by freight hauling businesses. As one Justice concluded in *Nat'l Pork*, "[n]one of our *Pike* precedents require us to attempt such a feat." *Id*. at 1167 (Barrett, J. concurring in part). Instead, if AB5 really does threaten to disrupt the interstate trucking industry, the Supreme Court teaches that Congress enjoys the power and the position to enact laws that explicitly preempt conflicting state laws like AB5. *Id*. at 1160-61. It has already come close to doing so with the FAAAA.

In the end, AB5 does not offend the core constitutional principle of prohibiting purposeful discrimination against interstate commerce. And while AB5 has economic effects, the effects do not confirm purposeful discrimination against interstate commerce in the design of AB5. Although courts are not well-equipped to do such weighing, when it comes to weighing the burdens of AB5 against the salutary effects under *Pike*, it does not appear that the pure economic burdens on out-of-state worker-drivers and freight hauling firms substantially outweigh the in-state benefits of correctly classifying worker-drivers as employees. *Nat'l Pork* reminds courts that "extreme caution" should be used when considering dormant Commerce Clause claims. *Id*. at 1165. The Supreme Court teaches, "[p]reventing state officials from enforcing a democratically adopted state law in the name of the dormant Commerce Clause is a matter of 'extreme delicacy,' something

courts should do only 'where the infraction is clear.'"  *Id*.  Today, the asserted AB5

infraction is not clear, therefore, Plaintiffs' request to enjoin AB5 is unavailing.

### D.  Fourth and Fifth Claims for Relief: Equal Protection

#### 1.  *Animus*

Lastly, Plaintiffs try to make the case that AB5 violates the Equal Protection

Clauses of the U.S. Constitution and the California constitution.[4]  They contend that the

employee classifications targeting motor carriers and owner-drivers were motivated by

animus.  The animus was expressed, in their view, by the legislative sponsor of AB5,

Assemblywoman Lorena Gonzalez.  Plaintiffs highlight her statement on the Assembly

Floor on September 11, 2019, that one purpose of AB5 is to "get rid of an outdated

broker model that allows companies to basically make money and set rates for people that

they call independent contractors."  *See* Pltfs' Mem. of Cont. of Facts and Law, Dkt. 189,

at 26.  Plaintiffs also underscore a tweet by Gonzalez on November 21, 2019, about how

AB5 would permit a trucker to "work as an independent contractor for a construction

firm" while requiring an owner-operator to "work as an employee for a trucking

company."  *Id*. at 26-27.  That refers to an exemption for construction industry drivers in

AB5 which is set to expire at the end of this year.

Yet, the statements of a single legislator do not necessarily represent the reasons

motivating other legislators who vote to pass a bill into law.  That was the case in New

Hampshire.  The Supreme Court cautioned about relying on the statement of a single

legislator in a case alleging legislative animus.  "Reliance on such isolated fragments of

legislative history in divining the intent of Congress is an exercise fraught with hazards,

and 'a step to be taken cautiously.'"  *New England Power Co. v. New Hampshire*, 455

U.S. 331, 341–42 (1982) ("To support its argument to the contrary, New Hampshire

relies on a single statement made on the floor of the House of Representatives during the

---

[4] Consideration of claims of equal protection violations under the federal and California

constitutions proceed along the same lines.

debates preceding enactment of Part II.") (citations omitted).  The statements of Assemblywoman Gonzalez alone are insufficient to prove legislative animus for an Equal Protection violation.  *Tingley v. Ferguson*, 47 F.4th 1055, 1087 (9th Cir. 2022), *cert. denied*, 144 S. Ct. 33 (2023) ("Stray remarks of individual legislators are among the weakest evidence of legislative intent.  The Court has 'long disfavored arguments based on alleged legislative motives' because such inquiries are a 'hazardous matter.'  The Court has 'been reluctant to attribute those motives to the legislative body as a whole' because 'what motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it.'") (citations omitted).  The Gonzalez statements identified by Plaintiffs are open to interpretation and do not purport to declare the intention of the entire Assembly.

Plaintiffs argue that this case is like *Olson v. California*, 62 F.4th 1206 (9th Cir. 2023).  *Olson* determined that AB5 violated the Equal Protection Clause based on statements by four legislators reflecting animus in the process of enacting AB5.  The *Olson* opinion, however, has been vacated.  *See Olson v. California*, No. 21-55757, 88 F.4th 781 (Mem.) (9th Cir. Dec. 18, 2023) (vacating and rehearing en banc); Joint Notice of Supp. Auth., Dkt. 205.

Without the benefit of *Olson*, Plaintiffs fall back on *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008) to argue their Equal Protection claim.  *Merrifield* concerned pest controller chemical licensing for non-chemical-using pest controllers and addressed an extreme case of a statute that lacked rationality.  *Merrifield* correctly teaches that rational basis review applies in such cases and that a plaintiff's claim will be rejected where "'there is any reasonably conceivable state of facts that could provide a rational basis' for the challenged law."  *Id*. at 989 (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993)).  Even *Merrifield* agreed that "[t]he government is not required to substantiate its reasoning with facts.  'In an equal protection case of this type those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true

by the governmental decisionmaker.'" *Id*. (quoting *Vance v. Bradley*, 440 U.S. 93, 111 (1979)).  *Merrifield* continued "'States are accorded wide latitude in the regulation of their local economies under their police powers, and rational distinctions may be made with substantially less than mathematical exactitude.'  Indeed, we must remember that 'the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines.'"  *Id*. (quoting *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976)).  In essence, *Merrifield* stands for the proposition that an inconceivably irrational law is prohibited by the Equal Protection Clause.  Thus, with *Olson* vacated, Plaintiffs assert that AB5 violates the Equal Protection Clause because the law is irrational.

### 2.  Rational Basis

#### a.  Construction Industry Exemption

It has been reported that there are 100 exemptions built into AB5.  Plaintiffs focus on two exemptions to demonstrate the law is irrational.  One is the exemption for truck drivers in the construction industry.  This exemption expires at the end of 2024.  The other exemption is the business-to-business exemption (known as "B2B").  *See* Cal. Labor Code § 2776.  Plaintiffs argue that neither exemption is rational.

For an equal protection inquiry on AB5, a court asks only whether the statute's occupational classifications are rationally-related to a legitimate governmental interest. *Am. Soc'y of Journalists & Authors*, 15 F.4th at 964 (reviewing rational basis for AB5's occupational classifications).  This is not a rigorous standard for a law to meet.  "This is a fairly forgiving standard, given the wide latitude afforded to states in managing their economies." *Id*. (citing *Dukes*, 427 U.S. at 303).  Economic classifications are upheld "so long as 'there is any reasonably conceivable state of facts that could provide a rational basis.'" *Id*. (quoting *FCC v. Beach Comm., Inc.*, 508 U.S. 307, 313, (1993)).  Put differently, in order for Plaintiffs to prevail on their Equal Protection Clause claim, they must shoulder the burden to "negate every conceivable basis which might have supported

the distinctions drawn." *Id*. (citations omitted).  Plaintiffs' arguments in this regard are not fully convincing.

Concerning the construction industry exemption, the reasons set forth by the State for the exemption are not irrational.  To the extent they appear to treat the same groups of worker-drivers differently for the present time, even *Merrifield* acknowledges that a state may implement its legislative solution in stages.  547 F.3d at 989 ("The Supreme Court has stated that 'legislatures may implement their program step by step, in economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.'") (citations omitted).  Here, the State has put forward a rationale for delaying implementation of AB5 for construction industry drivers working as independent contractors.  *See* State Defs' Mem. of Cont. of Facts and Law, Dkt.190, at 34-36; Declaration of Cesar Borjas in Supp. of Intervenor-Def, Dkt. 186-1, at ¶¶ 4-5 (construction industry driving needs and equipment are different than typical freight driving).  The reasons for the temporary construction industry exemption are not irrational and, in any event, the issue will soon be moot.

### b. B2B Exemption

Plaintiffs also point to the B2B exemption which provides that AB5's ABC test does not apply to bona fide business-to-business contracting relationships.  Under the B2B exemption, a driver-worker need not be classified as an employee if he or she contracts as a sole proprietor or a business entity.  *Bowerman v. Field Asset Servs., Inc.*, 60 F.4th 459, 478 (9th Cir. 2023) ("California Labor Code § 2776 recently enacted a retroactive business-to-business exception to the ABC test.  Under that exception, 'the holding in *Dynamex* does not apply to a bona fide business-to-business contracting relationship if an individual acting as a sole proprietor, or a business entity formed as a partnership, limited liability company, limited liability partnership, or corporation (business service provider) contracts to provide services to another such business.'  Instead, 'the determination of employee or independent contractor status of the business services provider shall be governed by *Borello*, if the contracting business demonstrates

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 21 of 295    (96 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 206  Filed 03/15/24  PageID.4565  Page 18 of 21
ER-21

that each of twelve criteria is satisfied.'").  A truck owner-operator may contract with another business to provide freight hauling services without being classified as an employee.  *Id*. at 478; State Defs' Mem. of Cont. of Facts and Law, Dkt.190, at 18-20 (chart).  Plaintiffs agree but assert that while intrastate worker-drivers can qualify for the B2B exemption, interstate worker-drivers cannot satisfy the B2B requirements.  Plaintiffs say that is because interstate worker-drivers are bound by federal Truth-in-Leasing regulations.  *See* Intervenor-Pltf OOIDA's Mem. of Cont. of Facts and Law, Dkt. 193, at 6-8 (citing 49 C.F.R. § 376.12(c)(1)).  Consequently, Plaintiffs argue that the B2B exemption is irrational and thus denies them equal protection.

It is not entirely clear how federal Truth-in-Leasing rules directly conflict with the B2B exemption.  In the freight trucking industry, many drivers own their heavy-duty trucks.  These owner-operators may decide to lease their trucks to freight carrier companies.  The owner-operator may at the same time agree to provide driving services to the freight carrier company by driving their (now leased to the carrier) truck.  In 1979, the ICC promulgated the Truth-in-Leasing regulations.  Title 49 C.F.R. §§ 376.1 *et seq*.  "The main purpose of the Truth-in-Leasing regulations is to ensure truth-in-leasing by fostering disclosure—meaning a full disclosure between the carrier and the owner-operator of the elements, obligations, and benefits of leasing contracts . . . in order to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers and to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry."  *Construction and Application of Truth-in-Leasing Regulations*, 74 A.L.R. Fed. 2d 521 (2013); *see also id.* ("The regulatory provisions also serve the goal of preventing motor carriers from taking advantage of the owner-operators' weak bargaining position and allow the owner-operators to better assess their rights and responsibilities under the lease.  The method Congress chose to achieve its stated purpose was to require that all leases between motor carriers and owner-operators be in writing, that certain terms be included in every lease between carriers and owner-operators, and that motor carriers return escrow deposits within 45 days after

termination of the leasing arrangement."). At their core, the Truth-in-Leasing rules are full disclosure requirements. The rules do not, however, dictate whether owner/drivers drive as employees or as independent contractors.

Nevertheless, Plaintiffs point to 49 C.F.R. § 376.12(c)(1) from the Truth-in-Leasing regulations as the obstacle to using AB5's B2B exemption. Section 376.12(c)(1) states, "[t]he lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." However, three subsections later, § 376.12(c)(4) also states, "*[n]othing in the provisions required by paragraph (c)(1) of this section is intended to affect whether the lessor or driver provided by the lessor is an independent contractor or an employee of the authorized carrier lessee.*" (emphasis added). Plaintiffs do not address the effect of subsection (c)(4), but it is clear that § 376.12(c) does not prevent an owner-operator from acting in either capacity.

At best, Plaintiffs' contention seems to be an argument that if a motor carrier must exercise exclusive possession and control of a leased truck, then *by implication*, it must also exercise exclusive control over the owner-operator who may drive the truck. *See* Intervenor-Pltf OOIDA's Mem. of Cont. of Facts and Law, Dkt. 193, at 10. For this proposition, Plaintiffs cite only ¶ 50 of the declaration of Todd Spencer, President of the Owner-Operator Independent Drivers Association, Inc. Dkt. 193-1. But Spencer's declaration simply does not explain how 49 C.F.R. § 376.12(c)(1) erects an obstacle to using the B2B exemption. Whatever the effect of the federal Truth-in-Leasing regulations are on the ability of interstate owner-operators to take advantage of the B2B exemption (when hauling freight into or inside of California), it is not at all clear that AB5 treats interstate owner-operators in an irrational manner. It is too far of a drive to go from saying that federal leasing disclosure regulations reveal that California's B2B

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 23 of 295   (98 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 206   Filed 03/15/24   PageID.4567   Page 20 of 21
ER-23

exemption is irrational, and because the B2B exemption as applicable to out-of-state drivers is irrational, AB5 violates the Equal Protection Clause and should be enjoined.

### E. Evidentiary Objections

Both parties assert evidentiary objections to their supporting declarations. Plaintiff OOIDA filed 65 individual evidentiary objections. *See* Dkt. 201. State Defendants filed 87 separate evidentiary objections. *See* Dkt. 200. Intervenor-Defendant filed 25 pages of unnumbered evidentiary objections. *See* Dkt. 199. The objections are primarily based on FRE 401 and 403, and 701 and 702. Concerns over the admissibility of evidence are heightened in jury trials. Evidence rules protect juries from time-wasting irrelevant evidence and misleading expert evidence. Rules of evidence guard against witnesses offering to tell jurors what the law is, and reserve that task for the judge alone. These concerns fade in the context of a bench trial.[5] With this in mind, the evidentiary objections are overruled.

---

[5] *See, e.g.*, *Kassel v. United States*, 319 Fed. Appx. 558, 560-61 (9th Cir. Mar. 12, 2009) ("His testimony in this regard was as an expert witness, rather than a percipient witness, and the testimony should have been excluded. Fed. R. Evid. 701, 702. But even though the testimony should have been excluded, its admission was harmless as there was no jury which could have been misled."); *E.E.O.C. v. Farmer Bros. Co.*, 31 F.3d 891, 898 (9th Cir. 1994) (recognizing reduced risk of prejudice in bench trial compared to jury trials); *Van Alen v. Dominick & Dominick, Inc.*, 560 F.2d 547, 552 (2d Cir. 1977) ("It may be the more prudent course in a bench trial to admit into evidence doubtfully admissible records, and testimony based on them."); *Kirsch v. United States*, 2024 U.S. Dist. LEXIS 24787, *5 (D. Haw. Feb. 13, 2024) ("Motions in Limine filed pursuant to Federal Rule of Evidence 403 regarding prejudicial evidence, however, are generally inapplicable in a bench trial. In a bench trial, there is no jury from which to shield prejudicial evidence. The Court is able to exclude any improper inferences from relevant evidence in reaching its decision."); *Food & Water Watch, Inc. v. United States EPA*, 2024 U.S. Dist. LEXIS 9638, *31, n.10 (N.D. Cal. Jan. 18, 2024) ("Plaintiffs correctly note that Federal Rule of Evidence 403 is of lesser import in the context of a bench trial rather than a jury trial, particularly as it relates to potential for prejudice, but it is not to be ignored entirely."); *Schilder Dairy, LLC v. DeLaval, Inc.*, 2011 U.S. Dist. LEXIS 71952, *7-8 (D. Idaho July 5, 2011) ("Although *Daubert*'s reliability and relevancy requirements continue to apply in a bench trial (as is the case here), the customary concerns

## III.    CONCLUSION

For Plaintiffs' First Claim for Relief that AB5 is expressly preempted by the FAAAA, this Court finds in favor of the Defendants based on controlling authority. *California Trucking Assoc.,* 996 F.3d at 659 ("Therefore, we conclude that the F4A does not preempt AB-5 as applied to motor carriers.").  Likewise, the Court finds in favor of the Defendants on Plaintiffs' related claim that AB5 is impliedly preempted by the FAAAA.  On Plaintiffs' Second Claim for Relief that AB5 is prohibited by the dormant Commerce Clause, the Court finds in favor of the Defendants.  Plaintiffs waived their Third Claim for Relief.[6]  Finally, the Court finds in favor of the Defendants on Plaintiffs' Fourth and Fifth Claims for Relief that AB5 violates the Equal Protection Clause of the U.S. Constitution and the California constitution.

Remedying complexities and perceived deficiencies in AB5 are the kind of work better left to the soap box and the ballot box than to the jury box.  If sufficient political or economic pressure can be brought to bear by Plaintiffs and their supporters, the more onerous provisions of the statute can be amended.  The courts, on the other hand, are not the proper bodies for imposing legislative amendments.

Judgment shall be entered in favor of the Defendants.

**IT IS SO ORDERED.**

Date: March 15, 2024

HON. ROGER T. BENITEZ
United States District Judge

surrounding FRE 702's precautions in a jury setting – that of keeping unreliable expert testimony from the jury – are understandably not present in the bench trial."); *Joseph S. v. Hogan*, 2011 U.S. Dist. LEXIS 76762, *9-10  (E.D.N.Y. July 15, 2011) ("It follows then that in a bench trial, the risk is with exclusion of expert testimony rather than with its admission — it is exclusion that has the potential for an indelible impact on the record; if the appellate court disagrees that the expert's testimony was unreliable, a review for harmless error will be thwarted.").

[6] *See* n.1, *supra*.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 25 of 295 (100 of 372)
Case 3:18-cv-02458-BEN-DEB Document 192 Filed 09/29/23 PageID.4114 Page 1 of 17
ER-25

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General
LARA HADDAD
Deputy Attorney General
State Bar No. 319630
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230
  Telephone: (213) 269-6250
  Fax: (916) 731-2124
  E-mail: Lara.Haddad@doj.ca.gov
*Attorneys for Defendants Attorney General
Rob Bonta, Director Katrina S. Hagen,
Secretary Stewart Knox, Labor
Commissioner Lilia García-Brower, and
Director Nancy Farias, in their official
capacities*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA TRUCKING ASSOCIATION, ET AL.,**<br><br>Plaintiff,<br><br>v.<br><br>**ATTORNEY GENERAL XAVIER BECERRA, ET AL.,**<br><br>Defendants. | 3:18-cv-02458-BEN-BLM<br><br>**STATE DEFENDANTS' ANSWER TO AMENDED COMPLAINT BY INTERVENOR-PLAINTIFF OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.**<br><br>Dept: Courtroom 5A<br>Judge: The Honorable Roger T. Benitez<br>Trial Date: November 13, 2023 |

Pursuant to Federal Rule of Civil Procedure 7, Defendants Attorney General Rob Bonta, Director Katrina S. Hagen, Secretary Stewart Knox, Labor Commissioner Lilia García-Brower, and Director Nancy Farias, in their official capacities ("Defendants"), answer the Amended Complaint filed by Intervenor-Plaintiff Owner-Operator Independent Drivers Association, Inc. ("OOIDA"), ECF No. 166, as follows.

To the extent OOIDA adopts the allegations in the Second Amended Complaint by Plaintiffs (ECF No. 47), Defendants incorporate their answer to those allegations in the Answer filed concurrently herewith.

1.    To the extent that the allegations contained in paragraph 1 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

2.    To the extent that the allegations contained in paragraph 2 refer to provisions of California statutory and case law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

3.    To the extent that the allegations contained in paragraph 3 refer to provisions of California law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

4.    To the extent that the allegations contained in paragraph 4 refer to provisions of California law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

5.    To the extent that the allegations contained in paragraph 5 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

6.    To the extent that the allegations contained in paragraph 6 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

7.      To the extent that the allegations contained in paragraph 7 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

8.      To the extent that the allegations contained in paragraph 8 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

9.      To the extent that the allegations contained in paragraph 9 refer to provisions of the *Borello* decision, that decision speaks for itself.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

10.     To the extent that the allegations contained in paragraph 10 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

11.     Responding to paragraph 11, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

12.     To the extent that the allegations contained in paragraph 12 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

13.     To the extent that the allegations contained in paragraph 13 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent that the allegations refer to provisions of law, those provisions speak for themselves.  To the extent they may be deemed allegations of fact, Defendants deny them.

14.     To the extent that the allegations contained in paragraph 14 are OOIDA's characterization of their case and conclusions of law, no answer is

required.  To the extent they may be deemed allegations of fact, Defendants deny them.

15.     To the extent that the allegations contained in paragraph 15 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

16.     To the extent that the allegations contained in paragraph 16 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

17.     To the extent that the allegations contained in paragraph 17 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

18.     Responding to paragraph 18, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

19.     Responding to paragraph 19, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

20.     Responding to paragraph 20, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

21.     Responding to paragraph 21, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

22.     Responding to paragraph 22, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

23.     Responding to paragraph 23, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

24.     To the extent that the allegations contained in paragraph 24 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

25.     Deny.

26.     Deny.

27.     Deny.

28.     To the extent that the allegations contained in paragraph 28 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

29.     Deny.

30.     To the extent that the allegations contained in paragraph 30 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

31.     Deny.

32.     Deny.

33.     Deny.

34.     To the extent that the allegations contained in paragraph 34 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

35.     To the extent that the allegations contained in paragraph 35 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

36.     To the extent that the allegations contained in paragraph 36 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

37.     To the extent that the allegations contained in paragraph 37 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

38.     To the extent that the allegations contained in paragraph 38 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

39.     To the extent that the allegations contained in paragraph 39 refer to provisions of California statutory and case law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

40.     To the extent that the allegations contained in paragraph 35 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

41.     To the extent that the allegations contained in paragraph 41 contain OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent these allegations may be deemed allegations of fact, Defendants deny them.

42.     Responding to paragraph 42, Defendants admit that AB 5 is a statute of general application.  To the extent that the remaining allegations contained in paragraph 42 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

43.     Deny.

44.     Deny.

45.     Deny.

46.     To the extent that the allegations contained in paragraph 46 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

## JURISDICTION AND VENUE

47.     Responding to paragraph 47, Defendants admit that OOIDA purports to bring claims under federal law, and that this Court has jurisdiction over this action, and otherwise deny the allegations in this paragraph.

48.     To the extent that the allegations contained in paragraph 48 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

49.     Responding to paragraph 49, Defendants admit that venue is proper in this judicial district.  Except as so admitted, Defendants deny the allegations in this paragraph.

50.     Responding to paragraph 50, Defendants admit that venue is proper in this judicial district.  Except as so admitted, Defendants deny the allegations in this paragraph.

## PARTIES

51.     Responding to paragraph 51, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

52.     Responding to paragraph 52, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

53.     Responding to paragraph 53, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

54.     Responding to paragraph 54, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

55.     Defendants incorporate their answers to the allegations in paragraphs 14-22 in Plaintiffs' Third Amended Complaint.

## GENERAL ALLEGATIONS

56.     Deny.

57.     Responding to paragraph 57, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

58.     Deny.

59.     Deny.

60.     Responding to paragraph 60, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

61.     Deny.

62.     Responding to paragraph 62, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

63.     Deny.

64.     Responding to paragraph 64, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

65.     Responding to paragraph 65, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

66.     Responding to paragraph 66, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

67.     To the extent that the allegations contained in paragraph 67 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent that they may be deemed allegations of fact, Defendants deny them.

68.     Responding to paragraph 68, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

69.     Responding to paragraph 69, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

70.     Responding to paragraph 70, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

71.     Responding to paragraph 71, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

72.     Responding to paragraph 72, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

73.     Responding to paragraph 73, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

74.     Responding to paragraph 74, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

75.     Responding to paragraph 75, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

76.     Responding to paragraph 76, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

77.     To the extent that the allegations contained in paragraph 77 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent that they may be deemed allegations of fact, Defendants deny them.

78.     To the extent that the allegations contained in paragraph 78 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent that they may be deemed allegations of fact, Defendants deny them.

79.     To the extent that the allegations contained in paragraph 79 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent that they may be deemed allegations of fact, Defendants deny them.

80.     To the extent that the allegations contained in paragraph 80 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

81.     To the extent that the allegations contained in paragraph 81 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

82.     To the extent that the allegations contained in paragraph 82 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

83.     To the extent that the allegations contained in paragraph 83 refer to provisions of law or caselaw, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

84.     To the extent that the allegations contained in paragraph 84 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

85.     To the extent that the allegations contained in paragraph 85 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

86.     To the extent that the allegations contained in paragraph 86 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

87.     To the extent that the allegations contained in paragraph 87 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent the allegations refer to provisions of law, they speak for themselves. To the extent they may be deemed allegations of fact, Defendants deny them.

88.     To the extent that the allegations contained in paragraph 88 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

89.     To the extent that the allegations contained in paragraph 89 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they refer to provisions of law, they speak for themselves.  To the extent they may be deemed allegations of fact, Defendants deny them.

90.    To the extent that the allegations contained in paragraph 90 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

91.    Deny.

92.    Deny.

93.    Deny.

94.    Deny.

95.    To the extent that the allegations contained in paragraph 95 refer to provisions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

96.    To the extent that the allegations contained in paragraph 96 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

97.    To the extent that the allegations contained in paragraph 97 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

98.    To the extent that the allegations contained in paragraph 98 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

99.    To the extent that the allegations contained in paragraph 99 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

100.    To the extent that the allegations contained in paragraph 100 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

101.    Deny.

102.    To the extent that the allegations contained in paragraph 102 refer to provisions of law, those provisions speak for themselves.  To the extent these

allegations may be deemed allegations of fact, Defendants deny them.

103.    To the extent that the allegations contained in paragraph 103 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

104.    To the extent that the allegations contained in paragraph 104 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

105.    To the extent that the allegations contained in paragraph 105 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

106.    Defendants incorporate their answers to the allegations in paragraphs 38-42 and 46-51 in Plaintiffs' Third Amended Complaint.

107.    Deny.

108.    To the extent that the allegations contained in paragraph 108 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

109.    To the extent that the allegations contained in paragraph 109 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

110.    To the extent that the allegations contained in paragraph 110 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them..

111.    To the extent that the allegations contained in paragraph 111 are OOIDA's characterization of their case and conclusions of law, no answer is required.  To the extent that they may be deemed allegations of fact, Defendants deny them.

112.    To the extent that the allegations contained in paragraph 112 are OOIDA's characterization of their case and conclusions of law, no answer is

required.  To the extent they may be deemed allegations of fact, Defendants deny them.

113.    Defendants incorporate their answer to the allegations in paragraph 60 in Plaintiffs' Third Amended Complaint.

## FIRST CLAIM FOR RELIEF

114.    Responding to paragraph 114, Defendants incorporate by reference their responses to paragraphs 1-113.

115.    To the extent that the allegations contained in paragraph 115 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

116.    To the extent that the allegations contained in paragraph 116 are OOIDA's characterization of its case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

117.    Deny.

118.    Deny.

119.    Deny.

120.    Deny.

121.    Deny.

## SECOND CLAIM FOR RELIEF

122.    Responding to paragraph 122, Defendants incorporate by reference their responses to paragraphs 1-121.

123.    To the extent that the allegations contained in paragraph 123 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

124.    To the extent that the allegations contained in paragraph 124 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

125.    Deny.

## THIRD CLAIM FOR RELIEF

126.    Responding to paragraph 126, Defendants incorporate by reference their responses to paragraphs 1-125.

127.    Deny.

128.    Deny.

129.    Deny.

130.    Deny.

131.    Deny.

132.    Deny.

133.    To the extent that the allegations contained in paragraph 133 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them

134.    To the extent that the allegations contained in paragraph 134 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them

135.    To the extent that the allegations contained in paragraph 135 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them

136.    Deny.

137.    Deny.

## FOURTH CLAIM FOR RELIEF

138.    Responding to paragraph 138, Defendants incorporate by reference their responses to paragraphs 1-137.

139.    Deny.

140.    Deny.

## AFFIRMATIVE DEFENSES

1.  The Amended Complaint, and the claims it alleges, fails to state facts sufficient to constitute a cause of action.

2.  Intervenor-Plaintiff OOIDA has no private right of action for its putative preemption claim under the Federal Aviation Administration Authorization Act.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray that:

1.  Intervenor-Plaintiff OOIDA take nothing by reason of the Amended Complaint;

2.  Judgment be entered in favor of Defendants;

3.  Defendants be awarded their costs incurred in defending this action; and

4.  Defendants be awarded such further relief that the Court may deem just and proper.

Dated:  September 29, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General

*s/ Lara Haddad*
LARA HADDAD
Deputy Attorney General
*Attorneys for Defendants Attorney
General Rob Bonta, Director
Katrina S. Hagen, Secretary Stewart
Knox, Labor Commissioner Lilia
García-Brower, and Director Nancy
Farias, in their official capacities*

# CERTIFICATE OF SERVICE

Case Name: **California Trucking Association, et al. v. Xavier Becerra, et al.**            No.    **3:18-cv-02458-BEN-BLM**

I hereby certify that on <u>September 29, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**STATE DEFENDANTS' ANSWER TO AMENDED COMPLAINT BY INTERVENOR-PLAINTIFF OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 29, 2023</u>, at Los Angeles, California.

|  |  |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |

SA2018103422
66267496.docx

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 42 of 295    (117 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 191   Filed 09/29/23   PageID.4096   Page 1 of 18
ER-42

Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Stephanie Albrecht
Deputy Attorney General
Lara Haddad
Deputy Attorney General
State Bar No. 319630
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6250
  Fax:  (916) 731-2124
  E-mail:  Lara.Haddad@doj.ca.gov
*Attorneys for Defendants Attorney General
Rob Bonta, Director Katrina S. Hagen,
Secretary Stewart Knox, Labor
Commissioner Lilia García-Brower, and
Director Nancy Farias, in their official
capacities*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **CALIFORNIA TRUCKING ASSOCIATION, ET AL.,**<br><br>Plaintiff,<br><br>**v.**<br><br>**ATTORNEY GENERAL ROB BONTA, ET AL.,**<br><br>Defendants. | 3:18-cv-02458-BEN-BLM<br><br>**STATE DEFENDANTS' ANSWER TO THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>Dept:        Courtroom 5A<br>Judge:       The Honorable Roger T. Benitez<br>Trial Date:  November 13, 2023 |

Pursuant to Federal Rule of Civil Procedure 7, Defendants Attorney General Rob Bonta, Director Katrina S. Hagen, Secretary Stewart Knox, Labor Commissioner Lilia García-Brower, and Director Nancy Farias, in their official capacities ("Defendants"), answer the Third Amended Complaint ("TAC") filed by Plaintiffs California Trucking Association, *et al.*, ECF No. 168, as follows.

1. To the extent that the allegations contained in paragraph 1 are Plaintiffs' characterization of their case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

2. To the extent that the allegations contained in paragraph 2 refer to provisions of California statutory and case law, those provisions speak for themselves. To the extent these allegations may be deemed allegations of fact, Defendants deny them.

3. Admit.

4. To the extent that the allegations contained in paragraph 4 refer to provisions of California law, those provisions speak for themselves. To the extent these allegations may be deemed allegations of fact, Defendants deny them.

5. Responding to paragraph 5, Defendants lacks sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

6. To the extent that the allegations contained in paragraph 6 are Plaintiffs' characterization of their case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them..

7. To the extent that the allegations contained in paragraph 7 are Plaintiffs' characterization of their case and conclusions of law, no answer is required. To the extent they may be deemed allegations of fact, Defendants deny them.

8.      Responding to paragraph 8, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations of the first sentence in this paragraph, and on that basis deny it.  To the extent that the allegations contained in paragraph 8 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them

9.      To the extent that the allegations contained in paragraph 9 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

10.      To the extent that the allegations contained in paragraph 10 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

## JURISDICTION AND VENUE

11.      Responding to paragraph 11, Defendants admit that Plaintiffs purport to bring claims under federal law, and that this Court has jurisdiction over this action, and otherwise deny the allegations in this paragraph.

12.      To the extent that the allegations contained in paragraph 12 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

13.      Responding to paragraph 13, Defendants admit that venue is proper in this judicial district.  Except as so admitted, Defendants deny the allegations in this paragraph.

## PARTIES

14.     Responding to paragraph 14, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

15.     Responding to paragraph 15, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

16.     Responding to paragraph 16, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

17.     Responding to paragraph 17, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

18.     Responding to paragraph 18, Defendants admit that Attorney General Rob Bonta is an appropriate party to defend this action.  To the extent the remaining allegations in this paragraph refer to provisions of law, those provisions speak for themselves.  To the extent that the allegations contained in paragraph 18 are conclusions of law, no answer is required. To the extent these allegations may be deemed allegations of fact, Defendants deny them.

19.     Admit that Defendant Natalie Palugyai was formerly the Secretary of the California Labor and Workforce Development Agency.[1]  Admit that the Labor and Workforce Agency is an executive branch agency overseeing the Department of Industrial Relations and its Divisions, including the Division of Labor Standards Enforcement and the Industrial Welfare Commission.  Admit that the Labor and Workforce Agency oversees the Employment Development Department and the California Unemployment Insurance Appeals Board.  Deny that the Employment Development Department and the California Unemployment Insurance Appeals

_____

[1] The Secretary of the California Labor and Workplace Development Agency is Stewart Knox.  Pursuant to Federal Rule of Civil Procedure 25(d), Mr. Knox is automatically substituted as a defendant.

Board are divisions of California Department of Industrial Relations. To the extent the remaining allegations in this paragraph refer to provisions of law, those provisions speak for themselves.

20.     Admit that Defendant Katrina Hagen is the Director of the Department of Industrial Relations. To the extent the remaining allegations in this paragraph refer to provisions of law, those provisions speak for themselves. To the extent that the allegations contained in paragraph 20 are conclusions of law, no answer is required. To the extent these allegations may be deemed allegations of fact, Defendants deny them.

21.     Admit that Defendant Lilia García-Brower is the California Labor Commissioner. To the extent the remaining allegations in this paragraph refer to provisions of law, those provisions speak for themselves. Defendants admit that, where warranted and appropriate, the Division of Labor Standards Enforcement investigates complaints and takes enforcement action authorized by law against employers for violations of the Labor Code and wage orders. Defendants admit that such enforcement action may include audits of payroll records, the collection of unpaid wages and imposition of penalties as authorized by California law. Defendants admit that the Division of Labor Standards Enforcement adjudicates wage claims in administrative processes referred to as "Berman" hearings, as authorized by California Labor Code section 96 et seq., and that such claims may in some cases involve allegations of misclassification. To the extent this paragraph characterizes these various enforcement actions other than as authorized and described in applicable sections of the Labor Code, Defendants deny such characterization.

22.     Admit that Defendant Nancy Farias is the Director of the Employment Development Department. To the extent the remaining allegations in this paragraph refer to provisions of law, those provisions speak for themselves. To the extent these allegations may be deemed allegations of fact, Defendants deny them.

## GENERAL ALLEGATIONS

23.     To the extent that the allegations contained in paragraph 23 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

24.     Defendants admit that Congress passed the Motor Carrier Act in 1980. To the extent that the remaining allegations contained in paragraph 24 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

25.     To the extent that the allegations contained in paragraph 25 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

26.     To the extent that the allegations contained in paragraph 26 refer to provisions of case law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

27.     To the extent that the allegations contained in paragraph 27 refer to provisions of case law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

28.     To the extent that the allegations contained in paragraph 28 refer to provisions of case law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

29.     Deny the second sentence of paragraph 29 alleging that a motor carrier's ability to contract with independent contractors is necessary.  To the extent that the remaining allegations contained in paragraph 29 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

30.      Responding to paragraph 30, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

31.      Responding to paragraph 31, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

32.      Responding to paragraph 32, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

33.      Deny.

34.      To the extent that the allegations contained in paragraph 34 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

35.      To the extent that the allegations contained in paragraph 35 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

36.      To the extent that the allegations contained in paragraph 36 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

37.      To the extent that the allegations contained in paragraph 37 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

38.      Responding to paragraph 38, Defendants admit that the California Labor Code and Wage Order No. 9 set out requirements for employers. To the

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 49 of 295  (124 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 191   Filed 09/29/23   PageID.4103   Page 8 of 18
ER-49

extent that the remaining allegations contained in paragraph 38 are Plaintiffs'
characterization of their case and conclusions of law, no answer is required. To the
extent they may be deemed allegations of fact, Defendants deny them.

39.     To the extent that the allegations contained in paragraph 39 refer to
provisions of law, those provisions speak for themselves. To the extent these
allegations may be deemed allegations of fact, Defendants deny them.

40.     To the extent the allegations in paragraph 40 refer to obligations under
the law, those obligations speak for themselves. To the extent that the allegations
in paragraph 40 contain assertions and conclusions of law, no answer is required.
To the extent they may be deemed allegations of fact, Defendants deny them.

41.     To the extent that the allegations contained in paragraph 41 refer to
provisions of law, those provisions speak for themselves. To the extent these
allegations may be deemed allegations of fact, Defendants deny them.

42.     To the extent that the allegations contained in paragraph 42 refer to
provisions of law, those provisions speak for themselves. To the extent these
allegations may be deemed allegations of fact, Defendants deny them.

43.     To the extent that the allegations contained in paragraph 43 are
Plaintiffs' characterization of their case and conclusions of law, no answer is
required. To the extent they may be deemed allegations of fact, Defendants deny
them.

44.     To the extent that the allegations contained in paragraph 44 refer to
provisions of the *Dynamex* decision, that decision speaks for itself. To the extent
these allegations may be deemed allegations of fact, Defendants deny them.

45.     To the extent that the allegations contained in paragraph 45 refer to
provisions of the *Dynamex* decision, that decision speaks for itself. To the extent
these allegations may be deemed allegations of fact, Defendants deny them.

46.     To the extent that the allegations contained in paragraph 46 are
Plaintiffs' characterization of their case and conclusions of law, no answer is

required.  To the extent they may be deemed allegations of fact, Defendants deny them.

47.     To the extent that the allegations contained in paragraph 47 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

48.     To the extent that the allegations contained in paragraph 48 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

49.     To the extent that the allegations contained in paragraph 49 are provisions of law, those provisions speak for themselves.  To the extent that the remaining allegations contained in paragraph 49 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

50.     To the extent that the allegations contained in paragraph 50 are provisions of law, those provisions speak for themselves.  To the extent that the remaining allegations contained in paragraph 50 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

51.     To the extent that the allegations contained in paragraph 51 are conclusions of law, no response is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

52.     To the extent that the allegations contained in paragraph 52 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

53.     To the extent that the allegations contained in paragraph 53 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

54.     To the extent that the allegations contained in paragraph 54 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

55.     To the extent that the allegations contained in paragraph 55 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

56.     To the extent that the allegations contained in paragraph 56 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

57.     Responding to paragraph 57, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

58.     To the extent that the allegations contained in paragraph 58 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

59.     To the extent that the allegations contained in paragraph 59 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

60.     To the extent that the allegations contained in paragraph 60 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

61.     To the extent that the allegations contained in paragraph 61 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

62.     To the extent that the allegations contained in paragraph 62 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

63.     To the extent that the allegations contained in paragraph 63 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

64.     To the extent that the allegations contained in paragraph 64 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

65.     To the extent that the allegations contained in paragraph 65 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

66.     To the extent that the allegations contained in paragraph 66 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

67.      To the extent that the allegations contained in paragraph 67 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

## FIRST CLAIM FOR RELIEF

68.      Responding to paragraph 68, Defendants incorporate by reference their responses to paragraphs 1-67.

69.      To the extent that the allegations contained in paragraph 69 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

70.      To the extent that the allegations contained in paragraph 70 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

71.      To the extent that the allegations contained in paragraph 71 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

72.      Responding to paragraph 72, Defendants lack sufficient knowledge or information to form a belief as to the truth of the allegations in this paragraph, and on that basis deny them.

73.      To the extent that the allegations contained in paragraph 73 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

74.      To the extent that the allegations contained in paragraph 74 are Plaintiffs' characterization of their case and conclusions of law, no answer is

required.  To the extent they may be deemed allegations of fact, Defendants deny them.

75.    To the extent that the allegations contained in paragraph 75 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

76.    Deny.

77.    To the extent that the allegations contained in paragraph 77 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

78.    To the extent that the allegations contained in paragraph 78 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

79.    To the extent that the allegations contained in paragraph 79 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

80.    Deny.

**SECOND CLAIM FOR RELIEF**

81.    Responding to paragraph 81, Defendants incorporate by reference their responses to paragraphs 1-80.

82.    To the extent that the allegations contained in paragraph 82 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

83.    To the extent that the allegations contained in paragraph 83 are Plaintiffs' characterization of their case and conclusions of law, no answer is

required.  To the extent they may be deemed allegations of fact, Defendants deny them.

84.     To the extent that the allegations contained in paragraph 84 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

85.     Deny.

86.     Deny.

## THIRD CLAIM FOR RELIEF

87.     Responding to paragraph 87, Defendants incorporate by reference their responses to paragraphs 1-86.

88.     To the extent that the allegations contained in paragraph 88 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

89.     To the extent that the allegations contained in paragraph 89 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

90.     To the extent that the allegations contained in paragraph 90 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

91.     To the extent that the allegations contained in paragraph 91 are provisions of law, those provisions speak for themselves.  To the extent they may be deemed allegations of fact, Defendants deny them.

92.     To the extent that the allegations contained in paragraph 92 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

93.     To the extent that the allegations contained in paragraph 93 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

94.     Deny.

## FOURTH CLAIM FOR RELIEF

95.     Responding to paragraph 95, Defendants incorporate by reference their responses to paragraphs 1-94.

96.     To the extent that the allegations contained in paragraph 96 refer to provisions of law, those provisions speak for themselves.  To the extent these allegations may be deemed allegations of fact, Defendants deny them.

97.     Deny.

98.     Deny.

99.     Deny.

100.    Deny.

101.    Deny.

102.    To the extent that the allegations contained in paragraph 102 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

103.    Deny.

104.    Deny.

105.    Deny.

106.    Deny.

107.    Deny.

108.    Deny.

109.    Deny.

110.    Deny.

## FIFTH CLAIM FOR RELIEF

111.   Responding to paragraph 111, Defendants incorporate by reference their responses to paragraphs 1-110.

112.   Deny.

113.   To the extent that the allegations contained in paragraph 113 are Plaintiffs' characterization of their case and conclusions of law, no answer is required.  To the extent they may be deemed allegations of fact, Defendants deny them.

114.   Deny.

## AFFIRMATIVE DEFENSES

1.       The TAC, and the claims it alleges, fails to state facts sufficient to constitute a cause of action.

2.       Plaintiffs have no private right of action for their putative preemption claim under the Federal Aviation Administration Authorization Act.

## PRAYER FOR RELIEF

WHEREFORE, Defendants pray that:

1.       Plaintiffs take nothing by reason of the Third Amended Complaint;

2.       Judgment be entered in favor of Defendants;

3.       Defendants be awarded their costs incurred in defending this action; and

4.       Defendants be awarded such further relief that the Court may deem just and proper.

Dated:  September 29, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
STEPHANIE ALBRECHT
Deputy Attorney General

*s/ Lara Haddad*
LARA HADDAD
Deputy Attorney General
*Attorneys for Defendants Attorney
General Rob Bonta, Director
Katrina S. Hagen, Secretary Stewart
Knox, Labor Commissioner Lilia
Garcia-Brower, and Director Nancy
Farias, in their official capacities*

# CERTIFICATE OF SERVICE

| | | | |
|---|---|---|---|
| Case Name: | **California Trucking Association, et al. v. Xavier Becerra, et al.** | No. | **3:18-cv-02458-BEN-BLM** |

I hereby certify that on <u>September 29, 2023</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**STATE DEFENDANTS' ANSWER TO THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on <u>September 29, 2023</u>, at Los Angeles, California.

| | |
|---|---|
| Lara Haddad | *Lara Haddad* |
| Declarant | Signature |

SA2018103422
66267567.docx

STACEY M. LEYTON (SBN 203827)
Email: sleyton@altber.com
SCOTT A. KRONLAND (SBN 171693)
Email: skronland@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA  94108
Telephone: (415) 421-7151
Facsimile:  (415) 362-8064

*Attorneys for Intervenor-Defendant*
*International Brotherhood of Teamsters*

Additional counsel listed on next page

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM,<br><br>Plaintiffs,<br><br>v.<br><br>ROB BONTA, in his official capacity as the Attorney General of the State of California; NATALIE PALUGYAI, in her official capacity as Secretary of the California Labor Workforce and Development Agency; KATRINA HAGEN, in her official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, NANCY FARIAS, in her official capacity as the Director of the Employment Development Department,<br><br>Defendants,<br><br>INTERNATIONAL BROTHERHOOD OF TEAMSTERS,<br><br>Intervenor-Defendant. | Case No. 3:18-cv-02458-BEN-DEB<br><br>**INTERVENOR-DEFENDANT INTERNATIONAL BROTHERHOOD OF TEAMSTERS' ANSWER TO PLAINTIFF CALIFORNIA TRUCKING ASSOCIATION'S THIRD AMENDED COMPLAINT**<br><br>Courtroom: 5A<br>Action Filed: October 25, 2018<br>Trial Date: November 13, 2023 |

1 | Additional Counsel:

2 | JULIE GUTMAN DICKINSON
(SBN 148267)
3 | Email: JGD@bushgottlieb.com
HECTOR DE HARO (SBN 300048)
4 | Email: HDeharo@bushgottlieb.com
BUSH GOTTLIEB, ALC
5 | 801 N. Brand Boulevard, Suite 950
Glendale, CA  91203
6 | Telephone: (818) 973-3200
Facsimile:  (818) 973-3201
7 |
*Attorneys for Intervenor-Defendant*
8 | *International Brotherhood of Teamsters*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Intervenor-Defendant International Brotherhood of Teamsters ("IBT")

2    hereby answers the Third Amended Complaint ("TAC") for Declaratory and

3    Injunctive Relief (Dkt. 168) filed May 19, 2023 by Plaintiffs California

4    Trucking Association, Ravinder Singh, and Thomas Odom ("Plaintiffs").  Except

5    as expressly admitted below, all allegations are denied.

6                              **IBT'S ANSWER**

7        1.    IBT admits that, in this lawsuit, Plaintiffs seek declaratory and

8    injunctive relief challenging the ABC test as set forth in *Dynamex Operations*

9    *West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018) and subsequently codified by

10   the California Legislature through Assembly Bill 5.  The remaining allegations in

11   paragraph 1 are legal assertions to which no response is required.  To the extent

12   that a response is necessary, IBT denies the remaining allegations in paragraph 1.

13       2.    Paragraph 2 contains legal assertions to which no response is required.

14   To the extent a response is required, IBT admits that Paragraph 2 contains a quote

15   from the *Dynamex* decision.

16       3.    IBT admits that the California Legislature adopted Assembly Bill 5 on

17   September 11, 2019 and that Governor Gavin Newsom signed the legislation on

18   September 18, 2019.  The remaining allegations in paragraph 3 are legal assertions

19   to which no response is required.

20       4.    IBT admits that Assembly Bill 5 took effect on January 1, 2020.  IBT

21   further admits that Assembly Bill 2257 took effect on January 1, 2021.  The

22   remaining allegations in paragraph 4 are legal assertions to which no response is

23   required.

24       5.    IBT lacks sufficient knowledge to admit or deny the allegations in

25   paragraph 5, and on that basis denies the allegations.

26       6.    Paragraph 6 contains legal assertions to which no response is required.

27   To the extent that a response is necessary, IBT denies the allegations in paragraph

28   6.

7.      IBT denies the allegations in paragraph 7.

8.      IBT lacks sufficient knowledge to admit or deny the allegations in the first sentence of paragraph 8, and on that basis denies the allegations.  The allegations in the second sentence of paragraph 8 are legal assertions to which no response is required.  IBT denies the allegations in the third and fourth sentences of paragraph 8.

9.      IBT admits that, in this lawsuit, Plaintiffs seek declaratory and injunctive relief against the ABC test as set forth in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal.5th 903 (2018) and subsequently codified by the California Legislature through Assembly Bill 5.  The remaining allegations in paragraph 9 are legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the remaining allegations in paragraph 9.

10.      IBT admits that, in this lawsuit, Plaintiffs challenge California's meal and rest break requirements as preempted under the Motor Carrier Safety Act and further asserts that the Court dismissed Plaintiffs' Motor Carrier Safety Act claim on February 10, 2020.  The remaining allegations in paragraph 10 are legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the remaining allegations in paragraph 10.

11.      IBT admits that this case raises claims under federal law.  However, IBT denies that those claims are ripe or that Plaintiffs have standing to bring them under Article III.

12.      IBT admits that this case raises claims under federal law.  However, IBT denies that those claims are ripe or that Plaintiffs have standing to bring them under Article III.

13.      IBT admits that, if this Court does have jurisdiction over Plaintiffs' claims, venue is proper under 28 U.S.C. §1391.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 64 of 295    (139 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 188    Filed 09/29/23   PageID.3271   Page 5 of 14
ER-64

14.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 14, and on that basis denies the allegations.

15.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 15, and on that basis denies the allegations.

16.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 16, and on that basis denies the allegations.

17.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 17, and on that basis denies the allegations.

18.    IBT admits that Defendant Rob Bonta is the Attorney General of California and is charged with enforcing and defending all state laws.  The remaining allegations in paragraph 18 are legal assertions to which no response is required.

19.    IBT denies the allegations in the first sentence of paragraph 19 on the basis that Defendant Natalie Palugyai is no longer Secretary of the California Labor and Workforce Development Agency.  IBT admits the remaining allegations in paragraph 19.

20.    IBT admits that Defendant Katrina Hagen is the Director of the Department of Industrial Relations, which is an executive agency charged with defending, amending, and republishing California's wage orders.  The remaining allegations in paragraph 20 are legal assertions to which no response is required.

21.    IBT admits the allegations in paragraph 21.

22.    IBT admits the allegations in paragraph 22.

23.    Paragraph 23 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 23.

24.    Paragraph 24 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 24.

25.     Paragraph 25 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT admits that Plaintiffs accurately quote the text of 49 U.S.C. §14501 and otherwise denies the allegations in paragraph 25.

26.     Paragraph 26 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 26.

27.     Paragraph 27 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 27.

28.     Paragraph 28 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 28.

29.     IBT denies the allegations in paragraph 29.

30.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 30, and on that basis denies the allegations.

31.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 31, and on that basis denies the allegations.

32.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 32, and on that basis denies the allegations.

33.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 33, and on that basis denies the allegations.

34.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 34, and on that basis denies the allegations.

35.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 35, and on that basis denies the allegations.

36.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 36, and on that basis denies the allegations.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 66 of 295   (141 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 188   Filed 09/29/23   PageID.3273   Page 7 of 14

ER-66

37.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 37, and on that basis denies the allegations.

38.     Paragraph 38 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT admits that the California Labor Code and Wage Order No. 9 impose obligations on employers and otherwise denies the allegations in paragraph 38.

39.     Paragraph 39 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT admits that the Labor Code imposes requirements on employers with respect to employees and otherwise denies the allegations in paragraph 39.

40.     Paragraph 40 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 40, and on that basis denies the allegations.

41.     Paragraph 41 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT admits that Plaintiffs accurately quote Wage Order No. 9 and otherwise denies the allegations in paragraph 41.

42.     Paragraph 42 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT admits that Wage Order No. 9 imposes obligations on employers with respect to their employees and otherwise denies the allegations in paragraph 42.

43.     Paragraph 43 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 43.

44.     Paragraph 44 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT admits that the *Dynamex*

1 decision addressed the test for determining whether a worker is an employee or
2 independent contractor and otherwise denies the allegations in paragraph 44.

3     45. Paragraph 45 contains legal assertions to which no response is
4 required. To the extent that a response is necessary, IBT admits the allegations in
5 paragraph 45.

6     46. Paragraph 46 contains legal assertions to which no response is
7 required. To the extent that a response is necessary, IBT denies the allegations in
8 paragraph 46.

9     47. Paragraph 47 contains legal assertions to which no response is
10 required. To the extent that a response is necessary, IBT denies the allegations in
11 paragraph 47.

12     48. Paragraph 48 contains legal assertions to which no response is
13 required. To the extent that a response is necessary, IBT denies the allegations in
14 paragraph 48.

15     49. Paragraph 49 contains legal assertions to which no response is
16 required. To the extent that a response is necessary, IBT admits that Assembly Bill
17 5 contains exceptions for certain professions and otherwise denies the allegations
18 in paragraph 49.

19     50. Paragraph 50 contains legal assertions to which no response is
20 required. To the extent that a response to those legal assertions is necessary, IBT
21 admits that Assembly Bill 5 contains an exception for "business-to-business"
22 contracting and otherwise denies the legal assertions in paragraph 50. IBT
23 otherwise denies the allegations in Paragraph 50.

24     51. IBT denies the allegations in paragraph 51.

25     52. Paragraph 52 contains legal assertions to which no response is
26 required. To the extent that a response is necessary, IBT denies the allegations in
27 paragraph 52.

28

1   53.   IBT admits that Plaintiffs accurately quote a portion of a statement

2   from Assemblymember Lorena Gonzalez.  IBT denies the remaining allegations in

3   paragraph 53.

4   54.   Paragraph 54 contains legal assertions to which no response is

5   required.  To the extent that a response is necessary, IBT admits that Assembly Bill

6   5 contains exceptions for certain professions but otherwise denies the allegations in

7   paragraph 54.

8   55.   Paragraph 55 contains legal assertions to which no response is

9   required.  To the extent that a response is necessary, IBT admits that Assembly Bill

10   5 contains a time-limited exception for subcontractors providing "construction

11   trucking services" and otherwise denies the allegations in paragraph 55.

12   56.   IBT admits that Assemblymember Lorena Gonzalez is a former

13   employee and union organizer for the IBT.  IBT also admits that Plaintiffs

14   accurately quote statements from Assemblymember Gonzalez.  IBT otherwise

15   denies the allegations in paragraph 56.

16   57.   IBT denies the allegations in paragraph 57.

17   58.   Paragraph 58 contains legal assertions to which no response is

18   required.  To the extent that a response is necessary, IBT denies the allegations in

19   paragraph 58.

20   59.   IBT denies the allegations in paragraph 59.

21   60.   IBT denies the allegations in the first and last sentences of paragraph

22   60.  With respect to the remaining allegations in paragraph 60, IBT lacks sufficient

23   knowledge to admit or deny those allegations, and on that basis denies them.

24   61.   IBT denies the allegations in paragraph 61.

25   62.   IBT denies the allegations in the first sentence of paragraph 62.  With

26   respect to the remaining allegations in paragraph 62, IBT lacks sufficient

27   knowledge to admit or deny those allegations, and on that basis denies them.

28   63.   IBT denies the allegations in paragraph 63.

64.    IBT admits that Assembly Bill 5 took effect on January 1, 2020 and otherwise denies the allegations in paragraph 64.

65.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 65, and on that basis denies the allegations.

66.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 66, and on that basis denies the allegations.

67.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 67, and on that basis denies the allegations.

68.    IBT incorporates its responses to previous paragraphs of the TAC as its response to paragraph 68.

69.    Paragraph 69 contains legal assertions to which no response is required.

70.    Paragraph 70 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 70.

71.    IBT denies the allegations in paragraph 71.

72.    IBT denies the allegations in paragraph 72.

73.    Paragraph 73 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 73.

74.    Paragraph 74 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in the first and second sentences in paragraph 74 and lacks sufficient knowledge to admit or deny the remaining allegations in paragraph 74, and on that basis denies them.

75.    IBT denies the allegations in paragraph 75.

76.    IBT denies the allegations in paragraph 76.

77.    IBT denies the allegations in paragraph 77.

78.    IBT denies the allegations in paragraph 78.

79.    IBT denies the allegations in paragraph 79.

80.    IBT denies the allegations in paragraph 80.

81.    IBT incorporates its responses to previous paragraphs of the TAC as its response to paragraph 81.

82.    Paragraph 82 contains legal assertions to which no response is required.

83.    IBT denies the allegations in paragraph 83.

84.    Paragraph 84 contains legal assertions to which no response is required.  To the extent that a response is necessary, IBT denies the allegations in paragraph 84.

85.    IBT denies the allegations in paragraph 85.

86.    IBT denies the allegations in paragraph 86.

87.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

88.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

89.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

90.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

91.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

92.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

93.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

94.    No response is required to paragraphs 87 to 94 in light of the Court's February 10, 2020 dismissal of Plaintiffs' Third Claim for Relief and Plaintiffs' confirmation that they are no longer pursing this claim.

95.    IBT incorporates its responses to previous paragraphs of the TAC as its response to paragraph 95.

96.    Paragraph 96 contains legal assertions to which no response is required.

97.    IBT denies the allegations in paragraph 97.

98.    IBT denies the allegations in the first sentence of paragraph 98.  With respect to the remaining sentences in paragraph 98, IBT admits that Assembly Bill 5 contains exceptions for certain professions, and otherwise denies the remaining allegations.

99.    Paragraph 99 contains legal assertions to which no response is required.  To the extent a response is required, IBT denies the allegations in paragraph 99.

100.   IBT denies the allegations in paragraph 100.

101.   IBT denies the allegations in paragraph 101.

102.   IBT denies the allegations in paragraph 102.

103.   Paragraph 103 contains legal assertions to which no response is required.  To the extent a response is required, IBT denies the allegations in paragraph 103.

104.   IBT denies the allegations in paragraph 104.

1     105.   IBT admits that Assembly Bill 5 contains exceptions for certain

2  professions and an exception for "business-to-business" contracting.  IBT

3  otherwise lacks sufficient knowledge to admit or deny the allegations in paragraph

4  105, and on that basis denies the allegations.

5     106.   IBT admits that Plaintiffs accurately quote a statement from the public

6  record.  IBT otherwise denies the allegations in paragraph 106.

7     107.   IBT denies the allegations in the first, second, and third sentences of

8  paragraph 107.  IBT lacks sufficient knowledge to admit or deny the remaining

9  allegations in paragraph 107, and on that basis denies the allegations.

10     108.   IBT admits that Assemblymember Lorena Gonzalez is a former

11  employee and union organizer for the IBT, and that Assemblymember Gonzalez

12  sponsored Assembly Bill 5.  IBT otherwise denies the allegations in paragraph

13  108.

14     109.   The first sentence of paragraph 109 contains legal assertions to which

15  no response is required.  To the extent a response is required, IBT denies the

16  allegations in the first sentence paragraph 109.  With respect to the second

17  sentence of paragraph 109, IBT admits that Assembly Bill 5 contains exceptions

18  for certain professions, including the construction industry.  IBT lacks sufficient

19  knowledge to admit or deny the remaining allegations in paragraph 109, and on

20  that basis denies the allegations.

21     110.   IBT denies the allegations in paragraph 110.

22     111.   IBT incorporates its responses to previous paragraphs of the TAC as

23  its response to paragraph 111.

24     112.   IBT denies the allegations in paragraph 112.

25     113.   Paragraph 113 contains legal assertions to which no response is

26  required.

27     114.   IBT denies the allegations in paragraph 114.

28

1    IBT denies that Plaintiffs are entitled to any of the relief requested in their

2  Prayer for Relief.

3                              **IBT'S AFFIRMATIVE DEFENSES**

4        1.      Plaintiffs lack standing to assert the claims pleaded in the TAC.

5        2.      The claims pleaded in Plaintiffs' TAC are not ripe for adjudication.

6        3.      Plaintiffs do not have a cause of action under 42 U.S.C. §1983 or a

7  private right of action to enforce the Federal Aviation Administration

8  Authorization Act preemption provision.

9        4.      Plaintiffs have failed to state a claim on which relief can be granted.

10                              **IBT'S PRAYER FOR RELIEF**

11       Wherefore, IBT prays for the following relief:

12       1.      That judgment be entered against Plaintiffs and that Plaintiffs take

13  nothing by way of this action;

14       2.      For costs of suit; and

15       3.      For such other, different, or further relief as the Court may deem just

16  and proper.

17

18  DATED: September 29, 2023              Respectfully submitted,

19                                         STACEY M. LEYTON
20                                         SCOTT A. KRONLAND
                                           ALTSHULER BERZON LLP
21
22                                         JULIE GUTMAN DICKINSON
                                           HECTOR DE HARO
23                                         BUSH GOTTLIEB, ALC

24                                         By: */s/ Stacey M. Leyton*
25                                         Stacey M. Leyton

26                                         Attorneys for Intervenor-Defendant
27                                         International Brotherhood of Teamsters

28

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 74 of 295          (149 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 187   Filed 09/29/23   PageID.3247   Page 1 of 20
ER-74

STACEY M. LEYTON (SBN 203827)
Email: sleyton@altber.com
SCOTT A. KRONLAND (SBN 171693)
Email: skronland@altber.com
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA  94108
Telephone: (415) 421-7151
Facsimile:  (415) 362-8064

*Attorneys for Intervenor-Defendant*
*International Brotherhood of Teamsters*

Additional counsel listed on next page

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION, RAVINDER SINGH, and THOMAS ODOM, | Case No. 3:18-cv-02458-BEN-DEB |
| Plaintiffs, | **INTERVENOR-DEFENDANT INTERNATIONAL BROTHERHOOD OF TEAMSTERS' ANSWER TO INTERVENOR-PLAINTIFF OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION'S FIRST AMENDED COMPLAINT** |
| v. | |
| ROB BONTA, in his official capacity as the Attorney General of the State of California; NATALIE PALUGYAI, in her official capacity as Secretary of the California Labor Workforce and Development Agency; KATRINA HAGEN, in her official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and LILIA GARCIA BROWER, in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement, NANCY FARIAS, in her official capacity as the Director of the Employment Development Department, | Courtroom: 5A Action Filed: October 25, 2018 Trial Date: November 13, 2023 |
| Defendants, | |
| INTERNATIONAL BROTHERHOOD OF TEAMSTERS, | |
| Intervenor-Defendant. | |

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 75 of 295 (150 of 372)
Case 3:18-cv-02458-BEN-DEB Document 187 Filed 09/29/23 PageID.3248 Page 2 of 20
ER-75

1   Additional Counsel:

2   JULIE GUTMAN DICKINSON
    (SBN 148267)
3   Email: JGD@bushgottlieb.com
    HECTOR DE HARO (SBN 300048)
4   Email: HDeharo@bushgottlieb.com
    BUSH GOTTLIEB, ALC
5   801 N. Brand Boulevard, Suite 950
    Glendale, CA 91203
6   Telephone: (818) 973-3200
    Facsimile: (818) 973-3201

7
    *Attorneys for Intervenor-Defendant*
8   *International Brotherhood of Teamsters*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Intervenor-Defendant International Brotherhood of Teamsters ("IBT")

2  hereby answers the First Amended Complaint for Declaratory and Injunctive

3  Relief (Dkt. 166) filed May 19, 2023 by Intervenor-Plaintiff Owner-Operator

4  Independent Drivers Association ("OOIDA").  Except as expressly admitted

5  below, all allegations are denied.

6                              **IBT'S ANSWER**

7        1.    IBT lacks sufficient knowledge to admit or deny the allegations in

8  paragraph 1 about OOIDA's motivation and on that basis denies such allegations.

9  IBT otherwise denies the allegations of paragraph 1.

10       2.    IBT admits that seeks declaratory and injunctive relief against AB 5

11  and AB 2257 insofar as they codify the test set forth in *Dynamex*.  IBT otherwise

12  denies the allegations of paragraph 2.

13       3.    IBT admits that paragraph 3 quotes from the cited statute.

14       4.    The allegations in paragraph 4 are legal assertions to which no

15  response is required.  To the extent a response is required, IBT denies that

16  paragraph 4 is a complete statement of the law.

17       5.    The allegations in paragraph 5 are legal assertions to which no

18  response is required.

19       6.    The allegations in paragraph 6 are legal assertions to which no

20  response is required.

21       7.    IBT denies the allegations of paragraph 7.

22       8.    The allegations in paragraph 8 are legal assertions to which no

23  response is required.

24       9.    The allegations in paragraph 9 are legal assertions to which no

25  response is required.

26       10.   IBT admits that paragraph 10 accurately cites a statistic from IBT's

27  brief, albeit without providing any context.

28

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 77 of 295    (152 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 187   Filed 09/29/23   PageID.3250   Page 4 of 20

ER-77

11. IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 11 and on that basis denies such allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

12. IBT admits that the term owner-operator is often used to refer to a driver who owns or leases the truck being driven but otherwise denies the allegations of paragraph 12. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

13. IBT denies the allegations of paragraph 13. IBT also avers that the term "independent owner-operator" is ambiguous because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

14. IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 14 and on that basis denies such allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

15. IBT denies the allegations of paragraph 15.

16. IBT denies the allegations of paragraph 16. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

17. IBT denies the allegations of paragraph 17. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some

Intervenor-Defendant IBT's Answer to OOIDA's First Amended Complaint,
Case No.18-cv-02458-BEN-DEB

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 78 of 295    (153 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 187    Filed 09/29/23    PageID.3251    Page 5 of 20
ER-78

owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

18.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 18 and on that basis denies such allegations.

19.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 19 and on that basis denies such allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status under any test of "employee" status.

20.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 20 and on that basis denies such allegations.

21.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 21 and on that basis denies such allegations.  IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status under any test of "employee" status.

22.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 22 and on that basis denies such allegations.

23.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 23 and on that basis denies such allegations.

24.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 24 and on that basis denies such allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status under any test of "employee" status.

25.     IBT denies the allegations of paragraph 25. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

26.     IBT denies the allegations of paragraph 26. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

27.     IBT denies the allegations of paragraph 27. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

28.     IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 28 and on that basis denies such allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

29.     IBT denies the allegations of paragraph 29. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

30.     IBT admits that paragraph 30 describes the relief OOIDA seeks but denies that OOIDA is entitled to such relief.

31.     IBT denies the allegations of paragraph 31. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

1    32.    IBT denies the allegations of paragraph 32. IBT also avers that the

2  term "independent owner-operator" is ambiguous and misleading because some

3  owner-operators are classified as employees and many owner-operators are

4  misclassified as independent contractors under any test of "employee" status.

5    33.    IBT denies the allegations of paragraph 33. IBT also avers that the

6  term "independent owner-operator" is ambiguous and misleading because some

7  owner-operators are classified as employees and many owner-operators are

8  misclassified as independent contractors under any test of "employee" status.

9    34.    IBT lacks sufficient knowledge to admit or deny the allegations in

10  paragraph 34 and on that basis denies such allegations. IBT also avers that the term

11  "independent owner-operator" is ambiguous and misleading because some owner-

12  operators are classified as employees and many owner-operators are misclassified

13  as independent contractors under any test of "employee" status.

14    35.    IBT lacks sufficient knowledge to admit or deny the allegations in

15  paragraph 35 and on that basis denies such allegations.

16    36.    IBT lacks sufficient knowledge to admit or deny the allegations in

17  paragraph 36 and on that basis denies such allegations.

18    37.    IBT denies the allegations of paragraph 37.

19    38.    IBT admits that paragraph 38 describes relief that OOIDA seeks but

20  denies that OOIDA is entitled to such relief.

21    39.    IBT admits that paragraph 39 quotes from one of the statements of

22  purpose in AB 5.

23    40.    IBT admits that AB 5 was adopted, in part, to address the

24  misclassification of workers in many industries as independent contractors rather

25  than employees and that, as a general matter, employees have the right under the

26  National Labor Relations Act to form and join labor organizations.  IBT admits

27  that Representative Lorena Gonzalez was a proponent of AB 5. IBT lacks

28

1    sufficient knowledge to admit or deny the remaining allegations in paragraph 40

2    and on that basis denies such allegations.

3          41.    IBT lacks sufficient knowledge to admit or deny the allegations in

4    paragraph 41 and on that basis denies such allegations.

5          42.    IBT admits that AB 5 codified the ABC test set forth in *Dynamex* and

6    that, like most employment standards legislation, AB 5 contains exceptions.  IBT

7    denies the remaining allegations of paragraph 42.

8          43.    IBT denies the allegations of paragraph 43.

9          44.    IBT denies the allegations of paragraph 44.

10         45.    IBT denies the allegations of paragraph 45.

11         46.    IBT admits that paragraph 46 describes relief that OOIDA seeks but

12   denies that OOIDA is entitled to such relief.

13         47.    IBT admits that this case raises claims under federal law.  However,

14   IBT denies that those claims are ripe or that OOIDA has standing to bring them

15   under Article III.

16         48.    IBT admits that this case raises claims under federal law.  However,

17   IBT denies that those claims are ripe or that OOIDA has standing to bring them

18   under Article III

19         49.    IBT admits that, if this Court does have jurisdiction over Plaintiffs'

20   claims, venue is proper under 28 U.S.C. §1391

21         50.    IBT admits that, if this Court does have jurisdiction over Plaintiffs'

22   claims, venue is proper under 28 U.S.C. §1391

23         51.    IBT lacks sufficient knowledge to admit or deny the allegations in

24   paragraph 51, and on that basis denies the allegations.

25         52.    IBT lacks sufficient knowledge to admit or deny the allegations in

26   paragraph 52, and on that basis denies the allegations

27         53.    IBT lacks sufficient knowledge to admit or deny the allegations in

28   paragraph 53, and on that basis denies the allegations.

54.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 54, and on that basis denies the allegations.

55.    IBT admits that OOIDA adopts Plaintiffs' description of the current parties as set forth in the Amended Complaint. Am. Compl. ¶¶ 14-22.

56.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 56, and on that basis denies the allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

57.    IBT lacks sufficient knowledge to admit or deny the allegations in paragraph 57, and on that basis denies the allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

58.    IBT denies that employee drivers do not own their trucks.  IBT admits that, while acting as employees, employee drivers do not operate their own businesses.  IBT otherwise denies the allegations of paragraph 58.

59.    IBT admits that paragraph 59 describes the work of many employee drivers.  IBT denies that paragraph 59 describes the work of all employee drivers or that paragraph 59 does not describe the work of many drivers classified (usually incorrectly) as independent contractors.

60.    IBT denies that owner-operator is synonymous with independent contractor or small trucking business and otherwise denies the allegations of paragraph 60.

61.    IBT denies the allegations of paragraph 61. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

1      62.   IBT admits the allegations of paragraph 62. IBT also avers that the

2 term "independent owner-operator" is ambiguous and misleading because some

3 owner-operators are classified as employees and many owner-operators are

4 misclassified as independent contractors under any test of "employee" status.

5      63.   IBT denies the allegations of paragraph 63. IBT also avers that the

6 term "independent owner-operator" is ambiguous and misleading because some

7 owner-operators are classified as employees and many owner-operators are

8 misclassified as independent contractors under any test of "employee" status.

9      64.   IBT lacks sufficient knowledge to admit or deny the allegations in

10 paragraph 64, and on that basis denies the allegations.  IBT also avers that the term

11 "independent owner-operator" is ambiguous and misleading because some owner-

12 operators are classified as employees and many owner-operators are misclassified

13 as independent contractors under any test of "employee" status.

14      65.   IBT admits that paragraph 65 describes the work of some owner-

15 operators.  IBT also avers that the term "independent owner-operator" is

16 ambiguous and misleading because some owner-operators are classified as

17 employees and many owner-operators are misclassified as independent contractors

18 under any test of "employee" status.

19      66.   IBT lacks sufficient knowledge to admit or deny the allegations of

20 paragraph 66 and on that basis denies the allegations. IBT also avers that the term

21 "independent owner-operator" is ambiguous and misleading because some owner-

22 operators are classified as employees and many owner-operators are misclassified

23 as independent contractors under any test of "employee" status.

24      67.   IBT denies the allegations of paragraph 67. IBT also avers that the

25 term "independent owner-operator" is ambiguous and misleading because some

26 owner-operators are classified as employees and many owner-operators are

27 misclassified as independent contractors under any test of "employee" status.

28

68.     IBT admits that paragraph 68 describes a small subset of owner-operators and otherwise denies the allegations of paragraph 68. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

69.     IBT lacks sufficient knowledge to admit or deny the allegations of paragraph 69 and on that basis denies such allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

70.     IBT admits that owner-operators are based throughout the nation and not necessarily in the same location as the motor carrier for which the owner-operator is working.  IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

71.     IBT denies the allegations of paragraph 71 because they assume that employee and owner-operator are distinct categories of workers. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

72.     IBT admits the allegations of paragraph 72.

73.     IBT admits the allegations of paragraph 73. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

74.     IBT lacks sufficient knowledge of how the OOIDA is defining words to be able to respond to the allegations of paragraph 74 and on that basis denies the

allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

75.    IBT lacks sufficient knowledge to admit or deny the allegations of paragraph 75 and on that basis denies such allegations.

76.    IBT lacks sufficient knowledge to admit or deny the allegations of paragraph 76 and on that basis denies such allegations.

77.    IBT denies the allegations of paragraph 77. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

78.    Paragraph 78 consists of legal assertions to which no response is required. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

79.    IBT admits that owner-operators have been part of the motor carrier industry for decades. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

80.    Paragraph 80 consists of legal assertions to which no response is required.

81.    Paragraph 81 consists of legal assertions to which no response is required.

82.    Paragraph 82 consists of legal assertions to which no response is required.

83.     Paragraph 83 consists of legal assertions to which no response is required.

84.     Paragraph 84 consists of legal assertions to which no response is required.

85.     Paragraph 85 consists of legal assertions to which no response is required.

86.     Paragraph 86 consists of legal assertions to which no response is required. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

87.     Paragraph 87 consists of legal assertions to which no response is required. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

88.     Paragraph 88 consists of legal assertions to which no response is required.  IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

89.     Paragraph 89 consists of legal assertions to which no response is required. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

90.     Paragraph 90 consists of legal assertions to which no response is required. IBT also avers that the term "independent owner-operator" is ambiguous

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 87 of 295    (162 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 187    Filed 09/29/23    PageID.3260    Page 14 of 20
ER-87

1    and misleading because some owner-operators are classified as employees and

2    many owner-operators are misclassified as independent contractors under any test

3    of "employee" status.

4         91.    IBT denies the allegations of paragraph 91 because it fails to account

5    for the business-to-business exception. IBT also avers that the term "independent

6    owner-operator" is ambiguous and misleading because some owner-operators are

7    classified as employees and many owner-operators are misclassified as

8    independent contractors under any test of "employee" status.

9         92.    IBT admits the allegations of paragraph 92, except that IBT avers that

10   the that the term "independent owner-operator" is ambiguous and misleading

11   because some owner-operators are classified as employees and many owner-

12   operators are misclassified as independent contractors under any test of

13   "employee" status.

14        93.    IBT denies the allegations of paragraph 93.

15        94.    IBT denies the allegations of paragraph 94.

16        95.    Paragraph 95 consists of legal assertions to which no response is

17   required.  IBT denies that paragraph 95 accurately describes the reach of California

18   law. Paragraph 89 consists of legal assertions to which no response is required.

19   IBT also avers that the term "independent owner-operator" is ambiguous and

20   misleading because some owner-operators are classified as employees and many

21   owner-operators are misclassified as independent contractors under any test of

22   "employee" status.

23        96.    IBT denies the allegations of paragraph 96.  IBT also avers that the

24   term "independent owner-operator" is ambiguous and misleading because some

25   owner-operators are classified as employees and many owner-operators are

26   misclassified as independent contractors under any test of "employee" status.

27        97.    IBT denies the allegations of paragraph 97. IBT also avers that the

28   term "independent owner-operator" is ambiguous and misleading because some

1   owner-operators are classified as employees and many owner-operators are

2   misclassified as independent contractors under any test of "employee" status.

3        98.    IBT denies the allegations of paragraph 98. IBT also avers that the

4   term "independent owner-operator" is ambiguous and misleading because some

5   owner-operators are classified as employees and many owner-operators are

6   misclassified as independent contractors under any test of "employee" status.

7        99.    Paragraph 99 consists of legal assertions to which no response is

8   required.  To the extent a response is required, IBT denies the allegations of

9   paragraph 99. IBT also avers that the term "independent owner-operator" is

10  ambiguous and misleading because some owner-operators are classified as

11  employees and many owner-operators are misclassified as independent contractors

12  under any test of "employee" status.

13       100.   Paragraph 100 consists of legal assertions to which no response is

14  required. IBT also avers that the term "independent owner-operator" is ambiguous

15  and misleading because some owner-operators are classified as employees and

16  many owner-operators are misclassified as independent contractors under any test

17  of "employee" status.

18       101.   Paragraph 101 consists of legal assertions to which no response is

19  required. To the extent a response is required, IBT denies the allegations of

20  paragraph 101. IBT also avers that the term "independent owner-operator" is

21  ambiguous and misleading because some owner-operators are classified as

22  employees and many owner-operators are misclassified as independent contractors

23  under any test of "employee" status.

24       102.   Paragraph 102 consists of legal assertions to which no response is

25  required.

26       103.   Paragraph 103 consists of legal assertions to which no response is

27  required.

28

104.   Paragraph 104 consists of legal assertions to which no response is required.

105.   Paragraph 105 consists of legal assertions to which no response is required.  To the extent a response is required, IBT denies the allegations of paragraph 105.

106.   IBT admits that OOIDA "adopts the allegations contained in Plaintiffs' Amended Complaint describing the obligations California imposes on hiring entities and the practical consequences of the ABC test on the business relationship between motor carriers and independent owner-operators. See Am. Compl. ¶¶ 38-42, 46-51."

107.   Paragraph 107 is ambiguous in using the word "definitive" thereby making it impossible for IBT to respond.  To the extent that a response is required, IBT denies the allegations of paragraph 107. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-operators are classified as employees and many owner-operators are misclassified as independent contractors under any test of "employee" status.

108.   Paragraph 108 consists of legal assertions to which no response is required.  To the extent that a response is required, IBT admits the allegations of paragraph 108.

109.   Paragraph 109 uses the term owner-operator in an inaccurate way, making it impossible for IBT to respond. To the extent a response is required, IBT lacks sufficient knowledge to admit or deny the allegations of paragraph 109 and on that basis denies the allegations.

110.   IBT lacks sufficient knowledge to admit or deny the allegations of paragraph 110 and on that basis denies the allegations.

111.   IBT lacks sufficient knowledge to admit or deny the allegations of paragraph 111 and on that basis denies the allegations. IBT also avers that the term "independent owner-operator" is ambiguous and misleading because some owner-

1   operators are classified as employees and many owner-operators are misclassified

2   as independent contractors under any test of "employee" status.

3       112.   IBT denies the allegations of paragraph 112. IBT also avers that the

4   term "independent owner-operator" is ambiguous and misleading because some

5   owner-operators are classified as employees and many owner-operators are

6   misclassified as independent contractors under any test of "employee" status.

7       113.   IBT admits that OOIDA "adopts the allegation contained in paragraph

8   60 of Plaintiffs' Amended Complaint."

9       114.   IBT incorporates by reference preceding paragraphs 1-105 of this

10  Answer.

11      115.   Paragraph 115 consists of legal assertions to which no response is

12  required.

13      116.   Paragraph 116 consists of legal assertions to which no response is

14  required. IBT also avers that the term "independent owner-operator" is ambiguous

15  and misleading because some owner-operators are classified as employees and

16  many owner-operators are misclassified as independent contractors under any test

17  of "employee" status.

18      117.   IBT denies the allegations of paragraph 117. IBT also avers that the

19  term "independent owner-operator" is ambiguous and misleading because some

20  owner-operators are classified as employees and many owner-operators are

21  misclassified as independent contractors under any test of "employee" status.

22      118.   IBT denies the allegations of paragraph 118. IBT also avers that the

23  term "independent owner-operator" is ambiguous and misleading because some

24  owner-operators are classified as employees and many owner-operators are

25  misclassified as independent contractors under any test of "employee" status.

26      119.   IBT denies the allegations of paragraph 119.  IBT also avers that the

27  term "independent owner-operator" is ambiguous and misleading because some

28

1 | owner-operators are classified as employees and many owner-operators are

2 | misclassified as independent contractors under any test of "employee" status

3 | 120. IBT denies the allegations of paragraph 120. IBT also avers that the

4 | term "independent owner-operator" is ambiguous and misleading because some

5 | owner-operators are classified as employees and many owner-operators are

6 | misclassified as independent contractors under any test of "employee" status

7 | 121. IBT denies the allegations of paragraph 121.

8 | 122. IBT incorporates by reference paragraphs 1-105 of this Answer.

9 | 123. Paragraph 123 consists of legal assertions to which no response is

10 | required.

11 | 124. Paragraph 124 consists of legal assertions to which no response is

12 | required.

13 | 125. IBT denies the allegations of paragraph 125. IBT also avers that the

14 | term "independent owner-operator" is ambiguous and misleading because some

15 | owner-operators are classified as employees and many owner-operators are

16 | misclassified as independent contractors under any test of "employee" status

17 | 126. IBT incorporates by reference paragraphs 1-125 of this answer.

18 | 127. IBT denies the allegations of paragraph 127.

19 | 128. IBT denies the allegations of paragraph 128.

20 | 129. IBT denies the allegations of paragraph 129.

21 | 130. IBT denies the allegations of paragraph 130.

22 | 131. IBT denies the allegations of paragraph 131.

23 | 132. IBT denies the allegations of paragraph 132.

24 | 133. IBT lacks sufficient knowledge to admit or deny the allegations in the

25 | denies the allegations in the first sentence of paragraph 133 and on that basis

26 | denies the allegations.  IBT otherwise denies the allegations of paragraph 133.

27 | 134. IBT denies the allegations of paragraph 134.

28 | 135. IBT denies the allegations of paragraph 135,

Intervenor-Defendant IBT's Answer to OOIDA's First Amended Complaint,
Case No.18-cv-02458-BEN-DEB

1    136.   IBT admits that AB 5 includes a time-limited exception from the ABC

2  test for certain construction trucking services provided directly to licensed

3  construction contractors.  IBT otherwise denies the allegations of paragraph 136.

4    137.   IBT denies the allegations of paragraph 137.

5    138.   IBT incorporates by reference preceding paragraphs 1-137 of this

6  Answer.

7    139.   IBT denies the allegations of paragraph 139.

8    140.   IBT denies the allegations of paragraph 140.

9    IBT denies that OOIDA is entitled to any of the relief requested in the

10  Prayer for Relief.

11                    **IBT'S AFFIRMATIVE DEFENSES**

12    1.   OOIDA lacks standing to assert the claims pleaded in the Amended

13  Complaint.

14    2.   The claims pleaded in OOIDA's Amended Complaint are not ripe for

15  adjudication.

16    3.   OOIDA does not have a cause of action under 42 U.S.C. §1983 or a

17  private right of action to enforce the Federal Aviation Administration

18  Authorization Act preemption provision.

19    4.   OOIDA has failed to state a claim on which relief can be granted.

20                    **IBT'S PRAYER FOR RELIEF**

21    Wherefore, IBT prays for the following relief:

22    1.   That judgment be entered against OOIDA and that OOIDA takes

23  nothing by way of this action;

24    2.   For costs of suit; and

25    3.   For such other, different, or further relief as the Court may deem just

26  and proper.

27

28

1   DATED: September 29, 2023         Respectfully submitted,

2

3                            STACEY M. LEYTON
                            SCOTT A. KRONLAND

4                            ALTSHULER BERZON LLP

5                            JULIE GUTMAN DICKINSON

6                            HECTOR DE HARO
                            BUSH GOTTLIEB, ALC

7

8                            By: /s/ Stacey M. Leyton
                            Stacey M. Leyton

9

10                         Attorneys for Intervenor-Defendant
                         International Brotherhood of Teamsters

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Intervenor-Defendant IBT's Answer to OOIDA's First Amended Complaint,
Case No.18-cv-02458-BEN-DEB

1   SPENCER C. SKEEN, CA Bar No. 182216
    spencer.skeen@ogletree.com
2   OGLETREE, DEAKINS, NASH, SMOAK &
    STEWART, P.C.
3   4370 La Jolla Village Drive, Suite 990
    San Diego, CA 92122
4   Telephone:  858.652.3100
    Facsimile:   858.652.3101
5
    ROBERT R. ROGINSON, CA Bar No. 185286
6   robert.roginson@ogletree.com
    ALEXANDER M. CHEMERS, CA Bar No. 263726
7   alexander.chemers@ogletree.com
    OGLETREE, DEAKINS, NASH, SMOAK &
8   STEWART, P.C.
    400 South Hope Street, Suite 1200
9   Los Angeles, California 90071
    Telephone:  213.239.9800
10  Facsimile:   213.239.9045

11  Attorneys for Plaintiffs
    CALIFORNIA TRUCKING ASSOCIATION,
12  RAVINDER SINGH, and THOMAS ODOM

13              **UNITED STATES DISTRICT COURT**

14           **SOUTHERN DISTRICT OF CALIFORNIA**

15  CALIFORNIA TRUCKING                    Case No. 3:18-cv-02458-BEN-BLM
    ASSOCIATION, RAVINDER SINGH,
16  and THOMAS ODOM,                       **THIRD AMENDED COMPLAINT
                                           FOR DECLARATORY AND
17              Plaintiffs,                INJUNCTIVE RELIEF**

18          v.

19  ROB BONTA, in his official capacity as
    the Attorney General of the State of
20  California; NATALIE PALUGYAI, in
    her official capacity as Secretary of the
21  California Labor Workforce and
    Development Agency; KATRINA
22  HAGEN, in her official capacity as the
    Acting Director of the Department of
23  Industrial Relations of the State of
    California; and LILIA GARCIA-
24  BROWER, in her official capacity as
    Labor Commissioner of the State of
25  California, Division of Labor Standards
    Enforcement, NANCY FARIAS, in her
26  official capacity as the Director of the
    Employment Development Department
27
    Defendants.
28

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 95 of 295    (170 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 168   Filed 05/19/23   PageID.2443   Page 2 of 35
ER-95

Plaintiffs CALIFORNIA TRUCKING ASSOCIATION ("CTA"), RAVINDER SINGH, and THOMAS ODOM (collectively, "Plaintiffs") state their complaint for declaratory and injunctive relief against Defendants as follows:

## INTRODUCTION

1.      Plaintiffs bring this lawsuit to vindicate their rights guaranteed by the Supremacy Clause, Commerce Clause, and Equal Protection Clause of the United States Constitution, as well as the Equal Protection Clause of the California State Constitution.  Plaintiffs seek declaratory and injunctive relief prohibiting the Defendants from applying and enforcing California's new test for whether a worker is an employee or independent contractor, as interpreted by the California Supreme Court in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018) ("*Dynamex*") and subsequently codified by the California Legislature through Assembly Bill 5 ("AB-5") at Labor Code § 2750.3.

2.      In *Dynamex*, the California Supreme Court adopted for the first time the so-called "ABC test" for determining whether a worker is an employee or independent contractor for purposes of Industrial Welfare Commission Wage Order No. 9 ("Wage Order No. 9"), 8 Cal. Code Regs. § 11090:

> Under this test, a worker is properly considered an independent contractor to whom a wage order does not apply only if the hiring entity establishes: (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex*, 4 Cal. 5th at 916-917.

3.      On September 11, 2019, the California Legislature passed AB-5, which was signed by Governor Gavin Newsom a week later on September 18, 2019.  It was

"the intent of the [California] Legislature in enacting [AB-5] to include provisions that would codify the decision of the California Supreme Court in *Dynamex* and would clarify the decision's application in state law."  AB-5, Section 1.  Pursuant to Section 2 of AB-5, Section 2750.3(a)(1) of the California Labor Code would provide that:

> [A] person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:
>
> (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.
>
> (B) The person performs work that is outside the usual course of the hiring entity's business.
>
> (C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

4.      The ABC test set forth in the preceding paragraph would (and will) apply not only to the determination under Wage Order No. 9 and other wage orders of whether a worker is an employee or independent contractor, but also to whether the worker is an employee under the Labor Code and the Unemployment Insurance Code unless one of the narrow exceptions set forth in AB-5 applies.  The new statute took effect on January 1, 2020.  It was then superseded by AB-2257, which took effect on January 1, 2021.

5.      Many of CTA's members regularly contract with individual independent contractors who own and operate their own trucks ("owner-operators") to provide interstate trucking services to customers in California and other states in accordance with federal and state regulations governing the transportation of property.

6.      Prior to *Dynamex*, it was lawful for CTA's members who contracted with owner-operators to treat them as independent contractors and not employees for

1  purposes of California's labor laws.  Now, however, under the ABC test adopted in

2  *Dynamex* and codified at Labor Code § 2775 *et seq.*, each motor-carrier member of

3  CTA that continues to use individual owner-operators to provide trucking services

4  for their customers must treat such workers as employees and will be required by law

5  to provide them with all protections that California law affords to employees.

6        7.    Given the realities of trucking, it would be impracticable if not

7  impossible for CTA's motor-carrier members to provide interstate trucking services

8  by contracting with independent owner-operators and to simultaneously comply with

9  California's onerous requirements for employees.  The direct and real consequence

10  of *Dynamex* and AB-5/AB-2257, therefore, is that CTA's motor-carrier members, if

11  they wish to avoid significant civil and criminal penalties, must cease contracting

12  with owner-operators to perform trucking services for customers in California and to

13  shift to using employee drivers only when operating within the State.

14        8.    Plaintiffs SINGH and ODOM are owner-operators who regularly

15  contract with licensed motor carriers to provide trucking services in California and in

16  other states.  Under the ABC test adopted in *Dynamex* and now codified by AB-

17  5/AB-2257, Plaintiffs SINGH and ODOM will, by operation of law, be deemed to be

18  the employees of any motor carrier that enters into a contract with them to provide

19  trucking services in California.  Because it would be impracticable for motor carriers

20  to contract with individual owner-operators to provide such services, motor carriers

21  will risk potential liability whenever they contract with owner-operators to provide

22  trucking services.  The prospect of liability resulting from AB-5/AB-2257 will

23  discourage, if not outright prevent, motor carriers from contracting with Plaintiffs

24  SINGH and ODOM, thereby harming their businesses.

25        9.    Plaintiffs seek a declaration that the ABC test set forth in AB-5/AB-

26  2257 (and, before it, Wage Order No. 9 as interpreted in *Dynamex*) is preempted by

27  the Federal Aviation Administration Authorization Act of 1994 ("the FAAAA"), 49

28  U.S.C. § 14501, and a corresponding injunction prohibiting Defendants from

1   attempting to apply or enforce Prong B of the ABC test under AB-5/AB-2257 or the

2   preceding interpretation in *Dynamex*.  Prong B of the ABC test under AB-5/AB-2257

3   (and, before it, Wage Order No. 9 as interpreted in *Dynamex*) is expressly preempted

4   by the FAAAA because the requirement that motor carriers treat all drivers as

5   employees and the concomitant *de facto* prohibition on motor carriers contracting

6   with independent owner-operators to perform trucking services in California directly

7   impacts the services, routes, and prices offered by CTA's motor-carrier members to

8   their customers.  Prong B of the ABC test under AB-5/AB-2257 (and the preceding

9   interpretation of Wage Order No. 9) is also impliedly preempted by the FAAAA

10  insofar as the ABC test effectively bars CTA motor-carrier members from using

11  individual owner-operators to provide trucking services to their customers is an

12  obstacle to the achievement of "Congress' overarching goal" of "helping assure

13  transportation rates, routes, and services that reflect 'maximum reliance on

14  competitive market forces.'"  *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 371

15  (2008).  Further, Prong B of the ABC test imposes an impermissible burden on

16  interstate commerce and thus violates the Commerce Clause of the United States

17  Constitution.

18          10.     Insofar as application of *Dynamex* and AB-5/AB-2257 would compel

19  motor carriers to comply with the meal and rest period requirements under California

20  law, Plaintiffs also seek a declaration that such meal and rest period requirements are

21  preempted by the Motor Carrier Safety Act (the "MCSA"), 49 U.S.C. § 31141, and a

22  corresponding injunction prohibiting Defendants from attempting to apply or enforce

23  such meal and rest period provisions.

24                          **JURISDICTION AND VENUE**

25          11.     This action arises under the Constitution and laws of the United States,

26  including the Supremacy Clause, U.S. Const. art. VI, § 3; the Commerce Clause,

27  U.S. Const., art. 1, § 8; the FAAAA, 49 U.S.C. §§ 14501(c), 14504a(c), and 14506;

28  the MCSA, 49 U.S.C § 31141; the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and

1988; and the Equal Protection Clauses of the United States and California Constitutions. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2201.

12.    This is a proceeding for declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-2202 and the Supremacy Clause, Commerce Clause, and Equal Protection Clause of the United States Constitution, as well as the Equal Protection Clause of the California Constitution. This action presents an actual controversy within the Court's jurisdiction.

13.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the transportation services provided by the individual Plaintiffs and other motor carriers whose interests are represented by CTA were contracted for and carried out within the geographical boundaries of this district, such that a substantial part of the events giving rise to the claim occurring in this district.

**PARTIES**

14.    CTA is an association devoted to advancing the interests of its motor-carrier members who provide transportation services in California. CTA promotes advocacy, safety, and compliance with all applicable state and federal laws on behalf of its members, including motor-carrier members operating in California.

15.    CTA members are licensed motor-carrier companies that manage, coordinate, and schedule the movement of property throughout California in interstate commerce through so-called "motor contract carrier permits" issued by the Federal Motor Carrier Safety Administration ("FMCSA"), a division of the U.S. Department of Transportation ("DOT"). Many of CTA's members are based in this judicial district, and many other CTA members are based elsewhere but provide transportation services in this judicial district. Many of CTA's motor-carrier members contract with owner-operators as independent contractors to provide interstate trucking services to their customers in and between several states, including California, and treat these owner-operators as independent contractors

rather than employees and are therefore directly impacted the *Dynamex* opinion.

16.     Plaintiff RAVINDER SINGH is an individual residing in Fremont, California.  Plaintiff SINGH owns and operates his own truck and performs trucking services for different motor carriers and brokers in California.  He contracts with and is treated by these motor carriers as an independent contractor and not an employee.

17.     Plaintiff THOMAS ODOM is an individual residing in Madera, California.  Plaintiff ODOM owns and operates his own truck and performs trucking services for a national motor carrier hauling property in California and between California and Texas.  He contracts with and is treated by these motor carriers as an independent contractor and not an employee.

18.     Defendant ROB BONTA is the Attorney General of California and is charged with enforcing and defending all state laws.  California's wage orders are constitutionally authorized, quasi-legislative regulations that have the force of law. *See* Cal. Const., art. XIV, § 1; Cal. Labor Code §§ 1173, 1178, 1178.5, 1182, 1185; *Industrial Welfare Comm'n v. Superior Court*, 27 Cal. 3d 690, 700-703 (1980). Because this action challenges the constitutional validity of the wage order as authoritatively interpreted by the California Supreme Court (*see Auto Equity Sales, Inc. v. Superior Court of Santa Clara County*, 369 P.2d 937, 939 (1962) ("The decisions of this court are binding upon and must be followed by all the state courts of California")), the Attorney General is an appropriate party to defend this action.  *See* Cal. Gov't Code § 12510 *et seq.*

19.     Defendant NATALIE PALUGYAI is the Secretary of the California Labor and Workforce Development Agency.  The Labor and Workforce Agency is an executive branch agency overseeing the Department of Industrial Relations and its Divisions, including the Division of Labor Standards Enforcement and the Industrial Welfare Commission, the Employment Development Department, and the California Unemployment Insurance Appeals Board.  *See* Cal. Gov't Code § 12813.

20.     Defendant KATRINA HAGEN is the Director of the Department of

THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Industrial Relations, an executive agency in California that is charged with defending, amending, and republishing California's wage orders.[1]  *See* Cal. Labor Code § 1182.

21.     Defendant LILIA GARCIA-BROWER is the Labor Commissioner of the California Department of Industrial Relations, which is a department of the California Labor and Workforce Development Agency.  The Office of the Labor Commissioner (also known as the State "Division of Labor Standards Enforcement," or "DLSE") is specifically empowered by the Legislature to interpret and enforce the Industrial Welfare Commission ("IWC") wage orders, including Wage Order No. 9. *See* Cal. Labor Code §§ 61 and 1193.5.  The DLSE investigates complaints and takes enforcement actions against companies, including motor carriers, seeking to impose penalties on the basis that the company has misclassified employees as independent contractors.  Enforcement actions taken by the DLSE include audits of payroll records, collection of unpaid wages, and issuing citations for violations of any applicable wage order and Labor Code provisions.  The DLSE also adjudicates wage claims, pursuant to California Labor Code §§ 96 and 98, on behalf of drivers who file claims contending that they are employees misclassified as independent contractors.

22.     Defendant NANCY FARIAS is the Director of the Employment Development Department.  The Employment Development Department is specifically empowered by the Legislature to interpret and enforce the Unemployment Insurance Code.  *See* Unemployment Ins. Code § 317.

/ / /

/ / /

---

[1] The Industrial Welfare Commission, a five-member commission within the Department of Industrial Relations (Cal. Labor Code § 70), is charged by statute with promulgating wage orders for various industries.  Cal. Labor Code § 517.  Although the IWC was defunded by the Legislature effective July 1, 2004, its wage orders remain in effect.  *Bearden v. U.S. Borax, Inc.*, 138 Cal. App. 4th 429, 434 (2006).

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 102 of 295    (177 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 168   Filed 05/19/23   PageID.2450   Page 9 of 35
ER-102

# GENERAL ALLEGATIONS

## Federal Regulation Of The Trucking Industry

23.     Prior to 1980, both federal and state governments regulated the trucking industry.  These regulations dictated, both directly and indirectly, how transportation services could be provided and the prices that could be charged for those services.

24.     In 1980, Congress passed the Motor Carrier Act, which deregulated interstate trucking so that the rates and services offered by licensed motor carriers and related entities would be set by the market rather than by government regulation. 79 Stat. 793.

25.     Fourteen years later, in 1994, to bolster deregulation, Congress included a provision within the FAAAA that expressly preempts state regulation of the trucking industry:

> [A] State… may not enact or enforce a law, regulation, or other provision having the force and effect of law *related to a price, route, or service of any motor carrier* (other than a carrier affiliated with a direct air carrier covered by section 41713(b)(4)) or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c)(1) (emphasis added).

26.     In enacting the FAAAA, Congress' "overarching goal" was "helping ensure transportation rates, routes, and services that reflect maximum reliance on competitive market forces, thereby stimulating efficiency, innovation, and low prices, as well as variety and quality."  *Rowe,* 552 U.S. at 371 (internal quotations omitted).  The FAAAA's express-preemption provision furthers this purpose by "'prevent[ing] States from undermining federal regulation of interstate trucking' through a 'patchwork' of state regulations." *Am. Trucking Ass'ns v. City of Los Angeles*, 660 F.3d 384, 395-96 (9th Cir. 2011), *rev'd on other grounds*, 133 S. Ct. 2096 (2013).

27.     The United States Supreme Court has explained that the "ban on

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 103 of 295     (178 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 168   Filed 05/19/23   PageID.2451   Page 10 of 35
ER-103

enacting or enforcing any law 'relating to rates, routes, or services is most sensibly read . . . to mean States may not seek to impose their own public policies or theories of competition or regulation on the operations of [a motor] carrier." *Am. Airlines, Inc. v. Wolens,* 513 U.S. 219, 229 n.5 (1995).[2]

28. Deregulation requires not only that states not interfere with the ability of private parties to contract, but also that they not interfere with the enforcement of those contracts. "Market efficiency requires effective means to enforce private agreements." *Wolens*, 513 U.S. at 230 (quotation marks omitted). Moreover, "[t]he stability and efficiency of the market depend fundamentally on the enforcement of agreements freely made, based on the needs perceived by the contracting parties at the time." *Id*.

### The Owner-Operator Model

29. For decades, the trucking industry has heavily relied on the owner-operator model—which involves the use by licensed motor carriers of independent contractors who own and operate their own trucks—to provide the transportation of property in interstate commerce. A motor carrier's ability to contract with independent contractors is necessary because the demand for, duration of, and volume of trucking services provided by individual motor carriers fluctuates significantly.

30. In many segments of the national economy, the volume of trucking services needed varies over time based on numerous factors. In the agricultural industry, for example, the demand for trucking services varies depending on the time of year, the price at which the produce can be sold, the available markets (both foreign and domestic) for the produce, the length of the growing season, and the size

---

[2] Although *Wolens* was interpreting the Airline Deregulation Act ("ADA"), the FAAAA's preemption clause borrows its language directly from the ADA and courts analyze the two acts similarly. *Rowe,* 552 U.S. at 370 ("when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its judicial interpretations as well") (internal quotation marks and alteration omitted).

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 104 of 295    (179 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 168   Filed 05/19/23   PageID.2452   Page 11 of 35
ER-104

of the crop, which itself varies based on the temperature, rainfall, and other factors. Likewise, a motor carrier could have an abundance of jobs during the growing season, but a small number of such jobs during the winter months.

31.    Motor carriers offer many types of trucking services including, but not limited to, conventional trucking, the transport of hazardous materials, refrigerated transportation, flatbed conveyance, intermodal container transport, long-haul shipping, movement of oversized loads, dedicated trucking, less-than-truckload shipping, and dump-truck haulage.

32.    In order to meet this fluctuating demand for highly varied services, motor carriers contract with owner-operators to provide trucking services.  Because the demand for shipment of goods fluctuates depending on the season, consumer demand, overseas orders, natural disasters, type of truck, and a multitude of other factors, many motor carriers depend on the use of individual owner-operators to provide consistent, uninterrupted, skilled, and specialized trucking services to their customers.

33.    Given the sizable investment that is necessary to acquire and maintain a truck, the fluctuating demand for trucking services generally, the sporadic demand for specialized trucking services in particular, and other related considerations, it would be extremely difficult if not impossible for a motor carrier doing business in California, particularly a smaller motor carrier, to own (or finance) and maintain a fleet of trucks operated by employee drivers that is sufficiently large to service their customers' needs for specialized trucking services or haulage during times of peak demand.

34.    Rather, because demand for their various services fluctuates, sometimes widely, throughout the year, motor carriers need to be able to expand and contract their capacity to provide transportation services at a moment's notice.  For example, if a motor carrier owned and operated its own fleet of sixty (60) trucks and employed only sixty (60) employee drivers to operate those trucks, that motor carrier would not

be able to provide trucking services to a customer or group of customers when such customers needed a total of eighty (80) trucks on a particular day.  Conversely, a motor carrier that is permitted to use independent contractor owner-operators could simply contract with individual owner-operators to provide the twenty (20) additional trucks needed.

35.     Employing a business model that is common both nationally and in California, individual owner-operators typically work for themselves for a period of time to build up their experience and reputation in the industry. When such an owner-operator is ready to expand his or her business, that owner-operator will contract for or bid on jobs that require more than one truck.  At that time, the owner-operator will subcontract with one or more other owner-operators to complete the job.

36.     Eventually, the owner-operator may have enough business to warrant hiring one or more employee-drivers.  In this way, the owner-operator model enables small businesses to grow from one-truck, one-driver operations to larger fleets with multiple trucks and multiple employee-drivers.

37.     Many individual owner-operators have invested in specialized equipment and have obtained the skills to operate that equipment efficiently.  Some of these owner-operators have unique and expensive equipment not available in the fleet of other trucking companies.  This can make them more attractive to other motor carriers that need to increase their freight-hauling capacity during the course of the year, because they can obtain the services of additional drivers and equipment without having to make large capital investments in either skilled operators or expensive equipment.

**The ABC Test Prevents Motor Carriers**

**From Contracting With Owner-Operators**

38.     Individually and together, the California Labor Code and Wage Order No. 9 set forth wide-ranging requirements on employers.

11

THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 106 of 295   (181 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 168   Filed 05/19/23   PageID.2454   Page 13 of 35
ER-106

39.     The California Labor Code imposes numerous obligations on "employers" with respect to "employees."  Such obligations attach "[a]t the time of hiring," when an employer must provide a detailed notice to employees setting forth many categories of information.  Labor Code § 2810.5.  And these obligations continue through the last day that the employee works, with all wages due on the last day of employment.  Labor Code § 202.  Each day in between and during employment, the employer is subject to detailed requirements governing hours and days of work, minimum wages, reporting time pay, recordkeeping and wage statements, meal periods, rest periods, uniforms and equipment, expense reimbursement, and other matters.

40.     In order to satisfy these obligations, employers must exercise sufficient control over the working conditions of their employees to ensure that they are provided the protections set forth in the Labor Code.  The requisite control includes, among other things, tracking all hours worked by the employee to fulfill the recordkeeping and minimum-wage requirements; implementing and maintaining lawfully compliant compensation plans; issuing itemized wage statements that include many categories of information; managing the employee's tasks and work schedule to ensure compliance with the meal and rest-period requirements as well as the reporting-time requirements; identifying, providing, and maintaining the tools and equipment necessary to the performance of the job; as well as reimbursing employees for such items.

41.     Similar obligations exist in Wage Order No. 9, which was promulgated by the IWC to govern the working conditions of employees in the transportation industry.  Wage Order No. 9 defines the "Transportation Industry" to mean "any industry, business, or establishment operated for the purpose of conveying persons or property from one place to another whether by rail, highway, air, or water, and all operations and services in connection therewith; and also includes storing or warehousing of goods or property, and the repairing, parking, rental, maintenance, or

cleaning of vehicles."  Wage Order No. 9, § 2(P).

42.    Like the Labor Code, Wage Order No. 9 imposes numerous obligations on "employers" with respect to "employees," including detailed requirements governing hours and days of work, minimum wage, reporting time pay, recordkeeping, and so forth.  Wage Order No. 9 also requires that employers engage in a similarly high level of control over their employees to ensure that these obligations are met.

43.    Prior to the adoption of the ABC test in *Dynamex* and then AB-5/AB-2257, CTA's motor-carrier members operating in California could—and did—lawfully contract with and treat owner-operators as independent contractors and not as "employees" within the meaning of the Labor Code and Wage Order No. 9. Accordingly, prior to *Dynamex* and AB-5/AB-2257, CTA's motor-carrier members contracted with owner-operators without incurring obligations to them under the Labor Code or Wage Order No. 9 and without risking an enforcement action or private misclassification suit in which such owner-operators would inevitably be deemed employees for purposes of California law.

44.    In *Dynamex*, the California Supreme Court announced a new interpretation of Wage Order No. 9 for purposes of classifying workers as either employees (and thus covered by numerous obligations) or independent contractors (and thus outside the ambit of numerous rules).

45.    As noted above, *Dynamex* adopted the so-called "ABC test" for classifying workers, which has now been codified by AB-5/AB-2257.  Under Prong B of the ABC test, an individual is deemed an employee rather than an independent contractor unless he or she "performs work that is outside the usual course of the hiring entity's business."

46.    Because drivers perform work that is within rather than outside the usual course of a motor carrier's business, the unavoidable effect of Prong B is to automatically classify every driver who works for a motor carrier as an "employee"

THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

under the Labor Code and Wage Order No. 9, no matter the actual and contractual relationship between the driver and the motor carrier.  As a consequence, under the new ABC test, all motor carriers operating in California, including CTA's motor-carrier members, are required to extend to all drivers, including owner-operators who heretofore have been lawfully treated as independent contractors under prior law, the full range of benefits mandated by the Labor Code and Wage Order No. 9 and to otherwise comply with the regulatory and statutory requirements with respect to such drivers.  Motor carriers that fail to do so face the significant risk of civil and criminal liability arising from the violation of the Labor Code and Wage Order No. 9.

47.    As a practical matter, for a motor carrier to comply with the Labor Code and Wage Order No. 9—which include detailed requirements governing hours and days of work, minimum wages, reporting-time pay, meal periods, rest periods, uniforms and equipment, recordkeeping, itemized wage statements, reimbursement, and other matters—the motor carrier must exercise significant control over each driver's route and working conditions.  It would be impracticable if not impossible for CTA's motor-carrier members to continue using the owner-operator model, under which they contract with independent drivers to perform particular shipments, while exercising the degree of control over the drivers that would be required to ensure compliance with the Labor Code and Wage Order No. 9.  Therefore, to avoid violating the Labor Code and Wage Order No. 9 under the new ABC test, motor carriers operating in California, including CTA's members, will be forced to discontinue using the owner-operator model and instead use only employees to provide trucking services to their customers.

48.    Conversely, because motor carriers cannot as a practical matter comply with the substantive requirements of the Labor Code and Wage Order No. 9 when they contract with individual owner-operators to perform trucking services, motor carriers that continue to employ that business model will risk significant civil and criminal liability arising from the violation of these statutes.  As a result, motor

14    Case No. 3:18-cv-02458-BEN-BLM

carriers will cease using individual owner-operators to perform trucking services and will hire employee drivers to perform such services.  The ABC test, as construed in *Dynamex* and codified by AB-5/AB-2257, therefore, undermines the economic viability of independent owner-operators.  As a consequence, owner-operators, who have invested considerable amounts in their businesses (including for the purchase of vehicles), face the prospect of being forced to abandon their business and losing the freedom that comes with being small-business owners.

49.     AB-5 contains a series of exceptions for specific professions and industries, which can be found at the newly enacted Labor Code § 2750.3(b)-(h).  None of these exceptions apply to the relationships between motor carriers and individual owner-operators.  For example, there is a narrow exception for persons performing work "pursuant to a subcontract in the construction industry," or providing "construction trucking services" (with the latter exception also set to expire on December 31, 2021).  Labor Code § 2750.3(f).

50.     Likewise, there is a narrow exception for a "*bona fide* business-to-business contracting relationship," which requires the independent contractor to satisfy twelve separate criteria.  Labor Code § 2750.3(e).  Plaintiffs SINGH and ODOM cannot satisfy those criteria, including the requirements that a business operate a "business location that is separate from the business or work location of the contracting business," "advertise[] and hold[] itself out to the public" to provide services, "negotiate its own rates," and "set its own hours and location of work."  For similar reasons, CTA's motor-carrier members will be unable to recast their historic use of owner-operators as falling within the "business-to-business" exception.  That AB-5 specifically excludes motor carriers and owner-operators like SINGH and ODOM from the scope of Section 2750.3(e) was made clear by the sponsor of AB-5, Assembly Member Lorena Gonzalez.  On September 11, 2019, shortly before AB-5 was enacted, Assembly Member Gonzalez discussed the "business-to-business" exception during floor debate.  She noted that Section 2750.3(e) was not intended to

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 110 of 295    (185 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 168    Filed 05/19/23    PageID.2458    Page 17 of 35
ER-110

encompass Plaintiffs, since "we are . . . getting rid of an outdated broker model that allows companies to basically make money and set rates for people that they called independent contractors that act a lot like employees."

51.    The intent and impact of the *Dynamex* decision and now AB-5 is clear—motor carriers can no longer contract with independent owner-operators and must shift to using an employee-only business model.

**There Is No Rational Basis For AB-5/AB-2257 Targeting Interstate Trucking**

52.    As originally crafted by the California Supreme Court, *Dynamex* established a standard that would have—for purposes of the Wage Orders—equally applied to all persons who sought to work in California as independent contractors. Through AB-5 and then AB-2257, the California Legislature did not replicate the impact of *Dynamex*, nor did they seek to overturn that decision in its entirety. Instead, by grafting numerous exemptions and exceptions onto the statute, the sponsors of these bills could principally target two disfavored groups—motor carriers and app-based driving or delivery companies.

53.    The fact that AB-5 was intended to target motor carriers is clear from floor debate on the bill.  The sponsor, former Representative Lorena Gonzalez, specifically stated on the Assembly Floor on September 11, 2019 that one of the purposes of AB-5 was to "get[] rid of an outdated broker model that allows companies to basically make money and set rates for people that they called independent contractors."

54.    This fact is also clear from the dozens of exemptions and exceptions inserted into AB-5 and AB-2257.  These exclusions establish that the traditional *Borello* test continues to apply to numerous industries and professions.  This includes not only white-collar roles such as doctors and lawyers, but freelance writers, graphic designers, manicurists, hair dressers, real estate agents, recording artists, musicians, interpreters, publicists, proofers, competition judges, and many more. Although the sponsor of AB-5 and AB-2257 has vocally criticized the *Borello*

16

standard as being too lax, it was approved for continued use in many situations.

55.     The lack of any rational basis (and the clear animus for interstate trucking) is also shown by the exception for the construction industry, and particularly construction trucking services.  Whereas interstate truckers had to continue to satisfy the ABC test, the Legislature provided an exemption for intrastate truckers providing "construction trucking services" applying instead the *Borello* test. The proliferation of exception and exemptions under AB-5 for workers in businesses other than interstate trucking, including an exception for an industry that involves intrastate trucking, underscores the animus towards non-construction-related motor carriers.

56.     The fact that AB-5 and then AB-2257 targeted interstate trucking is not surprising.  The bills were sponsored by former representative Gonzalez, who, before entering the Legislature, was an employee and union organizer for the International Brotherhood of Teamsters ("IBT").  She did not abandon her allegiance to the IBT when she joined the Legislature, proudly announcing on May 30, 2019 that "I am a Teamster" and "I am the union."

57.     Representative Gonzalez broadcast her continuing commitment to the Teamsters throughout the time that she sponsored AB-5 and then AB-2257.  For example, she tweeted on November 21, 2019 that AB-5 (and its exceptions) would permit a trucker to "work as an independent contractor for a construction firm" but that an owner-operator must "work as an employee for a trucking company," specifically acknowledging the disparate treatment of these similarly-situated drivers.

58.     There is no legislative record that demonstrates any rational basis for enforcing the ABC test to its fullest as to motor carriers and owner-operators, while the State of California has provided preferential treatment to dozens of other professions and industries, including purely intrastate activities like construction trucking.

### The Impact Of The ABC Test On Services, Routes, And Prices

59.     Because the ABC test effectively makes it unlawful for motor carriers to contract with individual owner-operators to provide trucking services, and as a practical matter, requires them to use employee drivers instead if they wish to avoid liability, it will significantly alter the services that the motor carriers provide to their customers.  Forced by *Dynamex* and now AB-5 to cease using the owner-operator model, motor carriers will no longer have the ability to provide the diverse and specialized services they were able to provide prior to adoption of the ABC test. Until now, motor carriers have contracted with owner-operators to acquire access on a short-term basis to the trucks and skilled drivers necessary to accommodate peak demand and customers' specialized trucking needs.  Given their limited capitalization and access to financing, it is not feasible for motor carriers to maintain the diverse fleets and large workforces that they would need in order to offer equivalent service using employee drivers.  As a result, because they do not currently have and cannot feasibly acquire and maintain the equipment, personnel, and experience necessary to perform certain jobs using employee drivers, these motor carriers must either stop providing certain services for their customers or continue doing so using owner-operators and face the risk of civil and criminal liabilities arising from the violation of the Labor Code and Wage Order No. 9.

60.     Due to the variable demand for freight transportation, effectively compelling motor carriers to cease contracting with independent owner-operators and to instead use only employee drivers will significantly impact the services that motor carriers provide to their customers.  Customers of motor carriers rely upon motor carriers for the timely pick-up and delivery of freight, which is typically required by a specified time or within a specified window of time.  Customers rely upon these pick-up and delivery times for the efficiencies of their own operations (*i.e.*, scheduling personnel to perform loading and unloading, arranging for future distribution of the goods, etc.).  Customers factor compliance with pick-up and

delivery times into the compensation paid to motor carriers to ensure efficient productivity and to avoid disruption to the movement of goods.  Motor carriers contract with owner-operators to fulfill these customer demands, recognizing that the owner-operator is limited only by federal safety and hours-of-service regulations and the owner-operator's own capacity and willingness to perform the requested services. By effectively rendering all drivers employees within the meaning of the Labor Code and Wage Order No. 9 and thereby imposing burdens and constraints on motor carriers far beyond those imposed on the owner-operators with whom they have contracted until now and would otherwise continue to contract, *Dynamex* and now AB-5 significantly impair motor carriers ability to provide—and their customers' ability to obtain—timely, peak, and/or specialized trucking services.

61.     Effectively prohibiting motor carriers from contracting with individual owner-operators and requiring that such drivers be treated as employees entitled to the protections of the Labor Code and Wage Order No. 9 also directly impacts the routes that a motor carrier must use when providing services to its customers.  This is true for at least three distinct reasons.  First, routes must be reconfigured by the motor carriers to ensure drivers are able to park the trucks legally and safely in order to take the meal and rest periods mandated by California law.  Second, motor carriers must reconfigure and consolidate routes to minimize, through increased efficiency, the effect of the higher fixed costs associated with owning vehicles and the decreased productivity, greater fuel consumption, and increased emissions in using employee drivers subject to the Labor Code and Wage Order No. 9.  Third, for motor carriers that contract with owner-operators to provide interstate trucking services originating or terminating in other states, such motor carriers must reconfigure routes to arrange for the transfer and movement of any cargo within California by employee drivers only.

62.     The prices that a motor carrier charges its customers are also directly impacted by the effective foreclosure of the use of independent-contractor owner-

1  operators.  Because a motor carrier incurs significantly more expenses maintaining a

2  fleet of trucks and employee drivers than it does using individual owner-operators

3  driving trucks that they own, forcing motor carriers to hire employees rather than

4  contracting with independent contractors will materially increase motor carriers'

5  costs.  The additional costs include the expenses of exercising the control over the

6  drivers and the drivers' operations that is necessary to ensure that the full panoply of

7  protections required under the Labor Code and Wage Order No. 9 are provided to the

8  drivers; the related training and benefits costs; costs in lower productivity from

9  employee drivers as compared to individual owner-operators; and the capital

10  expenditures necessary to obtain and maintain the trucks needed to provide the

11  trucking services.  Although not completely insensitive to changes in price, the

12  demand for trucking services is relatively inelastic given shippers' needs.  A farmer,

13  for example, is unlikely to let his or her crop rot in the field merely because the cost

14  of shipping it to market has increased a few percent.  Given the relative inelasticity

15  of demand for trucking services, much of the increased cost that motor carriers will

16  incur as a result of having to hire employees rather than contracting with independent

17  contractors will be passed on to their customers and reflected in higher shipping

18  prices.

19       63.    The *Dynamex* decision and now AB-5 put Plaintiffs in an impossible

20  bind.  CTA's motor-carrier members must either completely revamp their traditional

21  business model, and change the prices, routes, and services that they offer their

22  customers, or risk criminal and civil liability for violation of the Labor Code and

23  Wage Order No. 9.

24       64.    For their part, if they are to comply with the Labor Code and Wage

25  Order No. 9, motor carriers must begin to acquire trucks, to hire and train employees,

26  and to establish the administrative infrastructure necessary to ensure compliance

27  with these statutes.  This is particularly true since AB-5 is scheduled to take effect on

28  January 1, 2020, which is less than two months away and which highlights the

20

Case No. 3:18-cv-02458-BEN-BLM

immediate need for the injunctive relief requested by Plaintiffs.

65.     Obtaining the necessary capital, finding the appropriate employees, and building the requisite administrative capacity to comply with *Dynamex* and now AB-5 requires long-term planning.  Such planning is difficult if not impossible so long as the legal validity of the ABC test remains in dispute.  A bank is unlikely to lend money to a motor carrier to acquire a fleet of trucks, which represents a durable asset, when the bank knows that a motor carrier using owner-operators could provide the same trucking services at much lower cost and could thus make it hard for the borrower to service its debt if the ABC test is found to be preempted by federal law, as it has been in other jurisdictions and as is requested here.  Ironically, therefore, a failure to resolve the status of California's new ABC test will make it difficult for most motor carriers to comply with that test, thereby placing them in a terrible bind. If a motor carrier fearful of an enforcement action somehow manages to overcome the obstacles and obtain the necessary capital, that motor carrier risks competitive disadvantage and possible financial ruin if California's narrow ABC test is ultimately overturned and the motor carrier is saddled with capital expenses and administrative overhead that its competitors, who instead risked an enforcement action, are not burdened with.  Debt servicing and competitors aside, a motor carrier who, out of fear of enforcement, begins acquiring trucks and hiring employees in light of *Dynamex* and now AB-5 will be unable to recover certain costs—and will thus suffer irreparable injury—even if the ABC test is ultimately found to be unenforceable.  A motor carrier should not have to risk criminal and civil penalties to avoid those consequences.

66.     Alternatively, a motor carrier may decide to abandon the use of independent contractors in California and cease operating in California, as some motor carriers have done.  The fact that motor carriers which had previously operated throughout the United States cease operating in California illustrates the effect that *Dynamex* and now AB-5 are having on prices, routes, and services, and on

interstate commerce.  Less competition in the California market for trucking services necessarily results in heightened prices, diminished services, and the elimination of certain routes.

67.     Uncertainty as to the legal status of the ABC test also places owner-operators in a difficult bind.  As small-business owners, owner-operators, such as the two individual Plaintiffs in this action, must also make long-term capital investments—most importantly, in purchasing or leasing a truck.  They cannot reasonably do so until the legal status of *Dynamex* has been resolved.  They cannot afford to invest in a new truck, which will take years to pay off, if the motor carriers that have hired them until now will no longer do so.  The inability to invest in new trucks will cause owner-operators irreparable harm, by either forcing them out of business if their current truck dies or by preventing them from expanding their business despite otherwise feasible opportunities to do so.  Such losses are irreparable.

## FIRST CLAIM FOR RELIEF

### Supremacy Clause, U.S. Const. art. VI, § 3,

### Preemption by the FAAAA, § 49 U.S.C. 14501(c)

68.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

69.     The Supremacy Clause, which makes the federal constitution and laws "the supreme Law of the Land," U.S. Const. art. VI, § 3, together with the express preemption provision of the FAAAA, prohibit the State of California from making, applying, and enforcing laws "related to a price, route, or service of any motor carrier . . . or any private carrier, broker, or freight forwarder with respect to the transportation of property."  49 U.S.C. § 14501(c)(1).

70.     At all relevant times, Plaintiffs, CTA members, and all others similarly situated, had, have, and will have the right under the Supremacy Clause not to be subjected to or punished under state laws that interfere with, are contrary to, or are

THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

otherwise preempted by federal law.

71.    An actual controversy exists among the parties because CTA members cannot simultaneously contract with owner-operators and satisfy the ABC test as construed in *Dynamex* and codified by AB-5 and therefore are forced to cease contracting with Plaintiffs SINGH and ODOM and other similarly situated independent contractors to provide trucking services.

72.    Application of Prong B of the ABC test, as mandated by *Dynamex* and AB-5, directly impacts the services, routes and prices that CTA's members and other similarly situated motor carriers offer their customers for the transportation of property.

73.    Under the interpretation of Wage Order No. 9 that prevailed prior to *Dynamex*, motor carriers were able to contract with an extensive network of independent contractors to provide virtually any type and number of trucks, trailers, drivers, and equipment needed for a particular job on very short notice.  Following *Dynamex* and now AB-5, motor carriers that continue to use individual owner-operators to provide such services face the risk of significant civil and criminal penalties arising from the violation of the Labor Code and Wage Order No. 9.

74.    If they wish to avoid incurring such liability, motor carriers will be forced to cease using independent contractors to provide trucking services.  If they do so, licensed motor carriers will also be forced to cease providing the services of certain trucks, trailers, drivers, and equipment because they do not have them available in their own fleet or workforce.  It is cost-prohibitive for motor carriers to acquire every possible type of truck, trailer, and equipment that might possibly be needed at any given time, especially those that are only utilized occasionally.  A motor carrier that chooses to invest in specialized trucks demanded only sporadically by its customers will have to charge its customers higher prices than before for those specialized services—services that the motor carrier had previously provided on an as-needed basis by contracting with owner-operators.  As independent contractors

providing services to the customers of various motor carriers, owner-operators could aggregate the demand for specialized services and could thus amortize the cost of the specialized equipment over more loads—and thus charge lower per load prices— than is possible for any one motor carrier.

75.  Thus, under the new ABC test announced in *Dynamex* and codified by AB-5, licensed motor carriers must scale back their service offerings to only those trucks, trailers, drivers, equipment, and skilled drivers for which there is regular demand, must charge higher prices for those services, or must incur the risk of enforcement and civil actions and significant civil and criminal liability.  Similarly, under the new ABC test, Plaintiffs SINGH and ODOM face the threat of losing their businesses because they are not able to lawfully contract as individual owner-operators with motor carriers to provide trucking services in California to the motor carriers' customers.

76.  The ABC test is also impliedly preempted by the FAAAA because, insofar as the new rule effectively bars CTA motor-carrier members from using individual owner-operators to provide trucking services to their customers, it is an obstacle to "Congress' overarching goal" of "helping assure transportation rates, routes, and services that reflect 'maximum reliance on competitive market forces.'" *Rowe*, 552 U.S. at 371.

77.  Unless Defendants are restrained and enjoined from enforcing the newly created Labor Code § 2750.3 and Wage Order No. 9 as construed by the California Supreme Court in *Dynamex*, CTA members and other similarly situated motor carriers will suffer irreparable harm.  Under the new ABC test, CTA members and other similarly situated motor carriers that continue to engage owner-operators when needed to provide services to their customers face the prospect of the civil and criminal penalties and enforcement actions authorized by the Labor Code and Wage Order No. 9, as well as costly litigation, including class-action worker-misclassification lawsuits initiated by private parties who claim to be improperly

classified as independent contractors.  If motor carriers instead cease contracting with *bona fide* independent contractors like Plaintiffs SINGH and ODOM in order to avoid liability, that change to their business model will directly impact the types of services the motor carriers provide to their customers, the routes the drivers must take, and the prices that the motor carriers charge their customers for services.

78.    The threat that Labor Code § 2750.3 and Wage Order No. 9 as construed in *Dynamex* will be enforced against the CTA's members, and the fact that the ABC test is currently being used to challenge their use of independent contractors in private class actions, constitutes an irreparable harm that makes injunctive relief appropriate.

79.    Plaintiffs suffer irreparable harm from the existing and future enforcement of the ABC test.  Such irreparable harm to the CTA motor carriers includes, but is not limited to, civil and criminal liability authorized under the Labor Code and Wage Order No. 9, costly litigation, including class actions initiated by private parties who claim to be improperly classified as independent contractors, and being compelled to cease providing to their customers the trucking services which can be afforded only by specialized independent owner-operators.  The irreparable harm to Plaintiffs SINGH and ODOM, and other owner-operators who are similarly situated, is the loss of their respective businesses, their ability to operate and grow as independent small businesses providing trucking services, and the attendant loss of personal freedom and opportunity.

80.    Plaintiffs have no plain, speedy, and adequate remedy at law, making injunctive relief necessary.

### SECOND CLAIM FOR RELIEF

**Commerce Clause of the United States Constitution,**

**Article 1, Section 8**

81.    Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

82.     The Commerce Clause of the United States Constitution, Article 1, section 8, protects the right to engage in interstate commerce free of undue burdens and discrimination by state governments.

83.     California's test for determining whether a worker is an employee or an independent contractor, as interpreted in *Dynamex* as to Wage Order No. 9 and now codified by AB-5, means that motor carriers must cease contracting with individual owner-operators to provide trucking services in California or face the risk of significant civil and criminal penalties arising from the violation of California law. Accordingly, the new ABC test deprives CTA's motor-carrier members, and other similarly situated motor carriers of the right to engage in interstate commerce—in particular, the interstate transportation of property—free of unreasonable burdens, as protected by the Commerce Clause.

84.     For example, in order to comply with the ABC test, motor carriers that contract with individual owner-operators to provide trucking services to customers for movements that originate in other states and terminate in California can no longer use that same individual owner-operator to perform the entire movement.  Instead, under the new ABC test, the motor carrier must terminate that movement by the individual owner-operator at the California border and arrange for the final leg of that movement within California by an employee driver entitled to the protections of the Labor Code and Wage Order No. 9.  Similarly, for movements that originate in California and terminate in a different state, the motor carrier cannot contract with an individual owner-operator for that entire movement but must instead employ a driver entitled to the protections afforded by the Labor Code and Wage Order No. 9 to complete that first leg of the movement to the California border.

85.     The new ABC test is unlawful, and is void and unenforceable pursuant to the Commerce Clause of the United States Constitution as an unreasonable burden on interstate commerce.

86.     Individual Plaintiffs, CTA's motor-carrier members, and other similarly

situated motor carriers will incur irreparable harm from this constitutional violation.

**<u>THIRD CLAIM FOR RELIEF</u>**

**Supremacy Clause, U.S. Const. art. VI, § 3,**

**Preemption Under 49 U.S.C. § 31141(a)**

87.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

88.     The Supremacy Clause, which makes the federal constitution and laws "the supreme Law of the Land," U.S. Const. art. VI, § 3, together with the express preemption provision of 49 U.S.C. § 31141, prohibit states from enforcing a law or regulation on commercial motor vehicle safety that the Secretary of Transportation has determined to be preempted.  49 U.S.C. § 31141 (a).

89.     At all relevant times, Plaintiffs, CTA members, and all others similarly situated, had, have, and will have the right under the Supremacy Clause not to be subjected to or punished under state laws that interfere with, are contrary to, or are otherwise preempted by federal law.

90.     Pursuant to 49 U.S.C. § 31136, the Secretary of Transportation is responsible for promulgating regulations prescribing the minimum safety standards for commercial motor vehicles.  Among the regulations prescribed by the Secretary of Transportation are the federal Hours-of-Service ("HOS") regulations promulgated by the Federal Motor Carrier Safety Administration ("FMCSA"), which are found at 49 C.F.R. §§ 395.1–395.13 and set forth various requirements for property-carrying drivers, including that a driver may drive a maximum of 11 hours after 10 consecutive hours off duty and may drive only if eight hours or less have passed since the driver's last off-duty or sleeper berth period of at least 30 minutes.

91.     On December 21, 2018, the FMCSA issued an Order pursuant to 49 U.S.C. § 31141(a) granting petitions filed by industry trade associations representing motor carriers, concluding that: (1) the California's meal and rest period requirements under Wage Order No. 9 and the California Labor Code ("meal and

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 122 of 295 (197 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 168   Filed 05/19/23   PageID.2470   Page 29 of 35
ER-122

rest period rules") are laws and regulations "on commercial motor vehicle safety," to the extent they apply to drivers of property-carrying commercial motor vehicles subject to the FMCSA's HOS rules; (2) the California meal and rest period rules are additional to or more stringent than the FMCSA's HOS rules; (3) the California meal and rest period rules have no safety benefit; (4) the California meal and rest period rules are incompatible with the FMCSA's HOS rules; and (5) enforcement of the California meal and rest period rules would cause an unreasonable burden on interstate commerce.

92.     The FMCSA Order ruled that California may no longer enforce the meal and rest period rules with respect to drivers of property-carrying commercial motor vehicles subject to FMCSA's HOS rules.

93.     In accordance with the FMCSA Order issued pursuant to 49 U.S.C. 31141, the application of California's meal and rest period rules with respect to drivers of property-carrying commercial motor vehicles subject to FMCSA's HOS rules is unlawful, void and unenforceable.

94.     Individual Plaintiffs, CTA's motor-carrier members, and other similarly situated motor carriers who employ, or are deemed to employ, drivers of property-carrying commercial motor vehicles subject to FMCSA's HOS rules will incur, among other things, irreparable harm in lost and decreased productivity and increased administrative burdens and costs from any continuing enforcement of the California meal and rest period rules by Defendants.

## FOURTH CLAIM FOR RELIEF

### Equal Protection Clause, Fourteenth Amendment to U.S. Const.

95.     Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

96.     The Equal Protection Clause, found as the Fourteenth Amendment to the United State Constitution, establishes that "[n]o State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States;

nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

97.     California's worker-classification scheme as embodied principally by AB-5 and AB-2257 (along with AB-170) violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution in at least two primary ways.  Without advancing a legitimate governmental interest or rational basis for drawing distinctions, these laws establish differences: (1) between motor carriers and other types of businesses; and (2) between interstate motor carriers and intrastate construction trucking services.

98.     This worker-classification scheme is not rationally related to its stated purposes of protecting workers.  To the contrary—AB-5 and AB-2257 remove millions of workers from the ABC test established by *Dynamex* and instead re-establish the same *Borello* test which the bills' sponsors claim is inadequate to protect workers.  If the California Legislature's goal in enacting these amendments was in reality to protect workers from the perceived harms caused by purported misclassification, the statute would not contain dozens of exemptions from the ABC test—all of which affirmatively revoke the application of the ABC test that these workers received in wage order claims under the *Dynamex* decision—and the Legislature would not have rushed to seek hundreds of new exemptions.  It would also not have specifically exempted workers in industries perceived to have higher misclassification rates, such as the construction, janitorial, and hospitality industries.  This includes a *specific* exemption for one segment of motor carriers—"construction trucking services"—such that those drivers engaged in a largely intrastate activity may be able to continue to work as independent contractors, while other owner-operators not performing construction trucking services must work exclusively as employees.

99.     Where, as here, the breadth of the statute is so discontinuous with the

THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

reasons offered for it that the statute is inexplicable by anything but animus toward the class it is designed to harm, the statute lacks a rational relationship to legitimate state interests.  And where, as here, the exclusion of thousands of workers from the purportedly less flexible ABC standard for the purpose of wage orders is inconsistent with the state's asserted interest even taken on its own terms for passing the law, the law violates equal protection.

100.   As noted, the statutes drew irrational distinctions between owner-operators who wish to contract with motor carriers with owner-operators who wish to contract with brokers and others providing construction trucking services.  Consequently, the California Legislature did not even single out all trucking companies, but instead disfavored motor carriers to otherwise similar businesses responsible for providing construction trucking.

101.   The pretextual nature of California's proffered explanations for the classification scheme's differential treatment is apparent from the face of the statutes.  There is no rational distinction between motor carriers and many of the other companies granted exemptions under AB-5, and especially not between Plaintiffs and the construction trucking companies exempted through AB-2257.  This type of singling out fails to meet even rational basis review.

102.   And any such proffered explanation is easily undone by the Legislature's rapid response to the chaos and economic destruction caused by AB-5 to exempt dozens upon dozens of other occupations accidentally caught up by their first attempt through AB-2257's additional amendments.

103.   Plaintiffs, like app-based workers, are a politically disfavored group within the California government, similar to other disfavored groups (such as "hippies," civilian gun owners, companies disfavored by unions, and Planned Parenthood) that the Supreme Court and lower courts have protected against disparate treatment in legislation.

104.   Strict scrutiny review applies because the worker-classification scheme

was designed to burden the fundamental rights of motor carriers and owner-operators to pursue their chosen profession and determine when and how they earn a living.

105.   In addition, there is no rational basis for targeting motor carriers for disfavored treatment.  AB-5 and AB-2257 ostensibly exempted business-to-business services, freelance writers, grant writers, graphic designers, insurance agents, direct sellers, manicurists, hair dressers, real estate agents, recording artists, musicians, songwriters, composers, record producers, musical engineers, interpreters, independent radio promoters, film and independent production crews, publicists, proofers, competition judges, and independent service providers who use platforms to find leads for customers looking for graphic design, web design, photography, tutoring, consulting, youth sports coaching, wedding or event planning, minor home repair, moving, home cleaning, errands, furniture assembly, animal services, dog walking, dog grooming, picture hanging, pool cleaning, or yard cleanup, captioning, and interpreting and translating services (among untold others).  Yet the independence, autonomy, and other characteristics these types of workers enjoy are similar in all relevant respects to the owner-operators who contract with motor carriers.  If anything, there is a much greater history—and federally recognized role—for owner-operators to exist as independent contractors in the trucking industry, unlike various exceptions made by the Legislature for newfangled roles.

106.   Not only is animus toward motor carriers the only *possible* explanation for the express exemption of a litany of similarly situated companies but not trucking companies, but it is also the *actual* explanation for the scheme.  The public record is filled with statements by California legislators, including the sponsor of AB-5, attacking motor carriers specifically, targeting such companies in their support of AB-5 and stating their view that AB-5 will stop the purported "abuses by . . . trucking" companies.

107.   The manner in which AB-5's exemptions were created further confirms that the statute violates the Equal Protection Clause.  Many exemptions resulted from

THIRD AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  "back door" deals and political favors to industry groups—*i.e.*, not a valid legislative

2  purpose.  Truckers transporting construction materials are not different in any other

3  material way from interstate owner-operators.  In both cases, there are independent

4  contractor drivers who have many years of experience in the industry, who have

5  invested considerable money in purchasing their own vehicles, who are moving

6  heavy goods on interstate highways, and who are subject to licensing and other

7  safety regulations.  If anything, interstate owner-operators are subject to greater

8  federal regulations and safety requirements, since they must abide by the DOT's

9  HOS regulations, whereas intrastate construction truckers may be only subject to

10  California's rules.

11  108.  None of numerous exempted companies—as well as construction

12  trucking—are distinguished from Plaintiffs in any rational way.  This is not

13  surprising, since the principal sponsor of AB-5, and AB 2257's numerous

14  exemptions for other similarly situated companies, is a member of the IBT who is

15  acting as the arm for the unions to such an extent that she represents herself to be the

16  union.  And there is no other conceivable explanation for these numerous other

17  specific carve-outs but to secure the support of these same unions by targeting

18  Plaintiffs for disparate and unfair treatment.

19  109.  Legislatures may not draw lines for the purpose of arbitrarily excluding

20  individuals, including by doing so as a concession to one constituent but not another,

21  when there is no other rational basis for doing so.  Yet, the Legislature not only

22  created an exemption for construction, but a specific exemption for construction

23  trucking services, thereby affecting a largely intrastate business.  In contrast, the

24  Legislature was unwilling to countenance any similar exemption for interstate

25  trucking.  As such, AB-5 and AB-227 have a lesser impact on California citizens

26  engaged in intrastate activities, while disadvantaging various non-California

27  businesses and owner-operators who are engaged in interstate trucking.

28  110.  The public record is replete with evidence showing that California

32

Case No. 3:18-cv-02458-BEN-BLM

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 127 of 295 (202 of 372)
Case 3:18-cv-02458-BEN-DEB Document 168 Filed 05/19/23 PageID.2475 Page 34 of 35
ER-127

legislators supported the worker-classification scheme in an effort to isolate and harm certain industries, including particularly trucking companies and app-based businesses. The malicious and arbitrary purpose of the statutes—combined with the back-room dealing that led to their laundry list of irrational exemptions—creates a "wholly arbitrary" standard in violation of equal protection.

## FIFTH CLAIM FOR RELIEF

### Equal Protection Clause, Cal. Const. ar. I, §§ 3(b)(4) & (7)

111. Plaintiffs incorporate by reference the preceding paragraphs of this complaint.

112. For substantially the same reasons as described in the Fourth Claim for Relief, AB-5 violates Article 1, Section 3(b)(4) of the California Constitution.

113. California businesses have a constitutionally protected interest in operating free from unreasonable governmental interference. Businesses are therefore protected from baseless or invidiously discriminatory standards and have a right to be free from excessive and unreasonable government conduct intentionally directed toward them to force them out of business.

114. Plaintiffs will be deprived of equal protection under the law in violation of the California Constitution if AB-5 is enforced against them.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

1. This Court issue a declaration that, with respect to the trucking industry, the ABC test set forth in AB-5 and, before it, Wage Order No. 9 as construed by the California Supreme Court in *Dynamex*, are expressly and impliedly preempted by federal law;

2. This Court issue a declaration that, with respect to the trucking industry, the ABC test set forth in AB-5 and, before it, Wage Order No. 9 as construed by the California Supreme Court in *Dynamex*, violate the Commerce Clause and is

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 128 of 295 (203 of 372)
Case 3:18-cv-02458-BEN-DEB Document 168 Filed 05/19/23 PageID.2476 Page 35 of 35
ER-128

1    therefore unconstitutional;

2        3.    This Court issue a declaration that California's meal and rest period

3    requirements are expressly preempted and may not be enforced with respect to

4    drivers of property-carrying commercial motor vehicles subject to the federal HOS

5    rules.

6        4.    This Court issue a declaration that, with respect to the trucking industry,

7    the ABC test set forth in AB-2257 violates the Equal Protection Clause and is

8    therefore unconstitutional;

9        5.    This Court issue a preliminary and permanent injunction prohibiting

10   Defendants, and any division, board or commission within such Defendants, from

11   enforcing the ABC test set forth in AB-5 or Wage Order No. 9 as construed by the

12   California Supreme Court in *Dynamex* and, pursuant to Labor Code § 2750.3(a)(3),

13   issue a declaration that the determination of employee or independent-contractor

14   status with respect to Plaintiffs ODOM and SINGH and drivers of property-carrying

15   commercial motor vehicles performing trucking services for motor-carrier members

16   of Plaintiff CTA shall be governed by the California Supreme Court's decision in

17   *S.G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341

18   (1989).

19       6.    For an award of attorneys' fees, costs, and expenses in this action

20   pursuant to 42 U.S.C. § 1988; and

21       7.    Such other relief as this Court deems just and proper.

22   DATED:  May 19, 2023          OGLETREE, DEAKINS, NASH, SMOAK &
                                    STEWART, P.C.
23

24                                 By: /s/ Alexander M. Chemers
                                        Robert R. Roginson
25                                      Spencer C. Skeen
                                        Alexander M. Chemers
26
                                   Attorneys for Plaintiffs
27                                 CALIFORNIA TRUCKING ASSOCIATION,
                                   RAVINDER SINGH, and THOMAS ODOM
28

1   Timothy A. Horton (S.B.N. 205414)
    THE LAW OFFICE OF TIMOTHY A. HORTON
2   600 W. Broadway, Suite 700
    San Diego, CA 92101
3   Telephone: (619) 272-7017
4   timhorton@timhortonlaw.com

5
    Paul D. Cullen, Jr. (pro hac vice)
6   pxc@cullenlaw.com
    Charles R. Stinson (pro hac vice)
7   crs@cullenlaw.com
8   THE CULLEN LAW FIRM, PLLC
    1101 30th Street, NW, Suite 300
9   Washington, DC 20007
    Telephone: (202) 944-8600
10
11  *Attorneys for Intervenor-Plaintiff*
    *Owner-Operator Independent Drivers Association*
12

13              **UNITED STATES DISTRICT COURT**

14            **SOUTHERN DISTRICT OF CALIFORNIA**

15  CALIFORNIA TRUCKING                Case No.  3:18-CV-02458-BEN-DEB
    ASSOCIATION *et al.,*
16                                     **AMENDED COMPLAINT FOR**
              Plaintiffs,              **DECLARATORY AND**
17                                     **INJUNCTIVE RELIEF**
    OWNER-OPERATOR
18  INDEPENDENT DRIVERS
    ASSOCIATION,
19
              Intervenor- Plaintiff,
20
21    v.

22  BOB BONTA, *et al.,*

23            Defendants.

24

25        Plaintiff    OWNER-OPERATOR    INDEPENDENT    DRIVERS

26  ASSOCIATION, INC. ("OOIDA") intervenes in this ongoing litigation challenging

27  the enforcement of the ABC test, as first codified by AB 5 and later amended by AB

28  2257, against the motor carrier industry. OOIDA adopts the allegations set forth in

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 130 of 295    (205 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 166   Filed 05/19/23   PageID.2402   Page 2 of 22
ER-130

the Second Amended Complaint for Declaratory and Injunctive Relief (ECF No. 47) unless otherwise stated below and so long as those allegations are not contrary to OOIDA's allegations. OOIDA states its proposed complaint for declaratory and injunctive relief against State Defendants and Intervenor Defendant as follows:

## **INTRODUCTION**

1.      OOIDA brings this lawsuit to intervene to protect the rights of its members to engage in interstate commerce free from unduly burdensome state-imposed laws, which interfere with the interstate motor carrier industry and their chosen professions, under the Supremacy Clause and Commerce Clause of the United States Constitution.

2.      OOIDA seeks declaratory and injunctive relief prohibiting State Defendants from enforcing California's new, rigid worker classification test established by California Assembly Bill 5 ("AB 5") and subsequently amended by AB 2257, codifying the test set forth in *Dynamex Operations West, Inc. v. Superior Court*, 4 Cal. 5th 903 (2018). *See* Cal. Lab. Code § 2775.[1]

3.      Section 2275(b)(1) provides that:

> [A] person providing labor or services for remuneration shall be considered an employee rather than an independent contractor unless the hiring entity demonstrates that all of the following conditions are satisfied:
>
>> (A) The person is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the work and in fact.
>>
>> (B) The person performs work that is outside the usual course of the hiring entity's business.

---

[1] AB 5 was subsequently amended by AB 2257 earlier this year. Those amendments did not substantively change the ABC test previously located at Cal. Lab. Code § 2750.3. *See* Second Amended Complaint for Declaratory and Injunctive Relief (ECF No. 47) ("Am. Compl.") ¶ 3.

AMENDED COMPLAINT                          - 1 -                    Case No. 3:18-cv-02458-BEN-DEB

(C) The person is customarily engaged in an independently established trade, occupation, or business of the same nature as that involved in the work performed.

4.    Section 2275 ("the ABC test") applies to California's Labor Code, the Unemployment Insurance Code, and wage orders of the Industrial Welfare Commission. *See* Cal. Lab. Code § 2775(b)(1).

5.    On its face, the ABC test is not limited in its application to those businesses that are based in California or conduct a majority of their work in the state.

6.    On its face, the ABC test is also not limited in its application to those workers that are based in California or perform a majority of their professional responsibilities in the state.

7.    Instead, the ABC test applies to any business or individual that conducts any work or provides any service in California.

8.    The ABC test departs from the multi-factor test, often referred to as the *Borello* test, previously established by *S. G. Borello & Sons, Inc. v. Department of Industrial Relations*, 48 Cal. 3d 341 (1989).

9.    The *Borello* test took into consideration at least eight different factors, not one of which was dispositive of a worker's status as an employee or independent contractor.

10.    Nevertheless, under the *Borello* test, the State found in the worker's favor in 97% of cases. *See* Intervenor-Defendant's Mem. in Supp. of Mot. to Dismiss (ECF No. 63-1) at 6 (citing Analysis of SB 1402, California Senate Committee on May 7, 2018).

11.    The majority of OOIDA's members are independent owner-operators who provide interstate freight transportation services.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 132 of 295   (207 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 166  Filed 05/19/23  PageID.2404  Page 4 of 22
ER-132

12.    An independent owner-operator is a truck driver who operates a small trucking business: he or she owns at least one truck and typically provides interstate transportation services to motor carriers as an independent contractor.

13.    The business relationship under which an independent owner-operator provides transportation services to a motor carrier as an independent contractor is known as the leased owner-operator model and is governed by the federal Truth-in-Leasing regulations promulgated by the Federal Motor Carrier Safety Administration. *See* 49 C.F.R. §§ 376.1-376.42.

14.    Independent owner-operators that provide transportation services to motor carriers are often referred to as leased owner-operators or as being leased on to a motor carrier.

15.    The ability of owner-operators to lease on to a motor carrier allows owner-operators to start and run their own interstate freight transportation businesses without obtaining their own federal motor carrier operating authority.

16.    Independent owner-operators choose to work as independent contractors rather than employee drivers because of the additional freedom they enjoy and control they are able to exercise in operating their businesses.

17.    The independent owner-operator model has been a vital entrepreneurial avenue for truck drivers looking to build their own businesses and to have a greater say in developing their career in the trucking industry.

18.    Some of OOIDA's members are small-business interstate motor carriers that have obtained their own federal motor carrier operating authority.

19.    These members can and do work with independent owner-operators who provide their services as independent contractors.

20.    These small-business motor carriers also contract with other motor carriers.

21.    OOIDA's independent owner-operator and small-business interstate motor carrier members are based throughout the United States.

1    22.    Many of these members depend on access to the California market to

2    pick up freight being shipped from California and to drop off freight destined for

3    California and beyond.

4    23.    OOIDA's members also use California highways to transport freight in

5    interstate commerce between other states.

6    24.    Prior to AB 5 and but for the ABC test, OOIDA's independent owner-

7    operator members could work as independent contractors to deliver freight from, to,

8    or through California regardless of where they or the motor carriers they work for

9    are based in the United States.

10    25.    Under the ABC test, independent owner-operators are no longer able to

11    provide their services as independent contractors to motor carriers when delivering

12    freight from, to, or through California.

13    26.    Instead, under the ABC test, independent owner-operators will be

14    forced to: (1) close their businesses altogether and potentially lose the value in the

15    trucks or equipment in which they have invested; (2) abandon their businesses to

16    become employee drivers (assuming they can obtain such opportunities); or (3) if

17    they have sufficient experience and ability, obtain their own operating authority and

18    incur the costs and risks necessary to become interstate motor carriers.

19    27.    Under the ABC test, independent owner-operators would be forced to

20    abandon the business model and contractual relationships that they have chosen to

21    continue their trucking careers.

22    28.    But for the ABC test, many independent owner-operators would not

23    abandon their businesses, become employee drivers, or obtain their own operating

24    authority.

25    29.    Current owner-operators who obtain their own operating authority to

26    become motor carriers will face the same constraints as existing interstate motor

27    carriers: they will be unable to contract with independent owner-operators to deliver

28    freight from, to, or through California.

30.     OOIDA seeks a declaration that Section 2775(b)(1)(B) ("Prong B" of the ABC test) violates the dormant Commerce Clause by unduly burdening interstate commerce and a corresponding injunction prohibiting State Defendants from enforcing Prong B against the motor carrier industry.

31.     The ABC test unduly burdens interstate commerce by forcing independent interstate owner-operators to fundamentally alter their businesses or give up their businesses altogether to continue serving the California market. This is true even if the independent owner-operator is based outside California or spends a majority of their time working outside California.

32.     The ABC test also unduly burdens interstate commerce by discriminating between motor carriers that rely on employee drivers, which will be able to continue their business operations as usual, and those that rely on independent owner-operators, which will not be able to do business with owner-operators as usual, if at all, in California.

33.     Prong B of the ABC test will insulate in-state motor carriers relying on employee drivers from innovation and competition by out-of-state motor carriers that primarily rely on independent owner-operators. The costs associated with altering their business practices will deter those motor carriers from competing for and agreeing to move freight that originates in or is destined for California.

34.     If motor carriers that rely on independent owner-operators decline to compete for freight originating in or destined for California, independent owner-operators based throughout the nation will be deprived of income for transporting freight that they would have otherwise willingly and freely agreed to transport.

35.     Prong B of the ABC test will also increase the cost of starting a new interstate motor carrier that hopes, intends, or will need to rely on access to the California market, thus further reducing competition in the motor carrier industry and protecting existing carriers from new entrants.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 135 of 295 (210 of 372)
Case 3:18-cv-02458-BEN-DEB Document 166 Filed 05/19/23 PageID.2407 Page 7 of 22
ER-135

36. Small-business motor carriers will be particularly disadvantaged as they will be less able to adapt to the increased costs and challenges associated with using employee drivers.

37. The practical effect of Prong B of the ABC test is to legislate how businesses are formed, how businesses are operated, and which business models are preferred far beyond California's borders for the privilege of transporting freight into, out of, and through the state.

38. OOIDA also seeks a declaration that Prong B of the ABC test is preempted by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"), 49 U.S.C. § 14501, and a corresponding injunction prohibiting State Defendants from enforcing Prong B.

39. The stated purpose of AB 5 was to "ensure workers who are currently exploited by being misclassified as independent contractors instead of recognized as employees have the basic rights and protections they deserve under the law including a minimum wage, workers' compensation if they are injured on the job, unemployment insurance, paid sick leave, and paid family leave." AB 5 §1(e).

40. The legislative history of AB 5, however, and the public statements of its proponents, believe the intended purpose is to fundamentally change portions of the trucking industry to use employee drivers rather than independent contractors. More employee truck drivers mean more potential union members of the IBT, the cause and former employer of the principal proponent of AB 5 in the General Assembly, former Representative Lorena Gonzalez.

41. By way of example, those statements include:

- Then-Representative Gonzalez stated on the Assembly Floor on September 11, 2019 that one of the purposes of AB 5 was to "get[] rid of an outdated broker model that allows companies to basically make money and set rates for people that they called independent contractors."

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 136 of 295 (211 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 166    Filed 05/19/23    PageID.2408    Page 8 of 22
ER-136

1
2
3
4
5

- Then-Representative Gonzalez tweeted on November 21, 2019 that AB 5 (and its exceptions) permit a trucker to "work as an independent contractor for a construction firm" but "work as an employee for a trucking company," specifically acknowledging the disparate treatment of these similarly-situated operators.

6
7
8

- On September 2, 2019 tweet, then-Representative Gonzalez specifically referenced trucking and gig companies as a primary motivation for the reclassification brought about by AB 5.

9      42.    Borrowing from *Dynamex*, the legislature framed AB 5 as a statute of
10  general application. But the legislature carved out exceptions for workers in dozens
11  of industries and categories without justifying why those workers need any less
12  protection than the workers described in the purpose of the legislation or the
13  workers whose classification remained within the statute.

14      43.    The proliferation of exceptions to AB 5 for workers in businesses other
15  than trucking lacks any rational purpose and bears no relationship to AB 5's stated
16  purpose.

17      44.    Similarly, the specific carve-out for truckers in the construction
18  industry has no rational basis. Independent owner-operators, including many
19  OOIDA members, working in other industries are similarly situated to independent
20  owner-operators working in construction.

21      45.    Thus, the legislature exempted from AB 5 some truck drivers who are
22  indistinguishable with respect to the relevant business conditions from those truck
23  drivers represented by OOIDA to whom AB 5 applies. There is no legislative record
24  that demonstrates any rational basis for this legislative action. Indeed, the evidence
25  demonstrates that political animus motivated the disparate treatment of these
26  truckers.

27      46.     OOIDA seeks a declaration that the defendants have violated
28  OOIDA's members' rights protected by the Equal Protection clauses of the

AMENDED COMPLAINT                    - 7 -              Case No. 3:18-cv-02458-BEN-DEB

California and U.S. Constitutions and a corresponding preliminary and permanent injunction prohibiting the Defendants from enforcing AB 5 against the trucking industry.

## JURISDICTION AND VENUE

47.    This action arises under the Constitution and laws of the United States, including the Supremacy Clause, U.S. Const. art. VI, § 3; the Commerce Clause, U.S. Const., art. 1, § 8; the FAAAA, 49 U.S.C. §§ 14501(c), 14504a(c), and 14506; and the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 2201.

48.    This is a proceeding for declaratory judgment and injunctive relief under 28 U.S.C. §§ 2201-2202 and the Supremacy Clause and Commerce Clause of the United States Constitution. This action presents an actual controversy within the Court's jurisdiction.

49.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the transportation services provided by OOIDA's members, and the interstate independent owner-operators whose interests are represented by OOIDA, are contracted for and carried out within the geographical boundaries of this district, such that a substantial part of the events giving rise to the claim occurring in this district.

50.    This venue is also proper pursuant to Federal Rule of Civil Procedure 24 because OOIDA seeks to intervene in Plaintiffs' ongoing legal challenge to Prong B of the ABC test.

## PARTIES

51.    OOIDA is the largest international trade association representing the interests of independent owner-operators, small-business motor carriers, and professional truck drivers. It has more than 150,000 members located in all 50 states and Canada, who collectively own and operate more than 200,000 individual heavy-duty trucks. OOIDA is a leading advocate of single truck motor carriers, which

represent nearly half of the total active motor carriers in the United States, and independent owner-operators, which are a critical component of today's interstate motor carrier industry. Declaration of Todd Spencer in Support of Mot. to Intervene ("Spencer Decl.") ¶¶ 5-9 [ECF No. 122-3].

52.   Among the truck drivers directly represented by OOIDA are 6,103 members based in California. An additional 7,050 members reside nearby in Arizona, Nevada, Oregon, and Washington. Spencer Decl. ¶ 10.

53.   An even greater number independent owner-operator OOIDA members are based throughout the United States. Spencer Decl. ¶¶ 6, 11.

54.   These members rely on the independent owner-operator, also known as the leased owner-operator, model to occasionally, if not regularly, transport freight from, to, or through California.

55.   OOIDA adopts Plaintiffs' description of the current parties as set forth in the Amended Complaint. Am. Compl. ¶¶ 14-22.

## GENERAL ALLEGATIONS

### Independent Owner-Operator Model

56.   There are approximately 350,000 to 400,000 independent owner-operators on the roads today in the United States. Spencer Decl. ¶ 12.

57.   Independent owner-operators typically first start and gain experience in the motor carrier industry as employee drivers. Spencer Decl. ¶ 14.

58.   Employee drivers do not own their trucks and do not operate their own trucking businesses.

59.   Employee drivers typically work on a schedule dictated by their employer, are not permitted to decline transporting assigned freight, and are required to abide by other employer-imposed restrictions such as the routes they take, and where they can obtain fuel. *See* Spencer Decl. ¶¶ 20, 24.

60.   Some of these employee drivers choose to start their own small trucking businesses by becoming independent owner-operators. Spencer Decl. ¶¶ 14-15.

61.   Independent owner-operators typically provide their driving services using the trucking equipment they own (a tractor and sometimes trailer) to motor carriers as independent contractors under a contract called a "lease." Spencer Decl. ¶ 15.

62.   Some independent owner-operators may own more than more tractor, allowing them to work with different motor carriers at the same time, and may even have employees.

63.   Most independent owner-operators, however, enter into contracts, also known as lease agreements, with motor carriers to drive their own tractors as independent contractors.

64.   An independent owner-operator can spend more than $200,000 to purchase a tractor and even more to acquire a trailer or specialized equipment to use in their business. *See* Spencer Decl. ¶ 15.

65.   Under their lease contracts with motor carriers, independent owner-operators transport freight under that motor carrier's federal interstate motor carrier operating authority. Spencer Decl. ¶¶ 14-15, 18.

66.   Independent owner-operators are often separately incorporated. Spencer Decl. ¶ 19.

67.   Independent owner-operators remain the sole owners of their trucks. They are responsible for maintaining their trucks, setting their own schedules, deciding what freight they want to transport, selecting the route that works best for them, cultivating their own relationships and business goodwill, and otherwise operating their trucks as would any other small trucking business. Spencer Decl. ¶¶ 19-22.

68.   Independent owner-operators also invest in trailers, flatbeds, tankers, and others specialized equipment to grow their businesses and increase their opportunities. Spencer Decl. ¶ 20.

69.    Some motor carriers who contract with independent owner-operators own little or none of the tractor and trailer equipment used to haul freight under their own authority. Spencer Decl. ¶ 26.

70.    Independent owner-operators can be based throughout the nation regardless of where the motor carrier to which they are leased is based. Spencer Decl. ¶¶ 16-17.

71.    Independent owner-operators can be part of motor carrier fleets that also rely on employee drivers. Independent owner-operators can transport freight along with employee drivers as part of an integrated supply chain or transport freight between two destinations while employee drivers cover different freight and/or routes. Spencer Decl. ¶¶ 25, 27.

72.    Some independent owner-operators eventually choose to obtain their own federal interstate motor carrier operating authority. Spencer Decl. ¶ 28.

73.    These motor carriers can haul freight for a variety of shipping clients and contract with other trucker drivers, including independent owner-operators, to strategically expand their businesses.

74.    Small-business motor carriers can provide services as independent contractors and rely on independent owner-operators to respond to market demand. *See* Spencer Decl. ¶¶ 28-29.

75.    Of the approximately 530,000 interstate motor carriers operating in the United States, nearly 85% are fleets consisting of 1 to 6 tractors.

76.    Many of these motor carriers were founded by individuals who gained significant trucking experience as independent owner-operators. Spencer Decl. ¶ 30.

77.    The independent owner-operator model is an important part of the motor carrier industry and is a steppingstone for the creation of new motor carriers. *See* Spencer Decl. ¶¶ 22, 31, 43.

## Federal Regulation of the Motor Carrier Industry

78.   Federal regulation of the motor carrier industry has recognized and continues to recognize the importance of independent owner-operators.

79.   Although independent owner-operators have entered into different contractual arrangements with motor carriers over the years, they have been a consistent and important component of interstate commerce and the motor carrier industry for decades. *See* Spencer Decl. ¶¶ 13, 23.

80.   As early as the 1950s, the federal government has exercised oversight of the contractual relationship between motor carriers and owner-operators. *See* Amendments to the Interstate Commerce Act, Pub. L. No. 84-957; H.R. Rep. No. 84-2425, reprinted in 1956 U.S.C.C.A.N. 4304, 4309.

81.   As part of that regulation, the I.C.C. promulgated rules which stated, in part: "The lease shall provide that the authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease. The lease shall further provide that the authorized carrier lessee shall assume complete responsibility for the operation of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1).

82.   The regulations were motivated by "the Commission's deep concern for the problems faced by the owner-operator in making a decent living in his chosen profession." 42 Fed. Reg. 59984 (Lease & Interchange of Vehicles, Ex Parte No. MC-43 (Sub-No. 7)) (Nov. 23, 1977).

83.   In 1979, the I.C.C. adopted new rules governing the relationship between motor carriers and owner-operators in response to "a number of problems and abuses suffered by independent truckers." *Global Van Lines, Inc. v. I.C.C.*, 627 F.2d 546, 548 (D.C. Cir. 1980).

84.   These rules, which are known as the "Truth-in-Leasing Rules," were intended to strengthen and provide stability to the independent owner-operator model by guaranteeing "full disclosure of the benefits and obligations of leasing

1  arrangements between owner-operators and regulated carriers." Lease &

2  Interchange of Vehicles, 129 M.C.C. 700, 702 (June 13, 1978).

3      85.    According to the I.C.C., the Truth-in-Leasing Rules were intended to

4  "promote the stability and economic welfare of the independent trucker segment of

5  the motor carrier industry." Lease & Interchange of Vehicles, 131 M.C.C. 141 (Jan.

6  9, 1979).

7      86.    In addressing the issues negatively impacting owner-operators, the

8  Truth-in-Leasing Rules did not, and were not intended to, eliminate the independent

9  owner-operator model or the ability for owner-operators to work as independent

10  contractors for motor carriers.

11      87.    The relationship between independent owner-operators and motor

12  carriers, particularly motor carriers' use of equipment owned by independent owner-

13  operators, continues to be regulated pursuant to 49 U.S.C. § 14102.

14      88.    The Truth-in-Leasing Rules also govern other aspects of the

15  relationship between independent owner-operators and motor carriers, including the

16  amount of compensation to be paid for both the equipment and the driver's services

17  and who will be responsible for loading and unloading the truck. *See* 49 C.F.R. §

18  376.12(d)-(e).

19      89.    The importance of independent owner-operators was also

20  acknowledged by Congress when it enacted the FAAAA. *See* H.R. Conf. Rep. No.

21  103-677, at 87 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715, 1759 (explaining how

22  California passed legislation discriminating against motor carriers "using a large

23  proportion of own-operators instead of company employees").

24  **The ABC Test prohibits Independent Owner-Operators from continuing to**
25  **operate in California.**

26      90.    Independent owner-operators, by design, perform work that is within

27  "the usual course" of a motor carrier's business.

28

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 143 of 295    (218 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 166   Filed 05/19/23   PageID.2415   Page 15 of 22
ER-143

91.    Under Prong B of the ABC test, independent owner-operators are prohibited from continuing to work as independent contractors in California for motor carriers.

92.    Prior to the enactment of AB 5, motor carriers could and did contract with independent owner-operators based throughout the nation to transport freight from, to, and through California.

93.    Motor carriers continue to do so today pursuant to the preliminary injunction currently preventing the ABC test from being enforced against the motor carrier industry.

94.    But for the preliminary injunction, the ABC test would prevent independent owner-operators from continuing to work, in their chosen capacity as independent contractors, in California.

95.    On its face, the ABC test applies to any independent owner-operator or motor carrier operating in California, regardless of where they are based, how much time they spend in California, or how much of their business is actually conducted in the state.

96.    Independent owner-operators, including those based outside California or who spend a majority of their time working outside of California, will be forced to fundamentally change their businesses, decline freight originating from or destined for California, abandon their business to become employee drivers (provided such an opportunity is available), or cease trucking altogether.

97.    If they become employee drivers or cease trucking entirely, independent owner-operators not only risk losing significant value in the equipment and trucks they had purchased, they also risk losing their chosen profession and dream of being a small business owner.

98.    Alternatively, independent owner operators could be forced to turn over the freight they are carrying to an employee driver at the California border. Such a transfer of freight would result in lost earnings and transportation delays.

99.    The business-to-business exception, as amended by AB 2257, does not otherwise enable independent owner-operators to continue operating in California.

100.    In order to qualify for the business-to-business exception, an independent owner-operator must satisfy eleven factors. Cal. Lab. Code § 2776(a)(1)-(11).

101.    Several of those factors cannot be met by independent owner-operators.

102.    For example, the business-to-business exception requires that the "business service provider can contract with other businesses to provide the same or similar services and maintain a clientele without restrictions from the hiring entity." Cal. Lab. Code § 2776(a)(7).

103.    The Truth-in-Leasing Rules, however, require that the "authorized carrier lessee shall have exclusive possession, control, and use of the equipment for the duration of the lease." 49 C.F.R. § 376.12(c)(1).

104.    Similarly, the business-to-business exception requires that "[t]he business service provider advertises and holds itself out to the public as available to provide the same or similar services." Cal. Lab. Code § 2776(a)(8).

105.    The business-to-business exception is also inconsistent with the Truth-in-Leasing Rules, which explicitly recognize that a contract must give the motor carrier exclusive use of an owner-operator's equipment. 49 C.F.R. § 376.12 (c)(4).

106.    OOIDA adopts the allegations contained in Plaintiffs' Amended Complaint describing the obligations California imposes on hiring entities and the practical consequences of the ABC test on the business relationship between motor carriers and independent owner-operators. *See* Am. Compl. ¶¶ 38-42, 46-51.

107.    There are no definitive steps that current independent owner-operators can take to continue working as independent contractors in California.

108.    Obtaining federal interstate motor carrier operating authority does not per se satisfy the business-to-business exception to the ABC test.

109.   Moreover, obtaining federal interstate motor carrier operating authority involves greater burdens, including financial costs, with more statutory and regulatory responsibilities than those required of owner-operators.

110.   Not all owner-operators have the requisite experience to become a successful motor carrier and many that do have the requisite experience choose not to do so for both practical and business reasons.

111.   For example, becoming a motor carrier requires current independent owner-operators to obtain additional insurance, which can cost thousands of dollars that many independent owner-operators cannot afford.

112.   Relocating outside of California also does not present a solution for independent owner-operators because there are no express or implied limits to AB 5's geographical reach so long as the driver performs services within the state.

113.   OOIDA further adopts the allegation contained in paragraph 60 of Plaintiffs' Amended Complaint.

**<u>FIRST CLAIM FOR RELIEF</u>**

**Article I, Section 8 of the United States Constitutions (Commerce Clause)**

114.   OOIDA incorporates by reference preceding paragraphs 1-105 of its Proposed Complaint.

115.   The Commerce Clause of the United States Constitution protects the right to engage in interstate commerce free from state-imposed undue burdens.

116.   The Commerce Clause has long protected the motor carrier industry, including interstate small-business truckers (both motor carriers and independent owner-operators) from such burdens.

117.   Under the ABC test, motor carriers will no longer be able to contract with independent owner-operators as independent contractors to transport freight from, to, or through California regardless of where the independent owner-operators or motor carriers are based.

118.   For independent owner-operators, the ABC test means the end of their business as they know it today. Under AB 5, they must choose to change the way they operate, cease serving the California market, or cease working as truck drivers entirely.

119.   Regardless of how independent owner-operators attempt to adapt to the ABC test, independent owner-operators will incur unreasonable financial burdens in increased costs/reduced freight transportation opportunities. Accordingly, the interstate transportation of freight will be less efficient and more expensive.

120.   The ABC test intentionally and effectively discriminates against business relationships with independent contractors—motor carrier relationships with independent owner-operators—that are otherwise lawful throughout the nation, creating an undue burden on interstate commerce.

121.   Accordingly, the ABC test is unlawful and unenforceable pursuant to the Commerce Clause of the United States Constitution because it imposes undue burdens on interstate commerce.

## **SECOND CLAIM FOR RELIEF**

**Article IV, Section 3 of the United States Constitution (Supremacy Clause)**
**FAAAA preemption, 49 U.S.C. § 14501(c)**

122.   OOIDA incorporates by reference preceding paragraphs 1-105 of its Proposed Amended Complaint.

123.   The FAAAA prohibits states from enacting or enforcing a "law, regulation, or other provision having the force and effect of law related to a price, route, or service" of a motor carrier. 49 U.S.C. § 14501(c)(1).

124.   The Supremacy Clause of the United States Constitution prohibits states from enacting and enforcing state-imposed laws that have been expressly preempted by federal law.

125.   Prong B of the ABC test violates both the FAAAA and the Supremacy Clause by making it impossible for motor carriers operating in California to continue

to contract with independent owner-operators for the transportation of freight into, out of, or through California regardless of where they are based.

## **THIRD CLAIM FOR RELIEF**

### **Amendment XIV, Section 1 and Amendment V, Section of the United States Constitution (Equal Protection)**

126.   OOIDA incorporates by reference preceding paragraphs 1-125 of its Proposed Amended Complaint.

127.   AB 5 violates the Equal Protection Clause of the U.S. Constitution because it draws a distinction between similarly-situated workers—by exempting commercial vehicle operators working in the construction industry from its scope and including other commercial vehicle operators within its scope—with no rational basis or justification for such distinction.

128.   This carve-out for construction industry truckers bears no rational relationship to the claimed purpose of the law of protecting workers through proper classification. No rational basis exists for using one classification test for construction industry truckers—the *Borello* test—and another—AB 5—for other truckers, including OOIDA's members.

129.   The true basis in fact for this treatment of the trucking industry is political animus. As set forth above, AB 5's sponsor repeatedly stated AB 5's purpose of ending the independent owner-operator model. Yet the law carves out an exception for owner-operators in construction.

130.   Similarly, the dozens of other exemptions and exceptions for thousands of other workers bear no rational basis related to AB 5's claimed purpose of protecting workers. Rather than protect workers, the true purpose as repeated over and over again by AB 5's sponsors and proponents was to target specific groups of workers—namely, app-based workers and commercial truckers—based on political

expediency. The Legislature's repeated, myriad efforts to exclude thousands of workers from the so-called protections offered by AB 5's ABC test demonstrate that the claimed purpose of worker protection is an illusion.

131.  The sheer volume and diversity of exemptions and exceptions shows that AB 5 is not motivated by any rational basis. The disparate treatment of commercial truckers serves as one of many examples of textbook irrational and illegal economic classification and unequal treatment of similarly-situated persons.

132.  There exists no rational basis related to the protection of workers through proper classification that justifies the disparate treatment between construction and non-construction truckers or truckers and the dozens of workers whose political influence warranted a carve-out from AB 5.

133.  Truckers, particularly interstate truckers like OOIDA's members, are a frequent target of unpopular taxation and regulation due in large part to their transient nature and corresponding lack of political influence in any one state. It is no surprise that the construction trucking exemption disproportionately affects workers and companies that operate *intra*state—local entities with more influence on California politics. Yet the exemption shows no reason why those local truckers should be treated differently for the purposes of worker classification. And the public record demonstrates that the only motivation was political animus.

134.  That the trucking industry as a whole—an industry that employs thousands of *legitimate* independent contractors whose jobs are threatened by AB 5—was not able to secure an exemption but a subcategory of the powerful local construction industry was shows the true motivation for the disparate treatment of truckers.

135.  Furthermore, the obvious benefit to the Teamsters stemming from tens of thousands of independent contractor drivers being considered employees looms large in light of the pro-Teamster comments made by AB 5's sponsor throughout the adoption and implementation of the new, rigid classification rule.

AMENDED COMPLAINT                                        - 19 -                    Case No. 3:18-cv-02458-BEN-DEB

136.   AB 5 exempts some construction truckers from the ABC test and subjects most other truckers—including thousands of OOIDA's members—to the ABC test. This arbitrary distinction finds no rational basis in law or fact. AB 5 violates the Equal Protection Clause of the U.S. Constitution.

137.   OOIDA's members, furthermore, have no adequate remedy at law, as application of the ABC test to their industry will cause thousands of trucking companies and drivers to change their business models and/or leave the state.

## FOURTH CLAIM FOR RELIEF

### Article I, Sections 3(b)(4) & 7 of the California Constitution
### (Equal Protection)

138.   OOIDA incorporates by reference preceding paragraphs 1-137 of its Proposed Complaint.

139.   AB 5 violates Article I, Section 3(b)(4) and Section 7 of the California Constitution for substantially the same reasons it violates the Equal Protection Clause of the U.S. Constitution: Generally speaking, it draws a distinction between similarly-situated workers with no rational basis or justification for such distinction.

140.   Enforcement of AB 5 against OOIDA's members will deprive them of Equal Protection of the law as guaranteed by the California Constitution.

## REQUEST FOR RELIEF

**WHEREFORE**, OOIDA demands judgment against Defendants as follows:

1.      This Court issue a declaration that, as it pertains to the interstate motor carrier industry and interstate independent owner-operators, the ABC test, codified by AB 5, and Prong B in particular, violates the Commerce Clause.

2.     This Court issue a declaration that, as it pertains to the motor carrier industry, the ABC test, codified by AB 5, and Prong B in particular, is preempted by the FAAAA.

3.     This Court issue a declaration that, as it pertains to the motor carrier industry, the ABC test, codified by AB 5 violates the Equal Protection Clauses of the United States and California Constitutions.

4.     This Court issue an injunction prohibiting the enforcement of the ABC test, codified by AB 5, and Prong B in particular, against the motor carrier industry.

5.     For an award of attorneys' fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and

6.     Such other relief as this Court deems just and proper.

Dated: May 19, 2023          Respectfully submitted,

Timothy A. Horton
The Law Office of Timothy A. Horton
By:   /s/ Timothy A. Horton
       Timothy A. Horton

Local counsel for Intervenor-Plaintiff
Owner-Operator Independent Drivers
Association

Paul D. Cullen, Jr. (pro hac vice)
Charles R. Stinson (pro hac vice)

Attorneys for Intervenor-Plaintiffs
Owner-Operator Independent Drivers
Association

AMENDED COMPLAINT        - 21 -        Case No. 3:18-cv-02458-BEN-DEB

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 151 of 295 (226 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4179 Page 1 of 90

ER-151

# EXHIBIT 1

Timothy A. Horton (S.B.N. 205414)
THE LAW OFFICE OF TIMOTHY A. HORTON
600 W. Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 272-7017
timhorton@timhortonlaw.com

Paul D. Cullen, Jr. (pro hac vice)
pxc@cullenlaw.com
Charles R. Stinson (pro hac vice)
crs@cullenlaw.com
THE CULLEN LAW FIRM, PLLC
1101 30th Street, NW, Suite 300
Washington, DC 20007
Telephone: (202) 944-8600

*Attorneys for Intervenor-Plaintiff*
*Owner-Operator Independent Drivers Association*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION *et al.,*<br><br>Plaintiffs,<br><br>OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, INC.<br><br>Intervenor- Plaintiff,<br><br>v.<br><br>ATTORNEY GENERAL ROB BONTA, *et al.,*<br><br>Defendants. | Case No.  3:18-CV-02458-BEN-DEB<br><br>**DECLARATION OF TODD SPENCER IN SUPPORT OF INTERVENOR/PLAINTIFF OOIDA'S TRIAL BRIEF**<br><br>Judge: Hon. Roger T. Benitez<br>Date:  November 13, 2023<br>Time:  10:30 a.m.<br>**Courtroom: 5A** |

I, Todd Spencer, do hereby declare:

     1.    The facts set forth herein are of my own personal knowledge, and if called to testify thereto, I could and would do so under oath.

2.      I am the President of the Owner-Operator Independent Drivers Association, Inc. ("OOIDA"). I have held this position since 2018.

3.      I have been in the trucking industry since 1974 and have worked as an independent contractor truck driver.

4.       I have held an executive position in OOIDA, advocating for the rights of truck drivers, since 1981.

5.      OOIDA is a not-for-profit trade association representing the interests of independent contractor truck drivers, commonly called "owner-operators," as well as small-business motor carriers and professional drivers.

6.      OOIDA was founded in 1973 and today has more than approximately 150,000 members based in all fifty states and Canada.

7.      OOIDA members collectively own and operate more than 240,000 individual heavy-duty trucks.

8.      The overwhelming majority of OOIDA's members are part of the interstate motor carrier industry.

9.      OOIDA's membership consists of independent contractor owner-operator truck drivers and small business motor carriers.

10.      While a significant portion of OOIDA's members are independent contractor truck drivers, OOIDA is also the leading advocate of single-truck motor carriers. Single-truck motor carriers represent nearly half of all the active motor carriers in the United States. In addition, OOIDA has members that are small business motor carriers operating fleets of between 2 and 20 trucks.

11.      Small businesses represent 96% of all trucking companies in the United States.

12.      Most owner-operator truck drivers are sole proprietors and rely upon the independent contractor driver business model for their livelihood, contracting with motor carriers, shippers, or brokers to do business.

13.    OOIDA has approximately 6,103 members based in California. An additional 7,050 members reside nearby in Arizona, Nevada, Oregon, and Washington.

14.    These members, along with an even greater number of independent contractor truck drivers throughout the United States, have chosen to become small-business trucking companies and operate those businesses as independent contractors.

15.    There are an estimated 587,000 self-employed truck drivers, commonly referred to as owner-operators, in the United States in 2023. *See* Scott Elgin, Trucking Industry Trends, Statistics, & Forecast – 2023 Edition. (https://www.truckinfo.net/research/trucking-statistics).

### **The independent contractor truck driver business model is a critical part of the trucking industry, serving as an intermediate step in the career trajectory of many truckers.**

16.    While the independent contractor truck driver model has taken different forms over the years, independent contractor truck drivers have been a consistent and important component of interstate commerce and a critical segment of the trucking industry for decades.

17.    Typically, truck drivers start their careers as employee drivers. Employee drivers are assigned the truck they drive (which may not regularly be the same vehicle), told what loads to haul and what routes to take, and are denied all manner of self-determinative decisions and flexibility. They are generally closely monitored by the motor carrier that employs them.

18.    Eventually, some employee drivers decide to start their own small business trucking companies as independent contractors working for motor carriers.

19.    To become independent contractor truck drivers, they purchase their own trucks and sometimes additional equipment, which can cost hundreds of thousands of dollars.

20.     Typically, they then enter into a lease agreement with a single motor carrier and operate under that carrier's federally granted interstate motor carrier operating authority. The lease involves both the driver and the driver's equipment. These drivers are often referred to as independent contractor owner-operators or independent contractor drivers who are "leased on" with a motor carrier.

21.     Independent contractor owner-operators typically enter exclusive agreements with a motor carrier. Those lease agreements can automatically renew or be set for longer durations. Many independent contractor owner-operators work exclusively for the same motor carrier for several years on end.

22.     Independent contractor owner-operators assume business responsibilities and regulatory obligations that employee drivers do not have.

23.     Independent contractor owner-operators can be based anywhere in the country regardless of where the motor carrier to which they are leased is based.

24.     Regardless of where independent contractor owner-operators are based, they transport freight throughout the United States, including California.

25.     Independent contractor owner-operators are often separately incorporated. They remain the sole owners of their trucks, which they are responsible for maintaining.

26.     Independent contractor owner-operators can build business relationships, routines, and practices that make them successful business owners. Indeed, they are entrepreneurs.

27.     When the independent contractor owner-operator model is properly utilized, and motor carriers are in compliance with the federal Truth-in-Leasing regulations, 49 C.F.R. Part 376, their drivers have the ability to set their own schedules, choose the freight they want to transport, select their own routes to deliver that freight, purchase equipment that best serves their business needs, choose where and how that equipment is maintained, and make numerous other decisions that determine the success of their business, preferred lifestyle, and working conditions.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 156 of 295 (231 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4184 Page 6 of 90

ER-156

28.     These are the factors that should be used and are typically used to evaluate whether owner-operators are working as independent contractors.

29.     The federal Truth-in-Leasing regulations have recognized the existence and importance of independent contractor owner-operators in the motor carrier industry for decades. Those rules were created and continue to support the existence and viability of the independent contractor truck driver model by requiring transparent lease contracts between motor carriers and independent contractor owner-operators. *See* Spencer Decl.

30.     Factors that demonstrate that a motor carrier is treating drivers as employees (even if a motor carrier labels them as independent contractors) include forced dispatch ( e.g., the inability on the driver's part to decline an assigned load), the inability to select their route, the forced purchase of equipment or services from the motor carrier and/or its subsidiaries, extensive electronic monitoring of drivers' time other than for compliance with safety regulations, and the implementation of lease-purchase agreements (for a truck) whereby the driver has no real agency to make a living.

31.     Drivers who have signed a lease-purchase agreement for a truck assume the obligations in the agreement, including non-discretionary and binding contract provisions; they give up any discretion for managing the performance of his or her work or maintenance of the truck.

32.     Many motor carriers, particularly some of the largest motor carriers in the United States, rely on both independent contractors and employee drivers to transport freight.

33.     Some motor carriers that lease on independent contractor drivers own few or none of the tractors and trailer equipment used to haul freight under their authority.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 157 of 295    (232 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4185   Page 7 of 90
ER-157

34.    Independent contractor owner-operators can have designated routes or may be part of an integrated supply chain in which they transport freight for only one leg of a shipment.

35.    Engaging independent contractor owner-operators rather than employee drivers allows small-business motor carriers to adjust to market conditions, bid for and accept opportunities to haul specialized freight, and manage costs to strategically grow their businesses over time.

36.    Just as the employee driver position can be the training ground for becoming an independent contractor driver, independent contractor drivers with several years of experience often choose to obtain federal DOT authority to operate as a motor carrier. As a motor carrier, a trucker takes on even more responsibility and greatly expands his or her business opportunities.

37.    Not all independent contractor drivers have the experience and understanding of the trucking industry, and—even with adequate experience, they may lack the desire—to become a motor carrier.

38.    Many motor carriers operating today were founded by truck drivers who gained significant trucking experience as independent contractor owner-operators. Thus, the opportunity to work as an independent contractor owner-operator is an important part of ensuring the growth of the motor carrier industry because it gives drivers the opportunity to develop the necessary industry knowledge and experience to establish successful motor carrier businesses. The independent contractor owner-operator model is one of the few paths available for fostering safer, more financially astute entrants to enter into the motor carrier industry.

**Imposing the ABC test on the trucking industry will cause significant harm to many independent contractor truck drivers and motor carriers.**

39.    Prior to California's enactment of the ABC test, as codified by AB-5, independent contractor drivers were free to operate throughout the country.

40.    The ABC test presumes that workers, including independent contractor owner-operators, are employees, and makes it difficult to overcome that presumption.

41.    Prong B of the ABC test makes it impossible for independent contractor owner-operators to work as independent contractor drivers because the very nature of the service provided to motor carriers is within "the usual course of the hiring entity's business," *i.e.*, hauling freight. Cal. Lab. Code § 2775(b)(l)(B).

42.    Because the ABC test is not limited, on its face, to those independent contractor owner-operators or small-business motor carriers based in California or who conduct most of their business in California, many independent contractor owner-operators across the nation are concerned that they will lose the business that requires them to travel to California.  Many independent contractor drivers work for companies who have stopped taking loads to and from California because of AB-5.

43.    A plain reading of the ABC test, based on my professional trucking experience, means that independent contractor owner-operators throughout the United States are prevented from hauling freight from, to, or through California.

44.    The ABC test threatens the existence of independent contractor drivers and small-business motor carriers that rely on independent contractor owner-operators far beyond California's borders.

45.    The ABC test presents these truckers with an intolerable choice: cease working in California, abandon their businesses, or fundamentally change the way in which they operate—at significant cost.

46.    For example, an independent contractor owner-operator working exclusively for a motor carrier as an independent contractor is unable to meet several of the conditions required to qualify for the business-to-business exception.

47.    The ABC test raises the prospect that independent contractor owner-operators will be unable to work in California, which will likely deter some individuals from becoming independent contractor owner-operators and deter

existing independent contractor owner-operators from investing in additional equipment.

48.    Although worker misclassification is a problem in the trucking industry that can lead to the abuse of drivers and the degradation of their working conditions, AB-5 does not remedy that problem. Instead, its impact is to irrationally eliminate the independent contractor owner-operator business model from the motor carrier industry.

49.    The independent contractor owner-operator model continues to provide a great number of drivers with a legitimate opportunity for success and longevity as small-business truckers in the motor carrier industry.

50.    In my opinion, AB-5 burdens interstate commerce and is inconsistent with federal laws governing the operation of the motor carrier industry. An independent contractor driver cannot invoke the business-to-business exception if he is engaged in interstate commerce, because the qualifications for that exception are in direct contradiction with the Truth-in-Leasing regulations, 49 C.F.R. Part 376, which govern all motor carriers and truckers engaged in interstate commerce.

51.    AB-5 threatens to impose substantial damage to many of the businesses of OOIDA's independent contractor owner-operator and small-business motor carrier members both within and outside of California.

52.    Because OOIDA has unique access to the employee driver, owner-operator, and small business motor carrier population in sufficient numbers to obtain statistically significant information by surveying its members on a periodic basis, the OOIDA Foundation, the research and educational arm of OOIDA, has been able to both collect and analyze information from this critical segment of the industry. The OOIDA Foundation conducted the first survey of the Association's membership in 1998 to accurately communicate the professional opinions of its members engaged in transporting freight across the country with federal, state, and local agencies. The data provided by the survey has not only helped to define the direction

of the Foundation, but it has also created a profile for the community of this large and often overlooked group. The twelfth edition, the 2022 Owner-Operator Member Profile Survey, is attached as Exhibit A to this Declaration. Where indicated, this survey is the source of the information set forth in this declaration.

**AB-5 will place significant burdens on independent contractor truck drivers.**

53.    For owner-operators from around the country who haul loads to, from, and within California as a part of their business, the prospect of being reclassified as employees under AB-5 could cause significant harm.

54.    Faced with the prospect of giving up their owner-operator business and becoming employees to continue to haul loads to and from California, most owner-operators would likely choose to give up the business in California instead, foregoing potentially thousands of dollars in annual income.

55.    Alternatively, to keep hauling loads to California, they would be forced to give up the businesses they have worked to build and become employees instead of business owners. They would have to forgo the opportunity to maximize their income through their own effort and hard work. They might have to give up the truck they have invested in, customized, and maintained as their home to serve their work and personal needs. They could give up business relationships they have cultivated to make their business successful. They would give up the discretion they enjoy to set their own schedules and lose the ability they have as owner-operators to make their own decisions about their operations that give them a sense of control over their own success.

56.    Declarants and OOIDA members Marc McElroy (ECF 171-5), Stacy R. Williams (ECF 171-6), and Albert Hemerson (ECF 171-4) represent good examples of independent contractor owner-operator OOIDA members who are concerned that AB-5 is causing or will cause them injury by forcing them 1) to give up the business opportunities that put them on roads in California or 2) to abandon their businesses and become employees.

**Burdens on independent contractor truckers forced to become employees.**

57.    Burdens that are likely to be imposed upon independent contractor truckers who are forced to become employees include:

    a.  Independent contractor drivers could lose their ability to set their own schedules, the discretion to take time off when they believe they should, the freedom to choose the freight they want to transport, select their own routes to deliver that freight, purchase equipment that best serves their business needs, choose where and how that equipment is maintained, and make numerous other decisions that affect the success of their business.

    b.  Independent contractor drivers own their own equipment, which—should they become employees—they will likely be unable to sell in the current market without incurring a significant loss. This is a result of several factors:

        i.  Many independent contractor drivers entered the industry within the last several years. Those who purchased their trucks in 2021 and 2022, when freight rates were high, paid a premium price for their vehicles. *See* Exhibit B, attached hereto, "Used Truck Prices Have Doubled in the Last Year," DAT Freight & Analytics - August 2021 Market Report (reflecting surging Class 8 sleeper truck price increases for 3-year-old trucks (95% increase), 4-year-old trucks (121% increase), and 5-year-old trucks (128%)).

        ii.  OOIDA has an insurance arm that provides truck insurance to some of OOIDA's members. According to OOIDA's insurance arm, the average age of trucks currently on the road and insured by OOIDA's insurance arm is 13.2 years old.

       iii.  Currently, the market for used trucks has dropped significantly, *see* Exhibit C, "February 2023 Used Class 8 Sales Down 20%

Year-Over-Year" Transport Topics (March 2023). With a large number of independent contractor drivers forced to sell their trucks at the same time, it stands to reason that their trucks will flood the market and lower prices even more.

    iv. Most OOIDA members who are owner-operators have paid off their trucks. *See* Exhibit A, 2022 Owner-Operator Survey at 9, 48. Independent contractor drivers with longer experience will lose the equity in their trucks that they have been paying for over the years. Those who have invested in preventative maintenance of their trucks will lose the value of that investment as well.

    v. The problem of selling used trucks is exacerbated by California Air Resources Board's push to change over to all-electric trucks. (*See* https://ww2.arb.ca.gov/resources/fact-sheets/advanced-clean-trucks-fact-sheet).

c. Owner-operators who have bought their trucks on credit will be required to continue paying for trucks that they cannot drive.

**Burdens on independent contractor truckers who choose to obtain their own DOT authority.**

58. Burdens that will be imposed upon independent contractor truckers who choose to obtain their own DOT authority include:

a. New carriers will be required to take on the challenge of operating a motor carrier business within federal and state laws and regulations. OOIDA members who are owner-operators operating under their own authority report that the most serious challenge by far that they face is compliance with an ever-increasing list of regulations. *See* Exhibit A, OOIDA Owner-Operator Survey at 39.

b. Obtain a motor carrier number and DOT authority. There is a $300 filing fee to obtain a motor carrier number

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 163 of 295    (238 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4191   Page 13 of 90
ER-163

(https://www.fmcsa.dot.gov/registration/get-mc-number-authority-operate#filing-fees). A DOT number is separate from a motor carrier number. There is no cost to obtain a DOT number.

c. Register each vehicle under the California International Fuel Tax Agreement (IFTA) license is $10.00. In addition, there is a $2.00 per-set charge for annual IFTA decals. The motor carrier needs one set for each qualified motor vehicle it operates in IFTA jurisdictions. (https://www.cdtfa.ca.gov/taxes-and-fees/ifta-ciudft-di-license.htm#started).

d. Register each vehicle under the California Air Resources Board's new Heavy-Duty Inspection and Maintenance Program and pay a fee of $30.00 per vehicle. (*See* https://ww2.arb.ca.gov/resources/documents/june-2023-guidance-vehicle-owners-upcoming-requirements).

e. Register each vehicle under the California International Registration Plan (IRP). According to OOIDA's Business Services Department, the IRP fee is based on the final invoice, but the estimated fee would be approximately $2,900 per truck for a registered weight of 80,000 pounds (gross vehicle weight).[1]

f. Trailer plate registration fees in California range from $7.50 for an annual plate to $52.50 for a permanent plate, according to OOIDA's Business Services Department.

g. California participates in the Unified Carrier Registration Plan. Pursuant to 49 U.S.C. § 14504a, every carrier must annually pay the appropriate Unified Carrier Registration fee based on the number of vehicles owned. The current registration fee ranged from $37.00 for a

---

[1] Gross vehicle weight is the weight of the truck and its cargo together.

carrier with a single truck to $35,836.00 for a carrier with a fleet of 1001 trucks or more. (*See* https://plan.ucr.gov/).

h. Obtain required motor carrier permits. In California, a motor carrier permit depends upon the size of the fleet, and the cost ranges from $250 for a single truck entity to $5,144 for a fleet of 2,001 vehicles or more. *See* California Department of Transportation Motor Carrier Handbook (https://www.dmv.ca.gov/portal/file/mcp-handbook-pdf/).

i. Motor carriers that have a large number of trucks often negotiate a lower price on fuel and other products and services and may provide their drivers with various discounts including "fuel discount cards." Owner-operators who, rather than becoming employees, decide to obtain their own new DOT authority will lose these discounts because they will not have the same bargaining power as large carriers and will lose fuel discounts which are based on gallons purchased.

j. A hidden cost to motor carriers with a new DOT authority is the difficulty of finding customers. Shippers and brokers look on the FMCSA website to determine how long a motor carrier has had its operating authority. Often, they will not engage a motor carrier that lacks an established history and has held its authority for a year or less. After an owner-operator obtains their own authority, they must establish contracts with shippers in order to maintain operations.

k. OOIDA's insurance arm provides truck insurance to some of OOIDA's members.

l. For-hire interstate general freight carriers are required by the FMCSA to have a minimum of $750,000 in liability coverage. According to OOIDA's insurance arm, the average cost of this insurance coverage in California over the last six months is $11,104.50 annually per vehicle. Most shippers and brokers will not do business with a motor carrier that

does not also have cargo insurance. According to OOIDA'S insurance arm, the average cost of this insurance coverage over the last six months in California is $2,396.16 annually per vehicle.

m. According to OOIDA's insurance arm, a new quote to obtain similar insurance coverage for a 25-year-old driver with four years of recent verifiable experience, operating as a single driver driving one truck pulling one dry van trailer long haul in 48 states is estimated at $20,303.94.  However, many insurers will not insure a driver with less than four years of experience, and that driver will be forced to seek insurance coverage from an insurer that will likely charge a rate two to four times more than the preceding quote.

n. Other coverages include the following:

   i. Physical damage - covering truck or trailer damages from things like vandalism, collision, natural disasters, and theft. According to OOIDA's insurance arm, the average cost of this insurance coverage in California over the last six months is $6,137.16 per vehicle per year.

   ii. Other insurance coverages that are typical for motor carriers but for which I have not included an estimated cost are:

      1. Non-trucking related liability - coverage for driving the truck for personal reasons or off dispatch.

      2. Trailer interchange -physical damage coverage for trailers being pulled under a trailer interchange agreement (physical damage insurance for non-owned trailers).

      3. Uninsured/underinsured motorists (UM/UIM) - protection if another person hits you and doesn't have liability insurance.

      4. Coverage for miscellaneous occurrences, such as:

    a. refrigeration breakdown;

    b. lost or stolen cargo;

    c. damage to cargo caused by a collision.

**Burdens on motor carriers forced to reclassify their independent contractor drivers as employees.**

59.    Motor carriers that contract with independent contractor drivers and for whom a part of their business is hauling loads into or out of California are likely to give up many dollars in freight hauling work to and from California rather than bear the expense of changing their business model to use employee truck drivers.

60.    Motor carriers forced to switch to an employee model would be required to purchase or lease the trucks to be driven by their employees (up to $200,000 per vehicle (new)), take on the costs of maintaining and repairing that equipment, hire human resource professionals to ensure their compliance with California's employment laws, and either convince their owner-operators to become employee drivers (which is unlikely to succeed) or recruit all new drivers—a difficult task—to serve their existing customers.

61.    Motor carriers who must employ their drivers would lose the flexibility to engage independent contractor drivers in response to variable market conditions. Absent that flexibility, they are likely to lose business.

62.    Failure to comply with AB-5 while hauling freight in interstate commerce on California's roads would subject motor carriers to civil and criminal prosecutions.

63.    The cost of complying with AB-5 will likely increase the cost of trucking services to and from California and will exacerbate an already constricted supply chain in and out of California.

64.    Costs that motor carriers who are forced to engage their independent contractor drivers as employees are likely to incur include:

a. Purchasing or leasing the trucks and other equipment their employees drive, keeping in mind that the California Air Resources Board regulations require that a truck be model year 2010 or later to operate in the state (*see* https://ww2.arb.ca.gov/our-work/programs/truck-and-bus-regulation/about):

    i. The cost of a truck depends on the make, type, model and other variables.  In general, OOIDA independent contractor truck drivers are more likely to drive used Class 8 trucks with a gross vehicle weight rating of 33,001 pounds or greater. *See* Exhibit A, OOIDA Owner-Operator Survey at 28-29.

    ii. Based on research conducted by OOIDA, at the present time, a used sleeper cab commercial truck ranges in price from $22,125 to $68,717.[2]

    iii. OOIDA's research reveals that, at the present time, a used day cab commercial truck ranges in price from $22,125 to $50,248.

    iv. Eighty percent of OOIDA's members own at least one trailer. Forty percent of leased-on owner-operators own a trailer and sixty percent have purchased a used trailer. *See* Exhibit A, OOIDA Owner-Operator Survey at 9.

    v. OOIDA's research reveals that, at the present time, a used dry van trailer ranges in price from $10,742 to $20,953.

---

[2] OOIDA has based the calculations in this and the following paragraphs on used commercial vehicles currently on the market in order to estimate the minimum amount that a motor carrier would be required to pay for equipment, and because many OOIDA members purchase used trucks and equipment. The information was derived from searches of Taylor & Martin, Inc., (taylorandmartin.com) a leading auctioneer and reseller of second-hand over-the-road trucking equipment; and TruckPaper.com, an easily searchable online marketplace where buyers can browse listings, find trucks and trailers that meet the buyer's needs, and directly contact dealers to make a purchase. New trucks can exceed $200,000 in price.

vi. OOIDA's research reveals that, at the present time, a used refrigerated van trailer ranges in price from $17,630 to $34,449.

vii. OOIDA's research reveals that, at the present time, a used flatbed trailer ranges in price from $17,515 to $39,790.

b. All purchased equipment must be maintained. According to TruckersReport.com, semi-truck maintenance and repair costs can cost more than $15,000 per year. (*See* https://www.thetruckersreport.com/infographics/cost-of-trucking/; https://www.internationalusedtrucks.com/what-is-the-average-maintenance-cost-for-a-semi-truck/). The average amount that OOIDA members spend on truck and equipment maintenance is $18,000. *See* Exhibit A, OOIDA Owner-Operator Survey at 31.

c. Registration of purchased Tractors in California, according to OOIDA's Business Services Department, would cost approximately $2,900 per truck for a registered gross vehicle weight of 80,000 pounds.

d. Obtain oversize/overweight permits (per trip): Trucks operating on federal highways are limited to 80,000 gross vehicle weight. *See* https://ops.fhwa.dot.gov/freight/policy/rpt_congress/truck_sw_laws/index.htm. States have varying weight and size limitations. *Id.* To legally carry loads that exceed those limits the carrier must apply for and the driver must carry in the truck permits for oversize (length, width, and height) and/or overweight loads for each state it travels in or through, at a cost that could add up to hundreds of dollars per trip.

e. Register their trailers in California. Trailer plate registration fees in California range from $7.50 for an annual plate to $52.50 for a permanent plate, according to OOIDA's Business Services Department.

f.  Register each vehicle under the California International Fuel Tax Agreement (IFTA) license is $10.00. In addition, there is a $2.00 per-set charge for annual IFTA decals. The motor carrier needs one set for each qualified motor vehicle it operates in IFTA jurisdictions. (https://www.cdtfa.ca.gov/taxes-and-fees/ifta-ciudft-di-license.htm#started).

g.  Register each vehicle under the California Air Resources Board's new Heavy-Duty Inspection and Maintenance Program and pay a fee of $30.00 per vehicle.

h.  California participates in the Unified Carrier Registration Plan. Pursuant to 49 U.S.C. § 14504a, every carrier must pay annually the appropriate Unified Carrier Registration fee based on the number of vehicles owned. The current registration fee ranged from $37.00 for a carrier with a single truck to $35,836.00 for a carrier with a fleet of 1001 trucks or more.

i.  OOIDA's insurance arm provides truck insurance to some of OOIDA's members.

j.  For-hire interstate general freight carriers are required by the FMCSA to have a minimum of $750,000 in liability coverage. According to OOIDA's insurance arm, the average cost of this insurance coverage in California over the last six months is $11,104.50 annually per vehicle.

k.  Most shippers and brokers will not do business with a motor carrier that does not also have cargo insurance. According to OOIDA's insurance arm, the average cost of this insurance coverage over the last six months in California is $2,396.16 annually per vehicle.

l.  Other coverages include the following:

    i.  Physical damage - covering truck or trailer damages from things like vandalism, collision, natural disasters, and theft. According

to OOIDA's insurance arm, the average cost of this insurance coverage in California over the last six months is $6,137.16 per vehicle per year.

ii. Other insurance coverages that are typical for motor carriers but for which I have not included an estimated cost are:

1. Non-trucking related liability - coverage for driving the truck for personal reasons or off dispatch.

2. Trailer interchange -physical damage coverage for trailers being pulled under a trailer interchange agreement (physical damage insurance for non-owned trailers).

3. Uninsured/underinsured motorists (UM/UIM) - protection if another person hits you and doesn't have liability insurance.

4. Coverage for occurrences such as:

   a. refrigeration breakdown;

   b. lost cargo;

   c. damage to cargo due to a collision.

m. Labor costs including federal and state payroll taxes (FICA is 6.75% of the employee's wages), unemployment insurance (federal rate is 6% of each employee's first $7,000 gross income per year); workers' compensation insurance (average cost in California is $1,213 per employee per year). *See* https://www.zenefits.com/workest/payroll-costs/#:~:text=Payroll%20services%20companies%20generally%20charge,services%20will%20generate%20additional%20cost.

n. A motor carrier taking on employee drivers must engage a human resource professional. The average Human Resources Manager salary in California is $129,198 as of August 27, 2023, but the range typically falls between $114,472 and $145,444 (*see*

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 171 of 295 (246 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4199   Page 21 of 90
ER-171

https://www.salary.com/research/salary/benchmark/human-resources-manager-salary/ca). The average Human Resources Generalist I salary in California is $69,121 as of August 27, 2023, but the range typically falls between $61,940 and $76,932 (*see* https://www.salary.com/research/salary/benchmark/human-resources-generalist-i-salary/ca) That employee's benefits, the cost of training, etc., are additional. According to glassdoor.com, the average cost to hire a new employee is $4,000. *See* https://www.glassdoor.com/employers/blog/calculate-cost-per-hire/.

o. Costs of complying with all federal and California laws and regulations concerning employment, including, for example, the Fair Labor Standards Act and the requirements of the Occupational Safety and Health Administration.

65.    The declaration of Danny R. Schnautz (ECF 171-3), the owner of Clark Freight Lines, Inc., reflects the position of most of the motor carriers I have spoken to who are based outside of California that, in the past, have dispatched drivers to haul freight to, from, and through the state. Anticipating the application of AB-5 and California employment regulations to their drivers, they have decided to avoid the burden and expense of complying with California rules by refusing to haul freight to California. Mr. Schnautz has attested to his determination that giving up thousands of dollars in business per week to California was a lesser burden than complying with California's regulations.

**Drivers who serve the construction industry are no different than those who serve other industries.**

66.    There is no difference between independent truck drivers who haul for the construction industry and those who haul for other industries. There is no difference in the types of business arrangements, contracts, and agreements entered

into by independent contractor truckers who haul for the construction industry versus those who haul for other industries.

67.    The types of trucking equipment needed to serve the construction industry and the driving work required to haul freight for the construction industry are largely indistinguishable from the equipment used and work performed for many other industries.  Construction projects may demand the use of trucking particularly suited for bulk or heavy freight needed in construction.  But, with a few exceptions, that equipment is not used exclusively to serve the construction industry but is also used to haul freight for any number of industries (e.g., steel producers and manufacturing).

68.    Many different industries in our economy have variable needs for trucking through the course of a year, just like the construction industry, depending on the season, the status of a project, or the relative health of a part of the economy. For example, an independent contractor trucker may haul agricultural products for growers or processors during different harvest seasons for different products in different areas of the country and use different trailers based on what they are hauling.  The same trucker may be more in demand to haul goods to distribution centers and retailers in the months leading up to the holiday shopping season. Similarly, variations in oil prices or consumer demand for gasoline or diesel create changing demands for trucks to haul equipment to and from oil fields. The varying demand for trucking over time within different industries functions no differently than California construction industries' variable demand for truckers at different stages of a construction project's progress.

69.    It is not at all unusual for independent contractor truckers to haul loads for the construction industry and for other industries from day to day or week to week.

70.    To require companies to engage truck drivers as employees instead of contracting with independent contractor truckers would require those companies to

hire the number of truckers they need during times of peak demand and would be inefficient and costly. Such businesses would be required to compensate their employee truckers when they are idle during times of lower trucking demand.

71.    The variable needs of shippers across a wide spectrum of industries render an employer/employee relationship with the number of truckers they need all but economically impossible. I am unaware of companies with a variable need for truckers who employ all of their drivers.

72.    Independent contractor truckers are uniquely positioned to accommodate the needs of industries, including construction, which have variable demands over time for the trucking services they need. The availability of independent contractor drivers helps those businesses run efficiently and economically.  It is because independent contractor truckers are flexible to meet these needs that they have been a cornerstone of the trucking industry for decades.

73.    I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

//

//

//

//

//

//

//

//

//

//

//

//

//

Executed this 29th day of September 2023, at Grain Valley, Missouri.

Todd Spencer

President, OOIDA

# EXHIBIT A

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 176 of 295      (251 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4204   Page 26 of 90
ER-176



**Owner-Operator Independent Drivers Association Foundation**
*A subsidiary of Owner-Operator Independent Drivers Association Inc.*



# 2022 Owner-Operator Member Profile Survey

**05/23/22**

# 2022 Owner-Operator Member Profile Survey

May 2022



OOIDA Foundation, Inc.
One OOIDA Dr.
Grain Valley, MO 64029
FoundationDept@ooida.com

# Table of Contents

Introduction ................................................................................................................ 7

Methodology ............................................................................................................... 8

Profile of the Owner-Operator ................................................................................... 9

2022 Owner-Operator Member Profile Survey ........................................................ 11

    1. Personal Information ........................................................................................... 13

    2. Management of Business ..................................................................................... 16

    3. Medical Issues .................................................................................................... 23

    4. Environmental Issues ......................................................................................... 26

    5. Your Truck .......................................................................................................... 28

    6. Maintenance ...................................................................................................... 31

    7. Trucker Trivia ..................................................................................................... 33

    8. Leased-On Owner-Operator .............................................................................. 34

    9. Owner-Operator Under Their Own Authority ................................................... 37

Survey Results .......................................................................................................... 40

        Leased-On Owner-Operators ............................................................................ 51

        Owner- Operators under their Own Authority ................................................... 53

## List of Figures

Figure 1: Primary Operation by Region...................................................................... 19

Figure 2: Average Total Miles by Region.................................................................... 20

Figure 3: Gross Revenue Per Mile by Region ............................................................ 21

## List of Graphs

Graph 1: DAT Trendlines for Spot Rates, 2020-2021 ................................................ 13

Graph 2: Type of Operation, 2020-2022 .................................................................... 14

Graph 3: Average age of Owner-Operators, 1998-2022 ........................................... 14

Graph 4: Owner-operators without retirement planning, 2012-2022 ....................... 15

Graph 5: Owner-Operator Member Crash Rate per 100 million VMT compared to the National Average ...................................................................................................... 18

Graph 6: Cost of New and Used Trailers, 2012-2022................................................. 22

Graph 7: Prevalence of Health Insurance among Owner-Operators, 2016-2022 ...... 23

Graph 8: Body Mass Index, 2022 .............................................................................. 24

Graph 9: Maintenance Type Prescription Usage, 2022 ............................................. 25

Graph 10: Environmental Technology, 2022 ............................................................. 26

Graph 11: Cost of New and Used Trucks, 2001-2022 ............................................... 28

Graph 12: Prevalence of Automatic or Partial Automatic transmission, 2022........... 29

Graph 13: Adoption of Collision Mitigation Technology, 2022................................... 30

Graph 14: Maintenance Costs, 2010-2022 ............................................................... 31

Graph 15:  Maintenance Costs Breakdown, 2022 .................................................... 32

Graph 16: I drive a truck because ............................................................................ 33

Graph 17: Leased-on Owner-Operators Type of Business, 2022............................... 34

Graph 18: The most important issues to consider when leasing on ......................... 35

Graph 19: The most important issues that caused a leased-on owner-operator to leave their carrier .... 35

Graph 20: Owner-Operator under their Own Authority Type of Business, 2004-2022............................ 37

Graph 21: How do those under their Own Authority obtain freight, 2022 ................................ 38

## List of Tables

Table 1: Owner-Operator Income and Expense ........................................................................ 16

Table 2: Owner-Operator Income and Expense per Mile .......................................................... 16

Table 3: Business Experience of the Owner-Operator ............................................................. 17

Table 4: Load length of Haul .................................................................................................... 18

Table 5: Nights away from home .............................................................................................. 18

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 183 of 295  (258 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 193-1  Filed 09/29/23  PageID.4211  Page 33 of 90
ER-183

7

## Introduction

The trucking industry plays a significant role in the United States economy, employing 2.73 million hard working truckers[1] and moving $12.7 trillion[2] worth of freight annually, while collecting $732.3 billion in gross revenue.[3]  According to the Federal Motor Carrier Safety Administration (FMCSA), 90 percent of all fleets operate ten trucks or less, and nearly 50 percent are single-truck motor carriers.  Although small business owner-operators represent a majority of trucking businesses, this important segment is often marginalized in research as academia tend to focus on the opinions of safety managers and large motor carriers.

The Owner-Operator Independent Drivers Association (OOIDA or Association) is the largest not-for-profit international trade association representing the interests of over 150,000 small business owners and professional drivers who operate in all 50 states and Canada.  While OOIDA's membership does include company drivers, the majority are owner-operators.  These owner-operator members can be divided into two distinct segments, those operating under their own authority and those leased-on to a motor carrier.

While a majority of researchers do not have access to the owner-operator population with any significant numbers, the OOIDA Foundation (OOFI), the research and educational arm of the Association, has been able to both collect and analyze information from this critical segment of the industry.  OOFI conducted the first survey of the Association's membership in 1998 in order to accurately communicate the professional opinions of the owner-operators transporting freight across the country with federal, state, and local agencies.  The data provided by the survey has not only helped to define the direction of the Foundation, but it has also created a profile for the community of this large and often overlooked group.  This is the twelfth edition of the *Owner-Operator Member Profile Survey* (OOMP Survey).  OOFI conducts the survey every two years on even numbered years.

---

[1] https://data.bts.gov/stories/s/Freight-Transportation-the-Economy/6ix2-c8dn
[2] https://data.bts.gov/stories/s/Moving-Goods-in-the-United-States/bcyt-rqmu
[3] https://www.statista.com/statistics/922817/trucking-industry-united-states-total-revenue/

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 184 of 295 (259 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4212 Page 34 of 90
ER-184

8

## Methodology

The *2022 Owner-Operator Member Profile Survey* (2022 OOMP Survey) was emailed to a random sample of the Association's active membership list, in particular, to those members who identify themselves as owner-operators. To do so, OOFI first removed those business types that did not fit the criteria for the survey, primarily company drivers. OOFI then sorted the membership data by state, generated a random number for every member, and selected the top 25 percent in order to eliminate any potential bias and to make the survey geographically representative. This left a sample size of 17,190 members who allowed email communication. The 2022 OOMP Survey, which OOFI emailed on Friday, March 25, 2022, generated 488 total responses for any one question as of May 9, 2022. This equates to a 95 percent confidence level with a 4 percent margin of error. The Survey therefore received enough response to be considered statically significant

The statistical methods utilized as part of the 2022 OOMP Survey were the mean, mode, median, rank-order, and percentiles. It is important to note that not all survey participants answered all questions. Thus, some questions generated a small number of responses; hence, inferences made from these samplings must be viewed in accordance to the statistical significance of the smaller number of responses. OOFI utilized the following statistical measures to evaluate the 2022 OOMP Survey:

- The *mean*, or the average, is the most common measure of position and of central tendency. This is probably the easiest test measure to understand and is widely used. There are limitations to the mean however as it is affected by extreme values that may distort or misrepresent the analysis. For instance, a bowling score of 120, 130, and 250 will equate to a mean or average of 166.66 ((120 + 130 + 250) ÷ 3), and yet that score was never bowled and two of the three scores were below the mean.

- The *median* indicates the value above which 50 percent of the cases fall; thus it is less likely to lean in the direction of the extreme cases. In the above scenario, the score of 130 is the median because 50 percent of the scores fall above 130 and 50 percent fall below 130. It still is a measure of central tendency.

- The *mode* is the most commonly obtained score or the midpoint of the score interval, which has the highest frequency. If the bowling score was 120, 130, 130, 125, 130, and 250, the mode is 130 as it was the most frequently bowled score.

The percentage of each answer is given based on the total number of respondents marking any one answer; all percentages were rounded to the nearest whole number. Where multiple answers are allowed, the total number of respondents are listed, along with the numbers of responses checked. The percentages however were measured from the total number of respondents for each answer. Thus, they will not equal 100 percent. For rank-order questions, OOFI averaged each response for each category.

## Profile of the Owner-Operator

The typical owner-operator member of OOIDA is a Caucasian male, 59 years of age, standing 5 feet 10 inches tall, and weighing 224 pounds, which results in a body mass index (BMI) of 32.1.  According to the National Institute for Occupational Health and Safety (NIOSH), 26 percent of truck drivers are overweight (BMI 25.0-29.9) and 64 percent are obese (BMI >30.0),[4] which suggests that the 2022 OOMP Survey results are in harmony with other industry research.  However, it is important to note that the BMI does have several limitations, as it does not consider a person's body composition, age, or gender.

Medical studies have long since demonstrated that the sedentary lifestyle of a trucker can lead to many health issues, including weight gain, diabetes, and hypertension.  In the 2022 OOMP Survey, 50 percent of the respondents stated that they took maintenance type prescriptions.  Of those drivers who took prescriptions, most indicated that they were for high blood pressure, cholesterol, and diabetes.  The subject of driver health, which has affected the trucking industry for several years, continues to remain an area of concern as 25 percent of owner-operators do not have a health insurance plan.

In regards to starting their career in the trucking industry, the majority of owner-operators continue to come from blue-collar occupations such as farming, construction, manufacturing, etc., while several others indicated that they chose to drive a truck either due to their upbringing as a multiple generation truck driver or due to their career in the military.  In fact, 32 percent of the respondents stated that they had served in the military at some point in their life.

The average member has been involved in the trucking business for more than 30 years, and has been an owner-operator for nearly 20 years.  During this time, the typical owner-operator has accumulated approximately 2.8 million miles of driving, most of which has been without a Department of Transportation reportable accident[5] resulting in 78.5 crashes per 100 million vehicle miles traveled, or more than two times below the national crash rate for the overall trucking industry.

The owner-operator generally owns one to two trucks, although the number of small fleet owners has increased from 2 percent in 2016 to 5 percent in 2022.  The average price for a new vehicle was nearly $145,000, whereas the cost for a used was almost $60,000.  The majority of owner-operators however have paid off their truck while very few have entered into a lease purchase plan.  Most operate a Class 8 truck with a gross vehicle weight of 33,001 pounds or more.  The average engine continues to have an excess of over 450-horse power, equipped with a 13-speed transmission, and received 6.4 miles per gallon.

In addition to the truck, most owner-operators owned at least one trailer.  Members indicated that a new trailer typically costs approximately $52,000, compared to $30,000 for a used trailer.  Both the owner-operator under their own authority and those leased-on primarily pulled a dry van trailer, while fleet

---

[4] W. Karl Sieber et al., *The National Survey of Long-Haul Truck Driver Health and Injury*, National Institute for Occupational Safety and Health (2014).

[5] A DOT reportable accident is a crash that resulted in either (1) a fatality, (2) an injury receiving treatment immediately away from the accident scene, or (3) disabling damage to any vehicle involved

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 186 of 295  (261 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 193-1  Filed 09/29/23  PageID.4214  Page 36 of 90
ER-186

10

owners generally pulled flatbed trailers.  All segments indicated that they predominantly haul general freight.

For those owner-operators under their own authority, a majority have established their business as a Limited Liability Corporation.  Moreover, they primarily utilize brokers to obtain freight.  Whereas leased-on owner-operators established their business as a sole proprietorship and focus chiefly on freight rates, the amount of freight, and the company's reputation before signing on with a carrier.  The typical leased-on operator has been with their present carrier for more than 11 years and has changed carriers more than 5 times in their career.

Overall, the owner-operator drives solo rather than in a team operation and operates mainly in the north and southcentral regions of the United States.  He or she drove 103,000 miles last year while 17,600 of those miles were deadhead miles, representing 17 percent of all miles driven.  Most drove between 501 and 1,000 miles for a typical load's length of haul followed by 151-500 miles and 1,001 miles or more.  These trips necessitated being away from home for more than 150 nights per year.

The gross income for the average owner-operator was $258,000.  However, he or she typically accumulated a gross expense of $187,000, with a large portion attributed to fuel ($80,700),[6] maintenance ($18,000), tires ($6,000), and tolls ($2,400).  After figuring for all miles driven in the previous year, those under their own authority received an average *net* income of $0.68 per mile, while leased-on owner-operators earned $0.75 per mile.  The most common type of compensation was per trip pay followed by percentage.

Although the prevalence of technology continues to grow in the trucking industry, the owner-operator segment of the industry remains vastly different from that of the large motor carriers.  When asked if they had any advanced driver assistant system (ADAS) technology equipped on their truck, such as automatic emergency braking, lane departure warning, road-facing camera, etc., 41 percent of members stated they did not.  This is probably because most members believe the technology has no effect on safety nor any positive benefits to their bottom line.  Moreover, the vast majority also do not have a maximum speed setting on their truck, i.e. a speed limiter.  For those few who did, the maximum setting was 75 miles per hour.

---

[6] 17,713 gallons of fuel purchased × $2.42 (the average cost per gallon of diesel fuel for the U.S. at the start of August 2020 according to U.S. Energy Information Administration https://www.eia.gov/petroleum/gasdiesel/) = $42,865.

## 2022 Owner-Operator Member Profile Survey

The *2022 Owner-Operator Member Profile Survey* marks the twelfth in a series of member profile surveys. These surveys, which span more than 20-years, have either confirmed static trends, such as the vast majority of the trucking industry is male, or have assisted in shedding light on new and current trends, for an example, the steady increase in the use of automatic transmissions. Through this anonymous survey, OOFI has been able to track the dramatic changes in the owner-operator segment of the industry.

Academia, lawmakers, and regulators frequently ask OOFI (1) who OOIDA's members are, (2) what is their professional experience, and (3) what are the greatest challenges that they face today. The purpose of the OOMP Survey is to gather sufficient information in order to address these questions so that OOIDA can more accurately communicate the professional opinions of the small business owner and leased-on owner-operator with federal, state, and local agencies. Regrettably, most studies focus almost exclusively on the large carrier owners, business managers, dispatchers, and safety directors for information on various economic and regulatory issues. Hence, the OOMP Survey is critical in gaining a better understanding of the industry from the owner-operators' perspective.

Again, this survey is unique in that it represents the small business men and women who truly drive the economy and embody the trucking industry. It appears that few academics, lawmakers, and regulators have an adequate understanding of the many difficulties associated with being an owner-operator.

Thus, OOFI has continued to conduct these member profile surveys in order for OOIDA to present the collective voice of the small business owner-operator on issues specifically related to him or her. For organizational and analytic purposes, OOFI has separated the survey questions into the following nine distinct sections, including one for those leased on to a motor carrier and one for those operating under their own authority:

1. **Personal Information**: The section consisted of questions on the demographics of the owner-operator members, such as type of operation (owner-operator under their own authority, leased-on owner-operator, fleet owner, etc.), gender, ethnic background, marital status, etc.

2. **Management of Business**: The trucking industry today is incredibly diverse; thus, this section was designed to gather information on the various types of business models as well as the different levels of experience obtained by owner-operators. The questions in this section touch on a number of issues ranging from income, to the type of freight, to the main regions of operation in the U.S.

3. **Medical Issues**: Since 2014, drivers have been required to obtain medical certification from a Certified Medical Examiner (CME) in order to maintain their commercial driver license (CDL). This has raised a number of concerns within the industry and among OOIDA members. This section focuses on a variety of health and medical issues, including sleep apnea.

4. **Environmental Issues**: Over the past decade, the trucking industry has witnessed a higher awareness of environmental issues, and in particular, the focus on the reduction of greenhouse gas (GHG) and $CO_2$ emissions by various government agencies such as the Environmental

Case: 24-2341 08/05/2024 DktEntry: 16.1 Page 188 of 295 (263 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4216 Page 38 of 90
ER-188
12

Protection Agency and the California Air Resource Board. The three questions in this section give a glimpse of the overall utilization of environmental technologies and their return-on-investment.

5. **Your Truck**: This section characterizes the type of truck that a typical owner-operator drives and focuses on the power of the engine, the transmission, and the fuel mileage. Moreover, this section touches on the growing interest and adoption rate of ADAS technology in the small carrier segment of the industry.

6. **Maintenance**: This section assists in determining the variable costs that owner-operators must budget for in their cost of operations. The questions focus on how much members spend on maintenance costs and how much is related to emissions-related equipment and/or to poor road conditions.

7. **Trucker Trivia**: This section is important to help formulate an accurate picture concerning the background of the owner-operators as well as some of their reasoning behind choosing to become a truck driver. From these questions, OOFI has continued to learn what compels an owner-operator to remain in the trucking industry. Past member profiles have depicted that approximately 36% of OOIDA members have served in the military during their career.

8. **Owner-Operators Leased-On to a Motor Carrier**: This section is directed specifically to the leased-on owner-operators. The questions under this section address not only what a leased-on owner-operator considers when selecting a motor carrier to work for, but also their work experience with their motor carrier, which includes important questions addressing the issues of turnover and misclassification.

9. **Owner-Operators under their Own Authority**: Although nearly half of all motor carriers are one-truck operations, this segment of the industry is not well understood. Thus, OOFI has attempted to formulate a profile for those members operating under their own authority. This section contains questions that not only assess the owner-operators' business type, but also includes information about the utilization of filing on a broker bond, the DataQ system, and the greatest challenges they see in trucking today.

## 1. Personal Information

The percentage of respondents who identify themselves as owner-operators under their own authority has grown from 39 percent in 2020 to 44 percent in 2022. Likewise, the percentage of leased-on owner-operators has declined from 48 percent to 45 percent over the same time period. This data appears to supports the recent surge in new motor carriers as the freight market has experienced higher freight volumes, elevated demand, and numerous supply chain issues, which have placed continual upward pressure on freight rates over the past two years, as shown in Graph 1.

*Graph 1: DAT Trendlines for Spot Rates, 2020-2021*



According to FTR, 109,340 trucking companies obtained operating authority in 2021, which is 50,202 more than in 2020 (59,538) and 65,787 more than in 2018 (43,953), the third-largest year on record since 1999, when 15,597 carriers were granted authority.[7] OOIDA, which offers help to its membership to obtain their own authority, has also witnessed an uptick in the number of members seeking to obtain their own authority. Most of the new carriers which have entered the industry over the past two years have been single-truck owner-operators. Graph 2 depicts the subtle change in the type of operation amongst OOIDA's owner-operator members overall.

The average age of the owner-operator member has continued to increase through the past several OOMP surveys, from 48 years old in 1998 to 59 years old in 2022. Nevertheless, it is important to note the difference in the calculation from preceding years. In the past, OOFI simply presented the question to the survey respondents, but in 2018 OOFI began deriving the average age of owner-operator members by filtering the membership database for those who either operated under their own authority or leased

---

[7] Lyndon Finney, "Surging Ahead: Number of new trucking companies shattering records," The Trucker (Feb 24, 2022), https://www.thetrucker.com/trucking-news/truckload-authority/trends-in-trucking/surging-ahead-number-of-new-trucking-companies-shattering-records

14
Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 190 of 295    (265 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 193-1    Filed 09/29/23    PageID.4218    Page 40 of 90
ER-190

their truck to a carrier.  While the average age decreased greatly in 2018, effectively reversing the previous trend as shown in Graph 3, it rose again in 2020 and in 2022.



*Graph 2: Type of Operation, 2020-2022*



*Graph 3: Average age of Owner-Operators, 1998-2022*

In preparing for retirement, the percentage of members stating that they have no retirement planning has continued to decline over the past ten years, from 35 percent in 2012 to 19 percent in 2022.  For those with a retirement plan, both those under their own authority and those leased-on were more likely to rely

upon social security to secure their retirement opposed to fleet owners, who were more likely to employ an individual retirement arrangement (IRA).  Respondents overall were ahead of the curve in terms of retirement as statistics demonstrate that 33 percent of Americans do not have any retirement savings.[8]



*Graph 4: Owner-operators without retirement planning, 2012-2022*

---

[8] Mira Rakicevic, "30 Revealing Retirement Statistics & Facts for 2020," MedAlertHelp (accessed Aug 26, 2020), https://medalerthelp.org/blog/retirement-statistics/#:~:text=15%25%20of%20the%20US%20population%20is%20retired.%2033%25,56%25%20of%20retirees%20fully%20retired%20before%20age%2065.

## 2. Management of Business

The truckload (TL) business model, which has continued to be the primary niche for both owner-operators under their own authority and those leased-on to a carrier, has historically dominated the owner-operator segment of the trucking industry.  Overall, 71 percent of the respondents listed TL as their primary business model while 6 percent indicated that they operate less than truckload (LTL) and another 13 percent were power only.  The power only segment has increasingly become more popular, especially among leased-on owner-operators, as a way to reduce waste in the form of detention time and costs.

Since 1998, the annual gross income for the average owner-operator has continued to increase, from $100,000, or $0.96 per mile, to $258,000, or $2.50 per mile, in 2022.  However, their annual gross expenses have increased too, as they have almost quadrupled over the same time period from $50,000 ($0.48 per miles) to $187,000 ($1.81 per mile).  This is because the cost of items such as trucks, trailers, etc. have continued to increase over the past two decades.  Tolls for example have tripled since 2010, growing from $800 to $2,400. Nevertheless, the typical net income has consistently remained between $40,000 and $50,000 per year.  The last couple surveys however have marked an increase to between $60,000 and $70,000.  This might be due to the record freight rates over the past few years even despite the increase in expenses.

For owner-operators under their own authority, the average gross income was $222,300 ($2.23 per mile), while the average gross expense was $154,600 ($1.55 per mile), resulting in a net revenue of $67,700 ($0.68).  These figures amounted to an increase of 18 percent, 24 percent, and 6 percent, respectively, compared to the previous survey.  The overall income for the typical leased-on owner-operator was lower, $194,700 ($1.80 per mile), so too was their average gross expense, $113,700 ($1.05 per mile), equating to a net revenue of $81,000 ($0.75).

*Table 1: Owner-Operator Income and Expense*

| Annual Income | Own Authority | Leased On | Overall |
|---|---|---|---|
| Gross Income | $222,280 | $194,699 | $258,119 |
| Gross Expense | $154,603 | $113,662 | $187,195 |
| Net Income | **$64,560** | **$55,833** | **$64,453** |

*Table 2: Owner-Operator Income and Expense per Mile*

| Per Mile | Own Authority | Leased On | Overall |
|---|---|---|---|
| Gross Income per Mile | $2.23 | $1.80 | $2.50 |
| Gross Expense per Mile | $1.55 | $1.05 | $1.81 |
| Net Income per Mile | **$0.68** | **$0.75** | **$0.69** |

The average owner-operator member obtained their first CDL or chauffeur's license when they were 26 years old, meaning that they have been involved in trucking for 33 years overall, and have been an owner-operator for 19 years.  The average respondent became an owner-operator at age 38, which is two years older than the previous survey, and most plan to retire from trucking at age 69.

In the previous 12-months, the owner-operator under their own authority traveled 103,000 miles, of which 17,600, or 17 percent, were deadhead miles, meaning that the member drove their truck without a load.  This marked a 10 percent decrease in loaded miles from 2020, albeit with a higher compensation per mile, meaning owner-operators were making more money on less miles, and a 32 percent decrease in deadhead miles, which is a positive trend that will ultimately benefit an owner-operator's bottom line.  For years OOFI has fought against the old mantra that a truck driver needs to run more miles in order to be successful.  Instead, OOFI teaches in our educational material that a trucker needs to get paid more for the miles that they run.  This appears to be the case for the 2022 OOMP Survey results.

According to OOFI's *Freight Rate Survey*, many owner-operator members indicated a desire to make changes in their business plan by increasing the efficiency of their business, whether through more research into freight markets, changing lanes or regions, being more selective of their routes and securing backhauls, becoming more specialized, or simply focusing to reduce expenses and deadhead miles.  This seems to have occurred across the different operational types as those under their own authority, those leased-on, and those who identify as fleet owners, saw a decrease of 11 percent, 6 percent, and 22 percent respectively in terms of loaded miles; a decrease of 44 percent, 15 percent, and 53 percent respectively in deadhead miles; and a decrease of 18 percent, 8 percent, and 37 percent in overall miles.

*Table 3: Business Experience of the Owner-Operator*

| Business Experience | Own Authority | Leased On | Overall |
|---|---|---|---|
| Age of acquiring CDL or chauffeur lic. | 25 | 26 | 26 |
| Years in the trucking industry | 33 | 32 | 33 |
| Age at becoming an owner-operator | 25 | 39 | 38 |
| Years of being an owner-operator | 20 | 18 | 19 |
| Miles driven last year | 83,803 | 88,349 | 85,626 |
| Deadhead miles driven last year | 15,755 | 19,566 | 17,600 |
| Total miles driver last year | 99,558 | 107,915 | 103,226 |
| Miles in career | 2,712,225 | 2,840,865 | 2,777,247 |

According to FMCSA's 2019 *Large Truck and Bus Crash Facts*, after all crashes (i.e., fatal, injury, and property-damage only) and miles are figured, the overall crash rate for the trucking industry is 170.1 crashes per 100 million vehicle miles traveled (VMT).  The owner-operator segment of the industry however has consistently been among the safest drivers in the nation with a rate of 78.5 crashes per 100 million VMT, which is two times better than the national crash rate for the overall trucking industry.  In fact, after figuring for all career miles driven, OOIDA owner-operator members traveled on average roughly 3 million miles between accidents (930,377,585 miles reported by respondents for their career ÷ 307 accidents reported for their career = 3,030,546 miles) for a rate of 33 crashes per 100 million VMT.

In terms of both length of haul and nights away from home, owner-operator members under their own authority tended to operate around 500 miles or less and stay at home between 0 and 150 nights a year.  Conversely, those members who lease their truck onto a carrier typically operated over 500 miles and spent over 200 nights away from home.

*Graph 5: Owner-Operator Member Crash Rate per 100 million VMT compared to the National Average*



*Table 4: Load length of Haul*

| Typical Length of Haul | Own Authority | Leased On | Overall |
|---|---|---|---|
| 1-150 miles | 16% | 9% | 13% |
| 151-500 miles | 34% | 26% | 29% |
| 501-1,000 miles | 25% | 36% | 31% |
| 1,001+ miles | 25% | 29% | 26% |

*Table 5: Nights away from home*

| Nights away | Own Authority | Leased On | Overall |
|---|---|---|---|
| Less than 50 | 23% | 14% | 20% |
| 50 to 100 | 13% | 5% | 10% |
| 101 to 150 | 10% | 12% | 11% |
| 151 to 200 | 19% | 20% | 18% |
| 201 to 250 | 29% | 16% | 16% |
| 251 to 300 | 12% | 18% | 14% |
| 300+ | 5% | 16% | 10% |

Since the implementation of the first OOMP Survey in 1998, the standard owner-operator business model has largely remained a solo operation with loads weighing an average of 40,000 pounds or more. However, the degree to which members participate in solo operations compared to team driving has continued to increase from 88 percent in 1998 to 98 percent in 2022. This trend may continue until there is virtually no team driving at all due to the market shift in operations to more regional moves as opposed

to long-haul due to the increase in e-commerce.  However, time will tell.  Most owner-operator members continue to run in the northcentral and southcentral regions of the U.S. as indicated in Figures 1 through 4.

*Figure 1: Primary Operation by Region*



| | | |
|---|---|---|
| ■ Northwest | ■ Southwest | |
| ■ Northcentral | ■ Southcentral | |
| ■ Northeast | ■ Southeast | |

20

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 196 of 295    (271 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4224   Page 46 of 90

ER-196

**Figure 2: Average Total Miles by Region**





**Figure 3: Gross Revenue Per Mile by Region**



22

Whereas the vast majority of owner-operator members under their authority own at least one trailer (80%), only 40 percent of those members who are leased-on own a trailer.  Of those who do own their trailer, 64 percent purchased a used one.  The cost of used trailers has continued to increase over the past ten years, from $21,000 in 2012 to $30,000 in 2022.  While new trailers have also grown more expensive over the same time period, the cost did decrease from the previous survey as shown in Graph 6.  The average owner-operator member primarily pulls a dry van trailer, followed by flatbed trailers and refrigerated trailers, also called reefers.  Those respondents under their own authority and those leased-on tended to pull dry van trailers, while fleet owners typically pulled flatbed trailers more than anything else.

*Graph 6: Cost of New and Used Trailers, 2012-2022*



## 3. Medical Issues

Medical insurance coverage for owner-operators has been low historically.  Though this trend has largely continued despite the promulgation of the Affordable Care Act (ACA) in 2014, the 2022 OOMP Survey saw a significant increase in the percentage of members who stated that had health insurance, from 67 percent in 2020 to 75 percent in 2022.  This marks the largest percentage since OOFI began asking this question in 2014.  One possible explanation for this increase is the advent of the novel coronavirus, also known as COVID-19, which the World Health Organization officially declared COVID-19 a pandemic on March 11, 2020.

*Graph 7: Prevalence of Health Insurance among Owner-Operators, 2016-2022*



The average owner-operator member is 70 inches tall (5 feet and 10 inches) and weighs 224 pounds, which is consistent with past surveys.  This resulted in an average Body Mass Index (BMI) of 32.1, which is classified as obese.  BMI has become increasingly problematic for the owner-operator since the inception of the National Registry of Certified Medical Examiners in May 2014, as some certified examiners focus solely on a driver's BMI when considering a recommendation for sleep apnea testing.

According to the Center of Disease Control and Prevention (CDC), an individual with a BMI between 18.5 and 25 is considered to be healthy.  Nevertheless, a study released by UCLA in 2016 concluded that BMI mislabels approximately 54 million Americans as overweight or obese.  The lead author for the study stated, "This should be a final nail in the coffin for BMI.  The public is used to hearing 'obesity,' and they mistakenly see it as a death sentence, but obesity is just a number based on BMI, and we think BMI is just a really crude and terrible indicator of someone's health.[9]"  The study also found that more than 30

---

[9] Amina Khan, "BMI mislabels 54 million Americans as 'overweight' or 'obese,' study says," *Los Angeles Times* (Feb 4, 2016), http://www.latimes.com/science/sciencenow/la-sci-sn-bmi-does-not-measure-health-20160204-story.html

24

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 200 of 295      (275 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4228   Page 50 of 90
ER-200

percent of those with a BMI in the "normal" range (18.5-24.9), about 20.7 million people, were actually unhealthy based on their other health data, and more than 2 million people who are considered "very obese" by virtue of having a BMI of 35 or greater were actually healthy.[10]  It is important that BMI is not the only indicator for OSA screening.

Recognizing that a majority of owner-operators fall into the overweight and obese categories and that certain groups desire to mandate sleep apnea testing for those drivers who are obese and have a neck circumference of 17 inches or greater, OOIF asked respondents about their experiences with obstructive sleep apnea (OSA).  OOFI learned that 56 percent of respondents were either obese or very obese, 20 percent have a neck size exceeding 17 inches, and 9 percent have undergone OSA screening at some point in their career.  Overall, 7 percent were currently receiving treatment for OSA.  However, only 13 percent indicated that their medical policy covers OSA screening and equipment, while an additional 56 percent were unsure whether their policy covered OSA or not.



*Graph 8: Body Mass Index, 2022*

It is important to note that OSA has little, if any, connection with safety performance.  FMCSA's own studies in particular have found that there is "no association between sleep apnea, as measured by the apnea/hypopnea index, and commercial motor vehicle crashes.  Patients with sleep apnea had no greater probability of having a crash than patients without sleep apnea, either before or after their diagnosis. Drivers with sleep apnea were also not found to be at an increased risk for multiple crashes, nor were

---

[10] Stuart Wolpert, "Don't use BMI to determine whether people are healthy, UCLA-led study says," UCLA Newsroom (Feb 4, 2016),  http://newsroom.ucla.edu/releases/dont-use-body-mass-index-to-determine-whether-people-are-healthy-ucla-led-study-says

crash rates impacted by the prevalence of apnea.  No link between the severity of sleep apnea and traffic crashes.[11]"

In January 2014, NIOSH published a study entitled *The National Survey of U.S. Long-Haul Truck Driver Health and Injury*, which found that 32% of drivers have hypertension.[12]  According to the 2022 OOMP Survey, 50 percent are currently taking a maintenance type prescription, which represents a nearly 6 percent decrease from 2020.  While 50 percent appears to be high, 48.3 percent of all people between the ages of 20 and 59 and 88.4 percent of those over 60 use at least one prescription drug according to 1 2008 CDC study.  Looking at these percentages the average owner-operator is again in the norm or even below.  Of those drivers that took prescriptions, 61 percent indicated that they were for high blood pressure, 43 percent were for cholesterol, and 25 percent were for diabetes.

*Graph 9: Maintenance Type Prescription Usage, 2022*



[11] Lawrence C. Barr et al., *Sleep Apnea Crash Risk Study*, FMSCA (2004).
[12] *The National Survey of Long-Haul Truck Driver Health and Injury*

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 202 of 295   (277 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 193-1  Filed 09/29/23  PageID.4230  Page 52 of 90

ER-202

26

## 4. Environmental Issues

Clean air is a priority for everyone, especially for owner-operators, but they request that the technology used in heavy-duty trucks to improve air quality be affordable and reliable.  Between 1995 and 2016, the U.S. Environmental Protection Agency (EPA) promulgated more than 48 federal air-quality regulations, many of them targeting heavy-duty trucks, such as the "2007 Highway Rule."  In May 2010, President Barack Obama announced the first ever fuel efficiency and greenhouse gas emission (GHG) standards for model year (MY) 2014 through 2018 medium- and heavy-duty trucks.  President Obama announced the second round of GHG and fuel economy standards known as GHG Phase II on February 18, 2014.  This phase included both technology-forcing requirements, similar to the 2007 Highway Rule that dramatically increased the cost of new trucks, and trailers as part of the total package.

On August 5, 2021, EPA announced a new plan to reduce GHG emissions and other harmful air pollutants from heavy-duty trucks through a series of rulemakings which are to take place over the next three years.  The first rulemaking, which published March 28, 2022, is set to apply to heavy-duty vehicles starting in MY 2027.  This rule will set new standards for criteria pollutants for the entire sector as well as targeted updates to the current GHG emissions standards.  A second rule would set "Phase III" GHG emission standards for new heavy-duty vehicles sold as soon as MY 2030 that will be significantly stronger than the MY 2027 GHG standards.[13]  While the government's emission regulations have helped increase the average price of a new truck almost 52 percent since 2001, these upcoming rules have the potential to raise the price of a new truck even higher.

*Graph 10: Environmental Technology, 2022*



---

[13] https://www.epa.gov/regulations-emissions-vehicles-and-engines/clean-trucks-plan

According to the 2022 OOMP Survey, 37 percent of owner-operator members did not have environmental technology, such as anti-idling equipment, diesel particulate filters (DPF), trailer skirts, etc., equipped on their tractor and or trailer.  For those who did have such equipment, DPFs, selective catalytic reduction (SCR) and or exhaust gas recirculation (EGR), anti-idling equipment, and trailer skirting were the most commonly equipped technologies, respectively.  However, only 36 percent indicated that they were able to receive a return-on-investment, and for those who did, it took an average of 21 months before they did so.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 204 of 295 (279 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4232 Page 54 of 90
ER-204
28

## 5. Your Truck

In order to become an owner-operator, one must first own his or her own truck. However, this is becoming more difficult as the average price of a new truck has increased almost 52 percent since 2001 due in part to the ever more stringent greenhouse gas emission and fuel economy standards established by the EPA and the National Highway Traffic Safety Administration, as well as the introduction of advanced driver assistance systems (ADAS). While the cost of new vehicles has grown exponentially, Graph 10 demonstrates the cost of used trucks has also increased over the years, albeit at a slower pace, which is why 68 percent of respondents purchased a used truck compared to a new truck or even a glider. It is important to note that even though costs have increased for both new and used trucks, the percentage of members who have paid their truck off has also increased, from 58 percent in 2020 to 63 percent in 2022.



*Graph 11: Cost of New and Used Trucks, 2001-2022*

OOFI has noticed a strong tendency over the years for owner-operator members to continue to drive, or hold onto, their present truck, which was 12 years old on average, rather than purchasing a new vehicle. In 2022, owner-operators responded that their truck had traveled approximately 1.2 million miles since it was manufactured, which is more than double the mileage that was reported in 2001. The fuel mileage however has stayed relatively consistent with the average member receiving around 6.4 miles per gallon. This equates to over 16,000 gallons of fuel and $53,000 in fuel expenses, or about 28 percent of gross expenses.[14]

Owner-operator members are more likely to drive a Class 8 truck with a gross vehicle weight rating of 33,001 pounds or greater than any other class of vehicle. Moreover, the average member is more likely

---

[14] 16,129 gallons of fuel purchased × $3.29 (the average cost per gallon of diesel fuel for the U.S. for 2021 according to U.S. Energy Information Administration https://www.eia.gov/petroleum/gasdiesel/) = $53,012.20.

to have over 450 horsepower and a higher number of gears. Nevertheless, the number of automatic or partial automatic transmissions continues to rise from 0 percent in 1998 to 23 percent in 2022 as depicted in Graph 12. This was especially true for those owner-operators leased-on to carrier, as 30 percent indicated that they have an automatic or partial automatic transmission.

*Graph 12: Prevalence of Automatic or Partial Automatic transmission, 2022*



Although the prevalence of technology has grown in the trucking industry over the years, especially with the advent of automated driving systems and FMCSA's *Tech-Celerate Now*, a national outreach campaign that the Agency designed to help accelerate the adoption of promising ADAS technology within trucking, the owner-operator segment of the industry remains vastly different from that of the large motor carriers. When asked if they had ADAS technologies equipped on their truck, such as automatic emergency braking, lane departure warning etc., 41 percent stated they did not. This might be due to the fact that most members felt that these technologies either had no effect on safety (43%) or even reduced safety (20%). However, it is important to note the rapid growth in the prevalence of road-facing cameras, which increased from 36 percent in 2020 to 44 percent in 2022. Moreover, the vast majority (77%) also do not have a maximum speed setting on their truck, i.e. a speed limiter. For those few who did, the maximum setting was 75 miles per hour.

Considering the significant amount of capital required to purchase a truck and start a business, some individuals elect to enter into a lease-purchase agreement in an attempt to jump start their career. Yet, this is not without risk. In a lease-purchase agreement, a truck driver will sign a contract with a third-party, often a motor carrier, in order to a lease a truck with the hopes of one day owning the commercial vehicle. For various reasons however, the truck driver does not always obtain the title of the truck. According to the 2022 OOMP Survey, 29 percent of owner-operator members have entered into a lease-purchase agreement at some point in their career, with 49 percent actually obtaining the title. Of those

30

who have signed such an agreement, 22 percent are currently in a lease-purchase agreement.  These types of agreements tend to be more common for leased-on owner-operators and those who operate northwest or southeast regions of the country.

*Graph 13: Adoption of Collision Mitigation Technology, 2022*

## 6. Maintenance

Most successful owner-operators have their trucks on a regular maintenance schedule as they recognize the necessity of ensuring that their truck is fit and safe to operate on the roadways.  While the cost of maintenance decreased 14 percent overall from 2020, the cost per mile actually increased from $0.17 per mile to $0.18 per mile, indicating that the decrease in overall maintenance costs was due to the fact that the average owner-operator member drove fewer miles in 2022.  In fact, the cost of maintenance was directly related to an owner-operators standard length of haul, as well as which region of the country that they operated in.  Those who traveled 500 miles or more per trip spent $19,000 in maintenance, compared to $15,600 for those who traveled under 500 miles.  Moreover, those operating in the southwest and northcentral regions of the U.S. spent over $0.21 per mile in maintenance costs.  Those operating in the northwest experienced the lowest costs at $0.13 per mile.

*Graph 14: Maintenance Costs, 2010-2022*



Overall, the average owner-operator member spent $18,000 on maintenance, which included nearly $3,000 due to emissions or environmental related equipment, $4,175 due to highway damage or poor road conditions, and $9,300 on routine maintenance.  In fact, maintenance costs accounted for 10 percent of the average owner-operator member's annual gross expenses.  These costs however did not include tire repair and replacement costs.  The typical owner-operator under their own authority replaced 13 tires last year, costing $6,842, compared to those leased-on to a carrier, who replaced 7 tires, costing $5,149.  The discrepancy in the number of tires that members purchased is most likely because those under their own authority are more likely to own their own trailer, while the discrepancy in cost per tire might be because those under their own authority were using recaps.  Thus, they have more tires to replace overall than the leased-on owner-operator who only needs to concern themselves with the tires on their tractor.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 208 of 295 (283 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4236 Page 58 of 90
ER-208
32



Graph 15: Maintenance Costs Breakdown, 2022

## 7. Trucker Trivia

The construction and trucking industries have traditionally competed with one another for employees, with workers frequently flipping back and forth between the two. This is probably because both industries share similar backgrounds and difficult working conditions. However, the typical owner-operator's number one occupation prior to entering into the trucking industry, at least for those who did not identify themselves as "always been a trucker," was the military. Owner-operators continue to have a strong military service record, with 32 percent stating that they have served in the military at some point in their life.

The number one reason why owner-operators continue to drive a truck has traditionally been because, "I enjoy/love it." In the more recent surveys however, OOFI has discovered a slight change with 30 percent indicating that the chief reason behind why they have chosen to be a truck driver is the "freedom/adventure/own boss." Another 18 percent selected this occupation because "it pays the bills." These percentages speak volumes on how these owner-operators, with decades of experience, view their industry.

*Graph 16: I drive a truck because*



Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 210 of 295    (285 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4238   Page 60 of 90
ER-210
34

## 8. Leased-On Owner-Operator

OOFI directed a specific set of questions in the 2022 OOMP Survey toward leased-on owner-operators to better understand this unique segment of the industry. For example, unlike those operating under their own authority, members who are leased-on tend to establish their business as a sole proprietorship (52%) rather than a limited liability company. OOFI asked also respondents, "When selecting a carrier to lease on to, what are the most important issues that you consider (1 being the most important and 8 being the least important)?" The members top consideration was freight rates at 1.8, followed by the amount of freight (2.6) and the company' reputation (3.2). This was consistent with 2020's survey results. The majority of leased-on owner-operator have been with their present carrier for three years or less (39%), which is slightly less than in 2020 (42%).

*Graph 17: Leased-on Owner-Operators Type of Business, 2022*



In regards to retention, which is a huge issue in trucking with most large carriers having a turnover rate around 90 percent, 45 percent of leased-on owner-operator members indicated that they have been with 5 or more carriers in their career. When we asked the respondents what the most important issues were that caused them to leave (1 being the most important and 8 being the least important), members stated that low pay (2.1), lack of respect (2.7), and the lack of freight (2.9) were the three most important reasons.

According to FMCSA, 90 percent of all fleets operate ten trucks or less and 96 percent of fleets have twenty-five trucks or less. Regardless of this fact, those members who lease-on to a carrier primarily do so with medium- to large-sized companies, with 54 percent leasing on to motor carriers with between 21 and 1,000 trucks, and 23 percent leasing on to carriers with 1,001 trucks or more. Despite contracting on with bigger carriers however, owner-operators tend to have a large amount of control over the operation of their truck as 89 percent are able to select their own routes when hauling a load and 94 percent

specified that they could refuse loads. It is important to note that 13 percent stated that they would face consequences or penalties for refusing loads, which is a four-percentage point decrease from 2020.



*Graph 18: The most important issues to consider when leasing on*

*Graph 19: The most important issues that caused a leased-on owner-operator to leave their carrier*

These questions are important in defining the difference between an independent contractor and an employee, which continues to be a hot topic, especially with the advent and confusion around California's Assembly Bill 5 which presumes all workers are employees unless an employer can rebut that assumption

36

by passing what is commonly referred to as the ABC test.  While AB 5 is currently in limbo until the courts ultimately decide its fate, more and more states are looking into the issue of misclassification, as well as federal lawmakers, as carriers sometimes classify their drivers as independent contractors when they are in actuality employees under Internal Revenue Service standards.  OOFI expects this issue to grow even more pertinent in the coming years.

Finally, OOFI asked the leased-on owner-operators what they believed was their greatest challenge today.  While the answers varied and covered a wide range of issues, several commented that their paramount issue was low freight rates, high expenses, a lack of truck parking, and excessive regulation.  Together, these issues, as well as a host of others, are making it harder and harder for many to operate a successful trucking business today.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 213 of 295 (288 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4241 Page 63 of 90
ER-213
37

## 9. Owner-Operator Under Their Own Authority

Although nearly half of all motor carriers are single-truck operations, most lawmakers and regulators do not understand this segment of the trucking industry. OOFI has thus formulated a profile of those owner-operator members who operate under their own authority to better inform agencies and academia concerning this important community of truckers. To begin, it is interesting to note that while the standard business model for those under their own authority was a sole proprietorship historically, members now are more likely to establish their business as a limited liability corporation (LLC). This trend, which started in 2020 and has continued through 2022, may be due to the misperception that an LLC will protect an owner-operator from a lawsuit in the event of a crash. It might also be due to the Trump Administration's tax break on pass-through income.

*Graph 20: Owner-Operator under their Own Authority Type of Business, 2004-2022*



The typical owner-operator member continues to work with brokers (32%) and load boards (23%) in order to acquire loads even though OOFI has stressed through our business education series the importance to form direct relationships with small shippers. While brokers and load boards can be a necessary aspect of business, it is best for owner-operators to remove the middlemen and interact directly with the source of freight, meaning the shipper. This will have a positive impact on their bottom line as members who utilized shippers earned $1.75 more per mile than those who used brokers and $0.69 more per mile than those who used load boards.

Trucking can be a very difficult business, not only do owner-operators have to run their own company, including obtaining their own authority, permits, licenses, insurance, etc., but they also have to deal with unscrupulous brokers, shippers, factoring companies, etc. from time to time. Congress established the Safety Violation Hotline Service in 1998 as a way to assist carriers in filing complaints against a variety of

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 214 of 295   (289 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4242   Page 64 of 90
ER-214
38

entities.  The hotline was eventually transformed over the years to an online interface known as the National Consumer Complaint Databased (NCCDB).

However, OOIDA has listed many concerns with the NCCDB, stating, "This title does not signify a connection to the trucking industry in any way. OOIDA believes the (database) can help improve safety, but many drivers are unaware that the (database) is available for them to report violations of commercial regulations, nor are they aware that coercion complaints can be handled through the (database).[15]"  OOFI asked respondents if they had ever filed a complaint on the NCCDB in order to help quantify the issue. The answer was a resounding no, as 69 percent had never filed a complaint and the remaining 31 percent had never even heard of it.



*Graph 21: How do those under their Own Authority obtain freight, 2022*

The NCCDB is not the only mechanism however at an owner-operator's disposal in order to protect themselves from bad actors.  For example, the Motor Carrier Act of 1935 was the first major legislative directive regarding financial responsibility levels for the trucking industry.  Not only did the act establish minimum liability requirements for carriers, but it also required those individuals seeking authority to operate as a broker to furnish a $5,000 bond or other security in order to protect motor carriers and shippers from dishonest and financially unstable brokers.  Congress has increased the bonding amount over the years through various bills from the original $5,000 in 1935 to $75,000 today.  Once again, OOFI wanted to quantify how frequently owner-operator members file against a broker's bond, to which 13 percent indicated they had done so and 81 percent stated that they had not.  The remaining 7 percent responded that they were unaware that they could file on a broker's bond at all.

---

[15] Mark Schremmer, "OOIDA maintains stance that complaint database needs new name," Land Line Magazine (March 23, 2022), https://landline.media/ooida-maintains-stance-that-complaint-database-needs-new-name/

Another form of protection that FMCSA affords owner-operators is the DataQ Challenge System. The DataQ Challenge allows an owner-operator to remove an erroneous violation from the safety management system, or SMS, which can directly impact a carrier's ability to operate. However, the process itself can be arduous. In fact, only 16 percent of OOIDA members even know how to file a DataQ Challenge. Of those few who do know how, 45 percent have actually done so with 60 percent of the challenges concluding in their favor as the violation was either removed or downgraded.

Finally, OOFI asked those under their own authority what they believed was their greatest challenge today, just as it did with the leased-on owner-operators. While the two segments have similar difficulties, they experience them very differently. For example, the number one issue by far for those owner-operators under their own authority was compliance with an ever-increasing list of regulations. Though both groups stated regulations as a challenge, the number of regulations that those with their own authority have to comply with is much greater (paperwork, taxes, permits, licenses, insurance, etc.). Moreover, these regulations impact small carriers much differently than their larger competitors.

One member wrote, "Mismatched government regulation. Safety is absolutely paramount. However, the individual or small fleet owner is at risk by being required to provide equal expense to ensure compliance as the major carriers. There's no consideration made to varying fleet size as to cost incurred for ensuring compliance or the same with regard to cost of violations of compliance." Other challenges impacting owner-operators under their own authority today included rising fuel costs, declining rates, lack of truck parking, high maintenance costs, detention time, and poor road conditions.

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 216 of 295    (291 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 193-1  Filed 09/29/23  PageID.4244  Page 66 of 90

40                                                                           ER-216

## Survey Results

There are 488 total respondents currently for any one question as of May 9, 2022.  On March 25, 2022, the OOIDA Foundation emailed an online survey to 17,190 members who allow for email communication. The Survey had a started/viewed rate of 43.5 percent and a **95 percent** confidence level with a **4 percent** margin of error.  The Survey therefore received enough response to be considered statically significant.

The number of respondents per question is in ( ).  Percentage of each answer is given based on the number of respondents marking any one answer; all percentages have been rounded to the nearest whole number.

1. Which best describes your type of operation? (488)
   a. Owner-operator (own authority) – 44%
   b. **Owner-operator (leased to motor carrier) – 45%**
   c. Fleet owner – 5%
   d. Retired – 4%
   e. Other – 2%

2. What is your ethnic background? (477)
   a. **Caucasian – 81%**
   b. African-American – 9%
   c. Hispanic – 4%
   d. Asian-American – 0%
   e. Native American – 2%
   f. Mid-Eastern – 0%
   g. Eastern-European – 0%
   h. Sikh – 0%
   i. Other – 3%

3. What are you **primarily** depending on to secure your retirement income? (478)
   a. None – 19%
   b. IRA (Individual Retirement Account) – 19%
   c. SEP (Simplified Employee Pension) – 6%
   d. 401k plan – 4%
   e. Mutual funds – 1%
   f. Savings account – 9%
   g. **Social Security – 24%**
   h. Military – 3%
   i. Real Estate – 4%
   j. Other – 8%

4. Which **best** describes your business model? (475)
   a. **Truck load (TL) – 71%**

   b.   Less-than-truckload (LTL) – 6%
   c.   Expeditor – 1%
   d.   Power Only – 13%
   e.   Other – 8%


5. What was your ***gross income*** last year? (355)
   a.   Mean – $258,119
   b.   Median – $190,000
   c.   Mode – $200,000


6. What was your ***gross expense*** last year? (330)
   a.   Mean – $187,195
   b.   Median – $118,000
   c.   Mode – $150,000

        Net Income
              i.   By mean – $70,924
             ii.   By median – $72,000
            iii.   By mode – $50,000


7. What is the ***primary*** freight you haul? (465)
   a.   **General freight – 40%**
   b.   Refrigerated – 14%
   c.   Agriculture non-refrigerated – 3%
   d.   Building materials – 6%
   e.   Aggregate (concrete, gravel, sand, etc.) – 2%
   f.   Steel – 4%
   g.   Livestock – 2%
   h.   Automotive – 2%
   i.   Hopper – 1%
   j.   Intermodal containers – 3%
   k.   Hazmat/liquid/chemicals/fuel – 8%
   l.   Oversize/overweight – 5%
   m.   Other – 11%


8. How old were you when you first got your CDL or chauffeur's license? (470)
   a.   Mean – 25.6
   b.   Median – 22
   c.   Mode – 18


9. At what age did you become an owner-operator? (469)
   a.   Mean – 38.3

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 218 of 295        (293 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 193-1  Filed 09/29/23  PageID.4246  Page 68 of 90
ER-218

42

b.   Median – 38
c.   Mode – 35

10. How many years have you been an owner-operator? (463)
a.   Mean – 19.3
b.   Median – 18
c.   Mode – 6

11. Do you plan on retiring from trucking? (470)
a.   **Yes – 79%**
b.   No – 21%

12. If yes, at what age do you plan to retire? (418)
a.   Mean – 69.1
b.   Median – 68
c.   Mode – 65

13. How many **_loaded miles_** did you drive last year? (315) (average per truck)
a.   Mean – 85,626
b.   Median – 86,000
c.   Mode – 100,000

14. How many **_deadhead miles_** did you run last year? (276) (average per truck)
a.   Mean – 17,600
b.   Median – 12,000
c.   Mode – 10,000

15. How many miles have you driven in your career? (335)
a.   Mean – 2,777,247
b.   Median – 3,000,000
c.   Mode – 3,000,000

16. How many DOT reportable accidents did you have **_last year_**? (387)
a.   Mean – 0.1
b.   Median – 0.0
c.   Mode – 0.0

17. How many DOT reportable accidents have you had in your career? (384)
a.   Mean – 0.8
b.   Median – 0.0
c.   Mode – 0.0

Case: 24-2341 08/05/2024 DktEntry: 16.1 Page 219 of 295 (294 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4247 Page 69 of 90
ER-219
43

18. What is your **typical load's length** of haul? (387)

    a. 1 to 150 miles – 13%

    b. 151 to 500 miles – 29%

    **c. 501 to 1,000 miles – 31%**

    d. 1,001+ miles – 26%

19. How many nights were you away from home last year? (374)

    **a. Less than 50 – 20%**

    b. 50 to 100 – 10%

    c. 101 to 150 – 11%

    d. 151 to 200 – 18%

    e. 201 to 250 – 16%

    f. 251 to 300 – 14%

    g. 300+ – 10%

20. Do you run: (384)

    **a. Solo – 98%**

    b. Team – 2%

21. What is the average weight of the loads you haul? (370) Lbs.

    a. Mean – 41,715

    b. Median – 40,000

    c. Mode – 40,000

22. Do you *primarily* haul in: (375)

    a. Northwest (AK, ID, MT, NE, ND, OR, SD, WA, WY) – 8%

    b. Southwest (AZ, CA, CO, HI, NM, NV, UT) – 10%

    **c. Northcentral (IL, IN, IA, KY, MI, MN, OH, WI) – 27%**

    d. Southcentral (AR, KS, LA, MS, MO, OK, TX) – 23%

    e. Northeast (CT, DE, ME, MA, NH, NJ, NY, PA, RI, VT) – 10%

    f. Southeast (AL, FL, GA, MD, NC, SC, TN, VA, WV) – 21%

23. How much did you pay last year on tolls? (332) $

    a. Mean – $2,394.75

    b. Median – $500

    c. Mode – 500

24. What percentage of that toll cost were you reimbursed for? (326) %

    a. Mean – 17.3%

    b. Median – 0.0%

    c. Mode – 0.0

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 220 of 295      (295 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4248   Page 70 of 90
ER-220

25. How are you *primarily* paid for your services? (387) (***Select only one***)
   a. **Per Trip, What is your average trip pay? (100) – 33%**
      i. Mean – $2,060
      ii. Median – $1,200
      iii. Mode – $1,000

   b. **Per Mile**, What is your per mile pay? (58) – 23%
      i. Mean – $2.71
      ii. Median – $2.53
      iii. Mode – $3.00

   c. **Hourly**, What is your hourly rate of pay?  – 1%
   d. **Percentage**, What is the percentage of the load? (120) – 33%
      i. Mean – 74%
      ii. Median – 75%
      iii. Mode – 65%

   e. By **volume or weight**, What is your average pay? 5%
   f. **Salary**, What is your annual salary? – 2%
   g. Other – 3%

26. How many trailers do you own? (348)
   a. Mean – 1.3
   b. Median – 1.0
   c. Mode – 0

27. Is your trailer(s): (271)
   a. New – 22%
   b. **Used – 64%**
   c. Mixture – 14%

28. What was the purchase price of your trailer? (253)
   a. Mean – $37,996.44
   b. Median – $32,000
   c. Mode – $25,000

29. What type trailer do you *primarily* pull? (333)
   a. Flatbed (all configurations including lowboy and RGN) – 24%
   b. Reefer – 14%
   c. **Van – 32%**

    d.   Grain – 3%

    e.   Dump – 3%

    f.   Tanker (including pneumatic trailer) – 9%

    g.   Livestock – 1%

    h.   Lowboy – 3%

    i.   Auto hauler – 1%

    j.   Containers – 3%

    k.   Other – 8%

30. Do you have health insurance? (348)

    a.   **Yes – 75%**

    b.   No – 25%

    How much is your ***monthly*** premium for your health insurance plan? (226)

       i.   Mean – $403.47

      ii.   Median – $250

     iii.   Mode – $0.00

31. Do you take any maintenance type prescriptions? (346)

    a.   Yes – 50%

    b.   **No – 50%**

32. If yes, do you take prescriptions for: (164 respondents checked 309 answers)

    a.   High blood pressure – 61%

    b.   Heart – 15%

    c.   Diabetes – 25%

    d.   Pain – 8%

    e.   Cholesterol – 43%

    f.   Thyroid – 12%

    g.   Anxiety – 2%

    h.   Depression – 5%

    i.   Other – 16%

33. What is your height? (334)

    a.   Mean – 70.1 inches

    b.   Median – 71 inches

    c.   Mode – 72 inches

34. What is your weight? (341)

    a.   Mean – 224.2 lbs.

    b.   Median – 215 lbs.

46

    c.   Mode – 200 lbs.

BMI (334)
    a.   Mean – 32.1
    b.   Median – 30.7
    c.   Mode – 29.5

35. Does your neck size exceed 17 inches? (342)
    a.   Yes – 20%
    b.   **No – 80%**

36. Has a motor carrier or medical examiner required you to be screened for obstructive sleep apnea (OSA)? (349)
    a.   Yes – 9%
    b.   **No – 91%**

37. If yes, what was the cost? (24) $
    a.   Mean – $245.83
    b.   Median – $0.00
    c.   Mode – $0.00

38. Are you currently receiving treatment for OSA? (350)
    a.   Yes – 7%
    b.   **No – 93%**

39. If yes, what is the cost? (18)
    a.   Mean – $301.28
    b.   Median – $100.00
    c.   Mode – $0.00

40. Does your medical policy cover OSA screening and equipment? (342)
    a.   Yes – 13%
    b.   No – 30%
    c.   **Not sure – 56%**

41. Do you have any of the following on your tractor/trailer: (325 respondents checked 612 answers)
    a.   Trailer skirting – 23%
    b.   Side underride guard – 5%
    c.   Single wide tires – 9%
    d.   Roof faring – 19%
    e.   Boat tails – 0%

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 223 of 295          (298 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 193-1  Filed 09/29/23  PageID.4251  Page 73 of 90

ER-223

47

      f.   SCR/EGR – 30%

      **g.   DPF filters – 39%**

      h.   Anti-idling equipment – 24%

      i.   Other – 3%

      j.   None – 37%

42. If yes, have you received a return on your investment? (197)

      a.   Yes – 36%

      b.   No – 64%

      How many months did it take for you to receive a return on your investment? (54)

         a.   Mean – 21.1 months

         b.   Median – 13.5 months

         c.   Mode – 12 months

43. How many trucks do you own? (327)

      a.   Mean – 1.5

      b.   Median – 1.0

      c.   Mode – 1.0

44. Is your truck(s): (335)

      a.   New – 21%

      **b.   Used – 68%**

      c.   Glider – 5%

      d.   Mixture – 6%

45. What is the model year of your truck? (312)

      a.   Mean – 2010

      b.   Median – 2013

      c.   Mode – 2015

46. The GVWR of my truck is: (335)

      a.   Class 5 (Less than 19,500 lbs.) – 5%

      b.   Class 6 (19,501 to 26,000 lbs.) – 2%

      c.   Class 7 (26,001 to 33,000 lbs.) – 4%

      **d.   Class 8 (33,001 lbs. and greater) – 88%**

      e.   Other – 1%

47. How many miles have the vehicle been driven since it was manufactured? (314)

      a.   Mean – 1,180,852

      b.   Median – 785,000

    c.   Mode – 2,000,000

48. What was the purchase price of your truck? (305)
    a.   Mean – $81,440
    b.   Median – $65,000
    c.   Mode – $35,000

49. Is your truck paid off? (334)
    **a.   Yes – 63%**
    b.   No – 37%

50. Have you ever lease-purchased a truck? (339)
    a.   Yes – 29%
    **b.   No – 71%**

51. If yes, did you obtain the title? (94)
    a.   Yes – 49%
    **b.   No – 51%**

52. Are you currently, in a lease-purchase agreement? (98)
    a.   Yes – 22%
    **b.   No – 78%**

53. What is the horsepower of your engine? (323)
    a.   250 to 350 – 2%
    b.   351 to 400 – 4%
    c.   401 to 450 – 18%
    d.   451 to 500 – 33%
    **e.   501+ - 43%**

54. What is the transmission in your truck? (322)
    a.   5 speed – 0%
    b.   6 speed – 1%
    c.   9 speed – 4%
    d.   10 speed – 16%
    a.   Automatic or partial auto – 23%
    **b.   13 speed – 30%**
    c.   15 speed – 2%
    d.   18 speed – 24%

55. What is your average fuel mileage? (331)

     a.   Mean – 6.4

     b.   Median – 6.1

     c.   Mode – 6.0

56. Is your truck equipped with a specific device that restricts a vehicle's top speed regardless of design capabilities? (317) (i.e., a speed limiter)

     a.   Yes – 23%

     **b.   No – 77%**

57. If yes, what is the maximum speed setting of the speed limiter? (70)

     a.   Mean – 75 mph

     b.   Median – 75 mph

     c.   Mode – 75 mph

58. Is your truck equipped with: (*select all that apply*) (308 respondents selected 549 answers)

     a.   Automatic emergency braking – 10%

     b.   Air disc brakes – 20%

     c.   Adaptive cruise control – 20%

     d.   Active lane keep assist – 6%

     e.   Active lane centering assist – 3%

     f.   Adaptive steering control – 1%

     g.   Lane departure warning – 7%

     h.   Forward collision warning – 12%

     i.   Blind spot warning – 5%

     j.   Driver-facing camera – 5%

     **k.   Road-facing camera – 44%**

     l.   Camera-based mirror system – 4%

     m.  None – 41%

     n.   Other – 1%

59. In your professional opinion, how helpful is this equipment? (289)

     a.   Very helpful – 23%

     b.   Somewhat helpful – 24%

     **c.   Neutral or unsure – 31%**

     d.   Somewhat unhelpful – 7%

     e.   Very unhelpful – 15%

60. Do you feel that these technologies: (297)

     a.   Improve safety – 37%

     b.   Reduce safety – 20%

     **c.   Have no effect on safety – 43%**

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 226 of 295     (301 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4254   Page 76 of 90
ER-226

61. How many tires did you purchase last year? (300)
   a. Mean – 9.5
   b. Median – 8.0
   c. Mode – 10.0

62. What was your total tire repair and replacement cost last year? (242)
   a. Mean – $6,016.62
   b. Median – $5,000
   c. Mode – $5,000

63. Approximately how much do you spend on tractor/trailer maintenance per year overall? (260)
   a. Mean – $18,153.27
   b. Median – $14,229
   c. Mode – $10,000

64. Please allocate what percentage of your maintenance costs were related to one of these four items? (301) (The total of the four items combined cannot exceed 100%)
   a. emissions or environmental related equipment – 15%
   b. highway damage or poor road conditions – 22%
   c. **routine maintenance – 50%**
   d. other – 11%

65. What was your **_primary_** job before becoming a professional truck driver? (310) *(choose one)*
   a. Construction worker – 11%
   b. Farmer – 7%
   c. Military – 14%
   d. Mechanic – 9%
   e. Factory worker – 6%
   f. Sales – 5%
   g. Student – 4%
   h. Warehouse – 3%
   i. Oil field – 1%
   j. Always been a trucker – 17%
   k. **Other – 23%**

66. Have you ever served in the military? (316)
   a. Yes – 32%
   b. **No – 68%**

67. Complete this sentence: "I drive a truck because…" (317)

   a.  All I ever wanted to do – 15%

   b.  Love it/enjoy it – 18%

   **c.  Freedom/adventure/own boss – 30%**

   d.  It pays the bills – 18%

   e.  Multiple generation trucker – 8%

   f.  Other (ten words or less) – 11%

**Leased-On Owner-Operators**

1. What is the greatest challenge for owner-operators today? (131)

The following is a list of common challenges for leased-on owner-operators according to survey results:

- Regulations/government
- Fuel prices
- Low wages
- High maintenance costs
- Parking
- Road conditions
- ELDs
- Congestion

2. When selecting a carrier to lease to, what are the most important issues you consider? (109) Please rank (1-8) the following in order of importance, 1 being the most important:

   **a.  Amount of freight – 2.6 (2nd)**

   **b.  Freight rates – 1.8 (1st)**

   c.  Type of payment – 3.8

   d.  Detention pay – 4.3

   e.  Claims handling – 6.2

   **f.  Company reputation – 3.2 (3rd)**

   g.  Company safety record – 4.4

   h.  Other – 6.5

3. How long have you been with your present carrier? (144)

   a.  0-1 year – 15%

   b.  2-3 years – 24%

   c.  4-5 years – 14%

   d.  6-7 years – 8%

   e.  8-10 years – 12%

   **f.  11+ years – 26%**

4. How many carriers have you worked for in your career? (143)

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 228 of 295 (303 of 372)
Case 3:18-cv-02458-BEN-DEB Document 193-1 Filed 09/29/23 PageID.4256 Page 78 of 90
ER-228

52

    a. 1 – 8%
    b. 2 – 10%
    c. 3 – 21%
    d. 4 – 16%
    e. **5 or more – 45%**

5. If you have left a carrier, what were the most important issues that caused you to leave? (96) Please rank (1-8) the following in order of importance, 1 being the most important:
    a. **Lack of freight – 2.9 (3rd)**
    b. **Low pay – 2.1 (1st)**
    c. Excessive detention – 3.6
    d. Not enough home time – 3.8
    e. **Lack of respect – 2.7 (2nd)**
    f. Company reputation – 5.0
    g. Company safety record – 5.3
    h. Other – 4.8

6. The carrier I work for has: (138)
    a. 1 truck – 4%
    b. 2-5 trucks – 6%
    c. 6-20 trucks – 13%
    d. **21-100 trucks – 28%**
    e. 101-1,000 trucks – 26%
    f. 1,001+ trucks – 23%

7. Can you refuse loads? (144)
    a. **Yes – 94%**
    b. No – 6%

8. If yes, are there consequences or penalties? (134)
    a. Yes – 13%
    b. **No – 87%**

9. Are you able to choose your own routes? (147)
    a. **Yes – 89%**
    b. No – 11%

10. What type of business are you? (147)
    **a. Sole proprietorship – 52%**
    b. Partnership – 1%
    c. Limited Liability Corporation – 32%

    d.   Corporation – 16%

**Owner- Operators under their Own Authority**

1. What type of business are you? (133)
   - a.   Sole proprietorship – 33%
   - b.  Partnership – 2%
   - **c.   Limited Liability Corporation – 42%**
   - d.  Corporation – 23%

2. Please allocate what percentage of your business comes through the following entities: ()
   - **a.   Brokers – 32%**
   - b.  Shippers – 22%
   - c.  Load Boards – 23%
   - d.  Digital Load Matching (i.e., Uber Freight, Convoy, etc.) – 2%
   - e.  Other – 21%

3. Have you ever filed a complaint on the National Consumer Complaint Database? (134)
   - a.   Yes – 0%
   - **b.  No – 69%**
   - c.   I have never heard of it – 31%

4. Have you ever filed on a broker bond? (135)
   - a.   Yes – 13%
   - **b.  No – 81%**
   - c.   Didn't know you could – 7%

5. Do you know how to complete a DataQ challenge? (135)
   - a.   Yes – 16%
   - **b.  No – 84%**

6. If yes, have you ever completed a DataQ challenge? (22)
   - a.   Yes – 45%
   - **b.  No – 55%**

7. If you have completed a DataQ challenge, did the challenge: (10)
   - **a.   End in your favor and the violation was removed/downgraded – 60%**
   - b.  End in your favor but the violation was not removed/downgraded – 10%
   - c.   Did not end in your favor – 30%

8. Do you use a factoring service? (135)
   - a.   Yes – 28%

54

Case: 24-2341  08/05/2024  DktEntry: 16.1  Page 230 of 295     (305 of 372)
Case 3:18-cv-02458-BEN-DEB  Document 193-1  Filed 09/29/23  PageID.4258  Page 80 of 90

ER-230

**b. No – 72%**

9. What is the greatest challenge for owner-operators today? (131)

The following is a list of common challenges for owner-operators under their own authority according to survey results:

- Regulations/government
- Fuel prices
- Freight rates
- High maintenance costs
- Parking
- Road conditions
- ELDs
- Detention
- Congestion
- Lack of qualified drivers

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 231 of 295    (306 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 193-1   Filed 09/29/23   PageID.4259   Page 81 of 90
ER-231

# EXHIBIT B

# Used truck prices have doubled in the last year (https://www.dat.com/blog/used-truck-prices-have-doubled-in-the-last-year)

Dean Croke(https://www.dat.com/blog/author/dean-croke)   August 10, 2021
Market Update (https://www.dat.com/blog/category/market-update)
Broker (https://www.dat.com/blog/tag/broker), Carrier
(https://www.dat.com/blog/tag/carrier), Owner-Operator
(https://www.dat.com/blog/tag/owner-operator)

According to Chris Visser, J.D. Power Valuation Services commercial vehicles senior analyst and product manager: "Most segments of the used truck market are performing extremely well, with price appreciation widespread. Fundamentals support continued strength in the short term and possibly longer. We are now more than a full year into the freight market recovery, with no letup in pressure on the horizon."

Used truck prices have often been regarded as reliable indicators of:

- Overall market health
- Purchase cycle and resale values
- Truckload capacity

The current freight market is being driven by tight supply on the driver and equipment side. But unlike other more recent freight cycles, it's also being driven by high levels of freight demand.

*Get the clearest, most accurate view of the truckload marketplace with data from DAT iQ.* (https://www.dat.com/iq)



*Tune into DAT iQ Live, live on YouTube* (http://youtube.com/c/DATLoadBoards/live) *or LinkedIn* (https://www.linkedin.com/company/datsolutions/events/)*, 10am ET every Tuesday.*

## Used truck volumes at auction have dropped 82% in the last year

The J.D. Power June 2021 report (https://www.truckpartsandservice.com/economic-trends/indicators/article/15066557/jd-power-reports-used-truck-sales-prices-approaching-records) indicated that the volume of used trucks in the three to seven-year-old sleeper cab category sold at auction has dropped 82% year-over-year.

Right after the pandemic hit and demand crashed in March and April last year, carrier exits from the industry hit record levels. Just two months later, we saw the highest number of trucks hitting the auction block in the last decade.

In June 2020, the number of trucks at the two largest auction houses nationwide hit 1,054. This surpassed the previous high set in December 2019 by 36%. One year later that number is down to just 192 trucks.

"At this point, auction pricing for late-model sleepers is higher than any time in the six years we've been tracking our benchmark group," says Visser. "And retail pricing is at or above any period in the 12 years following the Great Recession."

## Categories

- Best Practices and Benchmarks (https://www.dat.com/blog/category/best-practices-and-benchmarks)
- Broker News (https://www.dat.com/blog/category/broker-news)
- Carrier News (https://www.dat.com/blog/category/carrier-news)
- COVID-19 (https://www.dat.com/blog/category/covid-19)
- DAT News (https://www.dat.com/blog/category/dat-news)
- DAT Product News (https://www.dat.com/blog/category/dat-product-news)
- DATCON (https://www.dat.com/blog/category/datcon)
- Flatbed markets (https://www.dat.com/blog/category/flatbed-markets)
- Freight Rates (https://www.dat.com/blog/category/freight-rates)
- Market Update (https://www.dat.com/blog/category/market-update)
- My Craziest Load (https://www.dat.com/blog/category/my-craziest-load)
- Podcast (https://www.dat.com/blog/category/podcast)
- Rate Trend of the Week (https://www.dat.com/blog/category/rate-trend-of-the-week)
- Reefer markets (https://www.dat.com/blog/category/reefer-markets)
- Transportation Tuesday (https://www.dat.com/blog/category/transportation-tuesday)
- Trucking Industry Trends (https://www.dat.com/blog/category/trucking-industry-trends)
- Trucking Lifestyle (https://www.dat.com/blog/category/trucking-lifestyle)
- Trucking Regulations (https://www.dat.com/blog/category/trucking-regulations)
- Uncategorized (https://www.dat.com/blog/category/uncategorized)
- Van markets (https://www.dat.com/blog/category/van-markets)

## Share

< Back to posts (/blog)



Three-year-old Class 8 trucks went under the hammer for $90,548 at auction. This represents a 95% annual increase, while four year-old trucks went for $71,263 on average — up 121%. The most gains were recorded in the five-year-old category where prices were up 128% to an average of $62,296 in June compared to the same time last year.

"June's auction results were a study in contrasts, with lower-mileage trucks bringing stratospheric money and higher-mileage, rougher-condition trucks unimpressive due to unfavorable mileage and condition," says Visser.

## What about used truck retail prices?

Ongoing truck production constraints due to labor and part shortages have resulted in many buyers looking to the used truck market to add capacity to their fleets. This is especially true for low-mileage trucks with some engine and powertrain warranty still in place.

After a full year of recovery in the freight markets, late-model sleeper tractors remain in tight supply and pricing continues to impress. The J.D. Power June 2021 Commercial Truck Guidelines industry report states that late-model truck values were up by 1.9% in June compared to May. And in the first six months of 2021, late-model trucks were 20.9% ahead of the same period of 2020, and 2.6% ahead of the same period of 2019. The average selling price of every sleeper truck sold is the highest since at least 2007, according to the report.

## Where did all the trucks come from?

In the last 12-months the industry has added just over 200,000 new trucks to the market since the pandemic took hold at the start of April last year, according to June's Federal Motor Carrier Safety Administration (FMCSA) Census File.

That represents a 4.4% year-over-year growth in truck capacity with 25% of that growth from owner-operators alone. In fact, fleets ranging in size from one to forty trucks that have a higher exposure to the spot market than most other categories, accounted for 78% of trucks added in the last 12-months. But these numbers may be slightly misleading.

A lot of leased owner-operators switched to the independent category under their own authority. So while the FMCSA has seen more trucks added, it includes both new entrants and owner-operators shifting from lease to independent.

Record-high spot rates have played a huge role in escalating truck prices as new carriers enter the market to take advantage of high profit margins.



In the last year, we saw the addition of new capacity while spot rates continued to hold steady at current levels. There also hasn't been any sign of the traditional post-July 4 fall in rates.

It's reasonably safe to assume the industry will continue to add independent contractor capacity and keep used truck prices high and auction inventory levels low while new trucks are delayed at the factory level.

## RELATED POSTS

(https://www.dat.com/blog/supply-chain-series-adopt-a-value-chain-mindset-for-data-driven-business-growth)

**MARKET UPDATE (HTTPS://WWW.DAT.COM/BLOG/CATEGORY/MARKET-UPDATE)**
September 19, 2023

**Supply Chain Series: Adopt a value chain mindset for data-driven business growth (https://www.dat.com/blog/supply-chain-series-adopt-a-value-chain-mindset-for-data-driven-business-growth)**

The way we view active supply chain management (SCM) has evolved. It's not just about saving money anymore. While financial considerations

READ MORE (HTTPS://WWW.DAT.COM/BLOG/SUPPLY-CHAIN-SERIES-ADOPT-A-VALUE-CHAIN-MINDSET-FOR-DATA-DRIVEN-BUSINESS-GROWTH)

(https://www.dat.com/blog/dat-survey-75-of-truck-drivers-say-job-is-stressful)

**MARKET UPDATE (HTTPS://WWW.DAT.COM/BLOG/CATEGORY/MARKET-UPDATE)**
September 18, 2023

**DAT survey: 75% of truck drivers say job is stressful (https://www.dat.com/blog/dat-survey-75-of-truck-drivers-say-job-is-stressful)**

Truck drivers find their work fulfilling; however, nearly 75% state the job is physically and emotionally stressful, according to a

READ MORE (HTTPS://WWW.DAT.COM/BLOG/DAT-SURVEY-75-OF-TRUCK-DRIVERS-SAY-JOB-IS-STRESSFUL)

(https://www.dat.com/blog/drivers-cutting-costs-by-cooking-on-the-road)

**MARKET UPDATE (HTTPS://WWW.DAT.COM/BLOG/CATEGORY/MARKET-UPDATE)**
September 11, 2023

**Drivers cutting costs by cooking on the road (https://www.dat.com/blog/drivers-cutting-costs-by-cooking-on-the-road)**

In the post-pandemic world, many truckers find themselves in truck stops where restaurants have not yet re-opened. If they are

READ MORE (HTTPS://WWW.DAT.COM/BLOG/DRIVERS-CUTTING-COSTS-BY-COOKING-ON-THE-ROAD)

## Newsletter Sign Up:

✉ SUBSCRIBE        (https://cloud.comms.dat.com/newsletter-signup)

I have read and accept the DAT Solutions privacy policy (/privacy-policy). By clicking subscribe I acknowledge that I want to receive emails from DAT.

| COMPANY (/COMPANY) | PRODUCTS (/PRODUCTS) | RESOURCES (/RESOURCES) | SUPPORT (/SUPPORT) |
| --- | --- | --- | --- |
| Leadership | Load Board | FAQs | Product Login |
| History | Freight Rates | Blog | Support Request |
| Careers | Benchmark Analytics | Press Room | Contact Us |
| News & Events | Operating Authority | Guides | |
| Partner with Us | Product Finder | Videos | |

NEWSLETTERS (HTTPS://CLOUD.COMMS.DAT.COM/NEWSLETTER-SIGNUP)

FACEBOOK (HTTPS://WWW.FACEBOOK.COM/DATFREIGHT)

TWITTER (HTTPS://TWITTER.COM/DATFREIGHTTEAM)

LINKEDIN (HTTPS://LINKEDIN.COM/COMPANY/DAT-FREIGHT-AND-ANALYTICS)

YOUTUBE (HTTPS://WWW.YOUTUBE.COM/C/DATLOADBOARDS/VIDEOS)

INSTAGRAM (HTTPS://INSTAGRAM.COM/DATFREIGHT)

Download the DAT One mobile app

(https://apps.apple.com/us/developer/dat-solutions-llc/id474213239)

GET IT ON Google Play (https://play.google.com/store/apps/developer?id=DAT+Solutions)

Review Us

(https://www.capterra.com/reviews/265434/DAT- (https://www.capterra.com/r

(https://www.g2.com/products/dat-
load-board/take_survey? (https://www.g2.com/products/dat-
Load Board? iq/take_survey?
utm_source=review-widget) (https://www.trustpilot.com/review/dat.com) utm_source=review-widget) iQ?
utm_source=vendor&utm_medium=badge&utm_campaign=capterra_reviews_badge) utm_source=vendor&utm_medium=badge&utm_campaign=cap

Marketing Index        Legal        Site Map        Privacy Policy

Copyright © 2023 DAT Solutions, LLC. All rights reserved. All trademarks are the property of their respective owners.

# EXHIBIT C

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 237 of 295    (312 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 53    Filed 03/06/24    PageID.2265    Page 87 of 90
ER-237

| Business | Technology | Equipment |   | **Connor D. Wolf | Staff Reporter** |

March 30, 2023 5:18 PM, EDT

# February Used Class 8 Sales Down 20% Year-Over-Year

## Prices Also Fall From 2022, January



*ViewApart/Getty Images*

*[Stay on top of transportation news: Get TTNews in your inbox.]*

Used Class 8 truck sales in February decreased 19.6% year-over-year to 17,600 units from 21,900 units, ACT Research reported.

The average price for a used truck fell 23.3% to $72,386 from $94,343 a year ago, and declined 3.5% month-over-month from $75,013 in January. Average mileage was unchanged while age was down 2%, ACT said.

On a month-to-month basis, sales slipped 4.9% from January's volume of 18,500 units.

The decline was felt at the dealership level, noted ACT Vice President Steven Tam.

"Following two months of gains, same-dealer Class 8 retail truck sales retreated into negative territory in February, down 8% from January," he said. "The drop was directionally consistent with seasonality, though a bit steeper than expected. It is no secret that 'normal' has been anything but in this cycle, so given the relatively small variance, it is tough to get too excited."

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 238 of 295    (313 of 372)
9/20/20, 4:53 AM Case 3:18-cv-02458-BEN-DEB   Document 133   Filed 12/23/22 over-Year-over-Year PageID.5742 Page 88 of 90
ER-238



**ACT Research**

@actresearch · **Follow**

According to the latest State of the Industry: U.S. Classes 3-8 Used Trucks, published by ACT, used CL8 retail volumes (same dealer sales) were 8% lower m/m in February.

hubs.la/Q01JyGZw0

#UsedTrucks, #Trucking #semitruck, #ACT, #ACTResearch

1:05 PM · Mar 30, 2023

Reply    Share

**Read more on Twitter**

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 239 of 295 (314 of 372)
Case 3:18-cv-02458-BEN-DEB Document 183 Filed 10/03/23 Page 89 of 90
ER-239

Tam said used truck sales typically increase between 15% to 20% going into March, and noted inventories ticking up and new truck activity could support an increase of that magnitude this year. But he also warned that softness in the economy and overall freight market could affect results.

"Concerns remain regarding how owner-operators and small fleets will fare in 2023, particularly as freight rates fall and operating costs rise," he said. "While the economy may avoid a recession, inflation remains a very real concern. And all of this says nothing about what fleets' equity position in their equipment looks like. Those that bought at the top of the market are likely underwater or headed there. With that in mind, we expect the market to fall as much as 10%."

Mission Financial Services Group saw an influx of dealer applications to finance used trucks during the month, fueled by smaller dealerships making gains over large franchises in acquiring used units to fill their lots. Smaller outlets primarily turn to auctions to source used inventory, while larger dealers rely on trade-ins — the market for which has been slow.

"We've noticed that they're not getting a lot of trade-ins because a lot of the new trucks have been allocated already during COVID," Charles Smith, regional business development and marketing manager at Mission Financial Services Group, said. "The ones that did come in were already allocated, so they're still not getting trade-ins. But even with the prices dropping in February, going into March we're starting to see the smaller dealerships pick up more used trucks, and we are starting to see an influx of applications come through."

Smith noted that higher prices began a descent in January which has continued, and expects a drastic price shift around midyear as more used trucks become available. He believes prices will keep falling and level off just above where they were before the coronavirus pandemic.



RoadSigns – RS109: …　🔊 SOUNDCLOUD

Kayne Grau, CEO of Uptake, discusses ways that fleets can use data to prevent expensive truck repairs. Hear the program above and at RoadSigns.TTNews.com.

"Every week is a new market, so you have to buy and sell in current inventory," said James Rys, general manager at dealership House of Trucks. "So, depending on specs, mileage and opportunity to replenish your inventory, you have to buy in today's pricing and you have to move the inventory that you might have had for 30 or 45 days. The market is just very choppy, but there is a lot of retail opportunity if you find the right equipment at the right pricing. That's what we see today."

He noted that used trucks entering the market are older with higher mileage, and suspects fleets have become more flexible when it comes to running their trucks longer versus replacing them.

"The problem that we're seeing is the mileage range has gone from 300,000-mile trucks to 400,000- and 500,000-mile trucks," Rys said. "So you're getting clobbered on both sides. You're going to have the [price] increase of new equipment and now the decrease of trade values based on the additional miles."

**Want more news?** Listen to today's daily briefing below or go here for more info:

9/20/2↑ 11:19 AM    Case 3:18-cv-02458-BEN-DEB    February Used Class 8 Sales Hold 2019 Year-Over-Year Transport Topics

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 240 of 295    (315 of 372)
Document 33-8 Filed 01/29/23 PageID.472 Page 90 of 90

ER-240



Transport Topics

## Transport Topics (Aug. 8, 2023)

00:00 / 02:25

  

**More Content About:** _used_, _Class 8_

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 241 of 295    (316 of 372)
Case 3:18-cv-02458-BEN-DEB    Document 171-3    Filed 06/19/23    PageID.2524    Page 1 of 3
ER-241

Timothy A. Horton (S.B.N. 205414)
THE LAW OFFICE OF TIMOTHY A. HORTON
600 W. Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 272-7017
timhorton@timhortonlaw.com

Paul D. Cullen, Jr. (pro hac vice)
pxc@cullenlaw.com
Charles R. Stinson (pro hac vice)
crs@cullenlaw.com
THE CULLEN LAW FIRM, PLLC
1101 30th Street, NW, Suite 300
Washington, DC 20007
Telephone: (202) 944-8600

*Attorneys for Intervenor-Plaintiff
Owner-Operator Independent Drivers Association*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION *et al.,*<br><br>Plaintiffs,<br><br>OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION,<br><br>Intervenor- Plaintiff,<br><br>v.<br><br>ATTORNEY GENERAL ROB BONTA, *et al.,*<br><br>Defendants. | Case No.  3:18-CV-02458-BEN-DEB<br><br>**DECLARATION OF DANNY R. SCHNAUTZ IN SUPPORT OF INTERVENOR-PLAINTIFF OOIDA'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Roger T. Benitez<br>Date:   August 28, 2023<br>Time:  10:30 a.m.<br>**Courtroom: 5A** |

I, Danny R. Schnautz, do hereby declare:

      1.    I am over the age of eighteen years and am competent to testify as to all the facts and subjects set forth in this declaration.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 242 of 295 (317 of 372)
Case 3:18-cv-02458-BEN-DEB Document 171-3 Filed 06/19/23 PageID.2525 Page 2 of 3
ER-242

2.     The facts herein are known to me and based on my personal knowledge.

3.     I have been a member of the Owner-Operator Independent Drivers Association, Inc. ("OOIDA") for about 30 years. I am currently a member of OOIDA's Board of Directors.

4.     Approximately one year ago, I became the owner of Clark Freight Lines, Inc. ("Clark") based in Pasadena, Texas.

5.     Prior to purchasing Clark Freight Lines, I worked for the company, beginning as a driver 36 years ago, and starting to work in the office 33 years ago.

6.     Clark is a motor carrier registered with the U.S. Department of Transportation to haul freight in interstate commerce.  Clark does business in 49 states and Canada.

7.     Clark has 140 drivers.

8.     Clark drivers operate a variety of equipment, including flatbeds, vans, specialized trailers, and intermodal chassis.  This allows Clark to serve the needs of a diverse range of shippers, including general freight, freight for the petrochemical industry, freight that is time-sensitive, hazardous materials, and freight that requires a temperature-controlled environment.

9.     At one time Clark ran between 8 and 10 loads a week into and out of California, which resulted in between $40,000 and $50,000 per week in revenue.

10.     California's regulatory scheme applicable to the trucking industry— including AB-5—has become prohibitively burdensome and expensive for Clark to operate on California's roads.

11.     Clark concluded that the added burden and expense of adhering to California's regulations, including the prospect of being required to comply with the state's employment rules because of AB-5, was more than the revenue we received for taking loads to California.  As a result, Clark rarely runs any loads into or out of California.

ER-243

12.     When Clark stopped running loads into and out of California, we gave up between $40,000 and $50,000 per week that we once earned from such work.

13.     If we could be assured that California's laws imposing burdens on trucking businesses do not apply to out-of-state motor carriers whose drivers and trucks that would not spend much of their time in California, like Clark, we may reevaluate the business of providing transportation to the state.

I declare under penalty of perjury, under the laws of the United States and the State of Texas, that the foregoing is true and correct and that this declaration was executed on this 11th day of January 2023.

Danny R. Schnautz

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 244 of 295 (319 of 372)
Case 3:18-cv-02458-BEN-DEB Document 155-6 Filed 01/11/23 PageID.2159 Page 1 of 4
ER-244

Timothy A. Horton (S.B.N. 205414)
THE LAW OFFICE OF TIMOTHY A. HORTON
600 W. Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 272-7017
timhorton@timhortonlaw.com

Paul D. Cullen, Jr. (pro hac vice)
pxc@cullenlaw.com
Charles R. Stinson (pro hac vice)
crs@cullenlaw.com
THE CULLEN LAW FIRM, PLLC
1101 30th Street, NW, Suite 300
Washington, DC 20007
Telephone: (202) 944-8600

*Attorneys for Intervenor-Plaintiff*
*Owner-Operator Independent Drivers Association*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION *et al.,* | Case No. 3:18-CV-02458-BEN-DEB |
| Plaintiffs, | **DECLARATION OF STACY R. WILLIAMS IN SUPPORT OF INTERVENOR-PLAINTIFF OOIDA'S MOTION FOR PRELIMINARY INJUNCTION** |
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, | |
| Intervenor- Plaintiff, | Judge: Hon. Roger T. Benitez |
| v. | Date: May 1, 2023 |
| ATTORNEY GENERAL ROB BONTA, *et al.,* | Time: 10:30 a.m. |
| Defendants. | **Courtroom: 5A** |

I, Stacy R. Williams, do hereby declare:

1. I am over the age of eighteen years and am competent to testify as to all the facts and subjects set forth in this declaration.

2.      The facts set forth herein are known to me and based on my own personal knowledge.

3.      I am a member of the Owner-Operator Independent Drivers Association, Inc. ("OOIDA") and have been for approximately two years.

4.      I am a veteran of the United States Navy, in which I served for 24 years. I retired as a Chief Petty Officer.

5.      In 2007, I started my career as a truck driver by leasing and then purchasing my own truck and becoming an independent owner-operator.

6.      I am currently an owner-operator for Landstar and have been operating for them since 2016.

7.      I was an employee driver for three years, from 2013 through most of 2016. Otherwise, all my work as a truck driver has been as an owner-operator.  This was a personal decision based on the independence and the potential for greater income that I would enjoy as an owner-operator rather than an employee.

8.      Additional reasons for choosing to work as an owner-operator are that, because I am my own boss, I choose which loads to haul, I choose the days and times I am available (within the Hours-of-Service regulations), and I choose where and when I drive my truck.

9.      I also select my own insurance at the best price and coverage level to protect my business. I choose where I buy fuel, allowing me to control my costs better.

10.     My wife passed away on October 23, 2022. Because I am an owner-operator rather than an employee, I was able to take the necessary time off to bury my wife and settle her affairs without hauling loads for a sufficient time to weather this personal storm. I would not have had the discretion to take this time off had I been an employee driver.

11.     I am based in Yuma, Arizona since September 2022. I largely haul Rheem water heaters out of Calexico, CA to destinations all over the country and into Canada. I spend far less than 50% of my working time in California.

12.     Prior to September 2022, I was based in California. In the face of the law known as "AB-5," my motor carrier presented me with the following three choices: (1) to obtain my own DOT authority; (2) to not haul freight out of California; or (3) to move out of California. Given these choices, I relocated to Yuma, AZ.  My motor carrier does not hire employee truck drivers.

13.     I understand that if AB-5 goes into effect, I may only be able to lawfully provide trucking service into, out of, and within California as an employee driver.

14.     If AB-5 goes into effect, I will suffer immediate, irreparable harm as I believe I will no longer be able to lawfully provide trucking services on California's highways for Landstar or other motor carriers as an independent owner-operator as I have done for decades.

15.     The loss of the business that takes me onto California's highways will also result in immediate financial harm to me because I will be forced to find a motor carrier who does not need me to haul on California's highways.  In the meantime, despite no income, I would be obligated to continue incurring costs directly related to owning, storing, and maintaining my truck.

16.     I will also suffer immediate, irreparable harm in that if I would like to continue driving in California, I must do so as an employee driver only. I do not want to work as an employee driver because it would deprive me of the independence, control, and opportunity for profit that I have enjoyed for years working as an independent owner-operator. But most significantly, becoming an employee driver would require me to abandon the small business that I have worked hard for years to make into a profitable enterprise.

I declare under penalty of perjury, under the laws of the United States and the State of Arizona, that the foregoing is true and correct and that this declaration was executed on this 7th day of December 2022.

s/Stacy R. Williams
_____
Stacy R. Williams

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 248 of 295 (323 of 372)
Case 3:18-cv-02458-BEN-DEB Document 155-5 Filed 01/11/23 PageID.2155 Page 1 of 4
ER-248

Timothy A. Horton (S.B.N. 205414)
THE LAW OFFICE OF TIMOTHY A. HORTON
600 W. Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 272-7017
timhorton@timhortonlaw.com

Paul D. Cullen, Jr. (pro hac vice)
pxc@cullenlaw.com
Charles R. Stinson (pro hac vice)
crs@cullenlaw.com
THE CULLEN LAW FIRM, PLLC
1101 30th Street, NW, Suite 300
Washington, DC 20007
Telephone: (202) 944-8600

*Attorneys for Intervenor-Plaintiff*
*Owner-Operator Independent Drivers Association*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION *et al.,* | Case No.  3:18-CV-02458-BEN-DEB |
| Plaintiffs, | |
| OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION, | **DECLARATION OF MARC MCELROY IN SUPPORT OF INTERVENOR-PLAINTIFF OOIDA'S MOTION FOR PRELIMINARY INJUNCTION** |
| Intervenor- Plaintiff, | |
| v. | Judge: Hon. Roger T. Benitez |
| ATTORNEY GENERAL ROB BONTA, *et al.,* | Date:  May 1, 2023 Time:  10:30 a.m. **Courtroom: 5A** |
| Defendants. | |

I, Marc McElroy, do hereby declare:

1.     I am over the age of eighteen years and am competent to testify as to all the facts and subjects set forth in this declaration.

2.　　The facts set forth herein are known to me and based on my own personal knowledge.

3.　　I am a California resident. I have been a truck driver for approximately 35 years. I have never applied for nor been on unemployment. I have never applied for nor been on disability. I have been a taxpayer for all that time.

4.　　I have been a member of the Owner-Operators Independent Drivers Association for many years and have been a lifetime member for approximately four years.

5.　　I started my career as an employee driver.

6.　　After gaining experience as an employee driver, I determined that it was time to take the next step in my career. Beginning in 1998, via a lease-purchase agreement, I purchased my own truck and became an owner-operator. By doing this, I took more control over many aspects of my work and improved my income.

7.　　I obtained my own DOT operating authority to operate as a motor carrier in 2006.  I allowed it to lapse, however, after about ten years when I determined that the costs and risks of operating as a motor carrier outweighed the benefits of operating as an owner-operator.

8.　　After giving up my DOT authority, I worked as an owner-operator for PCT Logistics, a company that specializes in shipping wine, for about one year.

9.　　I have been an owner-operator for my current carrier for about four and a half years.

10.　　Although I have hauled loads starting or ending in California, the vast majority of the miles I drive and the time I spend driving are outside of California.

11.　　My current carrier appears to be doing everything in their power to prepare for the impact of AB-5 on their business and on the owner-operators who haul for them. My current carrier has required me to sign an addendum to my contract stating that I will no longer take any loads within, out of, or into California.

12.     I have recently been required to pick up loads in Nevada and/or Arizona rather than in California. Any driving that I do on California roads to pick up these loads is uncompensated.

13.     I understand that if AB-5 goes into effect, I will only be able to lawfully provide trucking services out of California as an employee driver or if I reacquire my own operating authority. I do not want to work as an employee driver because it would deprive me of the independence, control, and opportunity for profit that I have enjoyed for years working as an independent owner-operator. I do not want to operate under my own DOT authority, a business model I have already rejected because I believe that the risks outweigh the benefits in my case. Either change would subject me to immediate irreparable harm by ending the owner-operator business that I have successfully built up for many years.

14.     If AB-5 is enforced, I will suffer immediate, irreparable harm as I will no longer be able to lawfully provide trucking services on California's highways for any motor carrier as an independent owner-operator.

15.     The loss of the business that takes me onto California's highways is already resulting in financial harm and will result in further financial harm to me because my business opportunities will be fewer. Nevertheless, I am still obligated to incur costs directly related to owning, storing, and maintaining my truck.

16.     I am 66 years old and have been considering retirement.  I live near my family.  It makes no sense for me to move outside the state away from my family and home for any period in order to try to preserve my work that I perform, part of the time, in California.

/ / /

/ / /

/ / /

/ / /

/ / /

I declare under penalty of perjury, under the laws of the United States and the State of California, that the foregoing is true and correct and that this declaration was executed on this 7th day of December 2022.


s/Marc McElroy
_____
Marc McElroy

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 252 of 295    (327 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 155-4   Filed 01/11/23   PageID.2151   Page 1 of 4
ER-252

Timothy A. Horton (S.B.N. 205414)
THE LAW OFFICE OF TIMOTHY A. HORTON
600 W. Broadway, Suite 700
San Diego, CA 92101
Telephone: (619) 272-7017
timhorton@timhortonlaw.com

Paul D. Cullen, Jr. (pro hac vice)
pxc@cullenlaw.com
Charles R. Stinson (pro hac vice)
crs@cullenlaw.com
THE CULLEN LAW FIRM, PLLC
1101 30th Street, NW, Suite 300
Washington, DC 20007
Telephone: (202) 944-8600

*Attorneys for Intervenor-Plaintiff*
*Owner-Operator Independent Drivers Association*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION *et al.*,<br><br>Plaintiffs,<br><br>OWNER-OPERATOR INDEPENDENT DRIVERS ASSOCIATION,<br><br>Intervenor- Plaintiff,<br><br>v.<br><br>ATTORNEY GENERAL ROB BONTA, *et al.*,<br><br>Defendants. | Case No. 3:18-CV-02458-BEN-DEB<br><br>**DECLARATION OF ALBERT HEMERSON IN SUPPORT OF INTERVENOR-PLAINTIFF OOIDA'S MOTION FOR PRELIMINARY INJUNCTION**<br><br>Judge: Hon. Roger T. Benitez<br>Date: May 1, 2023<br>Time: 10:30 a.m.<br>**Courtroom: 5A** |

I, Albert Hemerson, do hereby declare:

    1.    I am over the age of eighteen years and am competent to testify as to all the facts and subjects set forth in this declaration.

2.      The facts set forth herein are known to me and based on my own personal knowledge.

3.      I am an Iowa native and live with my wife of 39 years, Kimberly Hemerson, in Ankeny, IA. My wife rides with me on my hauls and does the paperwork and bookkeeping for the business.

4.      I am a member of the Owner-Operator Independent Drivers Association, Inc. ("OOIDA") and have been a Lifetime Member since 2010.

5.      I started my career as a truck driver in 1975. Throughout my career, I have been an independent owner-operator leased to a motor carrier. During my 48 years as a truck driver, I have driven more than 6,000,000 miles without a single accident.

6.      I am currently an owner-operator for C&A Transportation & Logistics, Inc. in Ankeny, IA, and have been operating for them since earlier in 2022. Prior to this position, I operated for 18 years as an owner-operator for Concorde Refrigerated, Inc., based in Des Moines, IA.

7.      I haul refrigerated loads, typically meat from Iowa into California and refrigerated produce from California back to Iowa. Consequently, I spend approximately 10-12% of my driving time in California.

8.      I choose to work as an owner-operator because the business model allows me more independence and flexibility than I would have as an employee driver.  For example, I determine what equipment I drive and how I drive it (in part, to achieve maximum fuel efficiency).

9.      Moreover, I receive better compensation than I would as an employee driver, and I am building equity in my business as I pay off my equipment. I enjoy owning my own business. I drive a 2022 Volvo BNL 860 truck. I have immense pride in ownership of my equipment, and I maintain it in near-perfect condition, which maintains the truck's resale value and increases its safety.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 254 of 295    (329 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 155-4   Filed 01/11/23   PageID.2153   Page 3 of 4
ER-254

10.     Additionally, since I am my own boss, I choose which loads to haul, I choose the days and times I am available (within the Hours-of-Service regulations), and I choose where and when I drive my truck.

11.     I also select my own insurance at the best price and coverage level to protect my business. I choose where I buy fuel, allowing me to control my costs better.

12.     I understand that if AB-5 goes into effect, I may only be able to lawfully provide trucking service into, out of, and within California by obtaining my own DOT authority or as an employee driver, which I choose not to be for reasons already explained.

13.     I have chosen not to obtain my own DOT authority to become a motor carrier because the added expenses outweigh the revenue I derive from hauling to California. In addition, with my own DOT authority, I would be taking on both more responsibility and more risk, which I choose not to do.

14.     If AB-5 goes into effect, I will suffer immediate, irreparable harm as I believe I will no longer be able to lawfully provide trucking services on California's highways for C&A Transportation & Logistics, Inc. or any other motor carrier as an independent owner-operator, as I have done for decades.

15.     The loss of the business that takes me onto California's highways will also result in immediate financial harm to me because I will be forced to find a motor carrier who does not need me to haul on California's highways, and in the meantime, despite no income, I would be obligated to continue incurring costs directly related to owning, storing, and maintaining my truck while I am looking for a new motor carrier.

16.     I will also suffer immediate, irreparable harm if I must work as an employee driver to continue driving to and from California. I do not want to work as an employee driver because it would deprive me of the independence, control, and opportunity for profit that I have enjoyed for 48 years working as an independent

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 255 of 295    (330 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 155-4   Filed 01/11/23   PageID.2154   Page 4 of 4
ER-255

owner-operator.  Most importantly, I would be giving up the business that I have worked so hard to make a success for the last 48 years.

   I declare under penalty of perjury, under the laws of the United States and the State of Iowa, that the foregoing is true and correct and that this declaration was executed on this 7th day of December 2022.

s/Albert Hemerson
_____
Albert Hemerson

Jarod Bona (234327)
jarod.bona@bonalawpc.com
Aaron R. Gott (314264)
aaron.gott@bonalawpc.com
Jon F. Cieslak (268951)
jon.cieslak@bonalawpc.com
Bona Law PC
4275 Executive Square, Suite 200
La Jolla, CA 92037
Telephone: (858) 964-4589

Paul D. Cullen, Jr. (*pro hac vice* application pending)
pxc@cullenlaw.com
Daniel E. Cohen (*pro hac vice* application pending)
dec@cullenlaw.com
Charles R. Stinson (*pro hac vice* application pending)
crs@cullenlaw.com
THE CULLEN LAW FIRM, PLLC
1101 30th Street, NW, Suite 300
Washington, DC 20007
Telephone: (202) 944-8600


*Attorneys for Proposed Intervenor-Plaintiff*
*Owner-Operator Independent Drivers Association*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA TRUCKING ASSOCIATION *et al.,*<br><br>             Plaintiffs,<br>   v.<br><br>XAVIER BECERRA, in his official capacity as the Attorney General of the State of California; ANDRE SCHOORL, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California; and JULIE A. SU, in her official capacity as Labor Commissioner of the State of | Case No.  3:18-CV-02458-BEN-DEB<br><br>**DECLARATION OF TODD SPENCER IN SUPPORT OF MOTION TO INTERVENE**<br><br>[Case Currently Stayed]<br><br>Date: May 17, 2021<br>Time: 10:30 a.m.<br>Courtroom:  Hon. Roger T. Benitez |

1     California, Division of Labor Standards
Enforcement,
2                Defendants,
3     and
4     INTERNATIONAL BROTHERHOOD
OF TEAMSTERS
5
6             Intervenor-Defendant.
7

8

9   I, Todd Spencer, do hereby declare:

10       1.     The facts set forth herein are of my own personal knowledge, and if

11 called to testify thereto, I could and would do so under oath.

12       2.     I am the President of the Owner-Operator Independent Drivers

13 Association, Inc. ("OOIDA"). I have held this position since 2018.

14       3.     I have been in the trucking industry since 1974 and worked as an

15 independent owner-operator.

16       4.     I have held an executive position in OOIDA, advocating for the rights

17 of truck drivers, since 1981.

18       5.     OOIDA is a not-for-profit trade association representing the interests

19 of independent owner-operators, small-business motor carriers, and professional

20 drivers.

21       6.     It was founded in 1973 and today has more than 150,000 members

22 based in all fifty states and Canada.

23       7.     OOIDA members collectively own and operate more than 200,000

24 individual heavy-duty trucks.

25       8.     The overwhelming majority of OOIDA's members are part of the

26 interstate motor carrier industry.

27

28

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 258 of 295    (333 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 122-3   Filed 04/19/21   PageID.1986   Page 3 of 8
ER-258

9.    While a significant portion of OOIDA's membership are independent owner-operators, OOIDA is also the leading advocate of single truck motor carriers, which represent nearly half of the total active motor carriers in the United States.

10.    OOIDA has approximately 6,103 members based in California. An additional 7,050 members reside nearby in Arizona, Nevada, Oregon, and Washington.

11.    These members, along with an even greater number of independent owner-operators based throughout the United States, have chosen to become small-business trucking companies and to operate those businesses as independent contractors.

12.    There are between 350,000 and 400,000 independent owner-operators on the road today.

13.    While the independent owner-operator model has taken different forms over the years, independent owner-operators have been a consistent and important component of interstate commerce and the motor carrier industry for decades.

14.    Typically, independent owner-operators start their trucking careers as employee drivers. Eventually, some decide to start their own small-business trucking companies as independent owner-operators, working for motor carriers as independent contractors.

15.    To become independent owner-operators, they purchase their own trucks, and sometimes additional equipment, that can cost hundreds of thousands of dollars. They then enter into a lease agreement with a single motor carrier and operate under that carrier's federally granted interstate motor carrier operating authority. These drivers are often referred to as independent owner-operators. Independent owner-operators assume business responsibilities and regulatory obligations that employee drivers do not have.

16.    Independent owner-operators can be based throughout the nation regardless of where the motor carrier to which they are leased is based.

17.　　Regardless of where independent owner-operators are based, they transport freight throughout the United States, including California, and have been a critical component of the interstate motor carrier industry for decades.

18.　　Independent owner-operators typically enter exclusive agreements with a motor carrier for a one-year lease. Those agreements can automatically renew or be set for longer durations. Many independent owner-operators work exclusively for the same motor carrier for several years on end.

19.　　Independent owner-operators are often separately incorporated. They remain the sole owners of their trucks, which they are responsible for maintaining.

20.　　When the independent owner-operator model is properly utilized, motor carriers are in compliance with the federal Truth-in-Leasing regulations at 49 C.F.R. Part 376, and their drivers have the ability to set their own schedules, choose the freight they want to transport, select their own routes in delivering that freight, purchase equipment that best serves their business needs, choose where and how that equipment is maintained, and make numerous other decisions that affect their success of their business.

21.　　These are the factors that should be used, and are typically used, to evaluate whether independent owner-operators are working as independent contractors.

22.　　Employee drivers do not enjoy the same flexibility in performing their work.

23.　　The federal Truth-in-Leasing regulations have recognized the existence and importance of independent owner-operators in the motor carrier industry for decades. They were created to, and continue to, support the existence and viability of the independent owner-operator model by requiring fair and transparent lease contracts between motor carriers and independent owner-operators.

24.　　Factors that demonstrate that a motor carrier is treating drivers as employees (even if a motor carrier labels them as independent contractors) include

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 260 of 295 (335 of 372)
Case 3:18-cv-02458-BEN-DEB Document 122-3 Filed 04/19/21 PageID.1988 Page 5 of 8
ER-260

1    forced dispatch (e.g., the inability to decline an assigned load), the inability to select

2    their route, the forced purchase of equipment or services from motor carrier

3    subsidiaries, extensive electronic monitoring of drivers' time other than for

4    compliance with safety regulations, and the implementation of lease-purchase (of a

5    truck) agreements whereby the driver has no real agency to make a living because

6    he or she has assumed the obligations of a truck loan but has little or no discretion

7    in the performance of his or her work or maintenance of the truck.

8        25.    Many motor carries, particularly some of the largest motor carriers in

9    the United States, rely on both independent owner-operators and employee drivers

10    to transport freight.

11        26.    Some motor carriers who lease with independent owner-operators own

12    few or none of the tractors and trailer equipment that is used to haul freight under

13    their authority.

14        27.    Independent owner-operators can have designated routes or may be part

15    of an integrated supply chain in which they transport freight for only one leg of a

16    shipment.

17        28.    Some independent owner-operators subsequently decide to obtain their

18    own federal interstate motor carrier operating authority. These small-business motor

19    carriers can also rely on independent owner-operators to transport freight throughout

20    the United States.

21        29.    Relying on independent owner-operators rather than employee drivers

22    allows small-business motor carriers to adjust to market conditions, bid for and

23    accept opportunities to haul specialized freight, and manage costs to strategically

24    grow their businesses over time.

25        30.    Many motor carriers operating today were founded by truck drivers that

26    gained significant trucking experience as independent owner-operators. Thus, the

27    opportunity of working as an independent owner-operator is an important part of

28    ensuring the growth of the motor carrier industry.

31.    The independent owner-operator model gives drivers the opportunity to develop the necessary industry knowledge and experience to establish successful motor carrier businesses. The independent owner-operator model is thus one of the few pathways available for fostering safer, more financially astute entrants into motor carrier industry.

32.    Prior to California's enactment the ABC test, as codified by AB 5, independent owner-operators were free to operate as independent contractors throughout the country. They remain free to do so today, except in California but for the current injunction against enforcement of AB 5 against the motor carrier industry.

33.    The ABC test presumes workers, including independent owner-operators, are employees and makes it difficult to overcome that presumption.

34.    In particular, Prong B of the ABC test makes it impossible for independent owner-operators to work as independent contractors because the very nature of the service provided to motor carriers is within "the usual course of the hiring entity's business." Cal. Lab. Code § 2775(b)(1)(B).

35.    Because the ABC test is not limited, on its face, to only those independent owner-operators or small-business motor carriers that are based in California or who conduct most of their business in California, many independent owner-operators across the nation are concerned that they will lose all their business that requires them to travel to California.

36.    A plain reading of the ABC test, based on my professional trucking experience, would mean independent owner-operators throughout the United States would be prevented from hauling freight from, to, or through California.

37.    The ABC test threatens the existence of independent owner-operators and small-business motor carriers that rely on independent owner-operators far beyond California's borders.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 262 of 295 (337 of 372)
Case 3:18-cv-02458-BEN-DEB Document 122-3 Filed 04/19/21 PageID.1990 Page 7 of 8
ER-262

38.    The ABC test presents these truckers with an intolerable choice: cease working in California, abandon their businesses, or fundamentally change the way in which they operate at significant cost.

39.    A plain reading of the business-to-business exception under AB 2257, based on my professional trucking experience and knowledge of federal regulations governing the independent owner-operator model, does not enable independent owner-operators to continue to work as independent contractors.

40.    For example, independent owner-operators work exclusively for a motor carrier as an independent contractor and are thus unable to meet several of the conditions required to qualify for the business-to-business exception.

41.    The ABC test raises the prospect that independent owner-operators will be unable to work in California, which will likely deter some individuals from becoming independent owner-operators and deter existing independent owner-operators from investing in additional equipment.

42.    Although worker misclassification is a problem in the trucking industry that can lead to the abuse of drivers and the degradation of their working conditions, AB 5 does not address that problem. Instead, its impact is to irrationally eliminate the independent owner-operator segment of the motor carrier industry.

43.    The independent owner-operator model continues to provide a great number of drivers a legitimate opportunity for success and longevity as small-business truckers in the motor carrier industry.

44.    AB 5 imposes unconstitutional burdens on interstate commerce and is inconsistent with federal laws governing the operation of the motor carrier industry.

45.    AB 5 threatens to impose irreparable damage to the businesses of OOIDA's independent owner-operator and small-business motor carrier members both within and outside of California.

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 263 of 295    (338 of 372)
Case 3:18-cv-02458-BEN-DEB   Document 122-3   Filed 04/19/21   PageID.1991   Page 8 of 8
ER-263

1        I declare under penalty of perjury under the laws of the United States that

2    the foregoing is true and correct.

3

4        Executed this _13_ day of April 2021, at Grain Valley, Missouri.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF SOUTHERN DISTRICT OF CALIFORNIA

### Form 1. Notice of Appeal from a Judgment or Order of a United States District Court

U.S. District Court case number: 3:18-cv-2458-BEN-BLM

Notice is hereby given that the appellant(s) listed below hereby appeal(s) to the United States Court of Appeals for the Ninth Circuit.

Date case was first filed in U.S. District Court: 10/25/2018

Date of judgment or order you are appealing: 03/15/2024

Docket entry number of judgment or order you are appealing: 207

Fee paid for appeal? *(appeal fees are paid at the U.S. District Court)*

◉ Yes    ○ No    ○ IFP was granted by U.S. District Court

**List all Appellants** *(List **each** party filing the appeal. Do not use "et al." or other abbreviations.)*

Owner-Operator Independent Drivers Association, Inc.

Is this a cross-appeal?  ○ Yes  ◉ No

If yes, what is the first appeal case number?

Was there a previous appeal in this case?  ◉ Yes  ○ No

If yes, what is the prior appeal case number? 20-55106

Your mailing address (if pro se):

City:          State:          Zip Code:

Prisoner Inmate or A Number (if applicable):

**Signature** /s/ Timothy A. Horton    **Date** April 12, 2024

*Complete and file with the attached representation statement in the U.S. District Court*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

**Form 1**                                              *Rev. 06/09/2022*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 6. Representation Statement

*Instructions for this form: http://www.ca9.uscourts.gov/forms/form06instructions.pdf*

**Appellant(s)** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

Name(s) of party/parties:

> Owner-Operator Independent Drivers Association, Inc.

Name(s) of counsel (if any):

> Timothy A. Horton
> Paul D. Cullen, Jr. [See Attachment 1]
> Charles R. Stinson [See Attachment 1]

Address: | 600 West Broadway, Ste. 700, San Diego, CA 92101

Telephone number(s): | (619) 272-7017

Email(s): | timhorton@timhortonlaw.com

Is counsel registered for Electronic Filing in the 9th Circuit?   ◉ Yes   ○ No

**Appellee(s)** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

Name(s) of party/parties:

> Attorney General Rob Bonta, in his official capacity as the Attorney General of the State of California [See Attachment 1]

Name(s) of counsel (if any):

> Jose A. Zelidon-Zepeda
> Lara Haddad [See Attachment 1]
> Stephanie Albrecht [See Attachment 1]

Address: | 1390 Market Street, 6th Floor, San Francisco, CA 94102

Telephone number(s): | (415) 554-3837

Email(s): | jose.zelidon-zepeda@sfcityatty.org

*To list additional parties and/or counsel, use next page.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**                                  *1*                        *New 12/01/2018*

ER-265

Case: 24-2341, 08/05/2024, DktEntry: 16.1, Page 266 of 295 (341 of 372)
Case 3:18-cv-02458-BEN-DEB Document 208 Filed 04/12/24 PageID.4572 Page 3 of 5
ER-266

Continued list of parties and counsel: *(attach additional pages as necessary)*

**<u>Appellants</u>**

Name(s) of party/parties:

Name(s) of counsel (if any):

Address:

Telephone number(s):

Email(s):

Is counsel registered for Electronic Filing in the 9th Circuit?  ○ Yes  ○ No

**<u>Appellees</u>**

Name(s) of party/parties:

International Brotherhood of Teamsters

Name(s) of counsel (if any):

Julie Gutman Dickinson

Address: 501 N. Brand Blvd, Ste 950, Glendale CA 91203

Telephone number(s): (818) 973-3200

Email(s): jgutmandickinson@bushgottlieb.com

Name(s) of party/parties:

International Brotherhood of Teamsters

Name(s) of counsel (if any):

Robin Starr Tholin

Address: 177 Post Street, Ste 300, San Francisco, CA 94108

Telephone number(s): (415) 421-7151

Email(s): rtholin@altshulerberzon.com

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 6**              *2*              *New 12/01/2018*

ER-266

## FORM 6. Representation Statement - ATTACHMENT 1

**<u>Appellant(s)</u>** *(List **each** party filing the appeal, do not use "et al." or other abbreviations.)*

**Name (s) of party/parties:**

Owner-Operator Independent Drivers Association, Inc. (continued)

**Name(s) of counsel (if any):**

Paul D. Cullen, Jr.

Charles R. Stinson

**Address:**

1101 30th Street, Ste. 500, Washington, DC 20007

**Telephone number(s):** (202) 298-4774; (202) 298-4762

**Email(s):** paul@cullenlaw.com; charles@cullenlaw.com

**<u>Appellee(s)</u>** *(List only the names of parties and counsel who will oppose you on appeal. List separately represented parties separately.)*

**Name (s) of party/parties:**

Katrina Hagen, *in her official capacity as the Acting Director of the Department of Industrial Relations of the State of California*;

Natalie Palugyai, *in her official capacity as Secretary of the California Labor Workforce and Development Agency*;

Nancy Farias, *in her official capacity as the Director of Employment Development Department; and*

Lilia Garcia-Brower, *in her official capacity as Labor Commissioner of the State of California, Division of Labor Standards Enforcement.*

**Name(s) of counsel (if any):**

Jose A. Zelidon-Zepeda

Lara Haddad

Stephanie Albrecht

**Address:**

300 South Spring Street, Suite 1702, Los Angeles, California 90013-1230

**Telephone number(s):** (213) 897-5775; (213) 269-6166

**Email(s):** Lara.Haddad@doj.ca.gov; stephanie.albrecht@goj.ca.gov

# CERTIFICATE OF SERVICE

Case Name: **California Trucking Association et al v. Becerra et al**
Case No.:    **S.D. Cal. No. 3:18-cv-2458-BEN-BLM**

I hereby certify that on April 12, 2024, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

## NOTICE OF APPEAL

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on April 12, 2024, at San Diego, California.

| | |
|---|---|
| Timothy A. Horton | */s/ Timothy A. Horton* |
| Declarant | Signature |

8/1/24, 10:37 AM     CM/ECF - casd

Query    Reports    Utilities    Help    Log Out

APPEAL,CLOSED,STAYED,ENE,REOPEN

# U.S. District Court
## Southern District of California (San Diego)
## CIVIL DOCKET FOR CASE #: 3:18-cv-02458-BEN-DEB

| | |
|---|---|
| California Trucking Association et al v. Becerra et al | Date Filed: 10/25/2018 |
| Assigned to: Judge Roger T. Benitez | Date Terminated: 03/15/2024 |
| Referred to: Magistrate Judge Daniel E. Butcher | Jury Demand: None |
| Case in other court:  USCA, 20-55106 | Nature of Suit: 950 Constitutional - State |
|               USCA, 20-55107 | Statute |
|               USCA, 24-02341 | Jurisdiction: Federal Question |
| Cause: 28:2201dj Declaratory Judgment | |

**Plaintiff**

**California Trucking Association**      represented by    **Robert R. Roginson**
Ogletree Deakins Nash Smoak & Stewart,
PC
400 South Hope Street
Suite 1200
Los Angeles, CA 90071
(213) 239-9800
Fax: (213) 239-9045
Email: robert.roginson@ogletree.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Spencer C Skeen**
Ogletree Deakins
4660 La Jolla Village Drive
Suite 900
San Diego, CA 92122
858-652-3100
Fax: 858-652-3101
Email: spencer.skeen@ogletreedeakins.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Miller Chemers**
Ogletree, Deakins, Nash, Smoak & Stewart,
P.C.
400 S. Hope Street
Suite 1200
Los Angeles, CA 90071
(213) 239-9800
Fax: (213) 239-9045
Email:
alexander.chemers@ogletreedeakins.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ravinder Singh**                    represented by   **Robert R. Roginson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Spencer C Skeen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Miller Chemers**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Thomas Odom**                    represented by   **Robert R. Roginson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexander Miller Chemers**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Plaintiff**

**Owner-Operator Independent Drivers**    represented by   **Aaron R. Gott**
**Association, Inc.**                                     Bona Law PC
331 Second Avenue, South
Suite 420
Minneapolis, MN 55401
612-284-5001
Email: aaron.gott@bonalawpc.com
*TERMINATED: 08/24/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Charles R. Stinson**
The Cullen Law Firm, PLLC
1101 30th Street NW
Suite 300
Washington DC, DC 20007
202-944-8600
Email: crs@cullenlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel E. Cohen**
The Cullen Law Firm, PLLC
1101 30th Street, N.W.

Suite 300
Washington, DC 20007
202-944-8600
Fax: 202-944-8611
Email: dec@cullenlaw.com
*TERMINATED: 12/07/2022*
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jarod Michael Bona**
Bona Law PC
4275 Executive Square
Suite 200
La Jolla, CA 92037
858-964-4589
Email: jarod.bona@bonalawpc.com
*TERMINATED: 08/24/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jon F. Cieslak**
Bona Law PC
4275 Executive Square
Suite 200
La Jolla, CA 92037
858-964-4589
Email: jon.cieslak@bonalawpc.com
*TERMINATED: 08/24/2022*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Paul D. Cullen , Jr.**
The Cullen Law Firm, PLLC
1101 30th Street, NW
Suite 300
Washington, DC 20007
202-944-8600
Email: pxc@cullenlaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Timothy Alan Horton**
Law Office of Timothy A. Horton
600 W Broadway, Ste 700
San Diego
San Diego, CA 92101
(619) 272-7017
Fax: (619) 374-1668
Email: timhorton@timhortonlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Xavier Becerra**
*in his official capacity as the Attorney*
*General of the State of California*

represented by **Jose A. Zelidon-Zepeda**
San Francisco City Attorney's Office
1390 Market Street
6th Floor
San Francisco, CA 94102
415-355-3312
Fax: 415-554-3837
Email: jose.zelidon-zepeda@sfcityatty.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Andre Schoorl**
*in his official capacity as the Acting*
*Director of the Department of Industrial*
*Relations of the State of California*

represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Julie Su**
*inher official capacity as Secretary of the*
*California Labor Workforce and*
*Development Agency*

represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Patrick Henning**
*in his official capacity as the Director of the*
*Employment Development Department*

represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Lilia Garcia-Brower**
*in her official capacity as Labor*
*Commissioner of the State of California,*
*Division of Labor Standards Enforcement*

represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lara Haddad**
California Department of Justice
300 South Spring Street
Suite 1702
Los Angeles, CA 90013-1230
213-269-6250
Fax: 213-897-5775
Email: Lara.Haddad@doj.ca.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Albrecht**
California Department of Justice
Office of the Attorney General
300 S. Spring Street

Suite 1702
Los Angeles, CA 90013
213-269-6166
Email: stephanie.albrecht@doj.ca.gov
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rob Bonta**                                  represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lara Haddad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Albrecht**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Katrina Hagen**                              represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lara Haddad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Albrecht**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Natalie Palugyai**                           represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lara Haddad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Nancy Farias**                               represented by **Jose A. Zelidon-Zepeda**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Lara Haddad**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Albrecht**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Intervenor Defendant**

**International Brotherhood of Teamsters**    represented by    **Julie Gutman Dickinson**
*TERMINATED: 09/24/2019*                                        Bush Gottlieb
                                                                501 N. Brand Boulevard
                                                                Ste 950
                                                                Glendale, CA 91203
                                                                818-973-3200
                                                                Fax: 818-973-3201
                                                                Email:
                                                                jgutmandickinson@bushgottlieb.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Robin Starr Tholin**
                                                                Altshuler Berzon LLP
                                                                177 Post Street
                                                                Suite 300
                                                                San Francisco, CA 94108
                                                                415-421-7151
                                                                Fax: 415-362-8064
                                                                Email: rtholin@altshulerberzon.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Stacey Monica Leyton**
                                                                Altshuler Berzon LLP
                                                                177 Post Street
                                                                Suite 300
                                                                San Francisco, CA 94108
                                                                (415)421-7151
                                                                Fax: (415)362-8064
                                                                Email: sleyton@altshulerberzon.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Andrew Edward Kushner**
                                                                Altshuler Berzon LLP
                                                                177 Post Street
                                                                Suite 300
                                                                San Francisco, CA 94108
                                                                415-421-7151
                                                                Fax: 415-362-8064

Email: akushner@altshulerberzon.com
*(Inactive)*
*ATTORNEY TO BE NOTICED*

**Elizabeth Vissers**
Altshuler Berzon
177 Post Street
Suite 300
San Francisco, CA 94108
415-421-7151
Fax: 415-362-8064
Email: evissers@altshulerberzon.com
*(Inactive)*
*TERMINATED: 04/11/2022*
*ATTORNEY TO BE NOTICED*

**Hector Alfredo De Haro**
Bush Gottlieb
500 N Central Ave, Suite 800
Glendale, CA 91203
818-973-3260
Fax: 818-973-3201
Email: hdeharo@bushgottlieb.com
*ATTORNEY TO BE NOTICED*

**Nicole Sara Collins**
Altshuler Berzon LLP
177 Post Street
Suite 300
San Francisco, CA 94108
415-421-7151
Fax: 415-362-8064
Email: ncollins@altshulerberzon.com
*(Inactive)*
*ATTORNEY TO BE NOTICED*

**Scott A Kronland**
Altshuler Berzon
177 Post Street
Suite 300
San Francisco, CA 94108
(415)421-7151
Fax: (415)362-8064
Email: skronland@altshulerberzon.com
*ATTORNEY TO BE NOTICED*

**Amicus**

**Office of the Los Angeles City Attorney**     represented by

**Danielle Luce Goldstein**
Office of the Los Angeles City Attorney
200 North Spring St.
14th Floor
Los Angeles, CA 90012
213-978-1868
Email: danielle.goldstein@lacity.org

*(Inactive)*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/25/2018 | 1 | COMPLAINT against Xavier Becerra, Andre Schoorl, Julie A. Su ( Filing fee $ 400 receipt number 0974-11832541.), filed by California Trucking Association, Ravinder Singh, Thomas Odom. (Attachments: # 1 Civil Cover Sheet)<br><br>The new case number is 3:18-cv-2458-BEN-BLM. Judge Roger T. Benitez and Magistrate Judge Barbara Lynn Major are assigned to the case. (Roginson, Robert)(tcf)(sjt). (Entered: 10/25/2018) |
| 10/25/2018 | 2 | Summons Issued.<br>**Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (tcf) (Entered: 10/25/2018) |
| 11/19/2018 | 3 | SUMMONS Returned Executed by California Trucking Association, Ravinder Singh, Thomas Odom. All Defendants served. (Luster, Julia) (anh). (Entered: 11/19/2018) |
| 11/19/2018 | 4 | SUMMONS Returned Executed by California Trucking Association, Ravinder Singh, Thomas Odom. Andre Schoorl served. (Luster, Julia) (anh). (Entered: 11/19/2018) |
| 11/19/2018 | 5 | SUMMONS Returned Executed by California Trucking Association, Ravinder Singh, Thomas Odom. Julie A. Su served. (Luster, Julia) (anh). (Entered: 11/19/2018) |
| 11/20/2018 | 6 | NOTICE of Appearance by Jose A. Zelidon-Zepeda on behalf of Xavier Becerra, Andre Schoorl, Julie A. Su (Zelidon-Zepeda, Jose)Attorney Jose A. Zelidon-Zepeda added to party Xavier Becerra(pty:dft), Attorney Jose A. Zelidon-Zepeda added to party Andre Schoorl(pty:dft), Attorney Jose A. Zelidon-Zepeda added to party Julie A. Su(pty:dft) (anh). (Entered: 11/20/2018) |
| 12/03/2018 | 7 | MOTION for Extension of Time to File *Defendants' Motion Under Civil Local Rule 12.1 for Extension of Time for Responsive Pleading* by Xavier Becerra, Andre Schoorl, Julie A. Su. (Attachments: # 1 Declaration of Counsel Supporting Defendants' Motion for Extension of Time to File Responsive Pleading, # 2 Proposed Order Granting Defendants' Motion Under Civil Local Rule 12.1 for Extension of Time for Responsive Pleading) (Zelidon-Zepeda, Jose) (anh). (Entered: 12/03/2018) |
| 12/03/2018 | 8 | ORDER Granting Motion for Extension of Time to Respond to Complaint. [Doc. 7 ] Answer by Respondent due 1/3/2019. Signed by Judge Roger T. Benitez on 12/3/2018. (anh) (Entered: 12/04/2018) |
| 12/07/2018 | 9 | NOTICE of Appearance by Andrew Edward Kushner on behalf of International Brotherhood of Teamsters (Kushner, Andrew)Attorney Andrew Edward Kushner added to party International Brotherhood of Teamsters(pty:intv) (anh). (Entered: 12/07/2018) |
| 12/07/2018 | 10 | NOTICE of Appearance by Stacey Monica Leyton on behalf of International Brotherhood of Teamsters (Leyton, Stacey)Attorney Stacey Monica Leyton added to party International Brotherhood of Teamsters(pty:intv) (anh). (Entered: 12/07/2018) |
| 12/07/2018 | 11 | MOTION to Intervene by International Brotherhood of Teamsters. (Attachments: # 1 Memo of Points and Authorities in Support of Motion for Leave to Intervene, # 2 Declaration of Bradley Raymond in Support of Motion for Leave to Intervene, # 3 Proposed Order Granting Motion for Leave to Intervene)(Leyton, Stacey) QC Email: Proposed Order(anh). (Entered: 12/07/2018) |

| 12/13/2018 | 12 | NOTICE OF RELATED CASE(S) by Xavier Becerra, Andre Schoorl, Julie A. Su of case(s) 16-cv-1866 CAB MDD; 18-cv-01989 MCE KJN *Defendants' Notice of Related Case (Civil L.R. 40.1)*. (Zelidon-Zepeda, Jose) (anh). (Entered: 12/13/2018) |
| 12/17/2018 | 13 | OBJECTION by California Trucking Association, Thomas Odom, Ravinder Singh re 12 Notice of Related Case (Chemers, Alexander) (sjm). (Entered: 12/17/2018) |
| 12/21/2018 | 14 | NOTICE *Defendants' Notice of Non-Opposition to Motion for Leave to Intervene by Proposed Intervenor International Brotherhood of Teamsters* by Xavier Becerra, Andre Schoorl, Julie A. Su re 11 MOTION to Intervene (Zelidon-Zepeda, Jose) (rmc). (Entered: 12/21/2018) |
| 12/31/2018 | 15 | RESPONSE in Opposition re 11 MOTION to Intervene *MOTION FOR LEAVE TO INTERVENE by International Brotherhood of Teamsters* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Proof of Service Certificate of Service CM/ECF December 31, 2018)(Chemers, Alexander) (anh). (Entered: 12/31/2018) |
| 01/03/2019 | 16 | MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss Complaint* by Xavier Becerra, Andre Schoorl, Julie A. Su. (Attachments: # 1 Memo of Points and Authorities Supporting Defendants' Motion to Dismiss Complaint)(Zelidon-Zepeda, Jose) (anh). (Entered: 01/03/2019) |
| 01/07/2019 | 17 | REPLY to Response to Motion re 11 MOTION to Intervene filed by International Brotherhood of Teamsters. (Leyton, Stacey) (anh). (Entered: 01/07/2019) |
| 01/08/2019 | 18 | MOTION for Leave to File *Memo of Points and Authorities or, in the alternative, Amicus Brief in support of Defendants' Motion to Dismiss, and to Participate in Hearing* by International Brotherhood of Teamsters. (Attachments: # 1 Memo of Points and Authorities In Support of Motion for Leave to File and to Participate in Hearing, # 2 Memo of Points and Authorities Or, in the Alternative, Amicus Brief in Support of Defendants' Motion to Dismiss)(Leyton, Stacey) (anh). (Entered: 01/08/2019) |
| 01/08/2019 | 19 | Ex Parte MOTION to Shorten Time *for Motion for Leave to File, and to Participate in Hearing* by International Brotherhood of Teamsters. (Attachments: # 1 Memo of Points and Authorities In Support of Ex Parte Application to Shorten Time for Motion for Leave to File, and to Participate in Hearing, # 2 Declaration of Andrew Kushner In Support of Ex Parte Application to Shorten Time for Motion for Leave to File, and to Participate in Hearing)(Leyton, Stacey) (anh). (Entered: 01/08/2019) |
| 01/09/2019 | 20 | Minute Order issued by the Honorable Roger T. Benitez: Submitting 11 MOTION to Intervene . Court to issue written Order. Motion Hearing date of 1/14/2019 is hereby vacated. (no document attached) (gxr) (Entered: 01/09/2019) |
| 01/14/2019 | 21 | ORDER: (1) GRANTING MOTION TO INTERVENE, DOC 11 ; (2) DENYING AS MOOT MOTION FOR LEAVE TO FILE, DOC 18 ; and (3) DENYING AS MOOT EX PARTE MOTION TO SHORTEN TIME, DOC 19 . Signed by Judge Roger T. Benitez on 1/14/2019. (sjm) (Entered: 01/15/2019) |
| 01/17/2019 | 22 | Joint MOTION to Continue */Stipulation to Continue Hearing on Defendants' Motion to Dismiss* by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander)Attorney Alexander Miller Chemers added to party California Trucking Association(pty:pla), Attorney Alexander Miller Chemers added to party Thomas Odom(pty:pla), Attorney Alexander Miller Chemers added to party Ravinder Singh(pty:pla) (sjm). (Entered: 01/17/2019) |
| 01/18/2019 | 23 | ORDER granting 22 Motion to Continue. Motion to Dismiss Hearing reset for 2/19/2019 10:30 AM before Judge Roger T. Benitez. Signed by Judge Roger T. Benitez on |

| 01/24/2019 | 24 | AMENDED COMPLAINT *FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUCTIVE RELIEF* against All Plaintiffs, filed by California Trucking Association, Ravinder Singh, Thomas Odom. (Roginson, Robert) (anh). (Entered: 01/24/2019) |
|---|---|---|
| 01/24/2019 | 25 | AMENDED COMPLAINT *FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUCTIVE RELIEF* against All Defendants, filed by California Trucking Association, Ravinder Singh, Thomas Odom. (Roginson, Robert) QC Email: Duplicate filing(anh). (Entered: 01/24/2019) |
| 01/25/2019 | 26 | NOTICE *OF WITHDRAWAL OF DOCUMENT* by California Trucking Association, Thomas Odom, Ravinder Singh (Roginson, Robert) QC Email: Document not signed by registered user(anh). (Entered: 01/25/2019) |
| 02/04/2019 | 27 | ORDER Denying as Moot Defendants' Motion to Dismiss [Doc. 16 ]. Signed by Judge Roger T. Benitez on 2/1/2019. (anh) (Entered: 02/04/2019) |
| 02/07/2019 | 28 | MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint* by Xavier Becerra, Andre Schoorl, Julie A. Su. (Attachments: # 1 Memo of Points and Authorities Supporting Defendants' Motion to Dismiss First Amended Complaint)(Zelidon-Zepeda, Jose) (anh). (Entered: 02/07/2019) |
| 02/07/2019 | 29 | MOTION to Dismiss *Plaintiffs' First Amended Complaint* by International Brotherhood of Teamsters. (Attachments: # 1 Memo of Points and Authorities in Support of Intervenor-Defendant's Motion to Dismiss)(Leyton, Stacey) (anh). (Entered: 02/07/2019) |
| 02/20/2019 | 30 | Joint MOTION Permitting Single Opposition Brief to Motions to Dismiss re 28 MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint*, 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint* by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (anh). (Entered: 02/20/2019) |
| 02/21/2019 | 31 | Joint MOTION to Continue *Hearing on Motions to Dismiss* by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (anh). (Entered: 02/21/2019) |
| 02/21/2019 | 32 | ORDER Granting Joint Stipulation [Doc. 30 ]. Signed by Judge Roger T. Benitez on 2/21/2019. (anh) (Entered: 02/22/2019) |
| 02/26/2019 | 33 | ORDER Granting Joint Motion to Continue Hearing on Defendants' Motion to Dismiss [Doc. 31 ] Responses due by 3/11/2019 Replies due by 3/25/2019. Motion Hearing set for 4/2/2019 10:30 AM in Courtroom 5A before Judge Roger T. Benitez.. Signed by Judge Roger T. Benitez on 2/25/2019. (anh) (Entered: 02/26/2019) |
| 03/11/2019 | 34 | RESPONSE in Opposition re 28 MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint*, 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Request for Judicial Notice, # 2 Exhibit A - to Request for Judicial Notice)(Chemers, Alexander) (anh). (Entered: 03/11/2019) |
| 03/25/2019 | 35 | Minute Order issued by the Honorable Roger T. Benitez: Submitting 28 MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint*, 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint*. Court to issue written Order. Motion Hearing date of 4/2/2019 is hereby vacated. (no document attached) (gxr) (Entered: 03/25/2019) |

| 03/25/2019 | 36 | REPLY to Response to Motion re 28 MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint Reply Supporting Defendants' Motion to Dismiss First Amended Complaint* filed by Xavier Becerra, Andre Schoorl, Julie A. Su. (Zelidon-Zepeda, Jose) (anh). (Entered: 03/25/2019) |
| 03/25/2019 | 37 | REPLY to Response to Motion re 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint* filed by International Brotherhood of Teamsters. (Leyton, Stacey) (anh). (Entered: 03/25/2019) |
| 03/29/2019 | 38 | NOTICE *of Supplemental Authority* by International Brotherhood of Teamsters re 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint* (Attachments: # 1 Exhibit A to the Notice of Supplemental Authority)(Leyton, Stacey) (dlg). (Entered: 03/29/2019) |
| 04/03/2019 | 39 | RESPONSE re 38 Notice (Other), 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint / Plaintiffs' Response to Intervenor's Notice of Supplemental Authority* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (anh). (Entered: 04/03/2019) |
| 04/16/2019 | 40 | NOTICE *of Supplemental Authority in Opposition to Defendants' and Intervenor's Motions to Dismiss* by California Trucking Association, Thomas Odom, Ravinder Singh re 28 MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint*, 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint* (Attachments: # 1 Exhibit A)(Chemers, Alexander) (anh). (Entered: 04/16/2019) |
| 06/14/2019 | 41 | RESPONSE in Opposition re 28 MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint*, 29 MOTION to Dismiss *Plaintiffs' First Amended Complaint* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Exhibit A)(Chemers, Alexander) (anh). (Entered: 06/14/2019) |
| 06/14/2019 | 42 | NOTICE *OF SUPPLEMENTAL AUTHORITY* by California Trucking Association re 28 MOTION to Dismiss *Defendants' Notice of Motion and Motion to Dismiss First Amended Complaint* (Chemers, Alexander) (anh). (Entered: 06/14/2019) |
| 08/05/2019 | 43 | ORDER STAYING CASE. Case stayed until pending appeal. The parties shall notify the Court within 7 days of a decision by the Ninth Circuit Court of Appeals. Signed by Judge Roger T. Benitez on 8/5/2019.(jrm)(jao). (Entered: 08/05/2019) |
| 09/11/2019 | 44 | MOTION Request to Lift Stay of Proceedings by Xavier Becerra, Andre Schoorl, Julie A. Su. (Attachments: # 1 Exhibit 1)(Zelidon-Zepeda, Jose) (mme). (Entered: 09/11/2019) |
| 09/16/2019 | 45 | ORDER Granting 44 Motion to Lift Stay. Signed by Judge Roger T. Benitez on 09/16/2019. (mme) (Entered: 09/17/2019) |
| 09/24/2019 | 46 | ORDER Granting 28 Defendants' and 29 Intervenor-Defendants' Motions to Dismiss. Defendants' motions to dismiss are granted, and this action is dismissed without prejudice. Plaintiffs may file an amended complaint within 60 days of the date of this Order. Signed by Judge Roger T. Benitez on 9/24/2019. (rmc) (sjt). (Entered: 09/24/2019) |
| 11/12/2019 | 47 | AMENDED COMPLAINT */SECOND AMENDED COMPLAINT* against All Defendants, filed by California Trucking Association, Ravinder Singh, Thomas Odom.New Summons Requested. (Chemers, Alexander) (mme). (Entered: 11/12/2019) |
| 11/13/2019 | 48 | Amended Summons Issued as to Second Amended Complaint. **Counsel receiving this notice electronically should print this summons and serve it in accordance with Rule 4, Fed.R.Civ.P and LR 4.1.** (Attachments: # 1 Attachment)(mme) (Entered: 11/13/2019) |
| 11/22/2019 | 49 | Joint MOTION for Extension of Time to File Answer re 47 Amended Complaint *(Stipulated Extension)* by International Brotherhood of Teamsters. (Leyton, Stacey) |

| | | (mme). (Entered: 11/22/2019) |
|---|---|---|
| 11/22/2019 | 50 | DECLARATION re 49 Joint MOTION for Extension of Time to File Answer re 47 Amended Complaint *(Stipulated Extension)* by Intervenor Defendant International Brotherhood of Teamsters. (Leyton, Stacey) (mme). (Entered: 11/22/2019) |
| 11/22/2019 | 51 | SUMMONS Returned Executed by California Trucking Association, Ravinder Singh, Thomas Odom. Lilia Garcia-Brower served. (Chemers, Alexander) (mme). (Entered: 11/22/2019) |
| 11/22/2019 | 52 | SUMMONS Returned Executed by California Trucking Association, Ravinder Singh, Thomas Odom. Patrick Henning served. (Chemers, Alexander) (mme). (Entered: 11/22/2019) |
| 11/22/2019 | 53 | ORDER granting 49 Joint Motion for Extension. As requested by the parties and to maintain consistency, the deadline for the newly-named State Defendants to file a responsive pleading is also extended. Accordingly, all defendants shall file a responsive pleading on or before December 20, 2019. Signed by Judge Roger T. Benitez on 11/22/2019. (mme) (Entered: 11/22/2019) |
| 12/02/2019 | 54 | MOTION for Preliminary Injunction by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration of Greg P. Stefflre, # 3 Declaration of Shawn Yadon, # 4 Declaration of Thomas Odom, # 5 Declaration of John E. Husing, Ph.D. (including Exhs. A-B))(Chemers, Alexander) (tcf). (Entered: 12/02/2019) |
| 12/16/2019 | 55 | RESPONSE to Motion re 54 MOTION for Preliminary Injunction *State Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction* filed by Xavier Becerra, Lilia Garcia-Brower, Patrick Henning, Andre Schoorl, Julie Su. (Zelidon-Zepeda, Jose) (mme). (Entered: 12/16/2019) |
| 12/16/2019 | 56 | OBJECTION by Xavier Becerra, Lilia Garcia-Brower, Patrick Henning, Andre Schoorl, Julie Su re 55 Response to Motion, *State Defendant's Objections to Evidence Supporting Plaintiffs' Motion for Preliminary Injunction*. (Zelidon-Zepeda, Jose) (mme). (Entered: 12/16/2019) |
| 12/16/2019 | 57 | NOTICE of Appearance by Elizabeth Vissers on behalf of International Brotherhood of Teamsters (Vissers, Elizabeth)Attorney Elizabeth Vissers added to party International Brotherhood of Teamsters(pty:intvd) (mme). (Entered: 12/16/2019) |
| 12/16/2019 | 58 | RESPONSE in Opposition re 54 MOTION for Preliminary Injunction filed by International Brotherhood of Teamsters. (Attachments: # 1 Declaration of Dr. Michael Belzer in Opposition to Motion, # 2 Declaration of Dr. Steve Viscelli in Opposition to Motion, # 3 Declaration of Eric Tate in Opposition to Motion, # 4 Declaration of Andrew Kushner in Opposition to Motion)(Leyton, Stacey) (mme). (Entered: 12/16/2019) |
| 12/18/2019 | 59 | Joint MOTION Permitting Single Reply Brief in Support of Motion for Preliminary Injunction by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (mme). (Entered: 12/18/2019) |
| 12/18/2019 | 60 | ORDER Granting 59 Joint Motion To Permit Plaintiffs To File Single Reply Brief. Signed by Judge Roger T. Benitez on 12/18/2019. (mme) (Entered: 12/18/2019) |
| 12/20/2019 | 61 | NOTICE of Change of Hearing on 54 MOTION for Preliminary Injunction : Motion Hearing reset for 1/13/2020 10:30 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 12/20/2019) |
| 12/20/2019 | 62 | MOTION to Dismiss Second Amended Complaint by Xavier Becerra, Lilia Garcia-Brower, Patrick Henning, Andre Schoorl, Julie Su (Attachments: # 1 Memo of Points and |

| | | Authorities Supporting State Defendants' Motion to Dismiss Second Amended Complaint)(Zelidon-Zepeda, Jose)Attorney Jose A. Zelidon-Zepeda added to party Lilia Garcia-Brower(pty:dft), Attorney Jose A. Zelidon-Zepeda added to party Patrick Henning(pty:dft) (ag). (Entered: 12/20/2019) |
|---|---|---|
| 12/20/2019 | 63 | MOTION to Dismiss *Second Amended Complaint* by International Brotherhood of Teamsters. (Attachments: # 1 Memo of Points and Authorities In Support of Motion) (Leyton, Stacey) (ag). (Entered: 12/20/2019) |
| 12/23/2019 | 64 | MOTION for Leave to File *Amicus Brief of the Office of the Los Angeles City Opposing Plaintiffs Motion for Preliminary Injunction* by Office of the Los Angeles City Attorney. (Attachments: # 1 Memo of Points and Authorities in Support of the Office of the Los Angeles City Attorneys Motion for Leave to Submit Brief of Amicus Curiae Opposing Plaintiffs Motion for Preliminary Injunction, # 2 Appendix Proposed Amicus Brief of the Office of the Los Angeles City Opposing Plaintiffs Motion for Preliminary Injunction, # 3 Appendix Attachment A to the Proposed Amicus Brief of the Office of the Los Angeles City Opposing Plaintiffs Motion for Preliminary Injunction, # 4 Appendix Attachment B to the Proposed Amicus Brief of the Office of the Los Angeles City Opposing Plaintiffs Motion for Preliminary Injunction, # 5 Appendix Attachment C to the Proposed Amicus Brief of the Office of the Los Angeles City Opposing Plaintiffs Motion for Preliminary Injunction)(Goldstein, Danielle)Attorney Danielle Luce Goldstein added to party Office of the Los Angeles City Attorney(pty:am) (mme). (Entered: 12/23/2019) |
| 12/23/2019 | 65 | MOTION for Leave to Appear at Argument *on Plaintiffs' Motion for Preliminary Injunction* by Office of the Los Angeles City Attorney. (Attachments: # 1 Memo of Points and Authorities in Support of Office of the Los Angeles City Attorney's Motion to Participate in Argument on Plaintiffs' Motion for Preliminary Injunction)(Goldstein, Danielle) (mme). (Entered: 12/23/2019) |
| 12/24/2019 | 66 | Ex Parte MOTION for Temporary Restraining Order by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Memo of Points and Authorities In Support Of Ex Parte Application For Temporary Restraining Order, # 2 Declaration Of Robert R. Roginson)(Roginson, Robert) (mme). (Entered: 12/24/2019) |
| 12/26/2019 | 67 | RESPONSE in Opposition re 66 Ex Parte MOTION for Temporary Restraining Order filed by International Brotherhood of Teamsters. (Attachments: # 1 Declaration of Stacey Leyton in Opposition to Request for a Temporary Restraining Order)(Leyton, Stacey) (mme). (Entered: 12/26/2019) |
| 12/26/2019 | 68 | NOTICE of Hearing on 66 Ex Parte MOTION for Temporary Restraining Order : Motion Hearing set for 1/3/2020 10:30 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 12/26/2019) |
| 12/26/2019 | 69 | RESPONSE re 67 Response in Opposition to Motion, *State Defendants' Opposition to Plaintiffs' Ex Parte Application for a Temporary Restraining Order* filed by Xavier Becerra, Lilia Garcia-Brower, Patrick Henning, Andre Schoorl, Julie Su. (Zelidon-Zepeda, Jose) (mme). (Entered: 12/26/2019) |
| 12/27/2019 | 70 | NOTICE re: Change of Hearing on 66 Ex Parte MOTION for Temporary Restraining Order : Motion Hearing reset for 1/6/2020 10:30 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 12/27/2019) |
| 12/27/2019 | 71 | MOTION for Leave to File *Amicus Brief of the Office of the Los Angeles City Attorney in Support of Defendants' and Defendant-Intervenor's Motions to Dismiss* by Office of the Los Angeles City Attorney. (Attachments: # 1 Memo of Points and Authorities in Support of Office of the Los Angeles City Attorney's Motion for Leave to Submit Brief of Amicus Curiae, # 2 Appendix Proposed Brief of Amicus Curiae the Office of the Los Angeles City Attorney In Support of Defendants' and Defendant-Intervenor's Motions to Dismiss, |

| | | |
|---|---|---|
| | | # 3 Appendix Attachment A to the Proposed Brief of Amicus Curiae the Office of the Los Angeles City Attorney In Support of Defendants' and Defendant-Intervenor's Motions to Dismiss, # 4 Appendix Attachment B to the Proposed Brief of Amicus Curiae the Office of the Los Angeles City Attorney In Support of Defendants' and Defendant-Intervenor's Motions to Dismiss, # 5 Appendix Attachment C to the Proposed Brief of Amicus Curiae the Office of the Los Angeles City Attorney In Support of Defendants' and Defendant-Intervenor's Motions to Dismiss)(Goldstein, Danielle) (mme). (Entered: 12/27/2019) |
| 12/30/2019 | 72 | MOTION for Leave to File *Proposed Amicus Brief Opposing Plaintiffs' Motion for Temporary Restraining Order* by Office of the Los Angeles City Attorney. (Attachments: # 1 Memo of Points and Authorities in Support of the Office of the Los Angeles City Attorney's Motion for Leave to Submit Brief of Amicus Curiae, # 2 Declaration of Danielle L. Goldstein in Support of the Office of the Los Angeles City Attorney's Motion for Leave to Submit Brief of Amicus Curiae, # 3 Exhibit Exhibit A to the Declaration of Danielle L. Goldstein, # 4 Appendix Proposed Amicus Brief of the Office of the Los Angeles City Attorney, # 5 Appendix Attachment A to the Proposed Amicus Brief of the Office of the Los Angeles City Attorney, # 6 Appendix Attachment B to the Proposed Amicus Brief of the Office of the Los Angeles City Attorney, # 7 Appendix Attachment C to the Proposed Amicus Brief of the Office of the Los Angeles City Attorney)(Goldstein, Danielle) (mme). (Entered: 12/30/2019) |
| 12/30/2019 | 73 | RESPONSE in Support re 54 MOTION for Preliminary Injunction filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Declaration of Alexander Chemers, # 2 Declaration of Shawn Yadon, # 3 Request for Judicial Notice)(Chemers, Alexander) (mme). (Entered: 12/30/2019) |
| 12/30/2019 | 74 | OBJECTION by California Trucking Association, Thomas Odom, Ravinder Singh re 58 Response in Opposition to Motion, *to Declarations of Dr. Michael Belzer and Dr. Steve Viscelli*. (Chemers, Alexander) (mme). (Entered: 12/30/2019) |
| 12/30/2019 | 75 | NOTICE *of Supplemental Authority in Support of Ex Parte Application for Temporary Restraining Order* by California Trucking Association, Thomas Odom, Ravinder Singh re 66 Ex Parte MOTION for Temporary Restraining Order (Chemers, Alexander) (mme). (Entered: 12/30/2019) |
| 12/31/2019 | 76 | Joint MOTION re 63 MOTION to Dismiss *Second Amended Complaint*, 62 MOTION to Dismiss Second Amended Complaint *re Request to Amend Briefing Schedule* by International Brotherhood of Teamsters. (Kushner, Andrew) (mme). (Entered: 12/31/2019) |
| 12/31/2019 | 77 | ORDER Granting 66 Motion for Temporary Restraining Order; and Denying 72 Motion for Leave to File Amicus Brief. Signed by Judge Roger T. Benitez on 12/31/19. (dlg) (Entered: 12/31/2019) |
| 01/06/2020 | 78 | RESPONSE re 73 Response in Support of Motion, *Request for Judicial Notice (Dkt. 73-3)* filed by International Brotherhood of Teamsters. (Leyton, Stacey) (mme). (Entered: 01/06/2020) |
| 01/06/2020 | 79 | RESPONSE re 74 Objection *to Declarations of Dr. Michael Belzer and Dr. Steve Viscelli* filed by International Brotherhood of Teamsters. (Leyton, Stacey) (mme). (Entered: 01/06/2020) |
| 01/06/2020 | 80 | RESPONSE in Opposition re 64 MOTION for Leave to File *Amicus Brief of the Office of the Los Angeles City Opposing Plaintiffs Motion for Preliminary Injunction /Plaintiffs' Opposition to Office of the Los Angeles City Attorney's Motion for Leave to Submit Brief of Amicus Curiae* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (mme). (Entered: 01/06/2020) |

| 01/07/2020 | 81 | NOTICE *of Supplemental Authority in Support of Opposition to Preliminary Injunction Motion* by International Brotherhood of Teamsters re 58 Response in Opposition to Motion, (Leyton, Stacey) (mme). (Entered: 01/07/2020) |
|---|---|---|
| 01/08/2020 | 82 | ORDER: Denying 64 Motion for Leave to File; Denying 65 Motion for Leave to Appear; Denying 71 Motion for Leave to File. Signed by Judge Roger T. Benitez on 1/8/2020. (mme) (Entered: 01/08/2020) |
| 01/08/2020 | 83 | ORDER Granting 76 Joint Motion to Amend Briefing Schedule. Plaintiffs shall file their oppositions to the Motions to Dismiss by January 15, 2020. State Defendants and Intervenor shall file their replies by January 27, 2020. Signed by Judge Roger T. Benitez on 1/8/2020. (mme) (Entered: 01/08/2020) |
| 01/09/2020 | 84 | NOTICE *of Supplemental Authority in Support of Motion for Preliminary Injunction* by California Trucking Association, Ravinder Singh (Attachments: # 1 Exhibit Exhibit A) (Skeen, Spencer)Attorney Spencer C Skeen added to party California Trucking Association(pty:pla), Attorney Spencer C Skeen added to party Ravinder Singh(pty:pla) (mme). (Entered: 01/09/2020) |
| 01/13/2020 | 85 | Minute Order for proceedings held before Judge Roger T. Benitez: Motion Hearing held on 1/13/2020. Submitting 54 MOTION for Preliminary Injunction filed by Thomas Odom, California Trucking Association, Ravinder Singh. Court to issue written Order. The temporary restraining order issued by this Court on 12/31/2019 shall remain in effect until further notice. (Court Reporter/ECR Amanda LeGore). (Plaintiff Attorneys Robert R. Roginson, Spencer C. Skeen, Alexander M. Chemers).(Defendant Attorneys Jose A. Zelidon-Zepeda).(Intervenor Attorneys Andrew Kushner, Stacey M. Leyton). (no document attached) (gxr) (Entered: 01/14/2020) |
| 01/14/2020 | 86 | Joint MOTION Amending Briefing Schedule and Permitting Single Opposition Brief to Motions to Dismiss re 63 MOTION to Dismiss *Second Amended Complaint*, 62 MOTION to Dismiss Second Amended Complaint by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (mme). (Entered: 01/14/2020) |
| 01/15/2020 | 87 | ORDER Granting 86 Joint Motion. Plaintiffs shall file a single Opposition brief of no more than 35 pages to both Motions to Dismiss on or before January 16, 2020. Signed by Judge Roger T. Benitez on 1/14/2020. (mme) (Entered: 01/15/2020) |
| 01/16/2020 | 88 | **DOCKETED IN ERROR** (sjm) (Entered: 01/16/2020) |
| 01/16/2020 | 89 | ORDER Granting 54 Preliminary Injunction. It is further ORDERED: 1. Defendant Xavier Becerra, in his official capacity as the Attorney General of the State of California, Julia A. Su, in her official capacity as the Secretary of the California Labor and Workforce Development Agency, Andre Schoorl, in his official capacity as the Acting Director of the Department of Industrial Relations of the State of California, Lilia Garcia Brower, in her official capacity as the Labor Commissioner of the State of California, and Patrick Henning, in his official capacity as Director of the California Employment Development Department are temporarily enjoined from enforcing Assembly Bill 5s ABC test, as set out in Cal. Labor Code § 2750.3(a)(1), as to any motor carrier operating in California, pending the entry of final judgment in this action. 2. Because there is no realistic likelihood of harm to Defendants from granting a preliminary injunction as to the enforcement of AB-5s ABC test, a security bond is not required. Signed by Judge Roger T. Benitez on 1/16/2020. (mme) (Entered: 01/16/2020) |
| 01/16/2020 | 90 | RESPONSE in Opposition re 63 MOTION to Dismiss *Second Amended Complaint*, 62 MOTION to Dismiss Second Amended Complaint filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (sjm). (Entered: 01/16/2020) |

| 01/27/2020 | 91 | REPLY to Response to Motion re 63 MOTION to Dismiss *Second Amended Complaint* filed by International Brotherhood of Teamsters. (Leyton, Stacey) (mme) (Entered: 01/27/2020) |
|---|---|---|
| 01/27/2020 | 92 | RESPONSE in Support re 76 Joint MOTION re 63 MOTION to Dismiss *Second Amended Complaint*, 62 MOTION to Dismiss Second Amended Complaint *re Request to Amend Briefing Schedule Reply Supporting Defendants' Motion to Dismiss Second Amended Complaint* filed by Xavier Becerra, Lilia Garcia-Brower, Patrick Henning, Andre Schoorl. (Zelidon-Zepeda, Jose) (mme). (Entered: 01/27/2020) |
| 01/28/2020 | 93 | Minute Order issued by the Honorable Roger T. Benitez: Submitting 63 MOTION to Dismiss *Second Amended Complaint*, 62 MOTION to Dismiss Second Amended Complaint. Court to issue written Order. Motion Hearing date of 2/3/2020 is hereby vacated. (no document attached) (gxr) (Entered: 01/28/2020) |
| 01/29/2020 | 94 | ***RE-DOCKETED BY THE USDC CLERK AS 95 NOTICE OF APPEAL TO THE 9TH CIRCUIT***: NOTICE *of Appeal from Preliminary Injunction Order* by Xavier Becerra, Lilia Garcia-Brower, Patrick Henning, Andre Schoorl, Julie Su. (Zelidon-Zepeda, Jose). (Modified on 1/29/2020: The filing has been re-docketed at document 95 using the "Notice of Appeal to the 9th Circuit" event.) (akr). (Entered: 01/29/2020) |
| 01/29/2020 | 95 | NOTICE OF APPEAL to the 9th Circuit by Xavier Becerra, Lilia Garcia-Brower, Patrick Henning, Andre Schoorl, Julie Su as to 89 Order Granting Preliminary Injunction. Fee not paid. (The Notice of Appeal was originally e-filed by the filer at document 94 using the "Notice - (Other)" event. The Notice of Appeal has been re-docketed by the USDC Clerk using the "Notice of Appeal to the 9th Circuit" event. Notice of Appeal electronically transmitted to the US Court of Appeals.) (akr) (Entered: 01/29/2020) |
| 01/29/2020 | 96 | NOTICE OF APPEAL to the 9th Circuit by International Brotherhood of Teamsters as to 89 Order Granting Motion for Preliminary Injunction. (Filing fee $ 505 receipt number 0974-13425099.) (Notice of Appeal electronically transmitted to US Court of Appeals.) (Leyton, Stacey). (Modified on 1/29/2020: Edited docket text re linked Order.) (akr). (Entered: 01/29/2020) |
| 01/30/2020 | 97 | USCA Case Number 20-55106 for 95 Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl. (akr) (Entered: 01/30/2020) |
| 01/30/2020 | 98 | USCA Case Number 20-55107 for 96 Notice of Appeal to the 9th Circuit filed by International Brotherhood of Teamsters. (akr) (Entered: 01/30/2020) |
| 01/30/2020 | 99 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT (Motions Hearing) held on 1/13/2020 before Judge Roger T. Benitez. Court Reporter/Transcriber: Amanda M. LeGore. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 2/20/2020. Redacted Transcript Deadline set for 3/2/2020. Release of Transcript Restriction set for 4/29/2020. (akr) (Entered: 01/30/2020) |
| 01/30/2020 | 100 | ORDER of USCA as to 95 Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl, 96 Notice of Appeal to the 9th Circuit filed by International Brotherhood of Teamsters. The USCA sua sponte consolidates appeal Nos. 20-55106 and 20-55107. The appeals, filed January 29, 2020, are preliminary injunction appeals. Accordingly, Ninth Circuit Rule 3-3 shall apply. Time |

| | | |
|---|---|---|
| | | schedule issued. No streamlined extensions of time will be approved. Any request for an extension of time to file a brief must be made by written motion under Ninth Circuit Rule 31-2.2(b). All parties on a side are encouraged to join in a single brief to the greatest extent practicable. A review of the USCA's docket reflects that the filing and docketing fees for appeal No. 20-55106 remain due. Within 21 days after the date of this order, appellant shall pay to the USDC the $505.00 filing and docketing fees for this appeal and file in the USCA proof of such payment. Failure to pay the fees or failure to timely file the opening brief shall result in the automatic dismissal of the appeal by the Clerk for failure to prosecute. (akr) (Entered: 01/30/2020) |
| 02/04/2020 | 101 | **WITHDRAWN PER ECF #105** Ex Parte MOTION to Stay re 89 Order on Motion for Preliminary Injunction,,,, *Pending Appeal* by International Brotherhood of Teamsters. (Attachments: # 1 Memo of Points and Authorities In Support of Ex Parte Application for Stay of PI Order Pending Appeal, # 2 Declaration of Andrew Kushner In Support of Ex Parte Application for Stay of PI Order Pending Appeal)(Leyton, Stacey) (mme). Modified on 2/5/2020 to reflect motion withdrawn and refiled (mme). (Entered: 02/04/2020) |
| 02/04/2020 | 102 | USCA Appeal Fees received ($505, receipt number CAS118962) re 95 Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl. (USCA Case Number 20-55106. Notice electronically transmitted to the US Court of Appeals.) (akr) (Entered: 02/04/2020) |
| 02/04/2020 | 103 | Ex Parte MOTION to Stay re 89 Order on Motion for Preliminary Injunction,,,, *Pending Appeal (Amended)* by International Brotherhood of Teamsters. (Attachments: # 1 Memo of Points and Authorities In Support of Ex Parte Application for Stay of PI Order Pending Appeal, # 2 Declaration of Andrew Kushner In Support of Ex Parte Application for Stay of PI Order Pending Appeal)(Leyton, Stacey) (mme). (Entered: 02/04/2020) |
| 02/04/2020 | 104 | NOTICE *of Errata* by International Brotherhood of Teamsters re 101 Ex Parte MOTION to Stay re 89 Order on Motion for Preliminary Injunction,,,, *Pending Appeal* (Leyton, Stacey) *QC Mailer sent re: To prepare Notice of Withdrawal* (mme). (Entered: 02/04/2020) |
| 02/05/2020 | 105 | NOTICE *of Withdrawal* by International Brotherhood of Teamsters re 101 Ex Parte MOTION to Stay re 89 Order on Motion for Preliminary Injunction,,,, *Pending Appeal* (Leyton, Stacey) (mme). (Entered: 02/05/2020) |
| 02/05/2020 | 106 | **WITHDRAWN PER ECF #107**RESPONSE in Opposition re 103 Ex Parte MOTION to Stay re 89 Order on Motion for Preliminary Injunction,,,, *Pending Appeal (Amended) (filed by California Trucking Association, Ravinder Singh, Thomas Odom)* filed by California Trucking Association. (Chemers, Alexander) *QC MAiler sent re: document not signed* (mme). Modified on 2/7/2020 to reflect document withdrawn (mme). (Entered: 02/05/2020) |
| 02/06/2020 | 107 | NOTICE *of Withdrawal of Docket No. 106* by California Trucking Association, Thomas Odom, Ravinder Singh re 106 Response in Opposition to Motion, (Chemers, Alexander) (mme). (Entered: 02/06/2020) |
| 02/06/2020 | 108 | RESPONSE in Opposition re 103 Ex Parte MOTION to Stay re 89 Order on Motion for Preliminary Injunction,,,, *Pending Appeal (Amended)* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (mme). (Entered: 02/06/2020) |
| 02/10/2020 | 109 | ORDER Denying 103 Ex Parte Motion for Stay. Signed by Judge Roger T. Benitez on 2/10/2020. (mme) (Entered: 02/10/2020) |
| 02/10/2020 | 110 | ORDER on 62 , 63 Motions to Dismiss. Defendants and Intervenor-Defendant's motions to dismiss are GRANTED IN PART AND DENIED IN PART. The motions are DENIED |

| | | |
|---|---|---|
| | | as to the 12(b)(l) challenges to Plaintiffs' standing, DENIED as to the 12(b)(6) challenge to Count 1,and GRANTED as to the 12(b)(6) challenges to Counts 2 and 3. Accordingly, Plaintiffs' dormant Commerce Clause and FMCSA claims are DISMISSED with prejudice. Signed by Judge Roger T. Benitez on 2/10/2020. (mme) (Entered: 02/10/2020) |
| 02/18/2020 | [111](#) | ORDER of USCA as to [95](#) Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl, [96](#) Notice of Appeal to the 9th Circuit filed by International Brotherhood of Teamsters. Appellants' joint motion for an extension of time to file the opening briefs is granted. Briefing schedule issued. No streamlined extensions of time will be approved. Any request for an extension of time to file a brief must be made by written motion under Ninth Circuit Rule 31-2.2(b). All parties on a side are encouraged to join in a single brief to the greatest extent practicable. (akr) (Entered: 02/18/2020) |
| 02/24/2020 | [112](#) | ANSWER to [47](#) Amended Complaint *State Defendant's Answer to Second Amended Complaint for Declaratory and Injunctive Relief* by Patrick Henning, Lilia Garcia-Brower, Xavier Becerra, Julie Su, Andre Schoorl.(Zelidon-Zepeda, Jose) (mme). (Entered: 02/24/2020) |
| 02/24/2020 | [113](#) | ANSWER to [47](#) Amended Complaint *(Second Amended Complaint)* by International Brotherhood of Teamsters.(Leyton, Stacey) (mme). (Entered: 02/24/2020) |
| 02/26/2020 | [114](#) | NOTICE AND ORDER for Early Neutral Evaluation Conference and Case Management Conference. Early Neutral Evaluation set for 3/30/2020 02:00 PM before Magistrate Judge Barbara Lynn Major. Case Management Conference set for 3/30/2020 02:00 PM before Magistrate Judge Barbara Lynn Major. Joint Discovery Plan due 3/20/2020. Signed by Magistrate Judge Barbara Lynn Major on 2/26/2020.(mme) (Entered: 02/26/2020) |
| 03/09/2020 | [115](#) | MOTION for Reconsideration re [110](#) Order on Motion to Dismiss, by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # [1](#) Memo of Points and Authorities In Support of Motion for Reconsideration, # [2](#) Declaration of Alexander M. Chemers In Support of Motion for Reconsideration)(Chemers, Alexander) (tcf). (Entered: 03/09/2020) |
| 03/16/2020 | [116](#) | Joint MOTION to Stay *District Court Proceedings Pending Preliminary Injunction Appeal* by International Brotherhood of Teamsters. (Kushner, Andrew) (mme). (Entered: 03/16/2020) |
| 03/17/2020 | [117](#) | ORDER Granting [116](#) Stipulated Request to Stay. Case stayed and all current deadlines VACATED, until either: (1) the Ninth Circuit grants Intervenor-Defendant International Brotherhood of Teamsters motion to stay the preliminary injunction order, if the Ninth Circuit grants that motion; (2) the Ninth Circuit issues its mandate following resolution of the appeals from the preliminary injunction order; or (3) the appeals of the preliminary injunction order are withdrawn or otherwise dismissed. The stay shall be automatically lifted if any such event occurs, and the Parties shall be required to file their confidential Early Neutral Evaluation statements and joint Rule 26(f) report within fourteen days of that event. However, until such time occurs, the preliminary injunction entered on January 16, 2020 (Doc. No. 89) remains in full force and effect. Signed by Judge Roger T. Benitez on 3/17/2020. (mme) (Entered: 03/17/2020) |
| 03/30/2020 | [118](#) | ORDER of USCA as to [95](#) Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl, [96](#) Notice of Appeal to the 9th Circuit filed by International Brotherhood of Teamsters. Intervenor's motion to stay the USDC's January 16, 2020 preliminary injunction order pending these consolidated appeals is denied. Intervenor has not made an adequate showing that it will be irreparably injured absent a stay, that a stay will not substantially injure the other parties, and that a |

| | | stay would be in the public interest. Briefing deadlines issued. These appeals shall be placed on the next available oral argument calendar. (akr) (Entered: 03/31/2020) |
|---|---|---|
| 05/27/2020 | [119](#) | ORDER OF TRANSFER. Magistrate Judge Barbara Lynn Major is no longer assigned. Case reassigned to Magistrate Judge Daniel E. Butcher for all further proceedings. All conferences or hearing dates previously set before Judge Major will remain as scheduled and will be before Judge Butcher. All dates set before any district judge remain unchanged. The new case number is 18cv2458-BEN-DEB. Signed by Magistrate Judge Barbara Lynn Major on 5/27/2020.(mme) (Entered: 05/27/2020) |
| 04/19/2021 | [120](#) | NOTICE of Appearance by Jarod Michael Bona on behalf of Owner-Operator Independent Drivers Association, Inc. (Bona, Jarod) (mme). (Entered: 04/19/2021) |
| 04/19/2021 | [121](#) | NOTICE of Appearance by Jon F. Cieslak on behalf of Owner-Operator Independent Drivers Association, Inc. (Cieslak, Jon) (mme). (Entered: 04/19/2021) |
| 04/19/2021 | [122](#) | MOTION for Leave to File *Motion to Intervene* by Owner-Operator Independent Drivers Association, Inc.. (Attachments: # [1](#) Memo of Points and Authorities, # [2](#) Exhibit 1 (Proposed Complaint), # [3](#) Declaration of Todd Spencer)(Cieslak, Jon) (mme). (Entered: 04/19/2021) |
| 04/19/2021 | [123](#) | NOTICE of Appearance by Aaron R. Gott on behalf of Owner-Operator Independent Drivers Association, Inc. (Gott, Aaron) (mme). (Entered: 04/19/2021) |
| 04/19/2021 | [124](#) | Request to Appear Pro Hac Vice ( Filing fee received: $ 213 receipt number ACASDC-15637260.) (Application to be reviewed by Clerk.) (Cullen, Paul) (rmc). (Entered: 04/19/2021) |
| 04/19/2021 | [125](#) | Request to Appear Pro Hac Vice ( Filing fee received: $ 213 receipt number ACASDC-15637272.) (Application to be reviewed by Clerk.) (Stinson, Charles) (rmc). (Entered: 04/19/2021) |
| 04/19/2021 | [126](#) | Request to Appear Pro Hac Vice ( Filing fee received: $ 213 receipt number ACASDC-15637277.) (Application to be reviewed by Clerk.) (Cohen, Daniel) (rmc). (Entered: 04/19/2021) |
| 04/20/2021 | 127 | PRO HAC APPROVED: Daniel E. Cohen, Charles R. Stinson, Paul D. Cullen, Jr appearing for Intervenor Plaintiff Owner-Operator Independent Drivers Association, Inc. (no document attached) (rmc) (Entered: 04/20/2021) |
| 04/23/2021 | [128](#) | Joint MOTION to Stay re [122](#) MOTION for Leave to File *Motion to Intervene* by International Brotherhood of Teamsters. (Kushner, Andrew) (mme). (Entered: 04/23/2021) |
| 05/03/2021 | 129 | Text ORDER of USCA as to [95](#) Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl, [96](#) Notice of Appeal to the 9th Circuit filed by International Brotherhood of Teamsters. Appellees' unopposed motion for a 14-day extension of time to file a petition for panel rehearing or rehearing en banc. The petition for rehearing or rehearing en banc shall be filed on or before May 26, 2021. (no document attached) (akr) (Entered: 05/03/2021) |
| 05/03/2021 | [130](#) | RESPONSE to Motion re [122](#) MOTION for Leave to File *Motion to Intervene* filed by International Brotherhood of Teamsters. (Kushner, Andrew) (tcf). (Entered: 05/03/2021) |
| 06/21/2021 | [131](#) | ORDER of USCA as to [95](#) Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl, [96](#) Notice of Appeal to the 9th Circuit filed by International Brotherhood of Teamsters. The petition for rehearing en banc is denied. (akr) (Entered: 06/21/2021) |

| | | |
|---|---|---|
| 06/23/2021 | 132 | ORDER of USCA as to 95 Notice of Appeal to the 9th Circuit filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl, 96 Notice of Appeal to the 9th Circuit filed by International Brotherhood of Teamsters. Appellees' Motion to Stay Issuance of the Mandate is granted. Pursuant to Fed. R. App. P. 41(d)(2), the mandate in the case is stayed to permit appellees to file a petition for writ of certiorari in the Supreme Court. Should the Supreme Court grant certiorari, the mandate will be stayed pending its disposition of the case. Should the Supreme Court deny certiorari, the mandate will issue immediately. The parties shall advise this court immediately upon the Supreme Court's decision. (akr) (Entered: 06/23/2021) |
| 10/21/2021 | 133 | MOTION to Withdraw as Attorney *of Record* by International Brotherhood of Teamsters. (Vissers, Elizabeth) (jrm). (Entered: 10/21/2021) |
| 04/11/2022 | 134 | ORDER Granting Motion To Withdraw [Doc. 133 ]. Signed by Judge Roger T. Benitez on 4/11/2022. (ddf) (Entered: 04/12/2022) |
| 07/08/2022 | 135 | NOTICE of Spreading the Mandate: Appeal Mandate Hearing set for 8/22/2022 10:30 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 07/08/2022) |
| 07/11/2022 | 136 | NOTICE of Appearance by Scott A Kronland on behalf of International Brotherhood of Teamsters (Kronland, Scott)Attorney Scott A Kronland added to party International Brotherhood of Teamsters(pty:intvd) (ddf). (Entered: 07/11/2022) |
| 08/12/2022 | 137 | NOTICE of Spreading the Mandate: Appeal Mandate Hearing reset for 8/29/2022 10:30 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 08/12/2022) |
| 08/22/2022 | 138 | NOTICE of Appearance by Timothy Alan Horton on behalf of Owner-Operator Independent Drivers Association, Inc. (Horton, Timothy)Attorney Timothy Alan Horton added to party Owner-Operator Independent Drivers Association, Inc.(pty:intvp) (ddf). (Entered: 08/22/2022) |
| 08/24/2022 | 139 | STATUS REPORT *JOINT REPORT IN ADVANCE OF SPREADING THE MANDATE:APPEAL MANDATE HEARING* by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (ddf). (Entered: 08/24/2022) |
| 08/24/2022 | 140 | NOTICE *of Withdrawal as Counsel of Record for Aaron Gott* by Owner-Operator Independent Drivers Association, Inc. (Gott, Aaron) (ddf). (Entered: 08/24/2022) |
| 08/24/2022 | 141 | NOTICE *of Withdrawal as Counsel of Record for Jon Cieslak* by Owner-Operator Independent Drivers Association, Inc. (Cieslak, Jon) (ddf). (Entered: 08/24/2022) |
| 08/24/2022 | 142 | NOTICE *of Withdrawal as Counsel of Record for Jarod Bona* by Owner-Operator Independent Drivers Association, Inc. (Bona, Jarod) (ddf). (Entered: 08/24/2022) |
| 08/25/2022 | 143 | MINUTE ORDER issued by the Honorable Roger T. Benitez: The Court hereby orders that all counsel shall appear in-person at the Appeal Mandate Hearing set for 8/29/2022 10:30AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 08/25/2022) |
| 08/29/2022 | 144 | Minute Order for proceedings held before Judge Roger T. Benitez: Appeal Mandate Hearing held on 8/29/2022. Appeal Mandate ordered filed for USCA Case Number(s): 20-55106.Granting 115 MOTION for Reconsideration re 110 Order on Motion to Dismiss filed by Thomas Odom, California Trucking Association, Ravinder Singh. Finding as moot 128 Joint MOTION to Stay re 122 MOTION for Leave to File *Motion to Intervene* filed by International Brotherhood of Teamsters. Injunction dissolved. Defendants have 20 days to file an opposition to the Motion to Intervene 122 . Deadline to file Plaintiffs |

| | | |
|---|---|---|
| | | renewed motion for preliminary injunction is October 11, 2022; Opposition briefs are due November 15, 2022; Any replies are due December 2, 2022. The Court will then decide whether to schedule any hearings or decide the preliminary injunction motion on the record. (Court Reporter/ECR Tricia Rosate). (Plaintiff Attorney Robert R. Roginson, Alexander M. Chemers).(Defendant Attorney Jose A. Zelidon-Zepeda). (no document attached) (gxr) (Entered: 08/30/2022) |
| 08/29/2022 | 145 | MANDATE of USCA as to 95 Notice of Appeal to 9th Circuit, filed by Patrick Henning, Julie Su, Lilia Garcia-Brower, Xavier Becerra, Andre Schoorl, 96 Notice of Appeal to 9th Circuit, filed by International Brotherhood of Teamsters. (Attachments: # 1 U. S. Supreme Court Denial of Certiorari)(smy1)(jrd) (Entered: 08/31/2022) |
| 09/16/2022 | 146 | RESPONSE in Opposition re 122 MOTION for Leave to File *Motion to Intervene* filed by Lilia Garcia-Brower, Rob Bonta, Katrina Hagen, Natalie Palugyai, Nancy Farias. (Zelidon-Zepeda, Jose) (jpp). (Entered: 09/16/2022) |
| 09/22/2022 | 147 | ORDER Granting Owner Operator Independent Drivers Association's Motion To Intervene [Doc. 122 ]. Signed by Judge Roger T. Benitez on 9/21/2022. (ddf) (Entered: 09/22/2022) |
| 10/11/2022 | 148 | Joint MOTION Amending Briefing Schedule (Chemers, Alexander) (exs). (Entered: 10/11/2022) |
| 10/12/2022 | 149 | ORDER Granting 148 Joint Motion Amending Briefing Schedule: Responses due by 2/8/2023 Replies due by 3/1/2023. Motion Hearing set for 4/10/2023 10:30 AM in Courtroom 5A before Judge Roger T. Benitez.. Signed by Judge Roger T. Benitez on 10/12/2022. (exs) (Entered: 10/12/2022) |
| 12/07/2022 | 150 | Joint MOTION to Continue / *Amend Briefing Schedule* by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (ddf). (Entered: 12/07/2022) |
| 12/07/2022 | 151 | **Document Withdrawn per 154 ** MOTION for Preliminary Injunction by Owner-Operator Independent Drivers Association, Inc.. (Attachments: # 1 Memo of Points and Authorities in Support, # 2 Declaration of T Spencer, # 3 Declaration of M McElroy, # 4 Declaration of S Williams, # 5 Declaration of A Hemerson)(Horton, Timothy) (ddf). (jms). (Entered: 12/07/2022) |
| 12/07/2022 | 152 | NOTICE *of Withdrawal of Attorney* by Owner-Operator Independent Drivers Association, Inc. (Horton, Timothy) (ddf). (Entered: 12/07/2022) |
| 12/15/2022 | 153 | ORDER Granting Joint Motion Amending Briefing Schedule [ECF No. 150 ]. Signed by Judge Roger T. Benitez on 12/15/2022.(ddf) (Entered: 12/15/2022) |
| 01/11/2023 | 154 | NOTICE OF WITHDRAWAL OF DOCUMENT by Owner-Operator Independent Drivers Association, Inc. re 151 MOTION for Preliminary Injunction filed by Owner-Operator Independent Drivers Association, Inc. . (Horton, Timothy) (jms). (Entered: 01/11/2023) |
| 01/11/2023 | 155 | MOTION for Preliminary Injunction by Owner-Operator Independent Drivers Association, Inc.. (Attachments: # 1 Memo of Points and Authorities in Support, # 2 Declaration of Spencer, # 3 Declaration of Schnautz, # 4 Declaration of Hemerson, # 5 Declaration of McElroy, # 6 Declaration of Williams)(Horton, Timothy) (jms). (Entered: 01/11/2023) |
| 01/11/2023 | 156 | MOTION for Preliminary Injunction / *Renewed Motion for Preliminary Injunction* by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Memo of Points and Authorities, # 2 Declaration of Thomas Odom, # 3 Declaration of Paul Medina, # 4 Declaration of Louis Estrella, # 5 Declaration of Greg Stefflre, # 6 |

| | | Declaration of Eric Sauer, # 7 [Proposed] Order)(Chemers, Alexander) qc mailer sent re attached proposed order (jms). (Entered: 01/11/2023) |
|---|---|---|
| 01/19/2023 | 157 | NOTICE of Appearance by Nicole Sara Collins on behalf of International Brotherhood of Teamsters (Collins, Nicole)Attorney Nicole Sara Collins added to party International Brotherhood of Teamsters(pty:intvd) (alns). (Entered: 01/19/2023) |
| 02/07/2023 | 158 | NOTICE of Appearance by Julie Gutman Dickinson on behalf of International Brotherhood of Teamsters (Gutman Dickinson, Julie)Attorney Julie Gutman Dickinson added to party International Brotherhood of Teamsters(pty:intvd) (ddf). (Entered: 02/07/2023) |
| 02/07/2023 | 159 | NOTICE of Appearance by Hector Alfredo De Haro on behalf of International Brotherhood of Teamsters (De Haro, Hector)Attorney Hector Alfredo De Haro added to party International Brotherhood of Teamsters(pty:intvd) (ddf). (Entered: 02/07/2023) |
| 03/03/2023 | 160 | Joint MOTION to Amend Briefing Schedule by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai. (Zelidon-Zepeda, Jose)Attorney Jose A. Zelidon-Zepeda added to party Rob Bonta(pty:dft), Attorney Jose A. Zelidon-Zepeda added to party Nancy Farias(pty:dft), Attorney Jose A. Zelidon-Zepeda added to party Katrina Hagen(pty:dft), Attorney Jose A. Zelidon-Zepeda added to party Natalie Palugyai(pty:dft) (alns). (Entered: 03/03/2023) |
| 03/07/2023 | 161 | ORDER Granting Joint Motion Amending Briefing Schedule [ECF No. 160 ]. Signed by Judge Roger T. Benitez on 3/7/2023. (All non-registered users served via U.S. Mail Service)(ddf) (Entered: 03/07/2023) |
| 03/29/2023 | 162 | Joint MOTION Permitting IBT to File a Single Opposition Brief, Permitting CTA and OOIDA Each to File a Single Reply Brief, and Adjusting the Briefing Deadlines by International Brotherhood of Teamsters. (Leyton, Stacey) (ddf). (Entered: 03/29/2023) |
| 04/19/2023 | 163 | Joint MOTION REQUESTING LEAVE TO FILE AMENDED COMPLAINTS AND ADJUSTING PRELIMINARY INJUNCTION BRIEFING by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Exhibit A- Plaintiff's Proposed Third Amended Complaint, # 2 Exhibit B- REDLINED Third Amended Complaint by Plaintiff, # 3 Exhibit C- Intervenor-Plaintiff's Proposed Amended Complaint, # 4 Exhibit D- REDLINED Amended Complaint by Intervenor Plaintiff) (Chemers, Alexander) (ddf). (Entered: 04/19/2023) |
| 05/15/2023 | 164 | NOTICE of Appearance by Lara Haddad on behalf of Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai (Haddad, Lara)Attorney Lara Haddad added to party Rob Bonta(pty:dft), Attorney Lara Haddad added to party Nancy Farias(pty:dft), Attorney Lara Haddad added to party Lilia Garcia-Brower(pty:dft), Attorney Lara Haddad added to party Katrina Hagen(pty:dft), Attorney Lara Haddad added to party Natalie Palugyai(pty:dft) (ddf). (Entered: 05/15/2023) |
| 05/17/2023 | 165 | Minute Order issued by the Honorable Roger T. Benitez: Granting 163 Joint MOTION Requesting Leave to File Amended Complaints and Adjusting Preliminary Injunction Hearing. Motion Hearing reset for 8/28/2023 10:30 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 05/17/2023) |
| 05/19/2023 | 166 | Amended Intervenor COMPLAINT , filed by Owner-Operator Independent Drivers Association, Inc..New Summons Requested. (Horton, Timothy) (aas). (Entered: 05/19/2023) |
| 05/19/2023 | 167 | RESPONSE in Support re 155 MOTION for Preliminary Injunction *Supplemental Brief re Equal Protection 165* filed by Owner-Operator Independent Drivers Association, Inc.. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration of Spencer in Support)(Horton, Timothy) (aas). (Entered: 05/19/2023) |
| 05/19/2023 | 168 | AMENDED COMPLAINT *Third Amended Complaint for Declaratory and Injunctive Relief* against All Defendants, filed by Ravinder Singh, California Trucking Association, Thomas Odom. (Chemers, Alexander) (aas). (Entered: 05/19/2023) |
| 05/19/2023 | 169 | RESPONSE in Support re 156 MOTION for Preliminary Injunction */ Renewed Motion for Preliminary Injunction - Supplemental Brief in Support of Plaintiff's Renewed Motion for Preliminary Injunction* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (aas). (Entered: 05/19/2023) |
| 06/15/2023 | 170 | Minute Order issued by the Honorable Roger T. Benitez: Finding as moot 150 Joint MOTION to Continue/Amend Briefing Schedule. In view of the filing of amended complaints: Finding as moot 155 MOTION for Preliminary Injunction by Owner-Operator Independent Drivers Association, Inc., finding as moot 156 MOTION for Preliminary Injunction / Renewed Motion for Preliminary Injunction by California Trucking Association. Plaintiffs may re-file their preliminary injunction motions and briefs and all parties may proceed in accordance with the agreed adjusted briefing schedule. (no document attached) (gxr) (Entered: 06/15/2023) |
| 06/19/2023 | 171 | MOTION for Preliminary Injunction by Owner-Operator Independent Drivers Association, Inc.. (Attachments: # 1 Memo of Points and Authorities in Support of Motion, # 2 Declaration of Spencer, # 3 Declaration of Schnautz, # 4 Declaration of Hemerson, # 5 Declaration of McElroy, # 6 Declaration of Williams, # 7 Supplement Memo re EP Argument, # 8 Declaration of Spencer Supplemental)(Horton, Timothy) (ddf). (Entered: 06/19/2023) |
| 06/20/2023 | 172 | MOTION for Preliminary Injunction */Renewed Motion for Preliminary Injunction* by California Trucking Association, Thomas Odom, Ravinder Singh. (Attachments: # 1 Memo of Points and Authorities in Support of Motion, # 2 Declaration of Thomas Odom, # 3 Declaration of Paul Medina, # 4 Declaration of Louis Estrella, # 5 Declaration of Greg Stefflre, # 6 Declaration of Eric Sauer, # 7 Supplement /Supplemental Brief ISO) (Chemers, Alexander) (ddf). (Entered: 06/20/2023) |
| 06/20/2023 | 173 | RESPONSE in Opposition re 172 MOTION for Preliminary Injunction */Renewed Motion for Preliminary Injunction*, 171 MOTION for Preliminary Injunction filed by International Brotherhood of Teamsters. (Attachments: # 1 Declaration of Dr. Michael Belzer in Opposition to Motions, # 2 Declaration of Dr. Steve Viscelli in Opposition to Motions, # 3 Exhibit A-D to Declaration of Dr. Steve Viscelli, # 4 Declaration of Alvaro Arambula in Opposition to Motions, # 5 Declaration of David Fuentes in Opposition to Motions, # 6 Declaration of Julio Garcia in Opposition to Motions, # 7 Declaration of Dennis Glackin in Opposition to Motions, # 8 Declaration of Chris Hannan in Opposition to Motions, # 9 Declaration of Juan Islas in Opposition to Motions, # 10 Declaration of Jorge Mayorga in Opposition to Motions, # 11 Declaration of William Peratt in Opposition to Motions, # 12 Declaration of Alan Ta in Opposition to Motions, # 13 Declaration of Eric Tate in Opposition to Motions)(Leyton, Stacey) (ddf). (Entered: 06/20/2023) |
| 06/20/2023 | 174 | RESPONSE in Opposition re 172 MOTION for Preliminary Injunction */Renewed Motion for Preliminary Injunction* filed by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai. (Haddad, Lara) (ddf). (Entered: 06/20/2023) |
| 06/20/2023 | 175 | RESPONSE in Opposition re 171 MOTION for Preliminary Injunction filed by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai. (Haddad, Lara) (ddf). (Entered: 06/20/2023) |

| 06/28/2023 | 176 | MINUTE ORDER issued by the Honorable Roger T. Benitez: Pursuant to Federal Rule of Civil Procedure 65(a)(2), the Court intends to advance the trial on the merits and consolidate it with the preliminary injunction hearing. (no document attached) (gxr) (Entered: 06/28/2023) |
| 07/12/2023 | 177 | Joint MOTION for Preliminary Injunction *Joint Motion to Adjust Reply Deadline for Preliminary Injunction Motions* by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (ddf). (Entered: 07/12/2023) |
| 07/14/2023 | 178 | MINUTE ORDER issued by the Honorable Roger T. Benitez: Finding good cause, the Court GRANTS ECF No. 177 and extends the deadline to file reply briefs to July 21, 2023. (no document attached) (gxr) (Entered: 07/14/2023) |
| 07/17/2023 | 179 | NOTICE of Appearance by Stephanie Albrecht on behalf of Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen (Albrecht, Stephanie)Attorney Stephanie Albrecht added to party Rob Bonta(pty:dft), Attorney Stephanie Albrecht added to party Nancy Farias(pty:dft), Attorney Stephanie Albrecht added to party Lilia Garcia-Brower(pty:dft), Attorney Stephanie Albrecht added to party Katrina Hagen(pty:dft) (ddf). (Entered: 07/17/2023) |
| 07/21/2023 | 180 | REPLY to Response to Motion re 172 MOTION for Preliminary Injunction *Renewed Motion for Preliminary Injunction* filed by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (ddf). (Entered: 07/21/2023) |
| 07/21/2023 | 181 | REPLY to Response to Motion re 171 MOTION for Preliminary Injunction filed by Owner-Operator Independent Drivers Association, Inc.. (Attachments: # 1 Declaration of Spencer, # 2 Exhibit)(Horton, Timothy) (ddf). (Entered: 07/21/2023) |
| 08/16/2023 | 182 | Joint MOTION to Continue *Hearing and Trial Date and to Set Pre-Trial and Trial Procedures* by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai. (Haddad, Lara) (ddf). (Entered: 08/16/2023) |
| 08/22/2023 | 183 | Minute Order issued by the Honorable Roger T. Benitez: granting 182 Joint Motion to Continue Hearing and Trial Date and to Set Pre-Trial and Trial Procedures. Trial on the merits and preliminary injunction hearing is continued to 11/13/2023 10:30 AM in Courtroom 5A before Judge Roger T. Benitez. (no document attached) (gxr) (Entered: 08/22/2023) |
| 09/21/2023 | 184 | MOTION to Withdraw as Attorney *of Record* by International Brotherhood of Teamsters. (Collins, Nicole) (ddf). (Entered: 09/21/2023) |
| 09/21/2023 | 185 | NOTICE of Appearance by Robin Starr Tholin on behalf of International Brotherhood of Teamsters (Tholin, Robin)Attorney Robin Starr Tholin added to party International Brotherhood of Teamsters(pty:intvd) (ddf). (Entered: 09/21/2023) |
| 09/29/2023 | 186 | MEMORANDUM OF FACTS AND CONTENTIONS OF LAW by International Brotherhood of Teamsters. (Attachments: # 1 Declaration of Cesar Borjas, # 2 Notice of Declarations Relied Upon for Trial on the Merits)(Leyton, Stacey) (ddf). (Entered: 09/29/2023) |
| 09/29/2023 | 187 | ANSWER to 166 Intervenor Complaint *Intervenor-Defendant International Brotherhood of Teamsters Answer to Intervenor-Plaintiff Owner-Operator Independent Drivers Associations First Amended Complaint* by International Brotherhood of Teamsters. (Leyton, Stacey) (ddf). (Entered: 09/29/2023) |
| 09/29/2023 | 188 | ANSWER to 168 Amended Complaint *Intervenor-Defendant International Brotherhood of Teamsters Answer to Plaintiff California Trucking Associations Third Amended* |

| | | |
|---|---|---|
| | | *Complaint* by International Brotherhood of Teamsters.(Leyton, Stacey) (ddf). (Entered: 09/29/2023) |
| 09/29/2023 | [189](#) | MEMORANDUM OF FACTS AND CONTENTIONS OF LAW by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (ddf). (Entered: 09/29/2023) |
| 09/29/2023 | [190](#) | TRIAL BRIEF *Memorandum of Contentions of Fact and Law* by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai. (Attachments: # [1](#) Request for Judicial Notice, # [2](#) Notice of Designation of Evidence Relied Upon for Trial, # [3](#) Declaration of Lara Haddad)(Haddad, Lara) (ddf). (Entered: 09/29/2023) |
| 09/29/2023 | [191](#) | ANSWER to [168](#) Amended Complaint *State Defendants Answr to Plaintiff California Trucking Associations Third Amended Complaint* by Lilia Garcia-Brower, Natalie Palugyai, Katrina Hagen, Nancy Farias, Rob Bonta.(Haddad, Lara) (ddf). (Entered: 09/29/2023) |
| 09/29/2023 | [192](#) | ANSWER to [166](#) Intervenor Complaint *State Defendants Answer to Intervenor-Plaintiff Owner-Operator Independent Drivers Associations First Amended Complaint* by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai.(Haddad, Lara) (ddf). (Entered: 09/29/2023) |
| 09/29/2023 | [193](#) | MEMORANDUM OF FACTS AND CONTENTIONS OF LAW by Owner-Operator Independent Drivers Association, Inc.. (Attachments: # [1](#) Declaration of T. Spencer, # [2](#) Declaration of B. Fowler)(Horton, Timothy) (ddf). (Entered: 09/29/2023) |
| 10/04/2023 | 194 | MINUTE ORDER issued by the Honorable Roger T. Benitez: Finding as moot [162](#) Joint MOTION Permitting IBT to File a Single Opposition Brief, Permitting CTA and OOIDA Each to File a Single Reply Brief, and Adjusting the Briefing Deadlines by International Brotherhood of Teamsters. (no document attached) (gxr) (Entered: 10/04/2023) |
| 10/27/2023 | [195](#) | TRIAL BRIEF *State Defendants' Opposition to CTA's and OOIDA's Memoranda of Contentions of Fact and Law* by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai. (Haddad, Lara) (ddf). (Entered: 10/27/2023) |
| 10/27/2023 | [196](#) | TRIAL BRIEF *in Response* by Owner-Operator Independent Drivers Association, Inc.. (Horton, Timothy) (ddf). (Entered: 10/27/2023) |
| 10/27/2023 | [197](#) | TRIAL BRIEF *Intervenor-Defendant International Brotherhood of Teamsters Response to Plaintiffs Memoranda of Contentions of Fact and Law* by International Brotherhood of Teamsters. (Attachments: # [1](#) Notice Updated Notice of Declarations Relied upon for Trial on the Merits, # [2](#) Declaration of Sarah M. H. Cooner, # [3](#) Declaration of David Raul Fuentes, # [4](#) Declaration of Chris Hong, # [5](#) Declaration of Dr. Steve Viscelli) (Leyton, Stacey) (ddf). (Entered: 10/27/2023) |
| 10/27/2023 | [198](#) | TRIAL BRIEF */ RESPONSE BRIEF IN SUPPORT OF MEMORANDUM OF CONTENTIONS OF FACT AND LAW* by California Trucking Association, Thomas Odom, Ravinder Singh. (Chemers, Alexander) (ddf). (Entered: 10/27/2023) |
| 11/01/2023 | [199](#) | OBJECTION by International Brotherhood of Teamsters *Intervenor-Defendant International Brotherhood of Teamsters Objections to Plaintiffs Evidence*. (Leyton, Stacey) (ddf). (Entered: 11/01/2023) |
| 11/01/2023 | [200](#) | OBJECTION by Rob Bonta, Nancy Farias, Lilia Garcia-Brower, Katrina Hagen, Natalie Palugyai *State Defendants' Objections to Plaintiffs' Evidence*. (Haddad, Lara) (ddf). (Entered: 11/01/2023) |
| 11/01/2023 | [201](#) | OBJECTION by Owner-Operator Independent Drivers Association, Inc. re [173](#) Response in Opposition to Motion,,,, [197](#) Trial Brief, [58](#) Response in Opposition to Motion, *to* |

| | | |
|---|---|---|
| | | *Evidence.* (Horton, Timothy) (ddf). (Entered: 11/01/2023) |
| 11/06/2023 | [202](#) | OBJECTION by International Brotherhood of Teamsters *Intervenor-Defendant International Brotherhood of Teamsters Responses to Plaintiffs Objections to Defendants Evidence.* (Leyton, Stacey) (ddf). (Entered: 11/06/2023) |
| 11/06/2023 | [203](#) | OBJECTION by Owner-Operator Independent Drivers Association, Inc. re [199](#) Objection, [200](#) Objection *Response to Defendants.* (Horton, Timothy) (ddf). (Entered: 11/06/2023) |
| 11/13/2023 | 204 | Minute Order issued by the Honorable Roger T. Benitez: Motion Hearing held on 11/13/2023.Submitting [171](#) MOTION for Preliminary Injunction filed by Owner-Operator Independent Drivers Association, Inc., [172](#) MOTION for Preliminary Injunction */Renewed Motion for Preliminary Injunction* filed by Thomas Odom, California Trucking Association, Ravinder Singh. Court to issue written Order. (Court Reporter/ECR Juliet Eichenlaub). (Plaintiff Attorney Alexander Chemers, Robert R. Roginson).(Defendant Attorney Lara Haddad).(Paul D. Cullen, Timothy Alan Horton, Stacey Monica Leyton, Robin Starr Tholin, Scott A. Kronland). (no document attached) (gxr) (Entered: 11/15/2023) |
| 12/19/2023 | [205](#) | NOTICE *Intervenor-Defendant International Brotherhood of Teamsters and State Defendants Joint Notice of Supplemental Authority* by International Brotherhood of Teamsters (Leyton, Stacey) (ddf). (Entered: 12/19/2023) |
| 03/15/2024 | [206](#) | DECISION. Signed by Judge Roger T. Benitez on 3/15/2024.(alns) (jmo). (Entered: 03/15/2024) |
| 03/15/2024 | [207](#) | CLERK'S JUDGMENT. IT IS SO ORDERED AND ADJUDGED: Judgment is entered in favor of the Defendants. The case is hereby closed.(alns)(jmo). (Entered: 03/15/2024) |
| 04/12/2024 | [208](#) | NOTICE OF APPEAL to the 9th Circuit as to [207](#) Clerk's Judgment, [206](#) Order Dismissing Case by Owner-Operator Independent Drivers Association, Inc. ( Filing fee $ 605 receipt number ACASDC-18755000.) (Notice of Appeal electronically transmitted to US Court of Appeals.) (Horton, Timothy) (dim). (Entered: 04/12/2024) |
| 04/12/2024 | [209](#) | NOTICE OF APPEAL to the 9th Circuit as to [207](#) Clerk's Judgment, [206](#) Order Dismissing Case by California Trucking Association, Thomas Odom, Ravinder Singh. ( Filing fee $ 605 receipt number ACASDC-18756979.) (Notice of Appeal electronically transmitted to US Court of Appeals.) (Attachments: # [1](#) Exhibit 1 - Decision and Judgment, # [2](#) Exhibit 2 - Form 6 Representation Statement)(Chemers, Alexander) (mjw). (Entered: 04/12/2024) |
| 04/15/2024 | [210](#) | USCA Case Number 24-2341 for [209](#) Notice of Appeal to 9th Circuit, filed by Thomas Odom, California Trucking Association, Ravinder Singh. (Attachments: # [1](#) Attorney Appeal Case Opening, # [2](#) Pro- Se Appeals Case Opening, # [3](#) Ninth Circuit Lawyer Mentoring Program, # [4](#) Appellate Practice Guide)(dim) (Entered: 04/16/2024) |
| 04/15/2024 | [211](#) | USCA Time Schedule Order as to [209](#) Notice of Appeal to 9th Circuit, filed by Thomas Odom, California Trucking Association, Ravinder Singh. (NOTICE TO PARTIES of deadlines regarding appellate transcripts: Appellant shall file transcript designation and ordering form with the US District Court, provide a copy of the form to the court reporter, and make payment arrangements with the court reporter on or by 5/13/2024 (see Ninth Circuit Rule 10-3.1); Due date for filing of transcripts in US District Court is 6/12/2024.) (cc: Court Reporter). (dim) (Entered: 04/16/2024) |
| 04/26/2024 | [212](#) | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on 11/13/2023, before Judge Roger T. Benitez. Court Reporter/Transcriber: Juliet Y. Eichenlaub. Transcript may be viewed at the court public terminal or purchased through |

the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER or the Court Reporter/Transcriber. If redaction is necessary, parties have seven calendar days from the file date of the Transcript to E-File the Notice of Intent to Request Redaction. The following deadlines would also apply if requesting redaction: Redaction Request Statement due to Court Reporter/Transcriber 5/17/2024. Redacted Transcript Deadline set for 5/28/2024. Release of Transcript Restriction set for 7/25/2024. (dim)(jrd) (Entered: 04/26/2024)

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 08/01/2024 07:37:38 | | | |
| **PACER Login:** | tclf2014 | **Client Code:** | 1006.300 |
| **Description:** | Docket Report | **Search Criteria:** | 3:18-cv-02458-BEN-DEB |
| **Billable Pages:** | 26 | **Cost:** | 2.60 |

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT



**FILED**

AUG 5 2024

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

---

CALIFORNIA TRUCKING
ASSOCIATION; et al.,

       Plaintiffs,

OWNER-OPERATOR INDEPENDENT
DRIVERS ASSOCIATION, INC.,

       Intervenor-Plaintiff -
Appellant,

  v.

ROB BONTA, in his official capacity as the
Attorney General of the State of California;
et al.,

       Defendants - Appellees,

INTERNATIONAL BROTHERHOOD OF
TEAMSTERS,

       Intervenor-Defendant -
Appellee.

No. 24-2341

D.C. No.
3:18-cv-02458-BEN-DEB
Southern District of California,
San Diego

ORDER

---

     The opening brief submitted by Appellant Owner-Operator Independent

Drivers Association, Inc. is filed.

     Within 7 days of this order, Appellant must file 6 copies of the brief in paper

format bound with blue front cover pages. Each copy must include certification at

the end that the copy is identical to the electronic version. The Form 18 certificate

is available on the Court's website, at http://www.ca9.uscourts.gov/forms.

The excerpts of record submitted by Appellant Owner-Operator Independent Drivers Association, Inc. are filed. Within 7 days of this order, Appellant must file 3 copies of the excerpts in paper format securely bound on the left side, with white front cover pages.

The paper copies must be sent to the Clerk's principal office. The delivery and overnight mailing address is 95 Seventh Street, San Francisco, CA 94103. The regular U.S. mailing address is P.O. Box 193939, San Francisco, CA 94119-3939.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT